**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* | ) | |
| **[UNDER SEAL],** | ) | |
| | ) | **No. _____** |
| **Plaintiffs,** | ) | |
| | ) | **FILED IN CAMERA AND** |
| **v.** | ) | **UNDER SEAL** |
| | ) | |
| **[UNDER SEAL],** | ) | **JURY DEMAND** |
| | ) | |
| **Defendants.** | ) | |

<u>**FALSE CLAIMS COMPLAINT WITH JURY DEMAND**</u>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, and THE STATES OF CALIFORNIA, DELAWARE, ILLINOIS, INDIANA, MARYLAND, MASSACHUSETTS, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NORTH CAROLINA, RHODE ISLAND, VIRGINIA, and WISCONSIN *ex rel*. TRACY SCHUTTE and MICHAEL YARBERRY, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | No. _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | FILED IN CAMERA AND |
| v. | ) | UNDER SEAL |
| | ) | |
| SUPERVALU, INC., ACME SAV-ON PHARMACY, ALBERTSONS OSCO PHARMACY, ALBERTSONS SAV-ON PHARMACY, BIGG'S PHARMACY, CUB PHARMACY, FARM FRESH PHARMACY, JEWEL PHARMACY, JEWEL-OSCO PHARMACY, SHAW'S OSCO PHARMACY, SHOP N' SAVE PHARMACY, SHOP N' SAVE OSCO PHARMACY, SHOPPERS PHARMACY, STAR OSCO PHARMACY | ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMAND |
| | ) | |
| Defendants. | ) ) | |
| | ) | |

## COMPLAINT WITH JURY DEMAND

Tracy Schutte and Michael Yarberry ("Relators") file this action on behalf of the United States and the States of California, Delaware, Illinois, Indiana, Maryland, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, North Carolina, Rhode Island, Virginia, and Wisconsin (collectively referenced as "States" or "Plaintiff States"), against SuperValu, Inc. and its subsidiaries, affiliates, and related organizations, including but not

limited to Acme Sav-On Pharmacy, Albertsons Osco Pharmacy, Albertsons Sav-On Pharmacy, Bigg's Pharmacy, Cub Pharmacy, Farm Fresh Pharmacy, Jewel Pharmacy, Jewel-Osco Pharmacy, Save-A-Lot, Shaw's Osco Pharmacy, Shop N' Save Pharmacy, Shop N' Save Osco Pharmacy, Shoppers Pharmacy, and Star Osco Pharmacy (hereinafter collectively referred to as "SuperValu") and allege the following:

## I. INTRODUCTION

1.      This is an action for damages and civil penalties on behalf of the United States of America and the States (collectively referenced as the "Plaintiffs"), through Relators, arising from SuperValu's violations of the False Claims Act, 31 U.S.C. § 3729, et seq., as amended, and certain state statutes referenced below. Defendants' culpable conduct, as alleged with particularity below, includes making, false claims for reimbursement from federal health care programs and using false records and statements to support those false claims.

## II. PARTIES

2.      SuperValu, Inc. operates its pharmacies both individually and through its subsidiaries, affiliates, and related organizations, including but not limited to, Acme Sav-On Pharmacy, Albertsons Osco Pharmacy, Albertsons Sav-On Pharmacy, Bigg's Pharmacy, Cub Pharmacy, Farm Fresh Pharmacy, Jewel Pharmacy, Jewel-Osco Pharmacy, Save-A-Lot, Shaw's Osco Pharmacy, Shop N' Save Pharmacy, Shop N' Save Osco Pharmacy, Shoppers Pharmacy, and Star Osco Pharmacy.

3.      SuperValu, Inc. is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.

4.      SuperValu operates and controls approximately 2,500 retail grocery locations and over 800 pharmacies in twenty-five (25) states within the United States, which include:

3

a.  California

b.  Delaware

c.  Idaho

d.  Illinois

e.  Indiana

f.  Iowa

g.  Maine

h.  Maryland

i.  Massachusetts

j.  Minnesota

k.   Missouri

l.  Montana

m.  Nevada

n.  New Hampshire

o.  New Jersey

p.  North Carolina

q.  Oregon

r.  Pennsylvania

s.  Rhode Island

t.  Utah

u.  Vermont

v.  Virginia

w.  Washington

    x.  Wisconsin

    y.  Wyoming

5.      Relator Schutte is a citizen of the United States and a resident of the State of Missouri.

6.      Relator Schutte graduated from St. Louis College of Pharmacy in 1992 and has worked as a pharmacist for Wal-Mart since June of 1992.  In addition to being a pharmacist at Wal-Mart, Relator Schutte has worked as a pharmacist for SuperValu since May of 2011.

7.      As a pharmacist for SuperValu, Relator Schutte has direct, personal, and independent knowledge of the facts underlying the allegations of this Complaint.

8.      Relator Yarberry is a citizen of the United States and a resident of the State of Kentucky.

9.      Relator Yarberry graduated from St. Louis College of Pharmacy in 1992 and has subsequently worked as a pharmacist in the retail pharmacy industry.  Currently, Relator Yarberry is a pharmacist for Kmart, Inc. in Louisville, Kentucky and has personal knowledge of Defendant's fraud.

### III. PRELIMINARY STATEMENT OF SUPERVALU'S FRAUDULENT CONDUCT

10.     This is an action for damages and civil penalties arising from SuperValu's violations of the Federal False Claims Act and the analogous false claims acts and health care fraud remedial statutes of the Plaintiff States.  SuperValu's culpable conduct includes knowingly presenting false claims for payment or approval by the United States and the States and knowingly making and using false records or statements supporting or material to false claims for monetary reimbursement from the United States and the States.

11.     Beginning on a limited basis in the latter part of 2006 and occurring nationwide in

early 2007, and continuing through the present, SuperValu has knowingly and systematically

defrauded the United States and the States listed herein by knowingly engaging, and continuing to

engage, in the pattern and practice of disregarding the amounts it charged, and continues to charge,

cash customers for certain generic pharmaceuticals when establishing its Usual and Customary

prices for reimbursement purposes and continuously presented, and continues to present, false and

fraudulent claims to the Plaintiffs for higher reimbursement.  Consequently, SuperValu was

reimbursed, and continues to be reimbursed, for certain pharmaceuticals at amounts that clearly

exceed its Usual and Customary prices.

## IV. BACKGROUND

### A. Government Program Reimbursement to Providers
### For Prescription Drugs Dispensed to Program Beneficiaries

12.     Medicare and Medicaid, the two largest health care programs funded wholly or

partly by the United States, include certain pharmaceutical benefits for covered persons, as do

certain other federally funded health care programs such as TRICARE (including "CHAMPUS,"

the Civilian Health and Medical Program of the Uniformed Services), the Civilian Health and

Medical Program of the Veterans Administration, the Federal Employees Health Benefits Program,

and the Indian Health Service.  These programs do not buy drugs; instead, they reimburse providers

who dispense covered drugs to program beneficiaries.

13.     By law, federal and state health care programs that reimburse providers such as

SuperValu for prescriptions dispensed to program beneficiaries pay an amount for each covered

drug that is limited to the *lesser of* (1) the pharmacy provider's usual and customary ("U&C") price;

or (2) one or more alternative price types ("APT" in the singular, and "APTs" in the plural, form).

14.     The APTs are known by designations such as "Estimated Acquisition Cost,"

"Negotiated Price," "Contract Price," and "Ingredient Cost," depending on the specific government

program.  Specific maximum prices known as "Federal Upper Limit" (FUL) prices are set for some

drugs by federal programs. Similarly, specific maximums known as "Maximum Allowable Cost"

(MAC) prices are set by state Medicaid agencies for some drugs.   Not all drugs are subject to a

FUL or a MAC.

### B.  The Emergence of Deeply Discounted Prices for Some Generic Drugs

15.     Historically, retail pharmacies' U&C prices ordinarily have substantially exceeded

APTs.  Consequently, reimbursement rates paid by government programs for most drugs have

usually been determined by APTs and not by U&C prices.

16.     In late 2006, one of SuperValu's national competitors, Wal-Mart, launched a

discount generic program which offered certain 30-day pharmaceuticals for $4 and 90-day

pharmaceuticals for $10.

17.     Then, beginning on a limited basis in the latter part of 2006 and occurring

nationwide in early 2007, to preserve their pharmacy customer base and maximize revenue,

SuperValu implemented a "Price Matching" program to contend with Wal-Mart's 30-day/90-day

discount generic program.  Specifically, SuperValu offered to match the $4 and $10 reduced prices

offered by Wal-Mart, along with a significant number of retail pharmacies in the United States, for

the generic drugs contained within SuperValu's national competitors' generic discount program.

18.     Accordingly, by early 2007, SuperValu's U&C prices became substantially lower

than its APTs and, consequently, there *should* have been a dramatic decrease in third-party

pharmacy reimbursement.

