E-FILED
Monday, 30 November, 2015  03:47:21 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, and THE STATES OF CALIFORNIA, DELAWARE, ILLINOIS, INDIANA, MASSACHUSETTS, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NORTH CAROLINA, RHODE ISLAND, and VIRGINIA *ex rel*. TRACY SCHUTTE and MICHAEL YARBERRY, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No.  11-cv-03290 |
| v. | ) ) ) | |
| SUPERVALU, INC., SUPERVALU HOLDINGS, INC., FF ACQUISITIONS, LLC, FOODARAMA, LLC, SHOPPERS FOOD WAREHOUSE CORP., SUPERVALU PHARMACIES, INC., ALBERTSON'S, LLC, JEWEL OSCO SOUTHWEST LLC, NEW ALBERTSON'S, INC., AMERICAN DRUG STORES, LLC, ACME MARKETS, INC., SHAW'S SUPERMARKET, INC., STAR MARKET COMPANY, INC., JEWEL FOOD STORES, INC., and AB ACQUISITION LLC | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMAND |
| Defendants. | ) | |

### PLAINTIFFS' FIRST AMENDED COMPLAINT WITH JURY DEMAND PURSUANT TO FEDERAL AND STATE FALSE CLAIMS ACTS

Tracy Schutte and Michael Yarberry ("Relators") file this First Amended Complaint on

behalf of the United States and the States of California, Delaware, Illinois, Indiana,

Massachusetts, Minnesota, Montana, Nevada, New Jersey, North Carolina, Rhode Island, and,

Virginia (collectively referenced as "States" or "Plaintiff States"), against Defendants Supervalu,

Inc., Supervalu Holdings, Inc., FF Acquisitions, LLC, Foodarama, LLC, Shoppers Food

Warehouse Corp., Supervalu Pharmacies, Inc., Albertson's, LLC, Jewel Osco Southwest LLC, New Albertson's, Inc., American Drug Stores, LLC, Acme Markets, Inc., Shaw's Supermarket, Inc., Star Market Company, Inc., Jewel Food Stores, Inc., AB Acquisitions LLC and their subsidiaries, affiliates, and related organizations, including but not limited to SuperValu, Albertsons, Acme Sav-On Pharmacy, Albertsons Osco Pharmacy, Albertsons Sav-On Pharmacy, Bigg's Pharmacy, Cub Pharmacy, Farm Fresh Pharmacy, Jewel Pharmacy, Jewel-Osco Pharmacy, Save-A-Lot, Shaw's Osco Pharmacy, Scott's Pharmacy, Shop N' Save Pharmacy, Shop N' Save Osco Pharmacy, Shoppers Pharmacy, and Star Osco Pharmacy (hereinafter collectively referred to as "Defendants") and allege the following:

## I.  **INTRODUCTION**

1.      This is an action for damages and civil penalties on behalf of the United States of America and the States (collectively referenced as the "Plaintiffs"), through the Relators, arising from the Defendants' violations of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., as amended, and analogous false claims acts and health care fraud remedial statutes of the Plaintiff States as referenced below.

2.      Relators also seek to recover on behalf of the twelve Plaintiff States which have enacted a false claims act or similar health care fraud remedial statute analogous to the federal False Claims Act, imposing liability upon violators for defined conduct in the nature of fraud, such as the submission of false claims, the use of false records and documents, and the failure to disclose material information, in presenting claims to that sovereign's Medicaid program.  The conduct of Defendants alleged in this complaint violated those statutes, as well as the federal False Claims Act. The pertinent statutes of the Plaintiff States upon which Relators seek to recover are as follows:

a.  California False Claims Act, CAL. GOV'T. CODE § 12650, et seq.;

b.  Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201 et seq.;

c.  Illinois False Claims Act, 740 ILL. COMP. STAT. 175/1, et seq.

d.  Indiana False Claims and Whistleblower Protection Act, IC §5-11-5.5;

e.  Massachusetts False Claims Act, M.G.L.A. Chap. 12, §5A, et seq.;

f.  Minnesota False Claims Act, MINN. STAT. § 15C.01, et seq.;

g.  Montana False Claims Act, MONT. CODE. ANN. § 17-8-401, et seq.

h.  Nevada False Claims Act, NEV. REV. STAT. § 357.010, et seq.

i.  New Jersey False Claims Act, §2A:32C-1, et seq.;

j.  North Carolina False Claims Act, N.C. STAT. ART. 51 §§1-605 et seq.;

k.  Rhode Island False Claims Act, R.I. GEN LAWS§ 9-1.1-1, et seq.

l.  Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.1, et seq.;

3.      Defendants also conduct or have conducted business in the states of Idaho, Iowa, Maine, Maryland, Missouri, New Hampshire, Oregon, Pennsylvania, Utah, Vermont, Washington, and Wyoming and submit false claims to the Medicaid programs of those respective states or areas through the use of false records and documents, and by failing to disclose material information in presenting their claims.  Relators do not seek to recover under an enacted false claims act or similar health care fraud remedial statute for these states, but because Medicaid is a program jointly funded by the United States and each state, each false claim submitted by the Defendants in each of those states is a false claim against the United States for the federal share of the claimed amount, in violation of the False Claims Act, 31 U.S.C. § 3729, et seq.

4.      Defendants' unlawful acts in violation of the federal and state FCAs, as alleged below, concern their submission of false claims to federal and state health care programs for prescription drugs furnished to program beneficiaries, and their use of materially false records and statements in support of those false claims.  More specifically, Defendants have knowingly submitted fraudulent, inflated pricing information to government health care programs on tens of thousands of prescription drug reimbursement claims, for the purpose of unlawfully obtaining reimbursement payments higher than those authorized by law.

## II.  PARTIES

**A.  Defendant**

5.      SuperValu, Inc. operates or controls or has operated and controlled at various relevant time periods many different branded pharmacies, both individually and through its subsidiaries, affiliates, and related organizations, including but not limited to, SuperValu, SuperValu Pharmacies, Albertsons, Acme Sav-On Pharmacy, Albertsons Osco Pharmacy, Albertsons Sav-On Pharmacy, Bigg's Pharmacy, Cub Pharmacy, Farm Fresh Pharmacy, Jewel Pharmacy, Jewel-Osco Pharmacy, Lucky Pharmacy, Mays Pharmacy, Save-A-Lot, Shaw's Osco Pharmacy, Shop N' Save Pharmacy, Shop N' Save Osco Pharmacy, Shoppers Pharmacy, Scott's Pharmacies, Star Osco Pharmacy, and Osco Drug.

6.      SuperValu, Inc. is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota that operates or controls or has operated and controlled at various relevant time periods approximately 2,500 retail grocery locations and over 800 pharmacies in twenty-five (25) states within the United States, which include:

    a.   California

    b.   Delaware

c.  Idaho

d.  Illinois

e.  Indiana

f.  Iowa

g.  Maine

h.  Maryland

i.  Massachusetts

j.  Minnesota

k.   Missouri

l.  Montana

m.  Nevada

n.  New Hampshire

o.  New Jersey

p.  North Carolina

q.  Oregon

r.  Pennsylvania

s.  Rhode Island

t.  Utah

u.  Vermont

v.  Virginia

w.  Washington

x.  Wisconsin

y.  Wyoming

7.      SuperValu Holdings, Inc., is a Missouri corporation with its principal place of business in Eden Prairie, Minnesota, wholly owned by Supervalu, that operates or controls or has operated and controlled at various relevant time periods, Shop 'N Save branded pharmacies in Missouri, and Cub Foods pharmacies in Illinois.

8.      FF Acquisitions, LLC, is a Virginia limited liability company with its principal place of business in Virginia Beach, Virginia wholly owned by Supervalu that operates or controls or has operated and controlled at various relevant time periods, Farm Fresh branded pharmacies in North Carolina, Virginia, and North Dakota.

9.      Foodarama LLC, is a Delaware limited liability company with its principal place of business in Baltimore, Maryland wholly owned by Supervalu, that operates or controls or has operated and controlled at various relevant time periods, Shoppers branded pharmacies in Virginia and Maryland.

10.      Shoppers Food Warehouse Corp., is a Ohio corporation with its principal place of business in Lanham, Maryland wholly owned by Supervalu, that operates or controls or has operated and controlled at various relevant time periods, Shoppers pharmacies in Virginia and Maryland.

11.      SuperValu Pharmacies, Inc., is a Minnesota corporation with its principal place of business in Eden Prairie, Minnesota wholly owned by Supervalu, that operates or controls or has operated and controlled at various relevant time periods numerous pharmacies in seven (7) states within the United States, which include:

     a.   Illinois

     b.   Indiana

     c.   Kentucky

    d. Minnesota

    e. Missouri

    f. Ohio

    g. Wisconsin

  12. Supervalu Pharmacies, Inc., operates or controls or has operated and controlled at various relevant time periods, many different branded pharmacies, including but not limited to, Bigg's Pharmacy, Cub pharmacy, Osco Pharmacy, Scott's Pharmacy, and Shop 'N Save pharmacy.

  13. Albertson's, LLC, is a Delaware limited liability company with its principal place of business in Boise, Idaho that operates or controls or has operated and controlled at various relevant time periods approximately 2,200 retail locations and over 600 pharmacies in sixteen (16) states within the United States, which include:

    a. California

    b. Idaho

    c. Montana

    d. Nevada

    e. Oregon

    f. Utah

    g. Washington

    h. Wisconsin

    i. Wyoming

  14. Albertson's LLC, operates or controls or has operated and controlled at various relevant time periods, Jewel-Osco, Albertson's Sav-On, Osco and Sav-On branded pharmacies.

15.     Jewel Osco Southwest LLC, is an Illinois limited liability company with its principal place of business in Boise, Idaho, that operates or controls or has operated and controlled at various relevant time periods, Jewel Osco stores in Illinois.

16.     New Albertson's, Inc., is an Ohio corporation with its principal place of business in Boise, Idaho.

17.     New Albertson's, Inc., operates or controls or has operated and controlled at various relevant time periods approximately 2,200 retail locations and over 600 pharmacies in sixteen (16) states within the United States, which include:

       a.  Delaware

       b.  Illinois

       c.  Indiana

       d.  Iowa

       e.  Maine

       f.  Maryland

       g.  Massachusetts

       h.  New Hampshire

       i.  New Jersey

       j.  Pennsylvania

       k.  Rhode Island

       l.  Vermont

       m.  Wisconsin

18.     New Albertson's, Inc., operates or controls or has operated and controlled at various relevant time periods many different branded pharmacies, both individually and through

its subsidiaries, affiliates, and related organizations, including but not limited to, Albertson's Sav-On, Jewel-Osco, Acme Sav-On, Shaws, Osco Drug, Star Markets, Osco and Sav-On in-store pharmacies.

