## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA et al., ex rel., TRACY SCHUTTE and MICHAEL YARBERRY, )))) | |
| Plaintiffs and Relators ))) | |
| v. ))))) | No. 11-cv-3290 |
| SUPERVALU, INC., et al. ))) | |
| Defendants ) | |

## RELATORS' FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56:

### DEFENDANTS' PRICE MATCH PROGRAM PRICES WERE THEIR USUAL AND CUSTOMARY PRICES THAT SHOULD HAVE BEEN PROVIDED TO THE GOVERNMENT

The Seventh Circuit opinion in *United States ex rel. James Garbe* definitively addressed, as a matter of law, how usual and customary ("U&C") prescription drug pricing is to be determined and why the Medicare Part D and Medicaid programs are entitled to the benefit of discounted cash prices. For many years, the Defendants here offered to everyone that they would match their competitor's lower cash prices on prescription drugs. Those lower match prices were indisputably the lowest prices for which Defendants' drugs were widely and consistently available. Therefore, according to *Garbe*, those lower cash match prices were the U&C prices Defendants were required to charge Medicare Part D and Medicaid for those drugs.

Defendants stipulate to the existence and duration of their Price Match Program, and that it was advertised at every banner in every state in which Defendants operated. No genuine issue of material fact precludes this Court from determining that Defendants' Price Match Program

constituted an open offer to the general public which extended continuously over multiple benefit years. Because these material facts are undisputed, Relators ask this Court to address the paramount issue in this litigation—whether Defendants were required to provide Price Match Program discounts to the Government—and apply the law that was so clearly established by the Seventh Circuit in *Garbe*.

Accordingly, the Relators ask this Court to find as a matter of law that: 1) the Defendants' lower matched prices established the usual and customary price for their drugs; and, 2) the Medicare Part D and Medicaid programs were entitled to that actual U&C price. Granting this motion will substantially reduce the number and complexity of the remaining triable issues.

## I.    UNDISPUTED MATERIAL FACTS[1]

1)   The Price Match Program began for SuperValu and Albertsons banners in the fall of 2006. [**Exhibit B**, Defendants' Supplemental and Amended Answers to Relators' First Set of Interrogatories, Supplemental Response No. 3].

2)   A Price Match Program "override" occurred when pharmacy personnel replaced Defendants' then current, reported cash "retail" price with a lower competitor price. [**Exhibit D-1**, Allgood Depo., 98:10–14].

3)   Albertsons discontinued the Price Match Program in October 2013. [**Exhibit B**, Defendants' Supplemental and Amended Answers to Relators' First Set of Interrogatories, Supplemental Response No. 3].

4)   SuperValu discontinued the Price Match Program in December 2016. [**Exhibit B**, Defendants' Supplemental and Amended Answers to Relators' First Set of Interrogatories, Supplemental Response No. 3].

---

[1] **Exhibit A**, Tate Declaration, identifies and describes the exhibits filed in support of Relators' Undisputed Material Facts.

5)   Defendants offered a price match policy and a price match guarantee. [**Exhibit D-2**, Tsipakis Depo., 110:21–114:23 (discussing **Exhibit P.E. 137**, HHS Subpoena)].

6)   All of Defendants' banners (i.e. Cub Pharmacy, Osco Drug, etc.) advertised price matching in all states where those banners operated at various times between October 2006 and June 2012. [**Exhibit C**, (d/e 152), Stipulation Regarding 30(b)(6) Deposition Topics, ¶D.2].

7)   Defendants' advertisements publicized Defendants' practice of matching competitor prices on prescription drugs and generally included disclaimers. [**Exhibit C**, (d/e 152), Stipulation Regarding 30(b)(6) Deposition Topics, ¶D.2].

8)   Defendants' price match advertisements were disseminated to the public through various means, such as in-store and pharmacy signage, fliers, circulars, in-store audio announcements, mailers, newspapers of general circulation, on the back of store receipts, and Defendants' web pages. [**Exhibit C**, (d/e 152), Stipulation Regarding 30(b)(6) Deposition Topics, ¶D.2].

9)   The Price Match Program advertisements described an offering about Defendants' price match policy. [**Exhibit D-3**, Dimos Depo., 167:9–15].

10)  The Price Match Program was available to anyone who would request that Defendants match a competitor's price. [**Exhibit C**, (d/e 152), Stipulation Regarding 30(b)(6) Deposition Topics, ¶D.1, particularly a.4, b.2 and b.3].

11)  No fee was required of customers to participate in the Price Match Program. [*See* **Exhibits P.E. 11, 14 & 96**, Prescription Pricing Policies].

12)  Unlike Walmart and some other competitors, Defendants did not have an official discount drug formulary. [**Exhibit B**, Defendants' Supplemental and Amended Answers to Relators' First Set of Interrogatories, Supplemental Response No. 4; **Exhibit E-1**, Defendants' Expert Gorospe Report, at 5].

13) Defendants have produced price matching advertisements and competitor drug formularies its employees collected in March 2012 from approximately 222 of Defendants' stores that can be individually identified. [**Exhibit F**, Pharmacy Documents Summary Chart].[2]

14) Of these 222 stores, 201 self-reported and produced competitor's discount drug formularies kept in the pharmacies at those stores, including 192 stores that kept Walmart's discount drug formulary in the pharmacy;[3] and, Defendants' stores "most commonly would have a Walmart list or – because it's very accessible off the internet, so they would have it . . . they would print them off and have them instead of having to keep going to the internet." [**Exhibit F**, Pharmacy Documents Summary Chart, Columns I & J; **Exhibit D-2**, Tsipakis Depo., 124:6–18, 125:3–18, 130:8–21].

15) Defendants' Price Overrides grew from 8.75% of cash sales of all drugs (including drugs that were not available from competitors at a lower cash price) in 2007 to 39.36% of cash sales of all drugs in 2011. [**Exhibit E-2**, Relators' Expert Dew Report, Table 4 at page 7].

16) Defendants identified specific competitor price matches for 88.31% of all Price Overrides; Defendants identified 56.94% of all Price Overrides as Walmart price matches. [**Exhibit E-2**, Relators' Expert Dew Report, Table 13 at page 31].