### V. <u>JURISDICTION AND VENUE</u>

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331 and 31 U.S.C. § 3730 (b).  This court has personal jurisdiction over SuperValu

pursuant to 31 U.S.C. § 3732(a).  This court also has supplemental jurisdiction over Plaintiffs'

state law claims under 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367.  Venue in this Judicial District

is appropriate under 31 U.S.C. § 3732(a) because SuperValu can be found in, and transacts

business in, this Judicial District.

## VI. <u>VOLUNTARY DISCLOSURE</u>

20.     As a pharmacist for SuperValu, Relator Schutte has direct, personal, and

independent knowledge of the facts underlying the allegations of this Complaint.

21.     As a pharmacist in the retail pharmacy industry since 1992, Relator Yarberry direct,

personal, and independent knowledge of the facts underlying the allegations of this Complaint.

22.     Relators have verified through personal experiences with SuperValu in Missouri and

Illinois, and through personal communications with other pharmacy employees of the SuperValu

through several States that the alleged fraudulent conduct has occurred, and continues to occur,

across numerous states in the United States.   Further, SuperValu utilizes a standard "ARx"

computer platform across all their pharmacies nationwide to process pharmacy claims.  Because

every one of SuperValu's pharmacies utilizes the same ARx platform to process claims,

SuperValu's fraudulent conduct is occurring nationwide in all of SuperValu's pharmacies.

23.     Relators believe there has been no public disclosure of the allegations and

transactions contained herein; but should the question arise, and should the court determine

otherwise, the Relators are an original source of the allegations in this Complaint, as defined in

31 U.S.C. §3730(e)(4)(B).

## VII. <u>SUPERVALU'S FRAUDULENT CONDUCT</u>

### A. Overview

24.     Beginning on a limited basis in the latter part of 2006 and occurring nationwide in

early 2007, SuperValu has knowingly engaged in a pattern of fraudulent conduct to obtain

excessive payments from federal and state government healthcare programs ("GHP" in the singular form and "GHPs" in the plural form) for generic prescription drugs furnished by SuperValu to GHP beneficiaries.

25.     SuperValu's claims for payment to GHPs for generic drugs furnished to GHP beneficiaries were false, because it was fully aware that GHP prescription drug reimbursement rules generally provide for the payment of the lesser of a provider's usual and customary ("U&C") price and one or more APTs. SuperValu knowingly concealed their true U&C prices, which were materially lower than APTs, and reported false, inflated U&C prices to GHPs which were higher than APTs, in order to obtain excessive payments under reimbursement rules.

26.     As a result of SuperValu's fraudulent conduct, GHPs unwittingly paid to SuperValu, and SuperValu fraudulently collected from GHPs, excessive reimbursements based on APTs higher than SuperValu's true, lower U&C prices,

27.     SuperValu's fraudulent scheme has caused, and continues to mislead, GHPs to pay SuperValu significantly higher reimbursement amounts than SuperValu was, and is, entitled to receive under federal and state laws and regulations for prescriptions filled for GHP beneficiaries.

28.     SuperValu has submitted millions of false claims for prescriptions SuperValu filled for GPH beneficiaries, based on the number of SuperValu's nationwide chain of pharmacies, the number of generic drugs involved, the number of GHP prescription drug transactions at each pharmacy, and the covered time period which is ongoing.

29.     GHPs that have been damaged by SuperValu's fraudulent conduct include, but are not limited to, Medicare Part D, Medicaid, TRICARE (including "CHAMPUS," the Civilian Health and Medical Program of the Uniformed Services), the Civilian Health and Medical

Program of the Veterans Administration, the Federal Employees Health Benefits Program, and the Indian Health Service.

### B.  SuperValu's False Claims for Excessive GHP Generic Prescription Drug Payments

#### 1.  Overview of GHP Prescription Drug Reimbursement Methodologies

30.     GHP prescription drug reimbursement methodologies generally provide for payment of the lower of - -

a.   The pharmacy provider's usual and customary ("U&C") price; or

b.   One or more APTs.

31.     GHPs, with the exception of certain State Medicaid programs, generally define the "U&C" price, in substance, as the price that a pharmacy charges a customer who does not have, or elects not to use, any form of prescription drug insurance coverage.  Customers who do not have or use insurance coverage to purchase prescription drugs are commonly referred to as "cash customers," and the related drug sales and purchases are commonly known as "cash transactions."

32.     While several State Medicaid programs define U&C price in the same, substantive manner as the pharmacy's price to cash customers, other State Medicaid programs define U&C price based on the pharmacy's prices to both cash customers and customers with private insurance coverage.

33.     Pharmacy providers have a legal duty as a condition of payment, when submitting claims for prescription drugs to GHP's that require the reporting of U&C prices to either i) report the pharmacy's prices to cash customers as its U&C prices, or ii) determine and report the

pharmacy's U&C prices based on its prices to both cash and privately insured customers,

depending on the particular GHP's U&C price definition.

34.     Examples of APTs included in GHP reimbursement methodologies which are

used as the basis for reimbursement when an APT is lower than the pharmacy reported U&C

price are as follows:

a.   Negotiated Price, plus Dispensing Fee.  Negotiated prices are the costs for
     drugs agreed upon through direct negotiation between GHPs, specifically
     Medicare Part D plan sponsors, or an intermediary organization such as a
     pharmacy benefit manager (third party administrators that process and pay
     claims for drug plans), and the drug manufacturer;

b.   Estimated Acquisition Cost ("EAC"), plus Dispensing Fee.  EAC is a State
     Medicaid agency's estimate of the price generally and currently paid by
     providers, e.g., pharmacies.  Although there are almost no restrictions on the
     methods used by States to determine EAC, States predominantly calculate
     (historically and currently) EAC as the Average Wholesale Price (AWP) less
     a fixed percentage. EACs are also sometimes defined as Wholesale
     Acquisition Cost plus a percentage, Direct Price plus a percentage, Average
     Sales Price plus a percentage, or Actual Acquisition Cost.  In some instances
     State reimbursement methodologies calculate EAC by more than one method
     and use the lowest amount to compare to U&C and other APTs;

c.   Maximum Allowable Cost ("MAC"), plus Dispensing Fee.  Originally, MACs
     that limited drug reimbursement under Federal programs, including Medicaid,
     were determined by a Federal Pharmaceutical Reimbursement Board, assisted
     by a Pharmaceutical Reimbursement Advisory Committee, pursuant to the
     procedures outlined in the regulations.  The Federal MAC later transitioned
     into the Federal Upper Limit described below.  State Medicaid agencies also
     had and have the discretion to establish State MACs as APTs.  A State MAC,
     in essence, is another type of EAC; or,

d.   Federal Upper Limit ("FUL"), plus Dispensing Fee.  Federal Medicaid
     regulations establish an upper limit on the amount State Medicaid programs
     may pay for certain multiple source drugs, that is, brand drugs with available
     generic drugs.  These limits are intended to assure the government acts as a
     prudent buyer of drugs and achieves savings by taking advantage of current
     market prices.  Beginning in 2007, payments for multi-source drugs subject to
     a FUL could not exceed, in the aggregate, payment levels determined by
     applying for each drug a reasonable dispensing fee plus 250% of the Average
     Manufacturer Price for the least costly therapeutic equivalent.  Prior to 2007,
     FUL aggregate payment levels were determined by applying for each drug a

reasonable dispensing fee plus 150% of the published price of the least costly therapeutic equivalent.

35.     As indicated, APTs consist of two components.  The first component, the negotiated price, EAC, MAC, or FUL, is intended to reimburse the ingredient cost of a drug. The second component, the dispensing fee, is intended to reimburse the pharmacy for pharmacy operation costs, including, but not limited to, costs associated with a pharmacist's time in checking the computer for information about an individual's coverage, performing drug utilization review and preferred drug list review activities, measuring or mixing the covered outpatient drug, filling the container, counseling the beneficiary, physically providing the completed prescription to the Medicaid beneficiary, delivery, special packaging, and overhead associated with maintaining the facility and  equipment necessary to operate the pharmacy.

36.     With respect to GHPs with reimbursement methodologies that provide for the payment of the lesser of U&C price or an APT, the GHP compares the U&C price with no dispensing fee against the APTs, each APT consisting of both the ingredient cost, plus a dispensing fee.

## 2. Specific GHP Prescription Drug Reimbursement Methodologies

### a.   Medicare Part D Voluntary Prescription Drug Benefit Program

37.     The voluntary Medicare prescription drug benefit program commonly known as Medicare Part D ("Part D")  was enacted into law on December 8, 2003 in section 101 Title 1 of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA") (Pub. L. 108-173) and became available to beneficiaries beginning on January 1, 2006.

38.     Generally, coverage for the Part D drug benefit is provided under private prescription drug plans ("PDP" in the singular, and "PDPs" in the plural, form).

39.    The Part D drug reimbursement methodology requires PDPs to ensure that Part D enrollees are not charged more than the lower of –

a.  The price based on negotiated prices, including or plus a dispensing fee; or

b.  The usual and customary price.