19.    American Drug Stores, LLC, is a Delaware corporation with its principal place of business in Wilmington, Delaware, that operates or controls or has operated and controlled at various relevant time periods, Osco Drug branded pharmacies in Iowa, Illinois, and Indiana.

20.    Acme Markets, Inc., is a Delaware corporation with its principal place of business in Malvern, Pennsylvania, that operates or controls or has operated and controlled at various relevant time periods, Acme Sav-On branded pharmacies in New Jersey, Maryland, Delaware, Pennsylvania.

21.    Shaw's Supermarket, Inc., is a Massachusetts corporation with its principal place of business in Itasca, Illinois, wholly owned by Supervalu, that operates or controls or has operated and controlled at various relevant time periods, Shaw Osco branded pharmacies in Massachusetts, Maine, New Hampshire, Rhode Island, and Vermont.

22.    Star Market Company, Inc., is a Massachusetts corporation with its principal place of business in Itasca, Illinois wholly owned by Supervalu, that operates or controls or has operated and controlled at various relevant time periods, Star Osco branded pharmacies in Massachusetts.

23.    Jewel Food Stores, Inc., is an Ohio corporation with its principal place of business in Itasca, Illinois, that operates or controls or has operated and controlled at various relevant time periods, Jewel Food Store with Osco branded pharmacies in Iowa, Illinois and Indiana.

24.    AB Acquisition LLC is a Delaware limited liability company with its principal place of business in Boise, Idaho ("AB").  On March 21, 2013 Supervalu sold New Albertson's,

Inc. to AB in a stock sale through which AB acquired certain SuperValu pharmacies that are the subject of this action.

25.     All of Defendants' pharmacies are integrated into a shared centralized ARx pharmacy transaction software information system, which enables their customers to fill or refill prescriptions in any of their stores throughout the country under common SuperValu billing policies and procedures.

26.     Defendants' pharmacies are managed and controlled by Supervalu, which directs all billing policies and practices, marketing, and price matching as illustrated by corporate instructions disseminated to "All Supervalu Pharmacists" regarding price matching procedures.

**B.  Relators**

27.     Relator Schutte is a citizen of the United States and a resident of the State of Missouri.  Relator Schutte graduated from St. Louis College of Pharmacy in 1992 and has worked as a pharmacist since June of 1992.

28.     Relator Schutte has worked as a pharmacist for Wal-Mart from June of 1992 through the present.

29.     Relator Schutte worked as a pharmacist for SuperValu for a short period of time beginning in April of 2011.  As a former pharmacist for SuperValu, Relator Schutte has direct, personal, and independent knowledge of the facts underlying the allegations of this Complaint.

30.     Relator Michael Yarberry is a citizen of the United States and a resident of the State of Kentucky.  Relator Yarberry graduated from St. Louis College of Pharmacy in 1992 and has subsequently worked as a pharmacist in the retail pharmacy industry since 1992.  Relator has knowledge of, and experience in, the retail pharmacy industry gained from his many years working as a pharmacist.

### III. JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3730 (b).  This court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a).  This court also has supplemental jurisdiction over the state law claims under 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367.

32.     Venue in this Judicial District is appropriate under 31 U.S.C. § 3732(a) because at least one of the Defendants transacts business in this Judicial District.

33.     Relators believe there has been no public disclosure of the allegations and transactions on which this action is based; but should the question arise, and should the court determine otherwise, the Relators are original sources of the information on which the allegations in this complaint are based, as defined in 31 U.S.C. §3730(e)(4)(B).

34.     To the extent, if any, that this case is deemed to be a related action and that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* FCA action pending at the time of filing of this action, as prohibited in 31 U.S.C. § 3730(b)(5), said factual allegations in common with either pending action, which would cause this to be a related cause of action, are hereby expressly excluded from this action, but only to the limited extent necessary to exclude such preemption.

35.     Furthermore, to the extent that the court finds that the allegations or transactions set forth herein are based upon allegations or transactions which are the subject of a federal civil suit or an administrative civil money penalty proceeding in which the United States is already a party, if any such proceedings exist, and the Government does not oppose the dismissal, then the allegations or transactions referred to herein that the court deems are based upon allegations or transactions which are the subject of any such civil suit or administrative civil money penalty proceeding are

expressly excluded, but only for the specific time periods, specific companies, and specific allegations or transactions as necessary and only for those allegations for which the Court determines Relators are not original sources.

## IV. GENERAL BACKGROUND INFORMATION CONCERNING GOVERNMENT-FUNDED PRESCRIPTION DRUG BENEFITS

36.     Federal and state government health care programs ("GHP" in the singular form and "GHPs" in the plural form), including Medicare, Medicaid, TRICARE (including "CHAMPUS," the Civilian Health and Medical Program of the Uniformed Services), and the Federal Employees Health Benefits Program ("FEHBP"), among others, offer pharmaceutical benefits to their respective beneficiaries. These programs do not buy drugs; instead, they reimburse providers who dispense covered drugs to program beneficiaries.

### A.        Overview of GHP Prescription Drug Reimbursement Methodologies

37.     Many GHPs that reimburse providers such as Defendants for prescriptions dispensed to program beneficiaries pay an amount for each covered drug that is limited to the *lesser of*:

   a.   the pharmacy provider's **usual and customary ("U&C")** price or charge; or

   b.   one or more **alternative price types ("APT" in the singular, and "APTs" in the plural, form)**.

38.     Common GHP U&C price/charge definitions are as follows:

   a.   the cash price including all applicable customer discounts, coupons or sale price which a cash paying customer would pay at the pharmacy;

   b.   the lowest price the provider would charge the patient if the patient were paying cash, including any applicable discounts offered to attract patients;

   c.   the price charged in a cash transaction, including any discounts and promotions; and

    d.   the U&C charges to the "general public," where "general public" is defined, particularly by different State Medicaid programs, in a variety of ways, including the cash price to the general public and including discounts offered to customers at the point of sale.

39.    Examples of APTs included in GHP reimbursement methodologies, which are used as the basis for reimbursement when an APT is lower than the pharmacy's reported U&C price, are as follows:

    a.   <u>Estimated Acquisition Cost ("EAC"), plus Dispensing Fee</u>.  EAC is a State Medicaid agency's estimate, calculated according to the agency's established rules and regulations, of the price generally and currently paid by providers, *e.g.*, pharmacies, for a drug marketed or sold by a particular manufacturer or labeler;

    b.   <u>Federal Upper Limit ("FUL"), plus Dispensing Fee</u>. Federal Medicaid regulations establish an upper limit on the amount State Medicaid programs may pay for certain multiple-source drugs, that is, a brand name drug available in generic form or under a different brand name; or

    c.   <u>Maximum Allowable Cost ("MAC"), plus Dispensing Fee</u>.  State Medicaid agencies also had and have the discretion to establish State upper limits on drugs.

40.    APTs consist of two components.  The first component such as EAC, MAC, or FUL, is intended to reimburse the pharmacy for the ingredient cost of a drug.  The second component, the dispensing fee, is intended to reimburse the pharmacy for pharmacy operation costs, including, but not limited to, costs associated with a pharmacist's time in checking the computer for information about an individual's coverage, performing drug utilization review and preferred drug list review activities, measuring or mixing the covered outpatient drug, filling the container, counseling the beneficiary, and physically providing the completed prescription to the Medicaid beneficiary, as well as costs of delivery and special packaging, and overhead costs associated with maintaining the facility and equipment necessary to operate the pharmacy.

41.     With respect to GHPs with reimbursement methodologies that provide for the payment of the lesser of U&C price or an APT, the GHP compares the provider's submitted U&C price with no dispensing fee against the APTs, each APT consisting of both the ingredient cost and a dispensing fee and reimburses the provider the lessor of the provider's U&C or APT.

42.     When a pharmacy submits a prescription drug claim to a GHP that has a reimbursement methodology which provides for the payment of the lesser of U&C price or an APT, the pharmacy has a legal duty to accurately determine and report its U&C price for the drug, based on the particular GHP's U&C price definition.  Truthful determination and reporting of the U&C price is a material component of the GHP's payment calculation in these circumstances.

### B.  Specific GHP Prescription Drug Methodologies Illustrating the Established, Well-Known Understanding and Application of U&C Price

#### 1.  Medicaid

43.     Medicaid is a joint and voluntary program between the federal government and the states, whereby lower-income, disabled and elderly individuals are offered basic healthcare coverage, including prescription drug benefits.

44.     The Federal government pays a share of the medical assistance expenditures under each state's Medicaid program.  That share, known as the Federal Medical Assistance Percentage ("FMAP") or the Federal Financial Participation ("FFP"), is determined annually by a formula that compares the State's average per capita income level with the national income average.  States with a higher per capita income level are reimbursed a smaller share of their costs. By law, the FMAP cannot be lower than 50 percent or higher than 83 percent.

45.     Since at least 1976, the Medicaid rules have divided reimbursable drugs into two categories; i) multiple source drugs subject to a FUL, and ii) other drugs.  Multiple source drugs

have been subjected to a FUL when there are multiple equivalent drugs and suppliers. "Other drugs" include single-source drugs, certified brand drugs (which requires the physician to certify the medical necessity for use of brand name drugs), and drugs other than multiple source drugs for which a FUL has not been established.

46.     During the same time period, Medicaid rules have provided that State agency payments for other drugs must not exceed, in the aggregate, payment levels the agency has determined by applying the lower of the following costs and charges:

      a.     EAC plus a reasonable dispensing fee established by the agency; or

      b.     The provider's usual and customary charges to the general public.

47.     The FUL is just that, an upper limit, and the State agency will pay the EAC plus a dispensing fee or the U&C price of a multi-source drug, if it is lower than the FUL.

48.     Accordingly, the Medicaid reimbursement methodology for all covered drugs can be summarized to provide for the payment of the lesser of the following costs, charges, or limits:

      a.     The provider's usual and customary charge to the general public;

      b.     EAC plus a reasonable dispensing fee established by the State agency;

      c.     State MAC, if any, plus a reasonable dispensing fee; or

      d.     FUL, if any, plus a reasonable dispensing fee.