---

[2] In March 2012, Defendants issued a directive ordering all of its pharmacies to "preserve all U&C/Price Match records." **Exhibit G**, March 2012 Example Record Collection (SVU00585078–89) at 1. Defendants' pharmacy employees were instructed to take pictures of marketing materials or signage "that is displayed in stores or on store premises to convey or promote SUPERVALU's Price Match Program," and to make a "copy of any competitor's price or drug lists used." *Id.* at 2. **Exhibit F** is a chart offered pursuant to Fed. R. Evid. 1006 as a summary of voluminous records that Defendants collected in response to this March 2012 SAM Task and produced (six years later) with sufficient information to identify Defendants' store location that collected the documents. *See* **Exhibit A**, Tate Declaration.

[3] The true percentage of Defendants' stores that kept competitor formularies in the pharmacy is likely even higher. *See* **Exhibit D-4**, Basler Depo. (Rough), 217:3–218:21 (testifying that he "assume[d]" advertisements and competitor lists were not found in some store packets because of his instruction to some pharmacists "to have those lists and ads discarded").

4

17) Price match overrides occurred as frequently as 18,000 times per week. [**Exhibits P.E. 58, 58A & 108**, Defendants' Pharmacy Metrics].

18) Customers who obtained a price match were required to pay cash. [**Exhibit C**, (d/e 152), Stipulation Regarding 30(b)(6) Deposition Topics, ¶¶G.1.a.1–2; **Exhibit D-5**, Cross Depo., 27:2–5, 31:23–24, 32:1–5; **Exhibit D-1**, Allgood Depo., 84:12–16].

19) Defendants did not submit lower matched price cash sales transactions to third-party payors, including Government Healthcare Programs. [**Exhibit D-6**, McCann Depo., 83:21–25, 84:1–19; **Exhibit D-1**, Allgood Depo., 84:12–24].

20) Defendants would not allow lower matched prices to be submitted to Third Party insurance even if a customer specifically asked Defendants to process a price match transaction through the customer's insurance. [**Exhibit D-7**, Knutson Depo., 228:2–7].

21) In October 2006, shortly after Walmart announced its discount generics program, Defendants estimated that adopting a similar discount generics program would result in tens of millions of lost profits, 90% of which "would go to PBMs, Managed Care and other payors due to co-pay and U&C contract language." [**Exhibit P.E. 115**, Salemi October 6, 2006 Email].

22) On December 27, 2007 SuperValu Executive Ron Richmond (Director of Managed Healthcare Contracting) sent an email to SuperValu Executives Pamela Caselius (Marketing Director), Maxine Johnson (Vice President, Managed Care Operations), and Dan Salemi (Vice President of Pharmacy Services) writing, in part:

> As for price matching on the various competitors generic programs, I believe that we have always taken a "stealthy" approach. We consider this to be something that we do as an "exception" for customer service reasons. Once we deviate to a process that is more "rule" or routine, we begin to affect the integrity of our U&C price - a slippery slope, as true U&C price is a claim submission requirement for all Medicaid and private commercial Managed Care and PBM agreements. The financial implication of this is very broad, Please communicate with Max and Dan for a broader discussion on Generic Price matching and/or promotional activities.

[**Exhibit H**, Jan. 2, 2008 Email Chain at 3].

23) Defendants promoted price matching in part to "combat" discount generic drug programs offered by Walmart and other competitors. [**Exhibit D-6**, McCann Depo., 70:5–72:21; **Exhibits P.E. 132, & 132A**, "Combating the $4 Generics Programs" Email and Attached Price Match Advertisement].

24) Defendants' Price Match Program was designed to retain existing customers and to attract new customers. [**Exhibit D-6**, McCann Depo., 70:5–72:21; **Exhibits P.E. 132, & 132A**, "Combating the $4 Generics Programs" Email and Attached Price Match Advertisement].

25) In October 2008, Defendants' ARx pharmacy application was enhanced with an ongoing price match override feature. The "Ongoing Price Override" 1) processed subsequent fills of the same prescription at the overridden price automatically; 2) maintained a record of the competitor pharmacy whose price had been matched; and 3) automatically logged notes to the prescription on which the override had been performed. [**Exhibit P.E. 160**, ARx Update at 2].

26) SuperValu Prescription Pricing Policy (September, 2009) stated that "[t]he company will not lose a prescription because of price," and required SuperValu employees responding to price quotes to "Mention service, convenience, and price match guarantee." [**Exhibit P.E. 11**, Prescription Pricing Policy (Sept. 2009), at 1–2; *see also* **Exhibit D-1**, Allgood Depo., 76:23–25, 77:1–7].

27) SuperValu's August 2012 Prescription Pricing Policy added the words "[i]f a customer requests that we match the price . . . ." to SuperValu's "Prescription Price Match Program" and removed the requirement from the September 2009 Prescription Pricing Policy to "Mention . . . price match guarantee." [*Compare* **Exhibit P.E. 11**, Prescription Pricing Policy (Sept. 2009) *with* **Exhibit P.E. 14**, Prescription Pricing Policy (August 2012)].

28) Individual pharmacies could not change the usual and customary price reported to Third Parties, including GHP's. [**Exhibit I**, Defendants' Responses to Relators' Second Requests for Admission, Response to No. 18].

29) The usual and customary price reported to Third Parties, including GHPs, "was set by Defendants' corporate pricing department . . . ." [**Exhibit I**, Defendants' Responses to Relators' Second Requests for Admission, Response to No. 17].

30) Defendants did not acknowledge or consider discount price match program cash prices when setting the U&C prices they reported to Third Parties. [**Exhibit D-1**, Allgood Depo., 106:19–25, 107:1–21; **Exhibit D-8**, Zook Depo., 58:4–12, 102:11–16, 106:3–17, 111:3–6, 113:3–13].

31) The "PBM Industry Definition of U&C Price" is "generally understood to be the cash price charged to the general public." [**Exhibit E-3**, Defendants' Expert Jacobs Report at 9; *accord* **Exhibit E-4**, Relators' Expert Schafermeyer Report at 4].