42 U.S.C. §1395w-141(h)(8).

40.    As mentioned above, negotiated prices are the plan discount prices a PDP negotiates with manufacturers for the benefit of its enrollees.

41.    With respect to price-matching drug programs like SuperValu's which offer every-day, reduced prices to their customers throughout the year on certain drugs, the reduced price is the pharmacy's U&C price, and the price on which the Part D sponsor must reimburse the pharmacy, if it is lower than the negotiated price with a dispensing fee.

42.    This principle was clarified in an October 11, 2006, memorandum to all Part D sponsors from the CMS Director of the Medicare Drug Benefit Group on the subject "Lower Cash Price Policy" (October 2006 CMS Memo).   The memo directly responded to a question concerning whether during a Part D deductible or coverage gap phase an individual's payment of a price lower than the Part D negotiated price would count toward the enrollee's true out-of-pocket ("TrOOP")[1] balance.  In answering the question, the memo noted the distinction between cases where a pharmacy like SuperValu offer a lower price to their customers throughout the year and the one-time or limited offer "lower cash price" situation that was the main subject of the guidance. The memo confirmed that every-day reduced prices are considered a pharmacy's U&C prices under the Part D benefit design.  In this respect the memo stated:

---

[1] Standard Part D beneficiaries are required to pay a deductible and then cover 25% of their drug costs until they enter a range of out-of-pocket spending called the "doughnut hole."  While in the doughnut hole, beneficiaries are responsible for 100% of their drug costs until their TrOOP reaches a specified amount called the "catastrophic limit," after which time beneficiaries are responsible for 5% or less of their drug costs for the remainder of the year.

13

We note that in cases where a pharmacy offers a lower price to its customers throughout a benefit year, this would not constitute a 'lower cash price' situation that is the subject of this guidance. For example, Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The low Wal-Mart price on these specific generic drugs is considered Wal-Mart's 'usual and customary' price, and is not considered a one-time 'lower cash' price. Part D sponsors consider this lower amount to be 'usual and customary' and will reimburse Wal-Mart on the basis of this price. To illustrate, suppose a Plan's usual negotiated price for a specific drug is $10 with a beneficiary copay of 25% for a generic drug. Suppose Wal-Mart offers the same generic drug throughout the benefit for $4. The Plan considers the $4 to take the place of the $10 negotiated price. The $4 is not considered a lower cash price, because it is not a one-time special price. The Plan will adjudicate Walmart's claim for $4 and the beneficiary will pay only a $1copay, rather than a $2.50 copay. This means that both the Plan and the beneficiary are benefitting from the Wal-mart 'usual and customary' price, and the discounted Wal-Mart price of the drug is actually offered within the Plan's Part D benefit design. Therefore, the beneficiary can access this discount at any point in the benefit year, the claim will be adjudicated through the Plan's systems, and the beneficiary will not need to send documentation to the plan to have the lower cash price count toward the TrOOP.

October 2006 CMS Memo n.1.

43. The foregoing quotation from the October 2006 CMS memo is re-stated verbatim in the Medicare Prescription Drug Benefit Manual ("MPDB Manual"), Chapter 14 – Coordination of Benefits, Section 50 – Part D Sponsor Requirements, Subsection 50.4.2 – Beneficiary Cash Purchases (CMS Pub. No. 100-18).

### b. Medicaid

44. Medicaid is a joint and voluntary program between the federal government and the states, whereby lower-income, disabled and elderly individuals are offered basic healthcare coverage.

45. The Federal government pays a share of the medical assistance expenditures under each State's Medicaid program. That share, known as the Federal Medical Assistance Percentage ("FMAP") or the Federal Financial Participation ("FFP"), is determined annually by a formula that compares each state's average per capita income with the national per capita income

average. The federal share varies inversely with each state's per capita income; the greater a state's per capita income, the smaller the federal share of its Medicaid costs.  By law, the FMAP cannot be lower than 50 percent or higher than 83 percent.  Attached hereto as Exhibit A is a list of Federal Medical Assistance Percentages and Enhanced Federal Medical Assistance Percentages for all states, for fiscal year 2009.

46.     Since at least 1976, the Medicaid rules have divided reimbursable drugs into two categories: i) multiple source drugs subject to a FUL; and ii) other drugs.  Multiple source drugs have been subjected to a FUL when there are multiple equivalent drugs and suppliers.  Other drugs include single-source drugs, certified brand drugs (physician certification brand is medically necessary for particular recipient), and drugs other than multiple source drugs for which a FUL has been established.

47.     The FUL for multi-source drugs has been determined for the last 20-plus years as follows:

1987-2006

State agency payments could not exceed, in the aggregate, payment levels determined by applying for each drug a reasonable dispensing fee plus 150% of the published price of the least costly therapeutic equivalent.

2007-Present

State agency payments could not exceed, in the aggregate, payment levels determined by applying for each drug a reasonable dispensing fee plus 250% of the Average Manufacturer Price for the least costly therapeutic equivalent.

48.     During the same time period, Medicaid rules have provided that State agency payments for other drugs must not exceed in the aggregate, payment levels the agency has determined by applying the lower of the following costs and charges:

a.  EAC plus a reasonable fee established by the agency; or

b.  The provider's usual and customary charges to the general public.

49.     The FUL is just that, an upper limit, and the State agency will pay the EAC or U&C price of a multi-source drug if it is lower than the FUL.  Accordingly, the Medicaid reimbursement methodology for all covered drugs can be summarized to provide for the payment of the lesser of the following costs, charges, or limits:

a.  The provider's usual and customary charge to the general public;

b.  EAC plus a reasonable dispensing fee established by the State agency;

c.  State MAC, if any, plus a reasonable dispensing fee; or

d.  FUL.

50.     As discussed above, several State Medicaid programs define U&C price as the pharmacy's prices to cash customers, and others define U&C price based on the pharmacy's prices to both cash and privately insured customers.  In either case, pharmacy providers have a legal duty as a condition of payment to accurately determine and report their true U&C prices when submitting claims to GHPs.

### c.  TRICARE

51.     TRICARE is the managed health care program established by the Department of Defense ("DoD") for active duty service members, active duty family members, retired service members and families, and certain other eligible beneficiaries (e.g., Medal of Honor recipients and their families) and is a major component of the Military Health System.  It includes the competitive selection of contractors under the prior existing Civilian Health and Medical program of the Uniformed Services ("CHAMPUS") fee for service program.   TRICARE is available worldwide and is managed in four separate regions, three in the United States (North, South and West) and one overseas region which is divided into 3 main areas (Eurasia – Africa,

Latin America and Canada, and Pacific Areas).  The Overseas region and its areas operate under different procedures than TRICARE in the U.S.

52.     To enable the DoD to concurrently provide military members and their families access to comprehensive health care services and maintain the capability to support military operations, TRICARE services are furnished through a combination of the military's direct care system of hospitals and clinics and a system of TRICARE authorized network and non-network civilian health care providers and suppliers.

53.     TRICARE selects contractors to establish networks of health care providers (contractor networks) to supplement the care available at Military Treatment Facilities ("MTF" in the singular, and "MTFs" in the plural, form) and to perform a variety of administrative and related support services, including claims processing.

54.     Non-active duty individuals, commonly referred to as "TRICARE eligibles," [2] also may use TRICARE authorized, non-network providers under CHAMPUS.

55.     TRICARE offers comprehensive health coverage with several plan options, a pharmacy benefit, dental options and other special programs.  The scope of covered benefits, providers of services, and beneficiary out-of-pocket costs depend on the plan selected, and plan eligibility depends on beneficiary status and, in certain instances, residency, e.g., individuals in designated remote locations in the U.S., in overseas areas near military treatment facilities, or in remote overseas areas. Beneficiary out-of-pocket costs are further based on beneficiary status and the provider of services.  Active duty service members do not pay any costs, and costs are lower for active-duty family members relative to retired service members and their families. Generally there is no charge for services provided by MTFs, and costs are lower for services

---

[2] E.g., the spouse and children of active duty personnel, retirees and their spouses and children, and survivors, include former spouses as defined by statute.

performed by network providers compared to non-network providers.  Active duty service members receive first priority for treatment at MTFs and the assignment of primary care managers, if availability is an issue.

56.     Included in the TRICARE benefit package is a retail pharmacy and a mail service pharmacy program.  The TRICARE pharmacy benefit is the same regardless of beneficiary category or which health plan option is selected.

57.     Prior to August 1, 2002 and continuing to the present, TRICARE contractors have been authorized to establish alternative reimbursement systems (except capitation payments), which may include usual and customary fees, when approved by TRICARE Management Activity and included in the network provider agreement.  TRICARE Reimbursement Manual 6010.55-M, August 1, 2002("TRM 2002"), Chapter 1, Section 1, Network Provider Reimbursement, II.B.; TRICARE Reimbursement Manual 6010.58-M, February 1, 2008("TRM 2008"), Chapter 1, Section 1, Network Provider Reimbursement, ¶2.2.