49.     Individual State Medicaid programs define U&C charge to the general public in a variety of ways, including, for example, the cash price to the general public, including any applicable discounts offered to attract patients; the average charge to all other customers; the lowest price routinely offered to any segment of the general public; the charges on all non-Medicaid prescriptions; charges to the patient group accounting for the largest number of non-Medicaid prescriptions from the individual pharmacy, excluding patients who purchase through a

third party payer; the provider's usual and customary charge, undefined; and charges to the general public, undefined.  In all cases, pharmacy providers have a legal material duty to accurately determine and report their true U&C prices according to the applicable Medicaid reimbursement methodology when submitting claims to a particular Medicaid program for payment.

### 2.  TRICARE

50.    TRICARE is the managed health care program established by the Department of Defense ("DoD") for active duty service members, active duty family members, retired service members and families, and certain other eligible beneficiaries.

51.    Since June 1, 2004 to the present, Pharmacy Benefit Manager ("PBM") Express Scripts has operated the TriCare Retail Pharmacy contract for all TRICARE beneficiaries located in the 50 States, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and Guam, except for beneficiaries enrolled in one particular plan which is not material to this action.

52.    Pursuant to the 2005 Express-Scripts pharmacy manual, Express Scripts' TRICARE reimbursement methodology was based on the lower of:

a.    Average Wholesale Price ("AWP") less the contracted discount baseline price (as calculated by First DataBank[1]), less the contracted discount for the specific network; or,

b.    MAC or submitted cost plus the contracted dispensing fee for that network, or U&C, whichever is lowest.

53.    The 2005 Express-Scripts pharmacy manual defined "Usual and Customary Retail Price (U&C)" as "[t]he usual and customary retail price of a Covered Medication in a <u>cash</u>

---

[1] First Data Bank ("FDB") provides integrated drug database products and is one of several commercial drug pricing compendia which compile and publish benchmark prices suggested by drug manufacturers for their products.

transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the

date that it is dispensed, including any discounts or special promotions offered on such date."

(Emphasis added).

54. Pursuant to the 2013 Express-Scripts pharmacy manual, Express Scripts' TRICARE

reimbursement is based on the following methodologies:

a. For **Single-Source Brand** Drugs, reimbursement is the lesser of:
   i. AWP ingredient cost minus contracted brand discount plus contracted brand dispensing fee for the applicable network; OR
   ii. Network Provider submitted brand ingredient cost plus contracted brand dispensing fee; OR
   iii. Usual and Customary Retail Price; OR
   iv. If applicable, specific Sponsor reimbursement; OR
   v. State Fee Schedule *(e.g.,* Workers' Compensation)

b. For **Generic Drugs or Multi-Source Brand Drugs**, reimbursement is the lesser of:
   i. AWP Generic Drugs or Multi-Source Brand Drugs ingredient cost minus contracted Generic Drug discount plus contracted Generic Drug dispensing fee for the applicable network; OR
   ii. MAC discount plus contracted Generic Drug dispensing fee for applicable network; OR
   iii. Network Provider-submitted ingredient cost plus contracted Generic Drug dispensing fee for applicable network; OR
   iv. Usual and Customary Retail Price; OR
   v. If applicable, special Sponsor reimbursement logic; OR
   vi. State Fee Schedule *(e.g.,* Workers' Compensation).

55. The 2013 Express-Scripts pharmacy manual defines "Usual and Customary Retail

Price (U&C)" as follows:

> To the extent no [sic] defined in the Provider Agreement, Usual and Customary Retail Price means the usual and customary retail price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, inclusive of 'loss leaders', frequent shopper or special customer discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in

> the price offered to that Member and offered by the Network
> Provider (or any of its Pharmacies) on such date.  Additionally, the
> Usual and Customary Retail Price must include any applicable
> discounts offered to attract customers including Members.

(Emphasis added).

### 3.  FEHBP

56.    The Federal Employees Health Benefits Program ("FEHBP") offers comprehensive group health insurance to federal employees, retirees and their eligible family members through a wide variety of qualified carriers and plans approved by the U.S. Office of Personnel Management ("OPM").

57.    Since at least 2006, FEHBP plans have been PBM Caremark's largest customers (the reference to "Caremark" includes its successor "CVS/Caremark").  The majority of FEHBP claims are processed by Caremark.

58.    Pursuant to the Caremark 2007 and 2009 manuals, FEHBP prescription drugs provided to its members have been reimbursed at the lower of:

    a.    Price Type plus or minus the applicable percentage of the Price Type, plus the applicable Dispensing Fee, less the applicable Patient Pay Amount (or if applicable Price Type is unavailable for a given drug, Caremark will pay Provider based upon AWP minus the applicable AWP Discount, plus the applicable Dispensing Fee, minus the applicable Patient Pay Amount);

    b.    MAC plus the applicable Dispensing Fee, less the applicable Patient Pay Amount;

    c.    Ingredient cost submitted by Provider, plus the applicable Dispensing Fee, less the applicable Patient Pay Amount; or,

    d.    Provider's U&C price less the applicable Patient Pay Amount.

59.    The 2007 and 2009 manuals define "Usual and Customary Price or U&C" as "the lowest price Provider would charge a particular patient if such patient were paying <u>cash</u> for an

identical prescription on that particular day at that particular location.  <u>This price must include any</u> <u>applicable discounts offered</u> to attract patients." (Emphasis added).

       **4.**      **Medicare Part D Voluntary Prescription Drug Benefit Program**

60.     The voluntary prescription drug benefit program for Medicare enrollees/beneficiaries is known as Medicare Part D ("Part D").  Part D was enacted into law on December 8, 2003 and became available to beneficiaries beginning on January 1, 2006.

61.     Unlike Medicaid, TRICARE and FEHBP, coverage for the Part D drug benefit is provided under private prescription drug plans ("PDP" in the singular, and "PDPs" in the plural, form).  Medicare contracts with private entities, known as PDP "sponsors," to administer prescription drug plans. PDP sponsors do not necessarily utilize the lesser of U&C or APT reimbursement methodology previously discussed, but the substance of the Part D benefit design reimbursement methodology is the same.

62.     CMS regulations require that PDP sponsors provide beneficiaries with access to the PDP sponsors' "Negotiated Prices" for covered Part D drugs as part of their qualified prescription drug coverage. Medicare Prescription Drug Benefit Manual (Benefits and Beneficiary Protections) Ch. 5., Sec. 20.6 (Negotiated Prices).

63.     Negotiated Prices are prices for covered Part D drugs that: (1) the Part D sponsor (or other intermediary contracting organization) and the network dispensing pharmacy or other network dispensing provider have negotiated as the amount such network entity will receive, in total, for a particular drug; (2) are reduced by those discounts, direct or indirect subsidies, rebates, other price concessions, and direct or indirect remuneration that the Part D sponsor has elected to pass through to Part D enrollees at the point of sale; and (3) includes any dispensing fees.  42 CFR § 423.100.

64.     Access to Negotiated Prices must be provided to Medicare beneficiaries even when

no benefits are otherwise payable on behalf of a beneficiary due to the application of a deductible or other cost-sharing.

65.     Under Part D PDP sponsor plans, if a pharmacy provider's U&C price for a specific drug is less than a PDP sponsor's Negotiated Price, the PDP Plan considers the discounted U&C price to take the place of the Negotiated Price. By way of example, assume the Negotiated Price of a drug is $10 with a beneficiary co-pay of 25%. If the pharmacy provider offers the same drug for $4, the PDP sponsor considers the $4 to take the place of the $10 Negotiated Price. The PDP sponsor will adjudicate the claim for $4 and the beneficiary will pay only a $1 co-pay rather than a $2.50 co-pay.  Consequently, Medicare, the PDP and the beneficiary benefit from the pharmacy provider's discounted U&C price under the Medicare Negotiated Price regulations.

66.     A failure to offer Medicare beneficiaries Negotiated Prices is a violation of CMS Part D regulations and occurs when a pharmacy provider charges a beneficiary the wrong amount, such as failing to offer Medicare beneficiaries available discounts or price concessions at the point of sale.

67.     When a pharmacy provider - such as one of Defendants' pharmacies - dispenses drugs to a Medicare beneficiary, the pharmacy submits an electronic claim to the beneficiary's PDP sponsor or PBM and receives reimbursement from the PDP sponsor or PBM for costs not paid by the beneficiary (co-payment).

68.     CMS payments to PDP sponsors are conditioned on the provision of information to CMS that is necessary for CMS to administer the Part D program.  The PDP sponsor must submit a summary record called the prescription drug event (PDE) to CMS. The PDE record includes data elements about the drug dispensed, the prescription and information about the payment to the pharmacy.

69.     Throughout the year, CMS makes prospective payments to PDP sponsors for three subsidies based on the sponsors' approved bids: (1) the direct subsidy designed to cover the sponsors' costs of providing the benefits; (2) the low-income cost-sharing subsidy; and (3) the reinsurance subsidy.

70.     CMS uses submitted PDE data to reconcile monthly subsidy payments made to PDP sponsors with actual program cost data.

71.     After the close of the plan year, CMS is responsible for reconciling the prospective payments to the PDP sponsors' actual allowable costs to calculate final payments and risk sharing amounts.

72.     PDP sponsors who fail to submit accurate claims-level information contained in the PDE to CMS risk having to return monthly payments to CMS during reconciliation.

73.     The current Part D benefit infrastructure however, does not provide CMS real time access to Part D point-of-sale and plan data to determine: i) whether PDE records submitted by PDP sponsors are accurate; or ii) whether pharmacy provider claims were adjudicated in accordance with the PDP sponsors' plan design, including whether the beneficiary was offered the benefit of an available discount to the general public at the point of sale.  So CMS may not detect inaccurate PDE records or instances where sponsors are adjudicating claims inaccurately, and in particular here, whether the provider offered and adjudicated the claim considering the provider's U&C discount price.  CMS is dependent on PDP sponsors and their pharmacy providers to adjudicate claims accurately according to PDP sponsors' plan designs and to provide CMS accurate and valid PDE data.

74.     Defendants, as subcontractor providers for PDP sponsors, are required to comply with all applicable federal laws, regulations and CMS instructions, which includes the obligation to

21

offer Medicare beneficiaries available discounts or price concessions to Negotiated Prices at the point of sale. Moreover, PDP sponsors are obligated by federal regulation to certify the accuracy, completeness and truthfulness of all data related to payment:

> (1) ***General Rule***. As a condition for receiving a monthly payment ... the Part D plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on best knowledge, information and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies.
> ...
> (3) ***Part D Sponsor Certification of Claims Data***: The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (Based on best knowledge, information and belief) that the claims data it submits under § 423.329(b)(3) (or for fallback entities, under § 423.871(f)) are accurate, complete and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement.