## II.   STANDARD

Pursuant to Fed. R. Civ. P. 56 and the well-settled standards controlling Motions for Summary Judgment in this Circuit:

> Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).

*Cent. Laborers' Pension Fund v. Demolition Excavating Grp., Inc.*, No. 11-3327, 2014 WL 1308891, at *5 (C.D. Ill. Apr. 1, 2014).

The Court does not weigh evidence or resolve material factual issues, but instead determines whether any such issues remain unresolved such that a reasonable fact finder could decide for either party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.  242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When making this determination, "[t]he Court construes all inferences in favor of the non-movant." *Cent. Laborers' Pension Fund*, 2014 WL 1308891 at *5 (citing *Siliven v. Indiana Dept. of Child Services,* 635

F.3d 921, 925 (7th Cir. 2011)). All inferences must, however, be "based on something more than 'speculation or conjecture'" in order to create a genuine issue of material fact. *Id.* (citing *Harper v. C.R. England, Inc.,* 687 F.3d 297, 306 (7th Cir. 2012)).

## III.   ARGUMENT

As a matter of law, Medicare Part D and Medicaid are entitled to usual and customary prices.

*United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016), *cert. denied sub nom. Kmart Corp. v. U.S. ex rel. Garbe*, 137 S. Ct. 627, 196 L. Ed. 2d 517 (2017):

> Medicare, Medicaid, and their corresponding regulations mandate that state plans ensure that "payments for services be consistent with efficiency, economy, and quality of care." Id. § 447.200 (citing 42 U.S.C. § 1396a(a) (30)).
> . . . .
> Taken together, "[t]he purpose of these regulations is clear: state agencies are not to pay more for prescribed drugs than the prevailing retail market price." *United States v. Bruno's, Inc.,* 54 F.Supp.2d 1252, 1257 (M.D. Ala. 1999) (interpreting 42 C.F.R. § 447.512(b), then numbered 42 C.F.R. § 447.331(b)). Regulations related to "usual and customary" price should be read to ensure that where the pharmacy regularly offers a price to its cash purchasers of a particular drug, Medicare Part D receives the benefit of that deal. See generally *Arkansas Pharmacists Ass'n v. Harris,* 627 F.2d 867, 869 n.4 (8th Cir. 1980).

*Garbe*, 824 F.3d at 644.

In the *Garbe* case, the defendant Kmart instituted price matching and a discount club that offered lower cash prices on drugs. *Id.* at 636. While Kmart charged discount cash prices for club members, it continued charging higher U&C prices to cash customers that did not join the club. *Id.* Arguing that its club members were not members of the "general public"—that they were instead a subset of its customer base that chose to join the club and pay a membership fee—Kmart offered club members discount cash prices that were not reflected in the usual and customary prices submitted to third-party insurers like Medicare Part D and Medicaid. *Id.*

Kmart argued that its customers who opted-in to the club and paid a fee were members of a "particular group" segregated from the "general public." *Id.* at 643. The Seventh Circuit rejected this argument because "[s]aying that someone is a member of a 'particular' organization . . . does not

make it so. We are given no reason to think that there was any meaningful selectivity for the people who joined Kmart's programs . . . ." *Id.* The Court then explained that "barriers to joining Kmart 'programs' were almost nonexistent" and that cash customers walking into Kmart "do not cease to be members of the general public the minute they are offered—or pushed into—'membership' in Kmart's 'discount program.'" *Id.* In its reasoning, the Court took an expansive view of the meaning of "'general public' [] consistent with the regulatory structure that gave rise to the 'usual and customary' price term." *Id.* at 644.

With respect to that term, the Seventh Circuit established that U&C price requirements are universal, mandatory, and consistent.[4] The Court observed that "[t]he term [U&C price] is included in state regulations, plans, and contracts related to Medicare Part D because the Medicare and Medicaid regulations *demand that it be.* Its meaning in many state regulations, plans, and contracts is lifted from the federal regulations *without significant modification.*" *Id.* at 644. (emphasis added). In ruling that U&C pricing includes discount programs, the Court determined that "[u]nless state regulations provide otherwise, the 'usual and customary' price is defined as the 'cash price offered to the general public.'" *Id.* at 643. So distilled, this generally accepted, omnibus, controlling definition identifies the target of the U&C inquiry: the cash customer purchasing a prescription without the use of insurance.

---

[4] The *Garbe* court took notice of expert testimony that "under industry practice and the terms of over 1,000 contracts between Kmart and Medicare Part D Benefit Managers and Plan Sponsors, Kmart should have based its reimbursement requests to the insurance companies handling Medicare Part D on its 'discount program' prices," but the Court did not review individual contracts or limit its holdings based on those contracts. *Garbe*, 824 F.3d 636–37.

Like Garbe's expert, Relators' expert Dr. Schafermeyer reviewed many third-party contracts, and determined that "usual and customary contract language in PBM contracts is ubiquitous," and "though U&C language may differ marginally from contract to contract, the very employment of U&C language – however varied – seeks the same goals of efficiency, economy, and quality of care noted by the *Garbe* court decision. [**Exhibit E-4**, Relators' Expert Schafermeyer Report at 24; *see also id.* at Exhibit B, pages 7–12 (listing contract documents reviewed in forming his opinions)].