58.     Beginning February 1, 2008, subject to approval of an alternative network reimbursement methodology, TRICARE mandated the reimbursement of prescription drugs based on the lesser of –

    a.  The usual and customary price; or

    b.  The Maximum Allowable Cost ("MAC")[3]; or

    c.  TRICARE Pharmacy contractor's contracted rate for ingredient cost.

TRM 2008 Chapter 1, Section 15, Legend Drugs and Insulin, ¶¶1.0 and 3.2.

59.     Since June 1, 2004 to the present, Pharmacy Benefit Manager ("PBM")[4] Express Scripts has operated the TriCare Retail Pharmacy contract for all TRICARE beneficiaries located

---

[3] MACs are developed by TRICARE on a nationwide, non-specialty basis and are set at the 80th percentile of charges made for a given benefit during the base period.

in the 50 States, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and Guam, except

for beneficiaries enrolled in the Uniformed Services Family Health Plan.

60.     The Express Scripts Pharmacy Network Manual 12/2005 Revision 5 ("E-S

Manual") claims adjudication guidelines, general claims submission policies, require, in part, as

follows:

    a.  All claims must be submitted online in current NCPDP (National Council for Prescription Drug Programs) HIPAA-approved format, including medications when the Pharmacy's Usual and Customary retail price is less than the Copay.

    b.  All claims submitted must include the Pharmacy's Usual and Customary retail price, including all discounts on applicable date of fill.

E-S Manual § 2.1.

61.     Pursuant to the E-S Manual, Express Scripts' TRICARE reimbursement

methodology is based on the lower of:

    a.  Average Wholesale Price ("AWP") less the contracted discount baseline price (as calculated by First DataBank[5]) less the contracted discount for the specific network;

    b.  MAC or submitted cost plus the contracted dispensing fee for that network, or U&C, whichever is lowest.

E-S Manual § 2.3.

---

[4] A PBM is a third party administrator of prescription drug programs for Plan Sponsors.  Plan Sponsor groups include managed-care organizations, insurance carriers, employers, and union-sponsored benefit plans.  PBMs are primarily responsible for processing and paying prescription drug claims. Other PBM services include negotiation of discount prices with retail pharmacies, mail pharmacy services, benefit design consultation, drug utilization review, formulary management, disease management, and clinical and utilization management programs.

[5] First Data Bank ("FDB") provides integrated drug database products and is one of several commercial drug pricing compendia which compile and publish the AWP and WAC prices suggested by drug manufacturers for their products.  For the past four decades, AWP has served as the standard pricing benchmark used to calculate reimbursement for drugs by most payers, including State Medicaid programs.  Recent litigation by State Medicaid Programs and others against drug manufacturers has exposed that published AWP and WAC prices do not remotely reflect actual transaction prices in most cases, and frequently are 5x, 10x, and 15x, or more, higher than actual transaction prices.  As a result of the settlement of a related lawsuit alleging that FDB conspired with drug wholesaler McKesson Corp. to fraudulently inflate AWP, causing consumers and third party payers to over pay  for drugs, FDB and publisher Medi-Span pledged to cease publishing AWP by September 26, 2011.

62.     The E-S Manual defines "Usual and Customary Retail Price (U&C)" as "The usual and customary retail price of a Covered Medication in a <u>cash transaction</u> at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, including any discounts or special promotions offered on such date.  E-S Manual Express Scripts Glossary. (Emphasis added).

### d.  FEHBP

63.     The Federal Employees Health Benefits Program ("FEHBP") offers comprehensive group health insurance to federal employees, retirees and their eligible family members through a wide variety of qualified carriers and plans approved by the U.S. Office of Personnel Management ("OPM").  Beneficiaries may choose among fee-for-service (FFS) plans, Preferred Provider Organization (PPO) plans, plans offering a Point-of-Service product, health maintenance organizations (HMOs), consumer-driven health plans (CDHPs) and high deductible health plans (HDHPs).  There are separate and different provider networks for each plan.

64.     Premiums vary by plan and are shared by the federal employee and the Federal agency employer. The government pays the lesser of 72% of the average total premium of all plans weighted by the number of enrollees in each, or 75% of the premium for the specific plan selected by the employee.  An employee's share of the premium is automatically paid through a payroll deduction using pretax dollars.  Government and enrollee contributions are paid into the U.S. Treasury Employees Health Benefits Fund which is administered by the OPM and available for payment to plans and to pay program administrative expenses.

65.     Since at least 2006, FEHBP plans have been PBM Caremark's largest customers, and, based on Relators' experiences in the industry, the majority of SuperValu's FEHBP claims are processed by Caremark.

66.     The 2007 Caremark Provider Manual ("2007 CM Manual") and 2009 CVS Caremark Provider Manual ("2009 CVS/CM Manual") contain identical FEHBP prescription drug reimbursement methodologies and related definitions, including the same U&C definition.

67.     Pursuant to the 2007 CM Manual and 2009 CVS/CM Manual, FEHBP prescription drugs processed by Caremark are reimbursed at the lower of:

    a.      Price Type[6] plus an applicable percentage of the Price Type, or minus the applicable percentage of the Price Type, plus the applicable Dispensing Fee less the applicable Patient Pay Amount (or if applicable Price Type is unavailable for a given drug, Caremark will pay Provider based upon AWP minus the applicable AWP Discount plus the applicable Dispensing Fee minus the applicable Patient Pay Amount);

    b.      MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount;

    c.      Ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; or

    d.      Provider's U&C price less the applicable Patient Pay Amount.

68.     The 2007 CM Manual and 2009 CVS/CM Manual define "Usual and Customary Price or U&C" as "the lowest price Provider would charge a particular customer if such customer were paying <u>cash</u> for an identical prescription on that particular day at that particular location.  This price must include any applicable discounts offered to attract customers." (emphasis added).

69.     Other terms identically defined in the 2007 CM Manual and 2009 CVS/CM Manual and referenced in the Caremark FEHBP reimbursement methodology are as follows:

    a.      "Price Type" means a current price of a given drug as defined by a nationally recognized reference that Caremark may reasonably select from time to time, which may include, but is not limited to: AWP (Average Wholesale Price), WAC (Wholesale Acquisition

---

[6] See paragraph 68(a).

Cost), AMP (Average Manufacturer Price, ASP (Average Sales Price) or DP (Direct Price).

b.  "Patient Pay Amount" means the amount an Eligible Person must pay to Provider at the time a Covered Item is dispensed as indicated by the claims system, which may include but is not limited to copayments, coinsurance, deductibles, transaction fees, access fees, and/or taxes.

c.  "AWP or Average Wholesale Price" means the current wholesale cost of a given drug as defined in the latest edition of the First DataBank Blue Book, Medi-Span (with supplements), MICROMEDEX, or any other similar nationally recognized reference which Caremark may reasonably select from time to time.

d.  "MAC or Maximum Allowable Cost" means a unit price that has been established as the reimbursement amount to Provider for certain multiple-source drugs without regard to the specific manufacturer whose drug is dispensed.

70.  The 2007 CM Manual and 2009 CVS/CM Manual also impose virtually identical, additional U&C validation requirements on pharmacies which obligate providers to submit accurate U&C pricing for all Caremark claims, including prices which are part of a set price program offered by the provider.  In this regard the 2007 CM Manual states as follows:

U&C Validation

Provider is required to submit accurate Usual and Customary (U&C) pricing for all Caremark claims, including prices which are part of a set price program offered by Provider.  Provider must provide, upon request, a record of the dispensing of a prescription (identical to the prescription being audited) that was dispensed to a cash paying customer on the same date if such dispensing occurred.  Provider can redact confidential patient health information from the record in accordance with applicable Law, but the record must contain the patient charge amount.

Caremark has the right to review and audit documentation as detailed in this section to validate U&C accuracy.  Provider is required to collect from the eligible Person the lesser of the U&C or Patient Pay Amount.  Provider must

submit a claim to Caremark regardless of collected amount from the Eligible Person.[7]

71.    In the context of discount generic prescription drug programs, the 2007 CM Manual and 2009 CVS/CM Manual also contain identical requirements which obligate a pharmacy to inform customers of its U&C price when the U&C price is less than the applicable patient co-pay.   In this regard the 2007 CM Manual states as follows:

> Provider shall disclose to each Eligible Person Provider's Usual and Customary Price if such Usual and Customary Price is less than the applicable Patient Pay Amount.  Provider shall allow the Eligible Person to pay either the Usual and Customary Price or the Patient Pay Amount, whichever is lower, unless a Plan otherwise requires.  Notwithstanding the foregoing, Provider shall submit a claim to Caremark, even if the Eligible Person elects to pay the Usual and Customary Price.