42 C.F.R. § 423.505(k)(1) & (3).

75.     The "Certification of data that determines payments" provision of the applicable regulation further provides that "[i]f the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k)(3).

76.     By failing to offer Medicare beneficiaries Negotiated Prices reflecting point of sale discounts and price concessions, Defendants submitted false requests for payment to PDP sponsors with inflated Negotiated Prices.  Accordingly, Defendants knowingly caused the PDP sponsors to submit false and fraudulent claims for payment to CMS.  That the PDP sponsors filed the claims with CMS is irrelevant because liability attaches to any person who "causes to be

presented" a false or fraudulent claim. The Defendants knowingly "caused the claim" to be presented by the PDP sponsors who then sought payment from the government and falsely certified the accuracy of the information.

**V.   Historical Perspective of Prescription Drug U&C Pricing and The Emergence of Pharmacy Discount Drug Programs**

77.    Historically, as today, GHP and private insurer drug reimbursement methodologies typically have provided for the payment of the lower of U&C price or one or more APTs.

78.    Retail pharmacies, in response, traditionally set U&C prices to cash patients at amounts far exceeding corresponding APT prices, in the absence of competitive pressures.  This is because the GHP and private insurer transactions generally outnumber sales to cash patients and, as a consequence, setting U&C prices below the highest available APTs would result in significant loss of revenue to a pharmacy.

79.    For these reasons, pharmacies were rarely reimbursed by GHPs and private insurers at the retail pharmacies' historically high, everyday U&C prices to cash patients.  Retail pharmacies were virtually always reimbursed at the lesser APT reimbursement formula rates.

80.    The historical U&C pricing model underwent a drastic, game-changing makeover when, beginning in approximately May 2006, closely following the implementation of Medicare Part D prescription drug coverage earlier that year, Kmart and Wal-Mart introduced and popularized the first discount generic drug programs.  Kmart initially offered 90-count supplies of some 300 generic maintenance drugs at commonly prescribed dosages for $10, $15 or $25, and 30 count supplies of select acute drugs for $5.  By the late fall of 2006, Wal-Mart had established a nationwide discount program that offered 30-count supplies of more than 300 drugs

for $4.  Before the end of the year, Kmart expanded its 30-count discount program to compete with Wal-Mart.

81.     By late 2006 or early 2007, many other pharmacy chains, including Kmart, Target and Kroger, had instituted competitive discount drug programs.  Most national pharmacy chains now offer a formulary of 30-count drug supplies for approximately $4 and 90-count supplies for approximately $10 or $15 or price match these programs.

82.     In addition, many pharmacy chains also offer across the board percentage or other discounts on non-formulary generics and select brand drugs.

83.     Instead of having their own formulary or discount program, some pharmacy chains such as Defendants', simply match Wal-Mart's or other competitors' discount prices, including their competitors' percentage discounts on non-formulary generics and discounts on select brand drugs.

84.     As a result of the emergence of these discount drug programs, hundreds of commonly prescribed drugs are now sold across the nation, every day, at deeply discounted prices counter to the historical U&C pricing model and materially below the Part D Negotiated Prices and APTs.

85.     On claims submitted to GHPs, depending on the particular GHP reimbursement methodology, a pharmacy is legally obligated to report its discount U&C prices and/or include the discounts in the calculation of its U&C and Negotiated Prices for purposes of reimbursement.

86.     Relator Schutte in his capacity as a Wal-Mart pharmacist has personal knowledge that Wal-Mart has and does properly report and account for its everyday discount prices as its U&C and Negotiated Prices to GHPs and their contractors and administrators, as applicable,

thereby according GHPs the benefit of the same discounted prices on generic and brand drugs

extended to the general public as intended by GHP reimbursement rules.

87.     This principle was clarified in an October 11, 2006 memorandum to all Part D

sponsors from the CMS Director of the Medicare Drug Benefit Group on the subject "Lower

Cash Price Policy" (October 2006 CMS Memo).  The memo confirmed that everyday, discount

prices are considered a pharmacy's Negotiated Prices under the Part D benefit design.  In this

respect the memo stated as follows:

> We note that in cases where a pharmacy offers a lower price to its patients
> throughout a benefit year, this would not constitute a 'lower cash price' situation
> that is the subject of this guidance. For example, Wal-Mart recently introduced a
> program offering a reduced price for certain generics to its patients. The low
> Wal-Mart price on these specific generic drugs is considered Wal-Mart's 'usual
> and customary' price, and is not considered a one-time 'lower cash' price. Part D
> sponsors consider this lower amount to be 'usual and customary' and will
> reimburse Wal-Mart on the basis of this price. To illustrate, suppose a Plan's
> usual negotiated price for a specific drug is $10 with a beneficiary co-pay of
> 25% for a generic drug. Suppose Wal-Mart offers the same generic drug
> throughout the benefit year for $4. The Plan considers the $4 to take the place of
> the $10 negotiated price. The $4 is not considered a lower cash price, because it
> is not a one-time special price. The Plan will adjudicate Wal-Mart's claim for $4
> and the beneficiary will pay only a $1 copay, rather than a $2.50 copay. This
> means that both the Plan and the beneficiary are benefitting from the Wal-Mart
> 'usual and customary' price, and the discounted Wal-Mart price of the drug is
> actually offered within the Plan's Part D benefit design. Therefore, the
> beneficiary can access this discount at any point in the benefit year, the claim
> will be adjudicated through the Plan's systems, and the beneficiary will not need
> to send documentation to the plan to have the lower cash price count toward the
> TrOOP.

88.     Express Scripts (TriCare) and CVS/Caremark (FEHBP) reimbursement manuals

also require providers to include such discounts in their calculations of U&C price for purposes

of reimbursement under those GHPs

89.     Some State Medicaid programs also issued guidance to providers affirming that

offered discounts under Wal-Mart styled discount programs were to be included in the provider's

calculation of their U&C, further clarifying that State Medicaid programs were to receive the same discounts offered to the general public.

## VI. DEFENDANTS' U&C PRICE FRAUD

### A. Summary Description of Unlawful Acts

90.     Since at least 2007, and continuing through the present, Defendants have knowingly and systematically defrauded GHPs by knowingly engaging in the pattern and practice of disregarding and/or concealing the everyday, discounted prices offered the general public through their price matching program when reporting and calculating their U&C and Negotiated Prices for purposes of reimbursement from GHPs.  As a consequence, Defendants have presented, and continue to present, false and fraudulent claims to GHPs at inflated U&C and Negotiated Prices to obtain larger amounts of reimbursement.  Defendants were reimbursed, and continue to be reimbursed by GHPs for certain pharmaceuticals at amounts that greatly exceed their discounted U&C and Negotiated Prices.

91.     Defendants' claims for payment to GHPs for discount drugs furnished to GHP beneficiaries were false because GHPs prescription drug reimbursement rules generally provide for the payment of the lesser of a provider's U&C price and one or more APTs or Negotiated Prices.  Defendants knowingly concealed and failed to report and utilize their true discount U&C prices on GHP claims, which were materially lower than APTs and Negotiated Prices, in order to obtain payments that were excessive under reimbursement rules.

92.     GHPs paid Defendants' false claims for generic and brand prescription drugs furnished to GHP beneficiaries based on the false set of facts, i.e., that Defendants' U&C prices were higher than other applicable APTs and Negotiated Prices; and GHPs would not have reimbursed such claims had they known the true state of facts.

93.     Defendants' fraudulent scheme has caused, and continues to cause, GHPs to pay Defendants significantly higher reimbursement amounts than Defendants were and are entitled to receive under federal and state laws and regulations for prescriptions filled for GHP beneficiaries.

94.     Defendants have submitted thousands of false claims for prescriptions Defendants filled for GHP beneficiaries through the shared centralized ARx pharmacy transaction software information system, based on the number of pharmacies Defendants operate, the number of drugs involved, the number of GHP prescription drug transactions at each pharmacy, and the covered time period, which began no later than 2007 and is ongoing through the present.

**B.      Defendants' Price Matching Discount Program**

**a.   Fraudulent Usual and Customary Price Matching Scheme**

95.     Beginning on a limited basis in the latter part of 2006 and occurring nationwide in early 2007 with the advent of competitor discount generic drug formularies and prices, Defendants reduced their every-day, U&C prices to the general public to the discount generic drug prices charged by its competitors by price matching.

96.     At the same time, on claims for payment Defendants submitted to GHPs for the same generic drugs it sold the general public at every-day discount prices, Defendants defrauded the GHPs in one or more the following respects:

> a.     knowingly and fraudulently failed to accurately report the actual, every-day discount U&C prices they charged the general public for the same drugs, and in instances where the computation of U&C prices under applicable GHP rules required it to take into account discount prices in calculating its U&C for purposes of reimbursement, knowingly made no effort to include the discount prices in its calculations of U&C prices; and

    b.    knowingly reported materially, and oftentimes grossly, inflated U&C prices for the same drugs they sold to the general public at deeply discounted prices.

97.    Defendants' knowing, fraudulent conduct misled and caused GHPs to pay thousands of false claims based on APTs and Negotiated Prices materially higher than Defendants' actual discount U&C prices, in contravention of government mandated reimbursement methodologies which dictate payment of the lessor of U&C prices or APTs/Negotiated Prices, and to the damage of financially-strained government programs. This allowed Defendants to maintain inflated revenue levels from GHPs and simultaneously compete for cash customers with discount prices not offered to GHPs. Defendants reaped egregiously excessive profits from GHPs and/or subsidized the general public's discount prices at the expense of GHPs to drive store traffic and profitability.

98.    In the absence of competitive pressures, pharmacies have an economic incentive to establish U&C prices higher than any health insurance APTs or Negotiated Prices, since GHP and private insurer reimbursement methodologies typically pay the lessor of U&C prices or APTs/Negotiated Prices. U&C prices below the highest APTs and Negotiated Prices result in a pharmacy's loss of available potential revenue. For this reason, the every-day, U&C prices pharmacies historically have charged the general public (which are largely uninsured cash customers) has been substantially higher than the prices charged to insured customers. This practice continues today for drugs that are not on a discount formulary or part of a discount price program.

99.    In September 2006, Wal-Mart launched a discount generic prescription drug program, which offered a 30-day supply of covered generic drugs for $4. The program was initially offered in the Tampa Bay, Florida market, but was expanded two months later in

November 2006 to all 3,800 Wal-Mart and affiliated Sam's Club and Neighborhood Market pharmacies nationwide in 49 states. Wal-Mart's initial 30-day supply formulary consisted of approximately 300 drugs at commonly prescribed dosages and was later expanded to include 90-day prescriptions for $10.