But this was no innovation. Both the Relators' expert, Dr. Schafermeyer, and Defendants' expert Mr. Jacobs agree that the generally understood PBM industry definition of U&C price is the cash price charged to the general public. [Undisputed Material Fact ("UMF") No.31]. In addition, as the Seventh Circuit observed: "[t]he CMS Manual has long noted that 'where a pharmacy offers a lower price to its customers throughout a benefit year' the lower price is considered the 'usual and customary' price rather than 'a one-time "lower cash" price,' even where the cash purchaser uses a discount card." *Id.* at 644 (quoting CENTERS FOR MEDICARE & MEDICAID SERVS., *Chapter 14—Coordination of Benefits*, *in* MEDICARE PRESCRIPTION DRUG BENEFIT MANUAL 19 n.1 (2006), https://perma.cc/MW6A-H4P6). When a pharmacy's "discount" prices are "the lowest prices for which its drugs were widely and consistently available," those "discount" prices are the pharmacy's 'usual and customary' charges for the drugs." *Id.* at 645. As a matter of law, Medicare Part D and Medicaid are entitled to those usual and customary prices. *Id.* at 644.[5]

A pharmacy's "usual and customary" price can be evidenced in two ways: 1) the price a pharmacy regularly offers cash customers for a particular drug; or, 2) the actual price a pharmacy accepts when it sells a drug, and at what frequency. The offer includes, for example, official discount formularies or, in the instant case, Defendants' Price Match Program effectively adopting the discount formularies of its competitors. The inquiry with respect to the offer is to simply ask, "at what price does the pharmacy make its drugs available?" Alternately, determining a pharmacy's

---

[5] The Seventh Circuit did not make these legal determinations about the meaning and applicability of U&C price based on contracts or an analysis of the facts of Garbe's case. This Court need not do so either.

The *Garbe* Court expressed no reservations about the lower court deciding the definition of "usual and customary" as a matter of law (though it noted the District Court took evidence of the industry definition of that term) nor was it troubled that the court resolved the meaning of "general public" without taking evidence. *Garbe*, 824 F.3d 632, *passim*; *see also id.* at 645 (rejecting Kmart's argument that "whether its discount prices were its 'usual and customary' charges" was a question of fact for the jury).

actual price requires an inquiry into actual sales. These sales show the actual price a pharmacy is willing to accept for a drug (in the absence of advertised discounts, formularies, clubs, etc.), or what *Garbe* referred to as "'the prevailing market price.'" *Garbe*, 824 F.3d at 644 (quoting *United States v. Bruno's, Inc.*, 54 F.Supp.2d 1252, 1257 (M.D. Ala. 1999)). That actual sale price becomes the U&C regardless of whether an offer was widely disseminated. As Plaintiffs' expert Dr. Schafermeyer noted, "U&C price is not a price arbitrarily set by a pharmacy, but is a price based on the actual retail market prices offered by the pharmacy to the general public, namely to its cash customers."[6] In this case, Defendants' actual U&C price is evidenced by both the lower cash prices they offered to the general public, [UMF Nos. 5–11], and the lower cash prices they accepted and failed to acknowledge in any way when setting U&C prices they reported to Third Parties. [UMF Nos. 28-30].

In no uncertain terms, *Garbe* requires that when a pharmacy offers (or accepts) discount cash prices to the general public that are "the lowest prices for which its drugs were widely and consistently available"—as opposed to "a one-time 'lower cash' price"—those discount cash prices are the pharmacy's U&C price.[7] There is no genuine dispute that Defendants offered (and accepted) discount lower cash prices to the general public, nationwide, over many years. Pursuant to *Garbe* and the large body of authority the Seventh Circuit relied upon, Defendants' Price Match Program set their U&C price. Medicare Part D and Medicaid should have received the benefit of that discount.

---

[6] [**Exhibit E-4**, Relators' Expert Schafermeyer Report at 17 (citing *United States ex el. Garbe v. Kmart Corp.*, 824 F.3d 632, 644 (7th Cir. 2016))]; *accord* [UMF No. 30].

[7] *Garbe*, 824 F.3d at 644–45; CENTERS FOR MEDICARE & MEDICAID SERVS., *Chapter 14—Coordination of Benefits*, *in* MEDICARE PRESCRIPTION DRUG BENEFIT MANUAL 19 n.1 (2006), https://perma.cc/MW6A-H4P6.

## A. Defendants Price Match Program was Offered to the General Public

It is undisputed that Defendants' Price Match Program was available to anyone that requested a price match. [UMF No. 10]. It is also undisputed that Defendants promoted their Price Match Program nationwide, in all of their stores, through means that were broad, varied, and pervasive. [UMF Nos. 5–9].[8] It is undisputed that lower cash matched prices were available to everyone at Defendant Albertsons until October 2013, and to everyone at Defendant SuperValu until December 2016. [UMF Nos. 3–4].

Moreover, it is undisputed that all of Defendants' banners advertised price matching in all states where those banners operated at various times between October 2006 and June 2012. [UMF No. 6]. That this advertising acted as an "offer" to everyone cannot be seriously challenged. For example, Plaintiffs' Exhibit 209A is a color "Iron Man" sign for Sav-On Pharmacy (Albertsons) which states "We Match Prescription Drug Prices* - Including all Generics". [**Exhibit P.E. 209A**, Price Match Advertisement].[9] When asked during his deposition whether the sign was used at Defendants' banners to advertise the matching prescription drug pricing, Christopher Dimos, Defendants' former President of Pharmacy, responded, "[t]his was used to describe – *describe an offering* that we had about matching prescription drug pricing." [**Exhibit D-3**, Dimos Depo., 167:9–15 (*emphasis added*)].

_____

[8] Defendants stipulate that they advertised price matching in all states where their banners operated. [UMF No. 6]. Defendants further stipulate that price match advertisements were disseminated to the public through various means, such as in-store and pharmacy signage, fliers, circulars, in-store audio announcements, mailers, newspapers of general circulation, on the back of store receipts, and Defendants' web pages. [UMF No. 8].

[9] The nominal restrictions to price matching were: "*Competitor's prices must be verifiable and from a nearby pharmacy. Internet prices and free offers are excluded." [*See, e.g.*, **Exhibit P.E. 209A**, Price Match Advertisement].

Defendants' Price Match Program—even setting aside Defendants' nationwide, public advertising of that program—was an "offer to the general public" under the plain meaning of that phrase. Little needs to be said in support of this fact. And whatever doubt may exist is quickly dispelled by *Garbe*.

Whether a customer was young or old, insured or uninsured, new or returning, Defendants' Price Match Program was available for the asking. [UMF No. 26]. Defendants presented fewer barriers to participation in their Price Match Program than Kmart presented to its discount club members in *Garbe*. [UMF No. 11]. Kmart required its club members to opt-in to the club, provide personal information, and pay a $10 fee. *Garbe*, 824 F.3d at 643. The *Garbe* court roundly rejected these "flimsy devices" Kmart used to "artificially divid[e] its customer base." *Id.* at 645. But the Defendants here did not even *attempt* to cloak the division between their customers who were offered lower cash matched prices and the "general public"—they just pretended price overrides were unique negotiations with individual customers.