72.    As part of a 2008 CVS Caremark Network Update, pharmacies were again reminded that they were required to submit accurate U&C pricing for all Caremark claims, particularly as generic drug programs featuring set prices became more popular and since providers were required to allow plan participants to pay either the U&C price or the patient pay amount, whichever was lower, except in one, rarely occurring circumstance.  The update states in relevant part as follows:

> **Usual & Customary (U&C) Charges**
>
> As generic drug programs featuring set prices become more popular, please remember you are required to submit accurate Usual and Customary pricing for all Caremark claims.  The Caremark Provider Manual defines Usual and Customary as:
>
> **"Usual and Customary Price or U & C"** means the lowest price Provider would charge to a particular customer if such customer were paying cash for an identical prescription on that particular day at that particular location. This price must include any applicable discounts offered to attract customers.

---

[7] Except for the replacement in the first sentence of the phrase "Usual and Customary (U&C) pricing" with the synonymous phrase "U&C prices", the 2007 CM Manual and 2009 CVS/CM Manual U&C validation provisions are identical.

As a reminder, Provider must submit all claims for Pharmacy Services related to Covered Items for Eligible Persons electronically through the applicable claims system.

The information transmitted must be accurate and complete.  Caremark audits for appropriate U&C pricing during several audit processes, including on-site visits.  In addition, Caremark's proprietary auditing program includes careful scrutiny of prescription reversals, changes in plan participant prescription dispensing and other criteria that may indicate pharmacy provider billing issues.  Please inform pharmacies and appropriate staff regarding this requirement to avoid audit discrepancies.  Provider is required to allow plan participants to pay either  the U&C price or the patient pay amount, whichever is lower unless a Plan otherwise requires.  Pharmacy Provider must still submit a claim to Caremark even if the claim pays at U&C.

### 3.  SuperValu's Non-formulary Based, Cash Override Prescription Fill Scheme

73.     Beginning on a limited basis in the latter part of 2006 and occurring nationwide in early 2007 with the advent of competitor discount generic drug formularies and prices, SuperValu reduced their every-day, U&C prices to cash customers to the discount generic drug prices charged by its competitors.

74.     At the same time, on claims for payment SuperValu submitted to GHPs for the same generic drugs it sold to cash customers at every-day low prices, SuperValu defrauded the GHPs in one or more the following respects:

a.  SuperValu knowingly and fraudulently failed to accurately report the actual, every-day U&C prices they charged cash customers for the same generic drugs, and in instances where the computation of actual U&C prices under applicable GHP rules (e.g., some State Medicaid programs) took into account sales prices in addition to cash customer prices, SuperValu knowingly made no effort to calculate their actual U&C prices; and

b.  SuperValu knowing reported materially, and oftentimes grossly, inflated U&C prices for the same generic drugs they sold to cash customers at deeply reduced prices.

75.     SuperValu's knowing, fraudulent conduct misled and caused GHPs to pay millions of SuperValu's false claims based on APTs materially higher than SuperValu's actual U&C prices, in contravention of government mandated reimbursement methodologies which

dictate payment of the lower of U&C prices or APTs, and to the damage of financially-strained government programs.  This allowed SuperValu to maintain revenue levels from GHPs and simultaneously compete for customer base.  SuperValu reaped egregiously excessive profits from GHPs and/or subsidized reduced cash customer prices at the expense of GHPs to drive store traffic and profitability.

### a.   Usual and Customary Price Fraudulent Scheme

76.     In the absence of competitive pressures, pharmacies have an economic incentive to establish U&C prices higher than any health insurance APTs, since GHP and private insurer reimbursement methodologies typically pay the lower of U&C prices or APTs.  U&C prices below the highest APTs result in a pharmacy's loss of available potential revenue.  For this reason, the every-day, U&C prices pharmacies historically have charged uninsured cash customers have been substantially higher than the prices charged to insured customers.  This practice continues today for drugs that are not on a discount formulary or part of a reduced price program.

77.     In September 2006, Wal-Mart launched a discount generic prescription drug program which offered a 30-day supply of covered generic drugs for $4.  The program was initially offered in the Tampa Bay, Florida market, but was expanded two months later in November 2006 to all 3,800 Wal-Mart and affiliated Sam's Club and Neighborhood Market pharmacies nationwide in 49 states. Wal-Mart's initial 30-day supply formulary consisted of approximately 300 drugs at commonly prescribed dosages.

78.     Beginning on a limited basis in the latter part of 2006 and occurring nationwide in early 2007, SuperValu implemented its "Price Matching" program to compete with the 30-day

and 90-day supply, formulary-based, discount generic drug program offered by Wal-Mart and similar, existing and anticipated programs of other competitors.

79.     SuperValu intentionally avoided creating their own proprietary discount drug formulary and instead, through their Price Matching program, offered to match the discount prices of drugs on their competitors' formularies.  The objective behind this program design was to enable SuperValu to use generic discount drug pricing to compete for customer base and store traffic, and at the same time deny that their discount prices were U&C prices.

80.     SuperValu customarily sold the 30-day and 60-day supplies of drugs on their competitors' generic program to cash and certain insured customers for $4.00 or less and sold 90-day supplies of drugs for $10 or less.

81.     Whether SuperValu sold the competitor's discount drug to a customer at the same, a lower, or a higher price depended on several factors, including whether the customer was a cash customer or a customer utilizing insurance coverage with a co-pay higher or lower than the discount drug program price.

82.     Insurance information generally was obtained from a customer by pharmacy staff on the customer's initial pharmacy visit.  If the customer had insurance, the pharmacy staff member entered the customer's primary and any secondary payer information in the third party payer section of SuperValu's pharmacy transaction software system, and on subsequent visits, the customer's designated, default primary payer coverage automatically would be applied, unless manually changed or unless a claim was reversed after submission to the carrier.  If the customer was uninsured, no payer information was entered into the system, and the initial and subsequent transactions were processed as cash transactions, unless the customer's uninsured

status changed.  For both customers paying cash and those utilizing insurance, the prescription number assigned to an original fill extended to any refills.

83.     Co-pay information was generally obtained by pharmacy staff from the insurer or its benefits administrator, when the staff member submitted a claim for adjudication between the time the customer dropped off and picked up the prescription.

84.     When a cash customer presented a prescription at one of SuperValu's pharmacies for a drug which was <u>not</u> on a competitor's discount formulary, SuperValu charged the customer their list U&C price, which generally was higher than the APTs paid by health insurers and substantially more than the $4 and $10 prices charged for drugs on the 30-day, 60-day, and 90-day discount formularies.

85.     When a cash customer presented a prescription at a SuperValu pharmacy for a drug on a competitor's discount formulary, SuperValu pharmacy staff member manually typed the reduced price of $4.00 or less or $10.00 or less in the price override field of the SuperValu ARx pharmacy transaction software system to bypass the inflated list U&C price and filled the prescription at the reduced price as a "cash transaction".  Since no insurance was involved, there was no claim to submit for adjudication to any Third Party Payer.

86.     If a customer participates in SuperValu's price-matching program and has their original prescription filled at the reduced price of $4.00 or less or $10.00 or less, SuperValu's ARx system automatically prompts the SuperValu staff member to price-override each prescription-refill in connection with said prescription for the reduced price the customer paid for their initial prescription.

87.     SuperValu's sales of drugs on their competitors' discount formularies to cash customers at their every-day, reduced price-match prices established their U&C prices for those

drugs under the rules of many GHPs, including Medicare Part D, many State Medicaid Programs, and TRICARE.

88. When a GHP beneficiary presented a prescription at one of SuperValu's pharmacies for a drug on a competitor's discount formulary, and the beneficiary's co-payment was <u>more</u> than the every day price to cash customers, the SuperValu pharmacy staff member routinely manually overrode the listed, inflated U&C price and filled the prescription at the reduced price as a "cash transaction," once again establishing the reduced cash price as SuperValu's actual U&C price for that drug. There were two common scenarios:

   a. If the pharmacy staff member was familiar with, and knew the reduced price was more than the GHP copay for the drug, the staff member would (i) select the price override tab, (ii) enter the competitor whose price is being matched, and (iii) manually type the reduced price of $4.00, or less, in the price override field.

   b. If the pharmacy staff member was not familiar with the GHP copay for the drug, the staff member would submit the claim to the GHP for payment, upon notification of a copay amount higher than the reduced price the staff member would follow steps (i) and (ii) in the foregoing subparagraph, and the ARx system would automatically reverse the claim after the transaction was completed.

89. In these instances, SuperValu did not submit a claim to the beneficiary's GHP, even when a GHP required the submission of a claim for purposes of tracking the beneficiary's fulfillment of program milestones that may affect benefits. It may be possible to identify some of the cash transactions described in this paragraph from SuperValu's and/or GHP claim reversal records.