100.    Beginning on a limited basis in the latter part of 2006 and occurring nationwide in early 2007, Defendants implemented their "Price Matching" program to compete with the 30-day and 90-day supply, formulary-based, discount generic drug program offered by Wal-Mart and similar, existing and anticipated programs of other competitors.

101.    Defendants intentionally avoided creating their own proprietary discount drug formulary and instead, through the Price Matching program, offered to match the discount prices of drugs offered by their competitors.  The objective behind this program design was to enable Defendants to use discount drug pricing to compete for customer base and store traffic with the general public, and at the same time deny that their discount prices were U&C prices for purposes of GHP reimbursement.

102.    Defendants customarily sold the 30-day and 60-day supplies of drugs on their competitors' generic programs to cash and certain insured customers for $4.00 or less and sold 90-day supplies of drugs for $10 or less.

103.    As the pharmacy discount programs of its competitors evolved to include percentage discounts on higher priced generics and select brand drugs, Defendants' Price Matching program was likewise extended to meet the competition.

104.    The prices Defendants sold drugs to customers did not depend on an actual U&C price offered the general public or calculated according to the requirements of a particular GHP, but whether the customer was a cash customer or a customer utilizing insurance coverage

without a co-payment or insurance coverage with a co-payment higher or lower than the discount price.

105.    Pharmacy staff generally obtained insurance and co-payment information from the insurer or its benefits administrator when the staff member submitted a claim for adjudication between the time the customer dropped off and picked up the prescription. Co-payments depend on the particular benefits offered by the particular GHP.  Some Medicaid programs do not require any co-payments.

106.    Insurance information was obtained from a customer by pharmacy staff on the customer's initial pharmacy visit.  If the customer had insurance, the pharmacy staff member entered the customer's primary and any secondary payer information in the third party payer section of Defendants' shared centralized ARx pharmacy transaction software system, and on subsequent visits, the customer's designated, default primary payer coverage automatically would be applied, unless manually changed or unless a claim was reversed after submission to the insurer.  The ARx software system's programmed U&C prices were generally set at high enough levels to exceed the APTs and Negotiated Prices, and did not reflect the discounts offered the general public, so reimbursements were paid by insurance at the higher APT and Negotiated Price reimbursement rates.

107.    When a GHP beneficiary presented a prescription at a SuperValu pharmacy for a drug where the GHP beneficiary's co-payment out-of-pocket expense for a drug was <u>less</u> than its competitor's discounted price offered its customers, Defendants collected the co-payment and submitted to the GHP its inflated U&C list price.  As a result, GHPs were overcharged and defrauded into paying Defendants based on the higher APTs and Negotiated Prices instead of their discounted prices.

108.     Where the GHP beneficiary owed no co-payment or the co-payment out-of-pocket expense for a drug was <u>less</u> than its competitor's discounted price offered its customers, the GHP beneficiary was generally unaware of the overcharge.  However, had the GHP beneficiary been offered the discount price, it would have reduced the obligation for those GHP beneficiaries that owed a co-payment, as co-payments are often calculated as a percentage of the overall cost of the drug. In addition, had the GHP beneficiary been offered the discount price, it would have reduced the obligation of the GHP.  At most, GHPs should have paid the difference between the co-payment and the discount price, instead of, the difference between the co-payment and the APT/Negotiated Price.

109.     When a cash customer presented a prescription at one of Defendants' pharmacies for a drug on a competitor's discount formulary or subject to another type of discount, Defendants' pharmacy staff member matched the discount price and manually typed the discount price in the price override field of the Defendants' shared centralized ARx pharmacy transaction software system to override the inflated U&C list price programmed into the system, and filled the prescription at the discount price as a "cash transaction".  If the customer was uninsured, no payer information was entered into the system, and the initial and subsequent transactions were processed as cash transactions, unless the customer's uninsured status changed.  Since no insurance was involved, there was no claim to submit for adjudication to any Third Party Payer. On subsequent refills, the ARx system would alert the staff member to price-override the inflated U&C list price on each prescription-refill in connection with said prescription and the staff would substitute the discount price the customer paid for their initial prescription.

110.     When a GHP beneficiary presented a prescription at one of Defendants' pharmacies for a drug where the GHP beneficiary's copayment out-of-pocket expense for a drug

was <u>more</u> than the discount price offered to cash customers, the pharmacy staff member routinely manually overrode the inflated U&C list price and filled the prescription at the discount price as a "cash transaction." Customers that discovered they paid a copayment that exceeded a price match discount could become angry or could demand an override at the discount price. For this reason, pharmacy staff usually offered the customer the discount price if the copayment was higher than the discount price situation. There were two common scenarios:

    a.    If the pharmacy staff member was familiar with, and knew the discount price was less than the GHP copayment for the drug, the staff member treated the transaction as a cash claim bypassing the GHP beneficiary's insurance. The staff member would (i) select the price override tab, (ii) enter the competitor's discount price being matched, and (iii) manually type the discount price into the price override field of the ARx software.

    b.    If the pharmacy staff member was not familiar with the GHP copayment for the drug, the staff member would submit the claim to the GHP for payment, but upon notification of a copayment amount higher than the discount price the staff member would follow steps (i) and (ii) in the foregoing subparagraph, and the ARx system would automatically reverse the claim which had been submitted to the GHP insurance.  The claim would then be reprocessed as a cash claim bypassing the GHP beneficiary's insurance.

    111.    In these instances, where Defendants gave the GHP beneficiary the benefit of the cash discount by processing the claim as a cash transaction instead of through the beneficiary's GHP insurance, the GHP beneficiary was still harmed even though the beneficiary received the discount price. Because the claim was processed as a cash transaction and not through the GHP beneficiary's insurance, the beneficiary did not get credit for the claim for purposes of tracking the beneficiary's fulfillment of program milestones that may affect benefits such as the TrOOP (true out of pocket) costs as explained in the October 11, 2006 memorandum to all Part D sponsors from the CMS Director of the Medicare Drug Benefit Group on the subject "Lower

Cash Price Policy" (October 2006 CMS Memo).  Both the GHP and the GHP beneficiary should have received the benefit of the SuperValu discount prices on all transactions, and not be limited to those transactions where the GHP beneficiary's copayment exceeded the discount match price offered the general public. Moreover, by processing discounted prices to GHP beneficiaries with high copayments as "cash transactions" instead of processing the claims through GHP insurance, a GHP beneficiary's health is put at risk as cash transactions are not included in all required centralized patient databases allowing for Drug Utilization Reviews ("DUR"). 7

112.    In some instances where a GHP beneficiary's copayment was more than Defendants' discount price, Defendants nonetheless collected the higher copayment and also submitted a false claim for payment to the GHP at the inflated U&C list price. The falsely reported U&C list price misled the GHP to pay Defendants an additional amount above the copayment, which itself exceed the discount price. In this situation, both the GHP and GHP beneficiary were doubly defrauded and damaged. The beneficiary paid a copayment materially greater than the discount price, and the GHP paid an additional amount on top of the copayment.

113.    Under the rules of many GHPs, including Medicare Part D, many State Medicaid Programs, TRICARE and FEHBP plans, Defendants' price matching of their competitors' discount prices to cash customers established the discount prices as its U&C and/or Negotiated Prices for purposes of reimbursement.  This gives the GHP beneficiary and the GHP the benefit of the discount prices offered the general public.  Defendants committed fraud by routinely charging the government more than the general public for the same drugs.

### b.  Supporting Information/Internal E-mails and other communications

114.    On April 15, 2011, Relator Schutte completed a mandatory training session with Bob Atchison, the clinical coordinator for SuperValu's Shop N' Save district and managing

pharmacist at SuperValu's Arnold, Missouri Shop N' Save pharmacy.   During the training

session, Mr. Atchison instructed Relator Schutte regarding the following:

   a.   When customers call the pharmacy to obtain a price quote on generic
        pharmaceuticals, it is SuperValu's policy that the pharmacy staff member
        quote the discounted price (e.g. $4 or $10) if said pharmaceutical is listed
        on one of SuperValu's national competitors' generic pharmaceutical
        discount programs; and,

   b.   Once a customer has obtained a generic pharmaceutical for a discounted
        price, it is SuperValu's policy to utilize said discounted price for all refills
        associated with the original prescription.

   115.   On May 27, 2011, Relator Schutte sent an email, attached hereto as Exhibit B, to

SuperValu's Pharmacy Operations representative, Lindsay Reel, asking if, instead of reversing

transactions involving customers with third party insurance whose co-pay exceeds $4 and re-

running said transactions as cash for $4, he could submit the $4 SuperValu charges to cash

customers to third-party insurance carriers for certain generic pharmaceuticals.

   116.   On June 3, 2011, Ms. Reel called Relator Schutte in response to his email inquiry

and stated that SuperValu has established contracts with various pharmacy benefit managers

(PBMs) that prevent it from changing the amount SuperValu reports as its U&C price before a

claim is adjudicated.  Ms. Reel explained to Relator Schutte that, in order for SuperValu to

change the amount it reports as its U&C price to third-party insurance to the $4 or less or $10 or

less it charges its cash customers, SuperValu would have to make an official price change like

Wal-Mart or Target who have established $4 and $10 generic drug programs.  Finally, Ms. Reel

stated that, because SuperValu is unable to charge cash customers an amount lower than the

amount it submits as their U&C price to third-party insurance carriers, SuperValu "gets around"

this requirement by simply matching the reduced prices of its national competitors.

117.     On July 8, 2011, Relator Schutte and SuperValu's Regional Manager of Managed Care, Matt Cross, R.Ph., had a telephone conversation in connection with Relator Schutte's July 4, 2011, email asking why SuperValu does not submit the amount it charges to cash customers to third-party insurance carriers.  Mr. Cross stated that Supervalu does not submit to third-party insurance carriers the discounted prices it charges to customers, and indicated that SuperValu's ARx pharmacy software actually prevents pharmacy staff members from overriding the U&C price submitted to third-party insurance carriers.

118.     In addition to conversations, training, e-mails, and transactions evidencing the scope of the fraud, Relators conducted numerous phone calls with pharmacy staff at Defendants' branded pharmacies verifying Defendants' price matching and fraudulent billing scheme occurred nationwide.