While Defendants might choose to characterize their price match customers as an "exception" to their standard cash customer, there was nothing exceptional about who had access to discounted cash prices. This is reflected in the testimony of Defendants' managers. Mark Allgood, Defendants' Director of Pharmacy Systems and Process Redesign, explained that "if they [a customer] had obtained a price from a competitor and they gave us that price, we found out which location it was and we verified that price and honored that price." [**Exhibit D-1**, Allgood Depo. at 71:11–14]. When asked if "anyone could qualify for a price match if they met those criteria that you just outlined?", Allgood responded, "Absolutely." [**Exhibit D-1**, Allgood Depo. at 71:15–18]. Steve McCann, Defendants' Vice President of Pharmacy, offered similar testimony. When presented with the proposition "[s]o assuming a person met the requirements of the SuperValu price match policy, any person could get a price match?" McCann responded, "Correct." [**Exhibit D-6**, McCann Depo. at 76:15–18]. Defendants by stipulation have

13

adopted this testimony as the Defendant companies' Rule 30(b)(6) testimony. [**Exhibit C**, d/e 152, Stipulation ¶D.1]

*Garbe* is also clear that asking for a discount cash price does not make a customer exceptional; Defendants' discount program is no less an offer to the general public even if it required customers to request a price match.[10] The Price Match Program as carried out was, in fact, indistinguishable from the discount programs at issue in *Garbe* for a very basic reason: a customer's choice to ask about an offered price match is no different than a Kmart customer's choice to enroll in a discount program. As Kmart unsuccessfully argued to the Seventh Circuit: "Clearly, customers *who choose* to enroll in a pharmacy's loyalty program—by completing some form of enrollment process and even paying an annual enrollment fee—are distinguishable from members of the cash paying 'general public' who make a purchase at the pharmacy counter." [**Exhibit J**, Brief of Appellant at 40, *United States ex rel. Garbe v. Kmart*, 842 F.3d 632 (7th Cir. 2016) (No. 15-1502) (emphasis added)].[11] For the same reasons the Seventh Circuit rejected Kmart's argument that customers who chose to join its club (and fill out a form and pay a fee) were not members of the general public, so too should this Court reject any suggestion by the Defendants that customers who ask for a price match are not members of the general public.

As this Court has already recognized: "The offer to the general public determines the usual and customary price—not whether the offer was couched as a discount club or whether a majority of people accepted it." (citing *Garbe*, 824 F.3d at 645 ("Because Kmart offered the terms of its 'discount programs' to the general public and made them the lowest prices for which its drugs were

---

[10] Though it is undisputed that Defendants did not always require a customer to ask each time he or she received a lower discount cash price. [UMF No. 25; *see also* UMF Nos. 26–27].

[11] Indeed, Kmart pharmacists "routinely overrode official program pricing to match competitor prices" before adopting a more sophisticated scheme—the club at issue in *Garbe*—to maintain artificially high U&C prices. *Garbe*, 824 F.3d, at 636.

widely and consistently available, the Kmart 'discount' prices at issue represented the 'usual and customary' charges for the drugs.")) [(d/e 65) Order Denying MTD at 21–22].

The undisputed facts here mandate the conclusion that Defendants' Price Match Program was an offer to the general public that determined Defendants' U&C price. Defendants offered lower cash prices for many years to everyone, without restriction, through a variety of methods. No fee was required to participate in the price match program, and any person satisfying the minimal requirements of Defendants' Price Match Program (which officially limited price matches to verifiable, nearby competitors) could obtain a lower cash price.

Undisputed pharmacy transaction data shows that people obtained Defendants' lower cash prices more than six million times.

## B. Defendants' Discounted Matched Prices were not One Time Lower Cash Prices

As the Seventh Circuit recognized and relied on in *Garbe*, the CMS Manual has "long noted" that "'where a pharmacy offers a lower price to its customers throughout a benefit year' the lower price is considered the 'usual and customary' price rather than 'a one-time lower cash' price." (*Garbe*, 824 F.3d at 644 (quoting CENTERS FOR MEDICARE & MEDICAID SERVS., *Chapter 14— Coordination of Benefits*, *in* MEDICARE PRESCRIPTION DRUG BENEFIT MANUAL 19 n.1 (2006), https://perma.cc/MW6A-H4P6)). Part D plan sponsors "consider this lower amount to be 'usual and customary' and will reimburse on the basis of this price." *Id.*

Defendants' Price Match Program discounts were not "one-time" lower cash prices or exceptions to their U&C price negotiated with individual consumers. The Price Match Program was Defendants' attempt to "combat" Walmart's and other competitors' discount drug programs. [UMF No. 23]. This program was adopted because Defendants wanted to retain and attract pharmacy customers, [UMF No. 24], without sacrificing millions in profit by officially lowering their drug

prices. [UMF No. 21]. Defendants even kept their competitors' formularies behind the pharmacy counter—201 out of 222 stores self-reported and produced competitor's discount drug formularies kept in the pharmacies at those stores, including *at least*[12] 192 stores that kept Walmart's discount drug formulary in the pharmacy—and accessed them on the internet without officially adopting their own. [UMF Nos. 12–14].

Though Defendants may have nominally "consider[ed]" price matching an "'exception' for customer service reasons," [UMF No. 22], they promoted the Price Match Program nationwide for years to combat their competitors' discount programs. Lower cash match prices were never supposed to be an exception.

Defendants' own pharmacy transaction data bears this out, conclusively showing that Price Match Program discounts were not "one-time" lower cash prices.[13] Defendants used price overrides to accomplish price matches without changing the higher U&C reported to Third Party payors like Medicare Part D and Medicaid. A price "override" occurred when pharmacy personnel replaced Defendants' then current, reported cash "retail" price with a lower competitor price. [UMF No. 2]. At least 56.94% of Defendants' price overrides explicitly matched Walmart's discount drug program; Defendants identified specific competitor price matches for 88.31% of all Price Overrides. [UMF No. 16].