90. In some instances where a GHP beneficiary's co-payment was more than SuperValu's every-day cash price, SuperValu nonetheless collected the higher co-pay and submitted a false claim for payment to the GHP with a false, inflated U&C price. The falsely reported U&C price misled the GHP to pay SuperValu an additional amount based on an APT

that was lower than the falsely reported U&C, but materially higher than SuperValu's true U&C price. These claims were false, whether paid or not, because it was unlawful under GHP reimbursement rules, which provided for the payment of the lower of U&C prices or APTs, for SuperValu to collect co-pays and submit claims for any amount which were collectively greater than their every day U&C prices to cash customers for the same drugs. The GHP beneficiary was also defrauded and damaged, since SuperValu did not disclose or offer their true U&C price to the beneficiary and the beneficiary paid a co-pay materially more than the U&C price.

91. When a GHP beneficiary presented a prescription at a SuperValu pharmacy for a drug on a competitor's discount formulary, and the beneficiary's co-payment was <u>less</u> than the every day, price to cash customers, SuperValu collected the co-pay and submitted to the GHP false claims for payment which failed to report the true U&C price to cash customers for the same drug and instead reported a fraudulent, higher inflated U&C price. As a result of SuperValu's fraudulent conduct, GHPs were misled into paying SuperValu based on APTs that were lower than the falsely reported U&C prices and materially higher than the actual U&C prices. At most, GHPs should have paid the difference between the actual U&C price and the co-pay.

92. In situations described in the foregoing paragraph, whether or not the pharmacy staff member knew the GHP co-pay was less than the every-day reduced price for the drug, SuperValu submitted a false claim for payment to the GHP designated as the default primary payer. If the staff member knew the co-pay was lower, a false claim was submitted for payment to the GHP. If the staff member did not know the co-pay was lower, the staff member submitted a false claim to the GHP, and upon notification of a co-pay amount less than the actual U&C cash price, completed the adjudication of the false claim through the GHP.

93.     Also, where a GHP beneficiary's out-of-pocket expense for a drug on a competitor's discount formulary was <u>less</u> than the every day, reduced price to cash customers, the beneficiary had no financial concern whether the GHP was overcharged.  In any event, the transaction was not transparent to the beneficiary, and the customer didn't know the GHP was overcharged.

**b.  Supporting Information/Internal E-mails and other communications**

94.     On April 15, 2011, Relator Schutte completed a mandatory training session with Bob Atchison, the clinical coordinator for SuperValu's Shop N' Save district and managing pharmacist at SuperValu's Arnold, Missouri Shop N' Save pharmacy.  During the training session, Mr. Atchison instructed Relator Schutte regarding the following:

> a.  When customers call the pharmacy to obtain a price quote on generic pharmaceuticals, it is SuperValu's policy that the pharmacy staff member quote the discounted price (e.g. $4 or $10) if said pharmaceutical is listed on one of SuperValu's national competitor's generic pharmaceutical discount program; and,

> b.  Once a customer has obtained a generic pharmaceutical for a discounted price, it is SuperValu's policy to utilize said discounted price for all refills associated with the original prescription.

95.     On May 27, 2011, Relator Schutte sent an email, attached hereto as Exhibit B, to SuperValu's Pharmacy Operations representative, Lindsay Reel, asking if, instead of reversing transactions involving customers with third party insurance whose co-pay exceeds $4 and re-running said transactions as cash for $4, he could submit the $4 SuperValu charges to cash customers to third-party insurance carriers for certain generic pharmaceuticals.

96.     On June 3, 2011, Ms. Reel called Relator Schutte in response to his email inquiry and stated that SuperValu has established contracts with various pharmacy benefit managers (PBMs) that prevent it from changing the amount SuperValu falsifies as its U&C price before a claim is adjudicated.  Ms. Reel explained to Relator Schutte that, in order for SuperValu to

change the amount it reports as its U&C price to third-party insurance to the $4 or less or $10 or

less it charges its cash customers, SuperValu would have to make an official price change like

Wal-Mart or Target who have established $4 and $10 generic drug programs.  Finally, Ms. Reel

stated that, because SuperValu is unable to charge cash customers an amount lower than the

amount it submits as their U&C price to third-party insurance carriers, SuperValu "gets around"

this requirement by simply matching the reduced prices of its national competitors.

97.     On July 8, 2011, Relator Schutte and SuperValu's Regional Manager of Managed

Care, Matt Cross, R.Ph., had a telephone conversation in connection with Relator Schutte's July

4, 2011, email asking why SuperValu does not submit the amount it charges to cash customers to

third-party insurance carriers.  Mr. Cross stated that Supervalu does not submit to third-party

insurance carriers the $4 or less and $10 or less it charges to cash customers, and indicated that

SuperValu's ARx pharmacy software actually prevents pharmacy staff members from overriding

the U&C price submitted to third-party insurance carriers.

### (1). Comparative 30-day Examples

98.     The following table summarizes and analyzes reasonably concurrent drug sales to

a cash customer and a Medicare Part D Plan member, and provides a clear example of

SuperValu's submission of a false claim to the GHP for more than the balance remaining unpaid

on the U&C price SuperValu charged to cash customers, after crediting the plan members' co-

payment:

### Medicare Part D Example

| Prescription: | Pravastatin Sodium 40mg, 30-day supply | |
|---|---|---|
| Pharmacy: | Shop N' Save pharmacy, Arnold, Missouri | |
| Drug Acquisition Cost: | $2.83 | |
| Cash  Customer 1-A Date:  04/04/11 | $4.00 | Actual U&C price paid by the cash customer, recorded by SuperValu as a co-payment |

| Part D Customer 1-B<br>Date: 04/04/11 | $2.50 | Co-payment paid by Part D beneficiary |
|---|---|---|
| | $[8] | Inflated U&C price fraudulently reported by SuperValu for claim submission and adjudication |
| **(Part D Reimbursement)** | $13.67 | Reimbursement amount paid by Medicare Part D |
| | $16.17 | Total reimbursement received by SuperValu, comprised of the beneficiary co-payment and Medicare Part D reimbursement ($2.50 + $13.67) |
| **Amount Medicare Should Have Paid** | $1.50 | The difference between SuperValu's actual U&C cash customer price and the beneficiary's co-payment ($4.00 - $2.50) |
| **Over payment** | $12.17 | The difference between 1) the total reimbursement paid by Medicare Part D and the amount Medicare should have paid ($13.67- $1.50), or 2) the total reimbursement SuperValu received and the actual U&C customer cash price ($16.17 - $4.00). |

99.     Redacted copies of screen shots printed from SuperValu's ARx system which pertain to and support the foregoing example are attached as Exhibit C.

100.     The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a Medicaid beneficiary, and provides a clear example of SuperValu's submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C price SuperValu charged to cash customers, after crediting the Medicaid beneficiary's co-payment:

### Illinois Medicaid Example

| Prescription: | Metoprolol Tartrate 100mg, 30-day supply | |
|---|---|---|
| Pharmacy: | Osco Pharmacy, Springfield, Illinois | |
| Drug Acquisition Cost: | $1.62 | |
| **Cash Customer 4-A<br>Date: 06/09/11** | $4.00 | Actual U&C price paid by the cash customer (price match), recorded by SuperValu as a co-payment |
| **Medicaid Customer 4-B<br>Date: 06/14/11** | $0.00 | Co-payment paid by Medicaid beneficiary |
| | $18.69 | Inflated U&C price fraudulently reported by SuperValu for claim submission and adjudication |

---

[8] The inflated U&C price fraudulently reported by SuperValu is indicated in SuperValu's ARx pharmacy software.

| (Medicaid Reimbursement) | $7.08 | Reimbursement amount paid by Medicaid, presumed to include recorded dispensing fee |
| | $7.08 | Total reimbursement received by SuperValu, comprised of the beneficiary co-payment and Medicaid reimbursement ($0.50 + $14.32) |
| Amount Medicaid Should Have Paid | $4.00 | The difference between SuperValu's actual U&C cash customer price and the beneficiary's co-payment ($4.00 - $0.00) |
| Over payment | $3.08 | The difference between 1) the total reimbursement paid by Medicaid and the amount Medicaid should have paid ($7.08 - $4.00), or 1) the total reimbursement SuperValu received and the actual U&C cash customer price ($7.08 - $4.00). |

101.    Redacted copies of screen shots printed from SuperValu's ARx system which

pertain to and support the foregoing example are attached as Exhibit D.