### (1). Comparative 30-day Examples

119.     The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a Medicare Part D Plan member, and provides a clear example of Defendant's submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C price Defendants' charged to cash customers, after crediting the plan members' co-payment:

### Medicare Part D Example

| Prescription: | Pravastatin Sodium 40mg, 30-day supply | |
|---|---|---|
| Pharmacy: | Shop N' Save pharmacy, Arnold, Missouri | |
| Drug Acquisition Cost: | $2.83 | |
| Cash Customer 1-A Date:  04/04/11 | $4.00 | Actual U&C price paid by the cash customer, recorded by SuperValu as a co-payment |
| Part D Customer 1-B | $2.50 | Co-payment paid by Part D beneficiary |

| Date: 04/04/11 | | |
|---|---|---|
| | $[2] | Inflated U&C price fraudulently reported by SuperValu for claim submission and adjudication |
| (Part D Reimbursement) | $13.67 | Reimbursement amount paid by Medicare Part D |
| | $16.17 | Total reimbursement received by SuperValu, comprised of the beneficiary co-payment and Medicare Part D reimbursement ($2.50 + $13.67) |
| Amount Medicare Should Have Paid | $1.50 | The difference between SuperValu's actual U&C cash customer price and the beneficiary's co-payment ($4.00 - $2.50) |
| Over payment | $12.17 | The difference between 1) the total reimbursement paid by Medicare Part D and the amount Medicare should have paid ($13.67- $1.50), or 2) the total reimbursement SuperValu received less the actual U&C customer cash price ($16.17 - $4.00). |

120.    Redacted copies of screen shots printed from Defendants' shared ARx system, which pertain to and support the foregoing example are attached as Exhibit C.

121.    The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a Medicaid beneficiary, and provides a clear example of Defendants' submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C price Defendants charged to cash customers, after crediting the Medicaid beneficiary's co-payment:

**Illinois Medicaid Example**

| Prescription: | Metoprolol Tartrate 100mg, 30-day supply | |
|---|---|---|
| Pharmacy: | Osco Pharmacy, Springfield, Illinois | |
| Drug Acquisition Cost: | $1.62 | |
| Cash Customer 4-A Date: 06/09/11 | $4.00 | Actual U&C price paid by the cash customer (price match), recorded by SuperValu as a co-payment |
| Medicaid Customer 4-B Date: 06/14/11 | $0.00 | Co-payment paid by Medicaid beneficiary |
| | $18.69 | Inflated U&C price fraudulently reported by SuperValu for claim submission and adjudication |

[2] The inflated U&C price fraudulently reported by SuperValu is indicated in Defendant's ARx pharmacy software.

| (Medicaid Reimbursement) | $7.08 | Reimbursement amount paid by Medicaid, presumed to include recorded dispensing fee |
| | $7.08 | Total reimbursement received by SuperValu, comprised of the beneficiary co-payment and Medicaid reimbursement ($0.00 + $7.08) |
| Amount Medicaid Should Have Paid | $4.00 | The difference between SuperValu's actual U&C cash customer price and the beneficiary's co-payment ($4.00 - $0.00) |
| Over payment | $3.08 | The difference between 1) the total reimbursement paid by Medicaid and the amount Medicaid should have paid ($7.08 - $4.00), or 1) the total reimbursement SuperValu received less the actual U&C cash customer price ($7.08 - $4.00). |

122.    Redacted copies of screen shots printed from Defendants' shared ARx system,

which pertain to and support the foregoing example are attached as Exhibit D.

### Missouri Medicaid Example

| Prescription: | Atenolol 50mg, 30-day supply |
| Pharmacy: | Shop N' Save pharmacy, Kirkwood, Missouri |
| Drug Acquisition Cost: | $1.04 |

| Cash Customer | $4.00 | Actual U&C price paid by a cash customer (price match) |
| Medicaid Customer 4-B Date:  05/16/11 | $0.50 | Co-payment paid by Medicaid beneficiary |
| | $10.69 | Inflated U&C price fraudulently reported by SuperValu for claim submission and adjudication |
| (Medicaid Reimbursement) | $14.32 | Reimbursement amount paid by Medicaid, presumed to include recorded dispensing fee |
| | $14.82 | Total reimbursement received by SuperValu, comprised of the beneficiary co-payment and Medicaid reimbursement ($0.50 + $14.32) |
| Amount Medicaid Should Have Paid | $3.50 | The difference between SuperValu's actual U&C cash customer price and the beneficiary's co-payment ($4.00 - $0.50) |
| Over payment | $10.82 | The difference between 1) the total reimbursement paid by Medicaid and the amount Medicaid should have paid ($14.32 - $3.50), or 1) the total reimbursement SuperValu received less the actual U&C cash customer price ($14.82 - $4.00). |

123.    Redacted copies of screen shots printed from Defendants' shared ARx system,

which pertain to and support the foregoing example are attached as Exhibit E.

### (2). Comparative 60-day Example

124.    The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a Medicaid beneficiary, and provides a clear example of Defendants' submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C price Defendants charged to cash customers, after crediting the Medicaid beneficiary's co-payment:

### Illinois Medicaid Example

| Prescription: | Naproxen 500mg, 60-day supply | |
|---|---|---|
| Pharmacy: | Osco Pharmacy, Springfield, Illinois | |
| Drug Acquisition Cost: | $1.82 | |
| Cash Customer 4-A Date: 06/06/11 | $4.00 | Actual U&C price paid by the cash customer (price match), recorded by SuperValu as a co-payment |
| Medicaid Customer 4-B Date: 07/15/11 | $0.00 | Co-payment paid by Medicaid beneficiary |
| | $16.69 | Inflated U&C price fraudulently reported by SuperValu for claim submission and adjudication |
| (Medicaid Reimbursement) | $7.47 | Reimbursement amount paid by Medicaid, presumed to include recorded dispensing fee |
| | $7.47 | Total reimbursement received by SuperValu, comprised of the beneficiary co-payment and Medicaid reimbursement ($0.00 + $7.47) |
| Amount Medicaid Should Have Paid | $4.00 | The difference between SuperValu's actual U&C cash customer price and the beneficiary's co-payment ($4.00 - $0.00) |
| Over payment | $3.47 | The difference between 1) the total reimbursement paid by Medicaid and the amount Medicaid should have paid ($7.47 - $4.00), or 1) the total reimbursement SuperValu received less the actual U&C cash customer price ($7.47 - $4.00). |

125.    Redacted copies of screen shots printed from Defendants' shared ARx system which pertain to and support the foregoing example are attached as Exhibit F.

### (3). Comparative 90-day Example

126.    The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a Medicare Part D Plan member, and provides a clear example of

Defendants' submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C price Defendant charged to cash customers, after crediting the plan members' co-payment:

## Medicare Part D Example

| Prescription: | Lovastatin 20mg | |
|---|---|---|
| Pharmacy: | Shop N' Save Pharmacy, Arnold, Missouri | |
| Drug Acquisition Cost: | $3.32 | |
| Cash Customer 1-A Date: 04/30/11 | $10.00 | Actual U&C price paid by the cash customer, recorded by SuperValu as a co-payment |
| Part D Customer 1-B Date: 04/26/11 | $0.00 | Co-payment paid by Part D beneficiary |
| | $80.69 | Inflated U&C price fraudulently reported by SuperValu for claim submission and adjudication |
| (Part D Reimbursement) | $47.99 | Reimbursement amount paid by Medicare Part D, presumed to include dispensing fee |
| | $47.99 | Total reimbursement received by SuperValu, comprised of the beneficiary co-payment and Medicare Part D reimbursement |
| Amount Medicare Should Have Paid | $10.00 | The difference between SuperValu's actual U&C cash customer price and the beneficiary's co-payment |
| Over payment | $37.99 | The difference between 1) the total reimbursement paid by Medicare Part D and the amount Medicare should have paid ($47.99 - $10.00), or 2) the total reimbursement SuperValu received less the actual U&C customer cash price ($47.99 - $10.00). |

127.    Redacted copies of screen shots printed from Defendants' shared ARx system which pertain to and support the foregoing example are attached as Exhibit G.

COUNT I – *FEDERAL FALSE CLAIMS ACT*

128.    Relators incorporate by reference and re-allege Paragraphs 1- 127 as if fully set forth herein.

129.    With respect to pharmaceuticals included in Defendants national competitors' discount programs that were price matched, Defendants have knowingly engaged, and continue to engage, in the fraudulent pattern and practice of submitting false claims for reimbursement to

Federal Health Care Programs and State Medicaid Programs with inflated Usual and Customary and Negotiated Prices that deny the United States the discounted Usual and Customary prices offered by Defendants to the general public.

130.    As alleged in Paragraph 44 above, the Federal Government pays a share of the medical assistance expenditures under each State's Medicaid program known as the FMAP or FFP.

131.    The payment by the various States' Medicaid programs of Defendants' false and fraudulent Medicaid clams resulted in the Federal Government paying an inflated FMAP and/or FFP, which it should not have been paid.

132.    Title 31 U.S.C. § 3729 of the FCA states in pertinent part as follows:

(a) LIABILITY FOR CERTAIN ACTS

(1) IN GENERAL.—Subject to paragraph (2), any person who—

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)    conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D)    has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E)    is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F)    knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

133.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims to federal and state government healthcare programs for payment or approval.

134.    Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims that were paid or approved by the Government.

135.    Defendants defrauded the Government by getting false or fraudulent claims allowed or paid.

136.    The Government, unaware of the falsity of the records, statements or claims made by Defendants, paid them for claims that would otherwise not have been allowed.

137.    Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money or property to the Government.

138.    By reason of these payments, the Government has been damaged and continues to suffer damages in a substantial amount.

139.    The Government, unaware of the falsity of the claims made by Defendants and lacking knowledge of the above described fraudulent acts, relied on the accuracy of Defendants' reimbursement claims to GHPs to its detriment.

140.    The Government, being unaware of the inaccuracies and documentation deficiencies submitted by Defendants, paid and continues to pay them for claims that should not

have been, and should not be paid, based upon Defendants' false and fraudulent reimbursement claims to GHPs.

COUNT II - <em>CALIFORNIA FALSE CLAIMS ACT</em>

141.   Relators incorporate by reference and re-allege Paragraphs 1- 127 as if fully set forth herein.

142.   This action is brought by Relators pursuant to the submission of False Claims to the State of California in violation of California False Claims Act, CAL. GOV'T. CODE § 12650, <u>et seq</u>.

143.   The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

COUNT III – <em>DELAWARE FALSE CLAIMS AND REPORTING ACT</em>

144.   Relators incorporate by reference and re-allege Paragraphs 1- 127 as if fully set forth herein.

145.   This action is brought by Relators pursuant to the Submission of False Claims to the State of Delaware in violation of the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201, <u>et seq</u>.