As the sales data reflects, Defendants' price overrides grew five-fold as a percentage of total cash sales from the beginning of Defendants' efforts to combat their competitors' discount

---

[12] [*See* **Exhibit D-4**, Basler Depo. (Rough), 217:3–218:21 (testifying that he "assume[d]" advertisements and competitor lists were not found in some store packets because of his instruction to some pharmacists "to have those lists and ads discarded")].

[13] [**Exhibit C**, (d/e 152), Stipulation Regarding 30(b)(6) Deposition Topics, ¶A.1 ("Defendants stipulate as to the authenticity of the data Defendants produced from the ARx database from September 1, 2006 through December 31, 2016, which was produced in four installments in June and July of 2017")].

programs with the Price Match Program to its peak in 2011. [UMF No. 15]. Price matching occurred at a rate as high as *18,000 overrides per week*. [UMF No. 17]. Defendants' own sales data reveals that the Price Match Program was available to all customers year-round, and was never even remotely a "one-time lower cash price" offer or a customer service exception to their true U&C price.

Defendants offered their Price Match Program to the general public continuously over the course of multiple prescription benefit years. Defendants began their price match program in the fall of 2006. [UMF No. 1]. Albertsons offered its price match program, uninterrupted, through October 2013. [UMF No. 3]. Supervalu's program ran continuously through December 2016. [UMF No. 4].

As the initial expert report of Plaintiffs' expert Ian Dew of Steck Consulting illustrates, Defendants routinely—over the course of a decade—overrode their own prices to match their competitors' discount drug programs. Millions of cash customers enjoyed the benefit of these discount prices. The Government did not. [UMF Nos. 18–20].

**Table 4. Summary of Sales and Claims per Year.**

| Year | Sales | Claims | Cash Sales | Cash Sales with Price Override |
|------|-------|--------|------------|-------------------------------|
| 2006 | 882,381 | 942,150 | 61,538 | 3,813 |
| 2007 | 25,271,285 | 27,687,645 | 1,623,962 | 142,154 |
| 2008 | 44,027,272 | 48,282,809 | 3,070,495 | 505,595 |
| 2009 | 42,684,942 | 47,915,590 | 3,300,096 | 983,886 |
| 2010 | 39,916,422 | 45,749,159 | 3,242,412 | 1,219,348 |
| 2011 | 39,139,129 | 45,018,958 | 3,180,202 | 1,251,883 |
| 2012 | 39,831,598 | 45,169,491 | 2,961,776 | 1,083,389 |
| 2013 | 37,645,186 | 42,625,397 | 2,388,881 | 748,347 |
| 2014 | 37,303,825 | 42,262,398 | 1,544,788 | 162,289 |
| 2015 | 35,628,870 | 40,456,492 | 1,347,323 | 132,162 |
| 2016 | 28,889,969 | 32,998,537 | 1,010,373 | 77,309 |
| Totals | 371,220,879 | 419,108,626 | 23,731,846 | 6,310,175 |

Defendants' Price Match Program was not a ten-year string of six million one-time exceptions to its true usual and customary price. It was a stealthy discount program, widely and consistently available to the general public—just not to the Government.

### C. Because California, Illinois, Washington, and Utah Regulations Do Not Provide Otherwise, "Usual and Customary" Price for Medicaid in those States is Defined as the "Cash Price Offered to the General Public"

The controlling Federal Medicaid regulations applicable to all state Medicaid programs cap pharmacy reimbursement at the "[p]rovider's usual and customary charges to the general public."[14] As the Seventh Circuit noted in *Garbe*, "[u]nless state regulations provide otherwise, the 'usual and customary' price is defined as the 'cash price offered to the general public.'"[15]

Because the Medicaid regulations for the states of California, Illinois, Utah and Washington do not provide otherwise, the applicable definition of U&C price for Medicaid reimbursement in these states is the "cash price offered to the general public."[16] Defendants offered their Price Match Program to the general public, and were obligated to report these lower cash match prices as their U&C prices to the California, Illinois, Utah, and Washington Medicaid programs.[17]

### 1.  CALIFORNIA MEDI-CAL

From at least 2006 to 2016, California Medi-Cal[18] regulations maintained a U&C price cap on prescription drug reimbursement at charges to "the general public" in accord with the regulatory framework articulated in *Garbe*:

Eligibility for Payment - Discriminatory Billings:

---

[14] 42 CFR § 447.512 (2007 to the present); 42 CFR § 447.331 (2006); *see also Garbe,* 824 F.3d at 644.

[15] *Garbe,* 824 F. 3d at 643.

[16] *Id.*

[17] *Id.* at 645.

[18] The California Medicaid program is known as "Medi-Cal."

(a) No provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service.

Title 22, California Code of Regulations, Section 51480 (effective 2005–2015).

Payment for Services and Supplies – General :

(a) Notwithstanding any other provisions to these regulations, no provider shall charge for any service or article more than would have been charged for the same service or article to other purchasers of comparable services or articles under comparable circumstances.

Title 22, California Code of Regulations, Section 51501 (effective 2005–2018).

Payment for Services and Supplies – Pharmaceutical Services and Prescribed Drugs:

(b) Payment for Legend Generic Drug Types (1) . . . (A) The price charged to the program shall not exceed that charged to the general public.

Title 22, California Code of Regulations, Section 51513 (effective 2005–2008).

Payment for Services and Supplies – Pharmaceutical Services and Prescribed Drugs:

(b) Payment for Legend and Nonlegend Drugs (1) . . . (A) The price charged to the program shall not exceed that charged to the general public.

Title 22, California Code of Regulations, Section 51513 (effective 2009–2018).