### Missouri Medicaid Example

| Prescription: | Atenolol 50mg, 30-day supply |
| Pharmacy: | Shop N' Save pharmacy, Kirkwood, Missouri |
| Drug Acquisition Cost: | $1.04 |

| Cash Customer 4-A Date: 05/16/11 | $3.00 | Actual U&C price paid by the cash customer (price match), recorded by SuperValu as a co-payment |
| Medicaid Customer 4-B Date: 05/16/11 | $0.50 | Co-payment paid by Medicaid beneficiary |
| | $10.69 | Inflated U&C price fraudulently reported by SuperValu for claim submission and adjudication |
| (Medicaid Reimbursement) | $14.32 | Reimbursement amount paid by Medicaid, presumed to include recorded dispensing fee |
| | $14.82 | Total reimbursement received by SuperValu, comprised of the beneficiary co-payment and Medicaid reimbursement ($0.50 + $14.32) |
| Amount Medicaid Should Have Paid | $2.50 | The difference between SuperValu's actual U&C cash customer price and the beneficiary's co-payment ($3.00 - $0.50) |
| Over payment | $11.82 | The difference between 1) the total reimbursement paid by Medicaid and the amount Medicaid should have paid ($14.32 - $2.50), or 1) the total reimbursement SuperValu received and the actual U&C cash customer price ($14.82 - $3.00). |

102.    Redacted copies of screen shots printed from SuperValu's ARx system which

pertain to and support the foregoing example are attached as Exhibit E.

### (2). Comparative 60-day Example

103.    The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a Medicaid beneficiary, and provides a clear example of SuperValu's submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C price SuperValu charged to cash customers, after crediting the Medicaid beneficiary's co-payment:

### Illinois Medicaid Example

| Prescription: | Naproxen 500mg, 60-day supply | |
|---|---|---|
| **Pharmacy:** | Osco Pharmacy, Springfield, Illinois | |
| **Drug Acquisition Cost:** | $1.82 | |
| **Cash Customer 4-A Date: 06/06/11** | $4.00 | Actual U&C price paid by the cash customer (price match), recorded by SuperValu as a co-payment |
| **Medicaid Customer 4-B Date: 07/15/11** | $0.00 | Co-payment paid by Medicaid beneficiary |
| | $16.69 | Inflated U&C price fraudulently reported by SuperValu for claim submission and adjudication |
| **(Medicaid Reimbursement)** | $7.47 | Reimbursement amount paid by Medicaid, presumed to include recorded dispensing fee |
| | $7.47 | Total reimbursement received by SuperValu, comprised of the beneficiary co-payment and Medicaid reimbursement ($0.00 + $7.47) |
| **Amount Medicaid Should Have Paid** | $4.00 | The difference between SuperValu's actual U&C cash customer price and the beneficiary's co-payment ($4.00 - $0.00) |
| **Over payment** | $3.47 | The difference between 1) the total reimbursement paid by Medicaid and the amount Medicaid should have paid ($7.47 - $4.00), or 1) the total reimbursement SuperValu received and the actual U&C cash customer price ($7.47 - $4.00). |

104.    Redacted copies of screen shots printed from SuperValu's ARx system which pertain to and support the foregoing example are attached as Exhibit F.

### (3). Comparative 90-day Example

105.    The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a Medicare Part D Plan member, and provides a clear example of

SuperValu's submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C price SuperValu charged to cash customers, after crediting the plan members' co-payment:

## Medicare Part D Example

| Prescription: | Lovastatin 20mg | |
|---|---|---|
| Pharmacy: | Shop N' Save Pharmacy, Arnold, Missouri | |
| Drug Acquisition Cost: | $3.32 | |
| Cash Customer 1-A Date: 04/30/11 | $10.00 | Actual U&C price paid by the cash customer, recorded by SuperValu as a co-payment |
| Part D Customer 1-B Date: 04/26/11 | $0.00 | Co-payment paid by Part D beneficiary |
| | $80.69 | Inflated U&C price fraudulently reported by SuperValu for claim submission and adjudication |
| (Part D Reimbursement) | $47.99 | Reimbursement amount paid by Medicare Part D, presumed to include dispensing fee |
| | $47.99 | Total reimbursement received by SuperValu, comprised of the beneficiary co-payment and Medicare Part D reimbursement |
| Amount Medicare Should Have Paid | $10.00 | The difference between SuperValu's actual U&C cash customer price and the beneficiary's co-payment |
| Over payment | $37.99 | The difference between 1) the total reimbursement paid by Medicare Part D and the amount Medicare should have paid ($47.99 - $10.00), or 2) the total reimbursement SuperValu received and the actual U&C customer cash price ($47.99 - $10.00). |

106.    Redacted copies of screen shots printed from SuperValu's ARx system which pertain to and support the foregoing example are attached as Exhibit G.

<u>COUNT I – *FEDERAL FALSE CLAIMS ACT*</u>

107.    Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set forth herein.

108.    With respect to pharmaceuticals on SuperValu's national competitors' generic discount program list, SuperValu has knowingly engaged, and continues to engage, in the fraudulent pattern and practice of submitting false claims for reimbursement to Federal Health

Care Programs at inflated prices that deny the United States the Usual and Customary prices offered to SuperValu's cash paying customers.

109.    As alleged in Paragraph 45 above, the Federal Government pays a share of the medical assistance expenditures under each State's Medicaid program known as the FMAP or FFP.

110.    The payment by the various States' Medicaid programs on the SuperValu's false and fraudulent Medicaid clams resulted in the Federal Government paying an inflated FMAP and/or FFP which it should not have been paid.

111.    That 31 U.S.C. § 3729 of the FCA states in pertinent part as follows:

(a) LIABILITY FOR CERTAIN ACTS

(1) IN GENERAL.—Subject to paragraph (2), any person who—

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)    conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D)    has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E)    is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F)    knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government,

or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

112.     SuperValu knowingly presented, or caused to be presented, false or fraudulent claims to federal and state government healthcare programs ("GHP" in the singular form and "GHPs" in the plural form) for payment or approval.

113.     SuperValu knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims that were paid or approved by the Government.

114.     SuperValu defrauded the Government by getting false or fraudulent claims allowed or paid.

115.     The Government, unaware of the falsity of the records, statements or claims made by SuperValu, paid SuperValu for claims that would otherwise not have been allowed.

116.     SuperValu knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money or property to the Government.

117.     By reason of these payments, the Government has been damaged and continues to suffer damages in a substantial amount.

118.     The Government, unaware of the falsity of the claims made by SuperValu and lacking knowledge of the above described fraudulent acts, relied on the accuracy of SuperValu's reimbursement claims to GHPs to its detriment.

119.     The Government, being unaware of the inaccuracies and documentation deficiencies submitted by SuperValu, paid and continues to pay SuperValu for claims that should

not have been, and should not be paid, based upon SuperValu's false and fraudulent

reimbursement claims to GHP reimbursement claims.

COUNT II - *CALIFORNIA FALSE CLAIMS ACT*

120.    Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set

forth herein.

121.    This action is brought by Relators pursuant to the submission of False Claims to

the State of California in violation of California False Claims Act, CAL. GOV'T. CODE § 12650, <u>et</u>

<u>seq</u>.

122.    The allegations set forth herein constitute violations of this state's false claims act

for which the Relators seek the maximum award pursuant to statute.

COUNT III - *CALIFORNIA INSURANCE FRAUD PREVENTION ACT*

123.    Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set

forth herein.

124.    This action is brought by Relators pursuant to the submission of False Claims to

private insurers in violation of Section 550 of the California Penal Code and Section 1871.7 of the

California Insurance Code.

125.    The allegations set forth herein constitute violations of this state's insurance fraud

and prevention act for which the Relators seek the maximum award pursuant to statute.

COUNT IV – *DELAWARE FALSE CLAIMS AND REPORTING ACT*

126.    Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set

forth herein.

38

127. This action is brought by Relators pursuant to the Submission of False Claims to the State of Delaware in violation of the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201, et seq.

128. The allegations set forth herein constitute violations of this state's false claims act for which the Relators seeks the maximum award pursuant to statute.

## COUNT V - *ILLINOIS FALSE CLAIMS ACT*

129. Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set forth herein.

130. This action is brought by Relators pursuant to the Submission of False Claims to the State of Illinois in violation of the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/1, et seq.

131. The allegations set forth herein constitute violations of this state's false claims act for which the Relators seeks the maximum award pursuant to statute.

## COUNT VI – *ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT*

132. Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set forth herein.

133. This action is brought by Relators pursuant to the submission of False Claims to private insurers in violation of Article 46 of the Illinois Penal Code and the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1, et seq.

134. The allegations set forth herein constitute violations of this state's insurance claims fraud prevention act for which the Relators seek the maximum award pursuant to statute.

## COUNT VII – *INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT*

135. Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set forth herein.

136.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Indiana in violation of the Indiana False Claims and Whistleblower Protection Act, IND. CODE § 5-11-5-1, et seq.

137.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT VIII – *MARYLAND FALSE HEALTH CLAIMS ACT*

138.    Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set forth herein.

139.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Maryland in violation of the Maryland False Health Claims Act, MD HEALTH CODE GEN. § 2-601, et seq.

140.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT IX - *MASSACHUSETTS FALSE CLAIMS ACT*

141.    Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set forth herein.

142.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Massachusetts in violation of the Massachusetts False Claims Act, MASS. GEN. LAWS ch.12, § 5A, et seq.