146.   The allegations set forth herein constitute violations of this state's false claims act for which the Relators seeks the maximum award pursuant to statute.

COUNT IV - <em>ILLINOIS FALSE CLAIMS ACT</em>

147.   Relators incorporate by reference and re-allege Paragraphs 1- 127 as if fully set forth herein.

148.   This action is brought by Relators pursuant to the Submission of False Claims to the State of Illinois in violation of the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/1, <u>et seq</u>.

149.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seeks the maximum award pursuant to statute.

<u>COUNT V – *INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT*</u>

150.    Relators incorporate by reference and re-allege Paragraphs 1- 127 as if fully set forth herein.

151.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Indiana in violation of the Indiana False Claims and Whistleblower Protection Act, IND. CODE § 5-11-5-1, <u>et</u> <u>seq</u>.

152.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

<u>COUNT VI - *MASSACHUSETTS FALSE CLAIMS ACT*</u>

153.    Relators incorporate by reference and re-allege Paragraphs 1- 127 as if fully set forth herein.

154.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Massachusetts in violation of the Massachusetts False Claims Act, MASS. GEN. LAWS ch.12, § 5A, <u>et</u> <u>seq</u>.

155.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

<u>COUNT VII – *MINNESOTA FALSE CLAIMS ACT*</u>

156.    Relators incorporate by reference and re-allege Paragraphs 1-127 as if fully set forth herein.

157.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Minnesota in violation of the Minnesota False Claims Act, MINN. STAT. § 15C.01, et seq.

158.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT VIII - *MONTANA FALSE CLAIMS ACT*

159.    Relators incorporate by reference and re-allege Paragraphs 1- 127 as if fully set forth herein.

160.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Montana in violation of the Montana False Claims Act, MONT. CODE. ANN. § 17-8-401, et seq., effective July 1, 2009.

161.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT IX - *NEVADA FALSE CLAIMS ACT*

162.    Relators incorporate by reference and re-allege Paragraphs 1- 127 as if fully set forth herein.

163.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Nevada in violation of the Nevada False Claims Act, NEV. REV. STAT. § 357.010, et seq.

164.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT X - *NEW JERSEY FALSE CLAIMS ACT*

165.    Relators incorporate by reference and re-allege Paragraphs 1- 127 as if fully set forth herein.

166.    This action is brought by Relators pursuant to the Submission of False Claims to the State of New Jersey in violation of the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-1, et seq.

167.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT XI – *NORTH CAROLINA FALSE CLAIMS ACT*

168.    Relators incorporate by reference and re-allege Paragraphs 1- 127 as if fully set forth herein.

169.    This action is brought by Relators pursuant to the Submission of False Claims to the State of North Carolina in violation of the North Carolina False Claims Act, N.C. STAT. ART. 51, § 1-605, et seq.

170.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT XII – *RHODE ISLAND FALSE CLAIMS ACT*

171.    Relators incorporate by reference and re-allege Paragraphs 1-127 as if fully set forth herein.

172.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Rhode Island in violation of the Rhode Island False Claims Act, R.I. GEN LAWS§ 9-1.1-1, et seq.

173.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

## COUNT XIII - *STATE OF VIRGINIA FRAUD AGAINST TAXPAYERS ACT*

174.    Relators incorporate by reference and re-allege Paragraphs 1- 127 as if fully set forth herein.

175.    This action is brought by Relators pursuant to the Submission of False Claims to the State of Virginia in violation of the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.1, et seq.

176.    The allegations set forth herein constitute violations of this state's false claims act for which the Relators seek the maximum award pursuant to statute.

<u>PRAYER</u>

WHEREFORE, for Counts I through XIII, Relators pray for judgment jointly and severally against  Supervalu, Inc., Supervalu Holdings, Inc., FF Acquisitions, LLC, Foodarama, LLC, Shoppers Food Warehouse Corp., Supervalu Pharmacies, Inc., Albertson's, LLC, Jewel Osco Southwest LLC, New Albertson's, Inc., American Drug Stores, LLC, Acme Markets, Inc., Shaw's Supermarket, Inc., Star Market Company, Inc., Jewel Food Stores, Inc., and their subsidiaries, affiliates, and related organizations, including but not limited to SuperValu, Albertsons, Acme Sav-On Pharmacy, Albertsons Osco Pharmacy, Albertsons Sav-On Pharmacy, Bigg's Pharmacy, Cub Pharmacy, Farm Fresh Pharmacy, Jewel Pharmacy, Jewel-Osco Pharmacy, Save-A-Lot, Shaw's Osco Pharmacy, Scott's Pharmacy, Shop N' Save Pharmacy, Shop N' Save Osco Pharmacy, Shoppers Pharmacy, and Star Osco Pharmacy (hereinafter collectively referred to as "SuperValu") as follows:

> A.  Defendants, their subsidiaries, affiliates, and related organizations be found to have violated and be enjoined from future violations of the Federal False Claims Act, 31 U.S.C. § 3729, California False Claims Act, CAL. GOV'T. CODE § 12651(a), the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, §

1201, the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/3, the Indiana False

Claims and Whistleblower Protection Act, IND. CODE § 5-11-5-2, the Massachusetts

False Claims Act, MASS. GEN. LAWS ch.12, § 5(B), the Minnesota False Claims Act,

MINN. STAT. § 15C.02(a), the Montana False Claims Act, MONT. CODE. ANN. § 17-

8-403, the Nevada False Claims Act, NEV. REV. STAT. § 357.040(1), the New Jersey

False Claims Act, N.J. STAT. ANN. § 2A:32C-3, the North Carolina False Claims

Act, N.C. STAT. ART. 51, § 1-607(a), the Rhode Island False Claims Act, R.I. GEN

LAWS§ 9-1.1-1, and the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. §

8.01-216.3.

B.   This Court enter judgment against Defendants, their subsidiaries, affiliates, and

related organizations for the maximum amount of damages sustained by The

United States and each State because of their false or fraudulent claims, plus the

maximum civil penalty for each violation of the Federal False Claims Act, 31

U.S.C. § 3729, California False Claims Act, CAL. GOV'T. CODE § 12651(a), the

Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201, the

Illinois False Claims Act, 740 ILL. COMP. STAT. 175/3, the Indiana False Claims

and Whistleblower Protection Act, IND. CODE § 5-11-5-2, the Massachusetts False

Claims Act, MASS. GEN. LAWS ch.12, § 5(B), the Minnesota False Claims Act,

MINN. STAT. § 15C.02(a), the Montana False Claims Act, MONT. CODE. ANN. § 17-

8-403, the Nevada False Claims Act, NEV. REV. STAT. § 357.040(1), the New Jersey

False Claims Act, N.J. STAT. ANN. § 2A:32C-3, the North Carolina False Claims

Act, N.C. STAT. ART. 51, § 1-607(a), the Rhode Island False Claims Act, R.I. GEN

LAWS§ 9-1.1-1, the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.,.

C.  This Court enters judgment against Defendants, their subsidiaries, affiliates, and related organizations in an amount equal to three times the amount of damages the Government has sustained because of their false or fraudulent claims, plus the maximum civil penalty for each violation of the various State false claims acts.

D.  Relators be awarded the maximum amount allowed pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, California False Claims Act, CAL. GOV'T. CODE § 12651(a), the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201, the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/3, the Indiana False Claims and Whistleblower Protection Act, IND. CODE § 5-11-5-2, the Massachusetts False Claims Act, MASS. GEN. LAWS ch.12, § 5(B), the Minnesota False Claims Act, MINN. STAT. § 15C.02(a), the Montana False Claims Act, MONT. CODE. ANN. § 17-8-403, the Nevada False Claims Act, NEV. REV. STAT. § 357.040(1), the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-3, the North Carolina False Claims Act, N.C. STAT. ART. 51, § 1-607(a), the Rhode Island False Claims Act, R.I. GEN LAWS§ 9-1.1-1, the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3, and all relief to which they are entitled pursuant to said laws.

E.  Relators be awarded all costs of this action, including expert witness fees, attorneys' fees, and court costs.

F.  Relators recover such other relief as the Court deems just and proper.

Respectfully Submitted,

/s/ Timothy Keller
Timothy Keller,

48

IL Bar No. 6225309
ASCHEMANN KELLER LLC
300 North Monroe Street
Marion, Illinois 62959-2326
Telephone:  (618) 998-9988
Facsimile:  (618) 993-2565
E-Mail:  tkeller@quitamlaw.org

Glenn Grossenbacher
Texas Bar No. 08541100
Law Office of Glenn Grossenbacher
24165 IH-10 W., Ste 217-766
San Antonio, Texas  78257-1160
Tel. 210.271.3888
E-Mail:  gglaw@satx.rr.com

John E. Clark
Texas Bar No. 04287000
Goode Casseb Jones Riklin Choate & Watson
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
Telephone: (210) 733-6030
Facsimile: (210) 733-0330
E-Mail: Clark@goodelaw.com

Gary M. Grossenbacher
Texas Bar No. 24008972
Attorney at Law
8114 Talbot Lane
Austin, Texas 78746
Telephone: (512) 699-5436
E-Mail:  gmgtex@austin.rr.com

*Attorneys for Relators,*
*Tracy Schutte and Michael Yarberry*

Development Funds, Foster Care Title IV–E Maintenance payments, and Adoption Assistance payments. The table gives figures for each of the 50 States, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Programs under title XIX of the Act existing each jurisdiction. Programs under titles I, X, and XIV operate only in Guam and the Virgin Islands, while a program under the title XVI (Aid to the Aged, Blind, or Disabled) operates only in Puerto Rico.

Programs under title XXI began operating in fiscal year 1998. The percentages in this notice apply to State expenditures for most medical services and medical insurance services, and assistance payments for certain social services. The statute provides separately for Federal matching of administrative costs.

Sections 1905(b) and 1101(a)(8)(B) of the Act require the Secretary, HHS to publish the Federal Medical Assistance Percentages each year. The Secretary is to calculate the percentages, using formulas in sections 1905(b) and 1101(a)(8)(B), from the Department of Commerce's statistics of average income per person in each State and for the Nation as a whole. The percentages are within the upper and lower limits given in section 1905(b) of the Act. The percentages to be applied to the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Northern Mariana Islands are specified in statute, and thus are not based on the statutory formula that determines the percentages for the 50 states.