California Welf. & Inst. Code § 14105.455, effective July 2009, added prices charged to "other third party payors" to California's definition of "Usual and customary charge": "[p]harmacy providers shall submit their usual and customary charge when billing the Medi-Cal program for prescribed drugs . . . '[u]sual and customary charge' means the lower of the following: (1) The lowest price reimbursed to the pharmacy by other third-party payers in California, excluding Medi-Cal managed care plans and Medicare Part D prescription drug plans. (2) The lowest price routinely

offered to any segment of the general public."[19]

On May 5, 2010, the United States District Court for the Central District of California issued a preliminary injunction to enjoin the enforcement of § 14105.455.[20] Shortly thereafter, on May 24, 2010, Medi-Cal issued a notice informing providers of the terms of the injunction and directing pharmacies to continue to comply with the U&C charge billing limits which existed prior to the enactment of § 14105.455—articulated in Title 22, California Code of Regulations above—and specifically §§ 22 CCR 51480 and 51501, while the injunction remained in effect.[21]

Because the existing regulations limiting California Medicaid prescription drug reimbursement to charges to "the general public" continued to apply during the pendency of the injunction, the injunction has no bearing on this case. California regulations and *Garbe* are in agreement that Defendants' "usual and customary" price is the cash price they offered to the general public.

## 2. *ILLINOIS MEDICAID*

During the relevant time period, Illinois Medicaid regulations, like *Garbe*, capped prescription drug reimbursement at a provider's "prevailing" or "usual" charge to the "general public," including "discounts to the general public":

> Payment for Non-Institutional Services – Legend Prescription Items (Not Compounded):
>
> For legend (prescription) drugs, the Department shall pay the lower of: a) the pharmacy's prevailing charge to the general public . . . .

---

[19] Cal. Welf. & Inst. Code § 14105.455.

[20] [**Exhibit K**, May 24, 2010 Medi-Cal Notice "Medi-Cal Fee-For-Service Reimbursement for Drugs May 5, 2010 Court Action"]. This notice provided information about the Court Order from *Calif. Pharm. Ass'n v. Maxwell-Jolly*, Case No. 09-08200 (C. D. Cal. May 5, 2010)). The district court issued a preliminary injunction, which required DHCS to refrain from enforcing the new U&C charge billing statute codified at Welf. & Inst. Code § 14105.455. *Id.*

[21] *Id.*

89 Illinois Administrative Code (IAC) § 140.445 (effective 2005–2012).

> Payment for Non-Institutional Services – Legend Prescription Items (Not Compounded):
>
> a) Effective July 1, 2012, for legend (prescription) drugs, the Department shall pay the lower of: 1) the pharmacy's usual and customary charge to the general public . . . .

89 Illinois Administrative Code (IAC) § 140.445 (effective 2012–2018).

> Medical Provider Participation – Participation Requirements for Medical Providers:
>
> The provider shall agree to: . . . (g) Make charges for the provision of services and supplies to recipients in amounts not to exceed the provider's usual and customary charges and in the same quality and mode of delivery as are provided to the general public . . . .

89 IAC 140.12(g) (2005) [subsection (g) moved to (h) in 2007] (effective 2005–2018).

Illinois Medicaid regulations further require that "[i]f a pharmacy gave discounts to the general public, is must provide the same to Public Aid recipients":

> Payment for Non-Institutional Services – Reimbursement:
>
> If a pharmacy gives discounts to the general public, it must provide the same to Public Aid recipients. If discounts are allowed only to a specific group of people, they shall be extended to a recipient if he or she is a member of the special discount group. Public Aid recipients can constitute a special group and receive a discount, but they cannot be excluded from a discount group just because they are recipients.

89 IAC 140.447(b) (effective 2001–2018).

Like California, Illinois is in accord with *Garbe* that Defendants' "usual and customary" price is the cash price they offered to the general public.

### 3.  UTAH MEDICAID

Until 2016, Utah Medicaid prescription drug reimbursement regulations did not independently define "usual and customary" price.

The Utah Department of Health notified providers in an October 2008 Medicaid Information Bulletin that discount prices were considered as U&C prices by Utah Medicaid:

**$4 Low-cost Generic Programs**

$4.00 prescriptions offered by pharmacies with low-cost generic programs are being considered as usual and customary by Utah Medicaid. Pharmacies offering these discounts must transmit the $4.00 as the U&C. Medicaid will recoup reimbursement amounts above the $4.00 upon audit.

[**Exhibit L**, Utah Department of Health Medicaid Provider Bulletin October 2008 at 17].

In 2016, Utah added definitions to UAC R414-60-2, including "'usual and customary charge' . . . the lowest amount a pharmacy charges the general public for a covered outpatient drug, which reflects all advertised savings, discounts, special promotions, or any other program available to the general public." UAC R414-60-2(5) (2016–2018); *see also* UAC R414-60-7(1) ("A pharmacy may not submit a charge to Medicaid that exceeds the pharmacy's usual and customary charge") (2016–2018).

*Garbe* defines "usual and customary price" as the "cash price offered to the general public,"[22] and Utah Medicaid regulations have never provided otherwise.

### 4. *WASHINGTON MEDICAID*

Washington Medicaid regulations also cap reimbursement at the providers' usual and customary charges to the general public and, in addition, expressly require a provider to give the Washington Medicaid the benefit of any discounts offered to non-Medicaid customers:

Pharmacy Services – Definitions:

"*Usual and customary charge*" means the fee that the provider typically charges the general public for the product or service.

Washington Administrative Code ("WAC") 388-530-1050 (effective 2004–2010).

Prescription Drugs (Outpatient) – Definitions:

"Usual and customary charge" – the fee that the provider typically charges the general public for the product or service.

WAC 182-530-1050 (effective 2011–2018).

---

[22] *Garbe,* 824 F. 3d at 643.

Pharmacy Services – General Reimbursement Methodology:

(1) The medical assistance administration's (MAA) total reimbursement for a prescription drug must not exceed the lowest of: . . . (g) The provider's usual and customary charge to the non-Medicaid population . . . (5) If the pharmacy provider offers a discount, rebate, promotion or other incentive which directly relates to the reduction of the price of a prescription to the individual non-Medicaid customer, the provider must similarly reduce its charge to MAA for the prescription.

WAC 388-530-1300 (effective 2006–2007).

Pharmacy Services Reimbursement – Reimbursement:

(1) The department's total reimbursement for a prescription drug must not exceed the lowest of: . . . (f) The provider's usual and customary charge to the non-Medicaid population . . . (5) If the pharmacy provider offers a discount, rebate, promotion or other incentive which directly relates to the reduction of the price of a prescription to the individual non-Medicaid customer, the provider must similarly reduce its charge to the department for the prescription."