143.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT X – *MINNESOTA FALSE CLAIMS ACT*

144.    Relators incorporate by reference and re-allege Paragraphs 1-106 as if fully set forth herein.

145.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Minnesota in violation of the Minnesota False Claims Act, MINN. STAT. § 15C.01, et seq.

146.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

<u>COUNT XI - *MONTANA FALSE CLAIMS ACT*</u>

147.    Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set forth herein.

148.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Montana in violation of the Montana False Claims Act, MONT. CODE. ANN. § 17-8-401, et seq., effective July 1, 2009.

149.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

<u>COUNT XII - *NEVADA FALSE CLAIMS ACT*</u>

150.    Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set forth herein.

151.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Nevada in violation of the Nevada False Claims Act, NEV. REV. STAT. § 357.010, et seq.

152.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

<u>COUNT XIII – *NEW HAMPSHIRE FALSE CLAIMS ACT*</u>

153.    Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set forth herein.

154.    This action is brought by Relators pursuant to the Submission of False Claims to the State of New Hampshire in violation of the New Hampshire False Claims Act, N.H. REV. STAT. ANN. § 167:61, et seq.

155.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT XIV - *NEW JERSEY FALSE CLAIMS ACT*

156.    Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set forth herein.

157.    This action is brought by Relators pursuant to the Submission of False Claims to the State of New Jersey in violation of the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-1, et seq.

158.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT XV – *NORTH CAROLINA FALSE CLAIMS ACT*

159.    Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set forth herein.

160.    This action is brought by Relators pursuant to the Submission of False Claims to the State of North Carolina in violation of the North Carolina False Claims Act, N.C. STAT. ART. 51, § 1-605, et seq.

161.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT XVI – *RHODE ISLAND FALSE CLAIMS ACT*

162.    Relators incorporate by reference and re-allege Paragraphs 1-106 as if fully set forth herein.

163.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Rhode Island in violation of the Rhode Island False Claims Act, R.I. GEN LAWS § 9-1.1-1, et seq.

164.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT XVII - *STATE OF VIRGINIA FRAUD AGAINST TAXPAYERS ACT*

165.    Relators incorporate by reference and re-allege Paragraphs 1- 106 as if fully set forth herein.

166.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Virginia in violation of the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.1, et seq.

167.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT XVIII - *STATE OF WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT*

161.    Relators incorporate by reference and re-alleges Paragraphs 1- 106 as if fully set forth herein.

162.    This action is brought by Relators pursuant to the submission of False Claims to the State of Wisconsin in violation of the Wisconsin False Claims for Medical Assistance Act, WISC. STAT. § 20.901, et seq.

163.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

<u>PRAYER</u>

WHEREFORE, for Counts I through XVIII, Relators pray for judgment jointly and severally against SuperValu, Inc. and its subsidiaries, affiliates, and related organizations, including but not limited to Acme Sav-On Pharmacy, Albertsons Osco Pharmacy, Albertsons Sav-On Pharmacy, Bigg's Pharmacy, Cub Pharmacy, Farm Fresh Pharmacy, Jewel Pharmacy, Jewel-Osco Pharmacy, Save-A-Lot, Shaw's Osco Pharmacy, Shop N' Save Pharmacy, Shop N' Save Osco Pharmacy, Shoppers Pharmacy, and Star Osco Pharmacy as follows:

a.  That SuperValu, Inc. and its subsidiaries, affiliates, and related organizations be found to have violated and be enjoined from future violations of the Federal False Claims Act, 31 U.S.C. § 3729, California False Claims Act, CAL. GOV'T. CODE § 12651(a), the California Insurance Code, Cal. Ins. Code 1871.7(b), the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201, the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/3, Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1, the Indiana False Claims and Whistleblower Protection Act, IND. CODE § 5-11-5-2, the Maryland False Health Claims Act, MD HEALTH CODE GEN. § 2-604, the Massachusetts False Claims Act, MASS. GEN. LAWS ch.12, § 5(B), the Minnesota False Claims Act, MINN. STAT. § 15C.02(a), the Montana False Claims Act, MONT. CODE. ANN. § 17-8-403, the Nevada False Claims Act, NEV. REV. STAT. § 357.040(1), the New Hampshire False Claims Act, N.H. REV. STAT. ANN. § 167:61-b, the New Jersey False Claims Act, N.J. STAT. ANN. **§** 2A:32C-3, the North Carolina False Claims Act, N.C. STAT. ART. 51, § 1-

44

607(a), the Rhode Island False Claims Act, R.I. GEN LAWS§ 9-1.1-1, the Virginia

Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3, the Wisconsin False

Claims for Medical Assistance Act, WISC. STAT. § 20.931(2).

b.  That this Court enter judgment against SuperValu, Inc. and its subsidiaries,

affiliates, and related organizations for the maximum amount of damages

sustained by The United States and each State because of SuperValu's false or

fraudulent claims, plus the maximum civil penalty for each violation of the

Federal False Claims Act, 31 U.S.C. § 3729, California False Claims Act, CAL.

GOV'T. CODE § 12651(a), the California Insurance Code, Cal. Ins. Code 1871.7(b);

the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201, the

Illinois False Claims Act, 740 ILL. COMP. STAT. 175/3, Illinois Insurance Claims

Fraud Prevention Act, 740 ILCS 92/1, the Indiana False Claims and Whistleblower

Protection Act, IND. CODE § 5-11-5-2, the Maryland False Health Claims Act, MD

HEALTH CODE GEN. § 2-604, the Massachusetts False Claims Act, MASS. GEN.

LAWS ch.12, § 5(B), the Minnesota False Claims Act, MINN. STAT. § 15C.02(a), the

Montana False Claims Act, MONT. CODE. ANN. § 17-8-403, the Nevada False

Claims Act, NEV. REV. STAT. § 357.040(1), the New Hampshire False Claims Act,

N.H. REV. STAT. ANN. § 167:61-b, the New Jersey False Claims Act, N.J. STAT.

ANN. § 2A:32C-3, the North Carolina False Claims Act, N.C. STAT. ART. 51, § 1-

607(a), the Rhode Island False Claims Act, R.I. GEN LAWS§ 9-1.1-1, the Virginia

Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3, the Wisconsin False

Claims for Medical Assistance Act, WISC. STAT. § 20.931(2).

c.  That this Court enters judgment against SuperValu, Inc. and its subsidiaries, affiliates, and related organizations in an amount equal to three times the amount of damages the Government has sustained because of SuperValu's false or fraudulent claims, plus the maximum civil penalty for each violation of the various State false claims acts.

d.  That Relators be awarded the maximum amount allowed pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, California False Claims Act, CAL. GOV'T. CODE § 12651(a), the California Insurance Code, Cal. Ins. Code 1871.7(b), the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201, the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/3, Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1, the Indiana False Claims and Whistleblower Protection Act, IND. CODE § 5-11-5-2, the Maryland False Health Claims Act, MD HEALTH CODE GEN. § 2-604, the Massachusetts False Claims Act, MASS. GEN. LAWS ch.12, § 5(B), the Minnesota False Claims Act, MINN. STAT. § 15C.02(a), the Montana False Claims Act, MONT. CODE. ANN. § 17-8-403, the Nevada False Claims Act, NEV. REV. STAT. § 357.040(1), the New Hampshire False Claims Act, N.H. REV. STAT. ANN. § 167:61-b, the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-3, the North Carolina False Claims Act, N.C. STAT. ART. 51, § 1-607(a), the Rhode Island False Claims Act, R.I. GEN LAWS § 9-1.1-1, the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3, the Wisconsin False Claims for Medical Assistance Act, WISC. STAT. § 20.931(2), and all relief to which they are entitled pursuant to said laws.

e.   That Relators be awarded all costs of this action, including expert witness fees,

attorneys' fees, and court costs.

f.   That Relators recover such other relief as the Court deems just and proper.

Respectfully Submitted,

_____/s/ Timothy Keller_____
Timothy Keller,
IL Bar No. 6225309
ASCHEMANN KELLER LLC
300 North Monroe Street
Marion, Illinois 62959-2326
Telephone:  (618) 998-9988
Facsimile:  (618) 993-2565
E-Mail:  tkeller@quitamlaw.org

Glenn Grossenbacher
Texas Bar No. 08541100
Law Office of Glenn Grossenbacher
24165 IH-10 W., Ste 217-766
San Antonio, Texas  78257-1160
Tel. 210.271.3888
E-Mail:  gglaw@satx.rr.com

JOHN E. CLARK
Texas Bar No. 04287000
Goode Casseb Jones Riklin Choate & Watson
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
Telephone: (210) 733-6030
Facsimile: (210) 733-0330
E-Mail: Clark@goodelaw.com

Gary M. Grossenbacher
Texas Bar No. 24008972
Attorney at Law
8114 Talbot Lane
Austin, Texas 78746
Telephone: (512) 699-5436
E-Mail:  gmgtex@austin.rr.com

*Attorneys for Relators,*
*Tracy Schutte and Michael Yarberry*

47