The "Federal Medical Assistance Percentages" are for Medicaid. Section 1905(b) of the Act specifies the formula for calculating Federal Medical Assistance Percentages as follows:

"Federal medical assistance percentage" for any State shall be 100 per centum less the State percentage; and the State percentage shall be that percentage which bears the same ratio to 45 per centum as the square of the per capita income of such State bears to the square of the per capita income of the continental United States (including Alaska and Hawaii); except that (1) the Federal medical assistance percentage shall in no case be less than 50 per centum or more than 83 per centum, (2) the Federal medical assistance percentage for Puerto Rico, the Virgin Islands; Guam, the Northern Mariana Islands, and American Samoa shall be 50 per centum. * * *

Section 4725(b) of the Balanced Budget Act of 1997 amended section 1905(b) to provide that the Federal Medical Assistance Percentage for the District of Columbia for purposes of titles XIX, and for the purpose of calculating the enhanced FMAP under title XXI, shall be 70 percent. For the District of Columbia, we note under the table of Federal Medical Assistance Percentages the rate that applies in certain other programs calculated using the formula otherwise applicable, and the rate that applies in certain other programs pursuant to section 1118 of the Social Security Act.

Section 2105(b) of the Act specifies the formula for calculating the Enhanced Federal Medical Assistance Percentages as follows:

The "enhanced FMAP", for a State for a fiscal year, is equal to the Federal medical assistance percentage (as defined in the first sentence of section 1905(b)) for the State increased by a number of percentage points equal to 30 percent of the number of

percentage points by which (1) such Federal medical assistance percentage for the State, is less than (2) 100 percent; but in no case shall the enhanced FMAP for a State exceed 85 percent.

The "Enhanced Federal Medical Assistance Percentages" are for use in the State Children's Health Insurance Program under Title XXI, and in the Medicaid program for certain children for expenditures for medical assistance described in sections 1905(u)(2) and 1905(u)(3) of the Act. There is no specific requirement to publish the Enhanced Federal Medical Assistance Percentages. We include them in this notice for the convenience of the States.

**DATES:** *Effective Dates:* The percentages listed will be effective for each of the 4 quarter-year periods in the period beginning October 1, 2008 and ending September 30, 2009.

**FOR FURTHER INFORMATION CONTACT:** Thomas Musco or Carrie Shelton, Office of Health Policy, Office of the Assistant Secretary for Planning and Evaluation, Room 447D-Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201, (202) 690–6870.

(Catalog of Federal Domestic Assistance Program Nos. 93.558: TANF Contingency Funds; 93.563: Child Support Enforcement; 93–596: Child Care Mandatory and Matching Funds of the Child Care and Development Fund; 93.658: Foster Care Title IV–E; 93.659: Adoption Assistance; 93.769: Ticket-to-Work and Work Incentives Improvement Act (TWWIIA) Demonstrations to Maintain Independence and Employment; 93.778: Medical Assistance Program; 93.767: State Children's Health Insurance Program)

Dated: November 19, 2007.

**Michael O. Leavitt,**

*Secretary of Health and Human Services.*

FEDERAL MEDICAL ASSISTANCE PERCENTAGES AND ENHANCED FEDERAL MEDICAL ASSISTANCE PERCENTAGES, EFFECTIVE OCTOBER 1, 2008–SEPTEMBER 30, 2009 (FISCAL YEAR 2009)

| State | Federal medical assistance percentages | Enhanced federal medical assistance percentages |
|---|---|---|
| Alabama | 67.98 | 77.59 |
| Alaska | 50.53 | 65.37 |
| American Samoa* | 50.00 | 65.00 |
| Arizona | 65.77 | 76.04 |
| Arkansas | 72.81 | 80.97 |
| California | 50.00 | 65.00 |
| Colorado | 50.00 | 65.00 |
| Connecticut | 50.00 | 65.00 |
| Delaware | 50.00 | 65.00 |
| District of Columbia** | 70.00 | 79.00 |
| Florida | 55.40 | 68.78 |
| Georgia | 64.49 | 75.14 |
| Guam* | 50.00 | 65.00 |
| Hawaii | 55.11 | 68.58 |
| Idaho | 69.77 | 78.84 |
| Illinois | 50.32 | 65.22 |
| Indiana | 64.26 | 74.98 |

Exhibit A

FEDERAL MEDICAL ASSISTANCE PERCENTAGES AND ENHANCED FEDERAL MEDICAL ASSISTANCE PERCENTAGES, EFFECTIVE OCTOBER 1, 2008–SEPTEMBER 30, 2009 (FISCAL YEAR 2009)—Continued

| State | Federal medical assistance percentages | Enhanced federal medical assistance percentages |
|---|---|---|
| Iowa | 62.62 | 73.83 |
| Kansas | 60.08 | 72.06 |
| Kentucky | 70.13 | 79.09 |
| Louisiana | 71.31 | 79.92 |
| Maine | 64.41 | 75.09 |
| Maryland | 50.00 | 65.00 |
| Massachusetts | 50.00 | 65.00 |
| Michigan | 60.27 | 72.19 |
| Minnesota | 50.00 | 65.00 |
| Mississippi | 75.84 | 83.09 |
| Missouri | 63.19 | 74.23 |
| Montana | 68.04 | 77.63 |
| Nebraska | 59.54 | 71.68 |
| Nevada | 50.00 | 65.00 |
| New Hampshire | 50.00 | 65.00 |
| New Jersey | 50.00 | 65.00 |
| New Mexico | 70.88 | 79.62 |
| New York | 50.00 | 65.00 |
| North Carolina | 64.00 | 75.22 |
| North Dakota | 63.15 | 74.21 |
| Northern Mariana Islands* | 50.00 | 65.00 |
| Ohio | 62.14 | 73.50 |
| Oklahoma | 65.90 | 76.13 |
| Oregon | 62.45 | 73.72 |
| Pennsylvania | 54.52 | 68.16 |
| Puerto Rico* | 50.00 | 65.00 |
| Rhode Island | 52.59 | 66.81 |
| South Carolina | 70.07 | 79.05 |
| South Dakota | 62.55 | 73.79 |
| Tennessee | 64.28 | 75.00 |
| Texas | 59.44 | 71.61 |
| Utah | 70.71 | 79.50 |
| Vermont | 59.45 | 71.62 |
| Virgin Islands* | 50.00 | 65.00 |
| Virginia | 50.00 | 65.00 |
| Washington | 50.94 | 65.66 |
| West Virginia | 73.73 | 81.61 |
| Wisconsin | 59.38 | 71.57 |
| Wyoming | 50.00 | 65.00 |

* For purposes of section 1118 of the Social Security Act, the percentage used under titles I, X, XIV, and XVI will be 75 per centum.
** The values for the District of Columbia in the table were set for the state plan under titles XIX and XXI and for capitation payments and DSH allotments under those titles. For other purposes, including program remaining in Title IV of the Act, the percentage for D.C. is 50.00.

[FR Doc. 07–5847 Filed 11–27–07; 8:45 am]

BILLING CODE 4150–24–M

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Office of the Assistant Secretary for Administration and Management; Program Support Center; Statement of Organization, Functions, and Delegations of Authority

Part P, Statement of Organization, Functions, and Delegations of Authority for the Department of Health and Human Services, Office of the Assistant Secretary for Administration and Management (AJ), Program Support Center (P), as last amended at 68 FR 69411–12, dated December 12, 2003 is being amended to reflect changes in Chapter PG, "Federal Occupational Health Service (FOHS)." This amendment realigns FOHS functions to increase efficiency, effectiveness, and management controls.

I. Under Chapter PG, "Federal Occupational Health Service" (PG), delete the functions entirely and replace with the following:

Section PEK.00 Mission. The mission of the Federal Occupational Health Service (FOHS) is to improve the health, safety, and productivity of the Federal workforce through the provision of comprehensive, high-quality, customer-focused occupational health services in strategic partnership with Federal agencies nation-wide. The services provided include health and wellness programs, employee assistance, work/life, and environmental health and safety services. The services that FOHS provided include consultations to agency management, program design to meet customer needs, service provider selection, direct provision of services, and program oversight and evaluation.

Section PEK.10 Organization. FOHS is headed by a Director who reports to the Deputy Assistant Secretary for Program Support, and includes the following components:

1. Office of the Director (PGA).
2. Division of Clinical Services (PGB).
3. Division of Employee Assistance Program Services (PGC).
4. Division of Environmental Health Services (PGE).
5. Division of Administration and Resource Management (PGF).
6. Division of Business Development (PGG).

Section PEK.20 Functions.

 You replied on 5/27/2011 5:22 PM.

**Schutte, Tracy**

| | | | |
|---|---|---|---|
| **From:** | Reel, Lindsay | **Sent:** | Fri 5/27/2011 10:46 AM |
| **To:** | Schutte, Tracy | | |
| **Cc:** | | | |
| **Subject:** | RE: shop and save question | | |
| **Attachments:** | | | |

Tracy,

Great question! Do you have a number that I can call?

It would be easier than typing out the entire answer.

Thanks,

**Lindsay Reel, Pharm D**
**Pharmacy Operations Shop 'n Save Pharmacies**
**Primary Phone: (314) 488-8769**
**Office: (314) 984-1513**
**Fax: (314) 984-1507**

 Go green! Read it from the screen.  Please consider **NOT** printing this email.

---

**From:** Schutte, Tracy
**Sent:** Fri 5/27/2011 10:57 AM
**To:** Reel, Lindsay
**Subject:** shop and save question

Hello Lindsay,

My name is Tracy Schutte and I recently started as a part time pharmacist in the St. Louis area for Shop and Save. I had a couple of general questions and Elise Augustus gave me your email and said I should contact you. I worked a couple shifts on the weekend, one in Arnold and one in Kirkwood. There were multiple patients with insurance that came in. The store had always been price matching the 4 dollar generics because their co pays were higher than 4 dollars.

Since I was filling in and unfamiliar with these patients I had ran these claims on their insurance, but had to reverse these claims and rerun then as cash and do the 4 dollar price match.

Can we simply submit the 4 dollar price match to the insurance to eliminate the reversing and rerunning of the claims.

Thanks
Tracy Schutte RPh

**Exhibit**

**B**

SchutteYarberry000199



**Exhibit C**

SchutteYarberry000139



SchutteYarberry000144



**Exhibit D**

SchutteYarberry000227



SchutteYarberry000228



**Exhibit E**

SchutteYarberry000028



Exhibit

F

SchutteYarberry000231



SchutteYarberry000232



**Exhibit G**

SchutteYarberry000051



SchutteYarberry000053