WAC 388-530-7000 (effective 2008–2010).

Prescription Drugs (Outpatient) Reimbursement – Reimbursement (2011–2016):

(1) The department's total reimbursement for a prescription drug must not exceed the lowest of: . . . (f) The provider's usual and customary charge to the nonmedicaid population. . . (5) If the pharmacy provider offers a discount, rebate, promotion or other incentive which directly relates to the reduction of the price of a prescription to the individual nonmedicaid customer, the provider must similarly reduce its charge to the department for the prescription.

WAC 182-530-7000 (effective 2011–2016).

Washington Medicaid, like its counterparts in California, Illinois, and Utah is in harmony with the federal regulatory scheme, articulated in *Garbe*, that limits Medicaid reimbursement to the "'usual and customary' price . . . defined as the 'cash price offered to the general public.'" *Garbe,* 824 F. 3d at 643 (holding that this definition of "usual and customary price" controls "[u]nless state regulations provide otherwise").

Accordingly, the governing baseline definition of U&C price for the four State Medicaid

programs at issue in this action is the "cash price offered to the general public."[23] Like Medicare Part D, because Defendants offered their Price Match Program to the general public and made those lower cash prices widely and consistently available, the California, Illinois, Utah, and Washington Medicaid programs should have also received the benefit of that deal.[24]

## IV.   CONCLUSION

There is no genuine dispute that Defendants offered lower cash prices on drugs sold to the general public, nationwide, over many years. Nor is there any genuine dispute that Defendants accepted lower cash prices from the general public, millions of times, nationwide, and over many years. Like Kmart's club in *Garbe*, Defendants' Price Match Program was a flimsy attempt to insulate high U&C prices by ignoring the lower cash prices it always offered and routinely charged customers under their Price Match Program. Pursuant to *Garbe* and the undisputed material facts, this attempt must fail. By reporting a U&C price that omitted the lowest prices for which their drugs were widely and consistently available, Defendants denied California, Illinois, Utah, Washington, and the United States the low prices to which they were entitled.

With the undisputed facts now at its disposal, this Court is presented with a pure question of law: Whether Defendants' Price Match Program prices were its "usual and customary" charges.[25]

The answer to this question has been made clear by the Seventh Circuit. The *Garbe* case controls the interpretation of "usual and customary" here, and requires a determination that: 1) the Defendants' lower matched prices, offered to the general public and widely and consistently available, are the usual

---

[23] *Garbe,* 824 F.3d at 643.

[24] *Id.* at 644–45.

[25] *Id.* at 645 (deciding affirmatively as a matter of law that "[Kmart's] discount prices were its 'usual and customary' charges").

and customary prices for their drugs; and, 2) Medicare Part D and Medicaid were entitled to those actual

U&C prices.

Accordingly, the Relators' First Motion for Partial Summary Judgment should be GRANTED.

Respectfully submitted,

*/s/ Dale J. Aschemann*
Timothy Keller
    Illinois Bar No. 6225309
Dale J. Aschemann
    Illinois Bar No. 6269347
ASCHEMANN KELLER LLC
300 North Monroe Street
Marion, Illinois 62959-2326
Telephone: (618) 998-9988
Facsimile: (618) 993-2565
E-Mail: tkeller@quitamlaw.org

*Lead Counsel for Relators*

*/s/ James A. Tate*
Paul B. Martins
    Ohio Bar No. 0007623
Julie Webster Popham
    Ohio Bar No. 0059371
James A. Tate
    Ohio Bar No. 0085319
Helmer, Martins, Rice and
Popham Co., L.P.A
600 Vine Street, Suite 2704
Cincinnati, Ohio 45202
Telephone: (513) 421-2400
Facsimile: (513) 421-7902
E-Mail: pmartins@fcalawfirm.com
            jpopham@fcalawfirm.com
            jtate@fcalawfirm.com

Glenn Grossenbacher
Texas Bar No. 08541100
Law Office of Glenn Grossenbacher
24165 IH-10 W., Ste 217-766
San Antonio, Texas 78257-1160
Telephone: (210) 271-3888
E-Mail: gglaw@satx.rr.com

Rand J. Riklin
Texas Bar No. 16924275
Goode Casseb Jones Riklin Choate & Watson
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
Telephone: (210) 733-6030
Facsimile: (210) 733-0330
E-Mail: riklin@goodelaw.com

Gary M. Grossenbacher
Texas Bar No. 24008972
Attorney at Law
402 Vale Street
Rollingwood, Texas 78746
Telephone: (512) 699-5436
E-Mail: gmgtex@austin.rr.com

C. Jarrett Anderson
Texas Bar No. 00796124
Anderson LLC
1409 Wathen Avenue
Austin, TX 78703-2527
Telephone: (512) 619-4549
Facsimile: (512) 582-8545
E-Mail: jarrett@anderson-llc.com

Jason M. Idell
Texas Bar No. 24055714
Idell PLLC
6800 Westgate Blvd. Ste 132 #301
Austin, Texas 78745
Telephone: (512) 689-3081
E-Mail: jason@idellpllc.com

*Attorneys for Relators*

## CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION

I certify that the foregoing Motion for Partial Summary Judgment complies with the type volume limitation set forth in C.D. Ill. Local Rules 7.1(B)(4)(b)(1) and 7.1(D)(5). The Argument section of the memorandum is 5204 words.

*s/ James A. Tate*

26

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2018, pursuant to Local Rule 5.3 and Federal Rule of Civil Procedure 5(b), that the foregoing document was filed electronically with the Clerk of the Court using the CM/ECF system and served upon counsel of record.

<u>s/ James A. Tate</u>
James A. Tate
    Ohio Bar No. 0085319
Helmer, Martins, Rice and
  Popham Co., L.P.A
600 Vine Street, Suite 2704
Cincinnati, Ohio 45202
Telephone: (513) 421-2400
Facsimile: (513) 421-7902
E-Mail: jtate@fcalawfirm.com