# IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF ILLINOIS SPRINGFIELD DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA et al., | ) | |
| ex rel., TRACY SCHUTTE and | ) | |
| MICHAEL YARBERRY, | ) | |
| | ) | |
| Plaintiffs and Relators | ) | |
| | ) | No. 11-cv-3290 |
| v. | ) | |
| | ) | |
| SUPERVALU, INC., et al. | ) | |
| | ) | |
| Defendants | ) | |

### Relators' Second Motion for Partial Summary Judgment Relating to False Claims Submitted By Defendants To Medco Health Solutions, Inc.

## INTRODUCTION

Pursuant to Civil Rule 56(a) and CDIL-LR 7.1(D), Plaintiffs/Relators in this False Claims Act action move this Court to enter partial summary judgment against Defendants for their submission of inflated false claims for payment to Medco Health Solutions, Inc. (**Medco**), a Medicare Part D Pharmacy Benefits Manager (**PBM**). Specifically, Defendants misrepresented their Usual and Customary (**U&C**) prices charged by their pharmacies for prescriptions sold to Government Healthcare Program (**GHP**) beneficiaries by failing to report the discounted cash prices offered through their price match program to the general public at their pharmacies nationwide.

As a matter of law, Defendants' submission of inflated U&C claims for payment by Medicare Part D result in False Claims Act liability. This legal analysis is detailed below and in Relators' companion First Motion for Partial Summary Judgment filed contemporaneously with this motion.

Relying on binding Seventh Circuit precedent, this summary judgment motion demonstrates there is no genuine dispute as to any material fact that:

(1) Defendants knew that Medco required that their cash price match prices be submitted as Defendants' U&C charge for prescriptions billed to Medicare Part D;

(2) Defendants submitted inflated U&C charges that did not reflect Defendants' discounted cash price match prices;

(3) As a result of Defendants' submission of at least 1,578,161 claims to Medco with inflated U&C charges, Defendants received no less than $12,058,310 in Government funds to which they were not entitled.

Accordingly, Relators request this court enter Partial Summary Judgment on behalf of them and the United States against the Defendants regarding the Medicare Part D claims Medco processed.

# I.    UNDISPUTED MATERIAL FACTS

## A.    Medicare Part D

1. On October 11, 2006, CMS issued a Memorandum to all Part D Sponsors addressing when a

   Medicare Part D customer may obtain a lower cash price at a network pharmacy than the Part

   D plan's negotiated price due to a "special" price or other discount. CMS then noted the

   following exception to this "lower cash price policy":

   > We note that in cases where a pharmacy offers a lower price to its customers
   > **throughout a benefit year,** this would not constitute a "lower cash price" situation
   > that is the subject of this guidance. For example, Wal-Mart recently introduced a
   > program offering a reduced price for certain generics to its customers. **The low Wal-**
   > **Mart price on these specific generic drugs is considered Wal-Marts "usual**
   > **and customary" price** and is not considered a one-time "lower cash" price. Part D
   > sponsors consider this lower amount to be "'Usual and customary" and will
   > reimburse Wal-Mart on the basis of this price. To illustrate, suppose a Plan's usual
   > negotiated price for a specific drug is $10 with a beneficiary copay of 25% for a
   > generic drug. Suppose Wal-Mart offers the same generic drug throughout the benefit
   > for $4. **The Plan considers this to take the place of the $10 negotiated price.**
   > The $4 is not considered a lower cash price, because it is not a one-time special price.
   > The Plan will adjudicate Wal-Mart's claim for $4 and the beneficiary will pay only a
   > $1 copay, rather than a $2.50 copay. This means that both the Plan and the
   > beneficiary are benefitting from the Wal-Mart "usual and customary" price, and the
   > discounted Wal-Mart price of the drug is actually offered within the Plan's Part D
   > benefit design. Therefore, the beneficiary can access this discount at any point in the
   > benefit year, the claim will be adjudicated through the Plan's systems, and the
   > beneficiary will not need to send documentation to the plan to have the lower cash
   > price count toward TrOOP [True Out of Pocket]." (emphasis supplied).[1]

2. The Defendants have stipulated that they possessed this October 11, 2006 CMS Memo,

   produced it in their document production in this case, and that the CMS Memo is an

   authentic government record.[2]

3. GHPs reimburse pharmacies for prescription drugs dispensed to Medicare Part D

   beneficiaries  using a "lower-of" formula. Reimbursement is capped at the lower of a)

---

[1] **Exhibit P.E. 127**, CMS 10/11/2006 Memo, fn.1.Throughout this motion, numbered exhibits
reflect Plaintiffs' Deposition Exhibits. Exhibits identified by letter are attachments specific to this
brief.
[2] **Exhibit K,** d/e 152, Amended Stipulation, ¶A.4.

contract price formulae meant to estimate the pharmacy's acquisition cost or b) the Usual and Customary price (U&C Price).[3]

4.     The Usual and Customary Price is generally understood to be the cash price to the general public.[4]

5.     The federal government pays the majority of Medicare Part D benefits.[5]

### B.     Defendants' Price Matching Policies and Practices

6.     The price match program began for SuperValu and Albertsons banners in the fall of 2006. Albertsons discontinued the price match program in October 2013. SuperValu discontinued the price match program in December 2016.[6]

7.     The price match program was offered to the general public and would be provided to all customers who met Defendants' criteria for a price match.[7]

8.     Defendants' policy was that price matches could only be processed as an "override" cash transaction and could not be submitted to a third party payer.[8]

9.     Under Defendants' policy, a cash price match transaction would not be submitted to a third party PBM and, as a result, that PBM would not receive notice that a beneficiary was offered a

---

[3] **Exhibit J-6**, Cross Depo. 191:20-193:13; **Exhibit J-7**, Salemi Depo. 53:9-14.

[4] *Garbe*, 824 F.3rd at 636; **Exhibit J-2**, Dony Depo., 39:13-18; **Exhibit J-4**, McCann Depo., 27:25 – 28:10; **Exhibit J-1**, Richmond Depo., 34:14-22; **Exhibit J-8**, Tsipakis Depo., 17:9-17; **Exhibit J-5**, Zook Depo., 19:9-17; **Exhibit A-5,** Defendants' Expert Jacobs Report at p. 9; and, **Exhibit A-4,** Relators' Expert Schafermeyer Report at p. 4.

[5] **Exhibit A-3**, Bertko Report/Declaration at p. 23, Table 1 (during the relevant period from 2006 to 2016 the federal government paid, on average, at least 77% of Medicare Part D benefits).

[6] **Exhibit G**, Defendants' Supplemental and Amended Answers to Relators' First Set of Interrogatories, Supplemental Response No. 3.

[7] **Exhibit P.E. 132**, 07/02/2008 *Combating the $4 Generic Programs* email: **Exhibit P.E. 132A** (Advertisement stating "We Match Prescription Drug Prices* - Including All Generics…We do it for you!"); d/e 152, Amended Stipulation, ¶¶D.1.b.1., D.1.b.2., D.1.b.3. (adopting McCann Depo., 74:18-23, 75:16-17, 76:1-4, 15-18 as corporate testimony under Civil Rule 30(b)(6)); McCann Depo., 73:6 – 77:21.

[8] **Exhibit K**, d/e 152, Amended Stipulation, ¶¶ G.1.a.1.-.2 (adopting Cross Depo., 320:11-15, 320:24-321:5); **Exhibit J-4,** McCann Depo., 83:24 -84:5; 142:3-8; **Exhibit P.E. 109**, Johnson 2/15/2008 email, *Price Matching on a Third Party claim*.

discounted cash price based on a competitor match.[9]

10.     Defendants had the ability to program their ARX system to allow cash price matches to be

reported as their U&C price but did not do so.[10]

11.     On February 15, 2008, SuperValu's Vice President of Managed Care Operations, Maxine

Johnson, issued instructions on price matching, directing that a price match must be

processed as a cash transaction. If a pharmacist "already billed a third party plan, you must

reverse the claim to the third party and reprocess the prescription as a cash claim."[11]

12.     On June 25, 2008, Mr. McCann, the Director of Pharmacy Operations, directed all

SuperValu pharmacies to continue to combat competitor $4 generic programs with the

"price match guarantee."

> At this time our combat strategy will be to continue to match prices. The
> pharmacy marketing team will be producing new "Price Match Guarantee"
> signs that all stores will be receiving shortly. It will be important for you to
> work with your Store Directors to ensure these signs are prominently place
> (sic) to inform the food store customer as well as the pharmacy customer of
> our "Price Match Guarantee."[12]

13.     In September 2009, SuperValu issued a Prescription Pricing policy whose purpose was in part

"to balance the retail price for cash customers with third party reimbursements for maximum

gross margins."[13]

14.     This Prescription Pricing Policy contained a "Prescription Price Match Guarantee" that stated

in part "The company will not lose a prescription because of price."[14]

---

[9] **Exhibit J-4**, McCann Depo., 117:24 -118:16, 119:10-19; 130:8-12.
[10] **Exhibit J-3**, Allgood Depo., 91:23 – 92:17; 232:12-20.
[11] **Exhibit P.E. 109**, Johnson 2/15/2008 email, *Price Matching on a Third Party claim*.
[12] **Exhibit P.E. 132**, McCann 6/25/2008 email, *Combating $4 Generic Programs*; McCann Depo.,
158:25 - 159:17.
[13] **Exhibit P.E. 11**.
[14] *Id.* at ¶1.

15.  On December 13, 2006, SuperValu issued a Medicare Part D Update to its pharmacies.[15]

  a.  In that Part D Update, SuperValu instructed all of its pharmacy staff concerning how to handle "low priced generics or specially priced generics that price at a lower rate than Medicare Part D copays."[16]

  b.  SuperValu acknowledged that "Medicare wants enrollees to receive the best pricing available in accordance with our Part D drug plan contracts."[17]

  c.  SuperValu told its pharmacy staff that "If a price match is offered, we may be giving an individual a lower cash price than the plan's negotiated price."[18]

  d.  The Part D Update also instructed pharmacy staff, "If asked by a Part D customer to match a lower cash price, follow the price match policy and ring the sale as cash."[19]

16.  "U&C" is a field in the ARX system used for electronic submission of the Usual and Customary price set at the SuperValu corporate headquarters to third party payers like Medco.[20]

17.  In 2010 through 2012, Defendants price matched between 11,500 and 18,000 competitor prices per week at their pharmacies.[21]

18.  Defendants' U&C prices were fixed prices set in the ARX software system at the SuperValu headquarters. Local pharmacists could not change these corporate-set U&C prices.[22]

19.  Defendants' discounted competitor match prices had no impact on the U&C price set at the SuperValu headquarters level.[23]

---

[15] **Exhibit P.E. 119**.
[16] *Id.* at p.2.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] **Exhibit J-3**, Allgood Depo., 45:3-12; 45:18 – 46:25.
[21] **Exhibits P.E. 58A, 108** (Total Company Overrides to Match Competitors' Programs line graph); **Exhibit J-7**, Salemi Depo., 159:11 - 160:1.
[22] **Exhibit J-3**, Allgood Depo., 88:18 -89:2, 107:2-7; **Exhibit J-4**, McCann Depo., 29:19 - 30:7; **Exhibit J-5**, Zook Depo.,77:16-78:1.
[23] **Exhibit J-3**, Allgood Depo., 107:16-21.

### C.    Identifying Claims Processed by Medco

20.    Medicare Part D claims processed by Medco can be identified using Defendants' ALL TOP reports, which are crosswalks created by Defendants linking PBMs to Part D Plans.[24] ALL TOP reports list PBMs by "Processor Name," and identify "Carrier Names," "Carrier IDs," and other information corresponding to Part D Plans in Defendants' transaction data.[25]

21.    ALL TOP reports identify Medco as "MEDCO HLTH."[26] The ALL TOP reports identify a number of plans processed by Medco, including three Part D Plans for which Relators seek damages.[27]

22.    Relators' original damages analysis identified 1,860,293 false claims and $14,469,332 associated with Part D claims processed by Medco from 2006 to December 31, 2015.[28] Relators' alternative rebuttal damages analysis identified 1,578,161 false Part D claims corresponding to at least $12,058,310 in federal payments for U&C overcharges from 2006

---

[24] **Exhibit D**, Ward Hartman (Senior Finance Analyst) Declaration, ¶¶ 6, 9-14; **Exhibit J-9,** Hartman Depo., 113:10 – 114:22, 125:21 – 126:23, 136:9 – 137:2; **Exhibit B**, Defendants 1/22/2018, 1/26/2018, 1/31/2018 Letters producing ALL TOP documents.
[25] *Id.*
[26] See, for example, **Exhibit E**, Sample ALL TOP report dated 05/02/2013 at p. 13 (SVU00542327).
[27] *Id.* The Part D Plans processed by Medco are identified in the ALL TOP reports by Carrier Names as i) MEDCO HLTH MEDICARE D; ii) MEDCO/PAID MEDICARE PART D; and iii) MEMBER HLTH MEDICARE D. See **Exhibit A-2**; Excerpt of Attachment B.4 to Ian Dew's rebuttal report identifies corresponding Plan Names: i) Medco Health Medicare Part D at B.4-15, 40, 65, 90 (2006-2011); ii) Medco/PAID Medicare Part D at B.4-15, 40, 65, 90 (2012-2016); and iii) Member Health Medicare Part D (2009-2011) at B.4-2, 27, 52, 77.
[28] **Exhibit A-1**, Dew Original Report / Declaration, Attachment D.4 Excerpt listing Plans processed by Medco (Carrier, GHP, Year summary). See **Exhibit A-1**; Excerpt of Attachment D.4 to Ian Dew's original report identifies the number of false claims per year in the "Number of Claims with High Reported UAC with Overpayment" column and damages in the "Total Discounted Overpayment" column for: i) Medco Health Medicare Part D (2006-2011) at D.4-39 (number of false claims) and D.4-87 (damages); ii) Medco/PAID Medicare Part D (2012-2016) at D.4-39 (number of false claims) and D.4-87 (damages); and iii) Member Health Medicare Part D (2009-2011) at D.4-26 (number of false claims) and D.4-87, 88 (damages).

through December 31, 2015.[29]

### D. Defendants Acted "Knowingly"

23. On October 27, 2006, Medco sent Defendants' top managers an e-mail entitled "Usual and

Customary pricing provisions reminder" which stated in part that:

> . . . we wanted your organization to be reminded of the Usual and Customary
> pricing provisions in all Medco pharmacy network agreements.
> Pharmacy is required, by contract, to:
> **Submit Pharmacy's Usual and Customary ("U&C") price, which
> represents the lowest net price a cash patient would have paid** on the day
> that the prescription was dispensed **inclusive of all applicable discounts**.
> **These discounts include, but are not limited to,** senior citizen discounts,
> loss leaders, frequent shopper, or special customer discounts, **competitor's
> matched price**, or other discounts offered customers. For Medco members or
> patients, it is expected that their prescription claim will be submitted through
> TelePAID/POS by pharmacy submitting appropriate pharmacy U&C
> pricing.[30]

24. This October 27, 2006 Medco email was circulated to Ronald Richmond (Director of

Managed Care Contracting), Maxine Johnson (Director of Managed Care Operations),

Daniel Salemi (Vice President of Pharmacy Services), and Chris Dimos (President of

Pharmacies).[31]

25. Defendants understood that Medco required discounted match prices to be reported as the

U&C Price, and internally modeled the financial impact of complying with Medco's terms,

---

[29] **Exhibit A-2**, Dew Rebuttal Report / Declaration, Calculation of damages for the three Part D
Plans identified supra, derived from Attachment B.4. See **Exhibit A-2**; Excerpt of Attachment B.4
to Ian Dew's rebuttal report identifies the number of false claims per year in the "Number of Claims
with High Reported UAC with Overpayment" column and damages in the "Total Discounted
Overpayment" column for i) Medco Health Medicare Part D (2006-2011) at B.4-40 (number of false
claims) and B.4-90 (damages); ii) Medco/PAID Medicare Part D (2012-2016) at B.4-40 (number of
false claims) and B.4-90 (damages); and iii) Member Health Medicare Part D (2009-2011) at B.4-41
(number of false claims) and B.4-91 (damages).
[30] **Exhibit P.E. 112**, 10/27/2006 Email of Bill Strein (Medco Senior Director) to SuperValu re:
*Usual and Customary (U&C) pricing provision reminder* (emphasis supplied).
[31] *Id.*

which was referenced as the "Medco impact."[32]

26.  Defendants also modeled the financial impact of nationally implementing a discount program similar to the $4 program implemented by Wal-Mart. In September 2006, the decrease in gross margin was estimated at $40 to $45 million annually. When Wal-Mart expanded its generic discount program in June 2008, Defendants estimated that the decrease in revenue climbed to approximately $70 million annually.[33]

27.  Marc Allgood, Defendants' Director of Pharmacy Systems and Process Redesign for SuperValu (until 2013) and then for Albertson Companies (2013 - present), received Fraud, Waste, and Abuse training from Defendants and understood "acting with deliberate ignorance or reckless disregard" to mean "anybody that's a little bit reckless or deliberately trying to avoid payment to the government or receive payment from the government."[34]

28.  Steve McCann, SuperValu's Vice President of Pharmacy, also received training on this issue and defined "deliberate ignorance" as "saying I don't know isn't a reasonable explanation for it"; and "reckless disregard" as "I knowingly disregard."[35]

29.  On October 27, 2006, when Defendants received Medco's reminder that they were required to include in their U&C price "all applicable discounts", which included "competitor's matched price", Mr. Salemi, Vice President of Pharmacy Services, forwarded Medco's U&C email to the President of Pharmacy Operations, Mr. Dimos, stating, "Note the comment

---

[32] **Exhibit P.E. 47** (6/23/2008 email, *$4 Generic PBM Info* discussing Medco U&C requirements); **Exhibit P.E. 48** (6/24/2008 email, *Walgreens Generic Discount talking points*, "Cost is now $15-16M and will increase as other managed care plans begin to follow Medco's lead."); **Exhibit P.E. 48A** (PowerPoint to Exhibit 48); **Exhibit P.E. 50** (11/10/2008 email, *Generic Discount card impact*, "Margin Impact of 100% uptake by Cash Customers $7-8 Million. Margin decrease due to Medco Impact (views as U&C – discuss) Additional $11-12.5M").

[33] **Exhibit P.E. 36**, Salemi 09/22/2006 *Wal-mart Pricing Scenario Impact* email; **Exhibit P.E. 44**, Salemi 06/18/2009 *Impact Analysis- New Wal-mart Generic Promo* email.

[34] **Exhibit J-3**, Allgood Depo., at 214:19 - 216:14.

[35] **Exhibit J-4**, McCann Depo., 168:4 - 172:6.

about price matching. Theoretically, they could audit."[36]

30. In December 2007, Ron Richmond, Director of Managed Care Contracting, characterized the price match program as "stealthy" and acknowledged that, the more it became a "rule" or "routine" the more it would become the "true U&C price":

> As for price matching on the various competitors generic programs, I believe that we have always taken a "stealthy" approach. We consider this to be something that we do as an "exception" for customer service reasons. Once we deviate to a process that is more "rule" or routine, we begin to affect the integrity of our U&C price – a slippery slope, as true U&C price is a claim submission requirement for all Medicaid and private commercial Managed Care and PBM agreements. The financial implication of this is very broad.[37]

31. On October 2, 2006, Maxine Johnson, Vice President of Managed Care Operations, in some "general bullet points" she drafted for a presentation to Defendants' Board of Directors acknowledged that in response to the Wal-Mart $4 discount program launch, PBMs were asking Defendants how they intended to respond. Ms. Johnson further acknowledged that PBMs had stated: "if we [Defendants] did this, no matter how we packaged the situation, they would consider the $4 our usual and customary price on those products."[38]

32. In June 2008, Maxine Johnson reported to Mr. Salemi and Mr. Richmond the "bad news" that Medco considered an enrollment discount program implemented by Walgreens that offered $4 generics to its customers to be its U&C.[39]

33. In August 2009, when Medco's Manual defined U&C price as including "all applicable discounts" but no longer listed specific programs such as "competitor's match price", Mr.

---

[36] **Exhibit P.E. 112**, 10/27/2006 Salemi email forwarding Medco email, *Usual and Customary (U&C) pricing provision reminder.*

[37] **Exhibit C**, Richmond 12/28/2007 email (SVU00592879 - 884) to Dan Salemi (Vice President, Pharmacy Services), Maxine Johnson (Vice President, Managed Care Operations), Pam Caselius (Marketing Director, Pharmacies). This document was produced by Defendants on the evening of the last day of discovery, April 6, 2018, so it could not be used in any of the depositions.

[38] **Exhibit P.E. 205**, Johnson 10/02/2006 email; **Exhibit P.E. 205A** (quote at p. 1, under Walmart: Repercussions).

[39] **Exhibit P.E. 47**, Johnson 6/23/2008 email, *$4 Generic PBM Info.*

Salemi understood that this change was designed "to be more vague – they can 'interpret' each program with each chain as they see fit."[40]

34. Defendants appreciated a need to protect their U&C for reimbursement purposes.[41]

35. Defendants understood that Medicare Part D regulations required them to offer negotiated prices to beneficiaries.[42]

## II. ARGUMENT

### A. Summary Judgment Standard

Pursuant to Fed. R. Civ. P. 56 and the well-settled standards controlling Motions for Summary Judgment in this Circuit:

> Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).[43]

The Court does not weigh evidence or resolve material factual issues, but instead determines whether any such issues remain unresolved such that a reasonable fact finder could decide for either party.[44] When making this determination, "[t]he Court construes all inferences in favor of the non-movant."[45] All inferences must, however, be "based on something more than 'speculation or

---

[40] **Exhibit G**, Salemi 8/31/2009 email, *Medco take on club card*; **Exhibit P.E. 114**, 8/31/2009 Richmond email, *Medco take on club card.*

[41] **Exhibit H**, 10/30/2007 email from Pharmacy District Manager Chris Basler with replies from Ron Richmond, Maxine Johnson at 1, 3 (Basler question: "How should we handle this?...I know we need to protect our U&C as well."; Maxine Johnson response: "These price matches must be done as "cash" and not TP…" (**Exhibit H**, SVU00530607-10, was marked as Plaintiff's Exhibit 340 during Mr. Basler's deposition, however, counsel has not yet received the transcript or exhibits from the Court Reporter.)

[42] **Exhibit P.E. 124**, Maxine Johnson (VP Managed Care Operations) Managed Care Update presentation at SVU00439295 ("Failure to offer negotiated prices" identified under the Governmental Definition of Fraud, Waste & Abuse).

[43] *Cent. Laborers' Pension Fund v. Demolition Excavating Grp., Inc.*, No. 11-3327, 2014 WL 1308891, at *5 (C.D. Ill. Apr. 1, 2014).

[44] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[45] *Cent. Laborers' Pension Fund*, 2014 WL 1308891 at *5 (citing *Siliven v. Indiana Dept. of Child Services,* 635 F.3d 921, 925 (7th Cir. 2011)).

conjecture'" in order to create a genuine issue of material fact.[46]

### B.      The False Claims Act

Relators bring this Partial Summary Judgment Motion on behalf of the United States under the False Claims Act (**FCA**) relating to Defendants' submission of inflated U&C prices in their claims for payments to Medicare Part D GHPs. The FCA "broadly … protect[s] the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the Government instrumentality upon which such claims were made."[47]  In enacting the FCA, Congress intended "'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'"[48]

The False Claims Act imposes liability when a person "knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval,"[49] or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[50]

The vast majority of the money paid to Defendants under Medicare Part D is from government coffers.[51]

### C.      Defendants presented or caused to be presented, false or fraudulent claims, in violation of 31 U.S.C. 3729(a)(1)(A)

---

[46] *Id.*, citing *Harper v. C.R. England, Inc.,* 687 F.3d 297, 306 (7th Cir. 2012).

[47] *Rainwater v. United States*, 356 U.S. 590, 592 (1959); *Cook County, Illinois v. United States ex rel. Chandler,* 538 U.S. 119, 129 (2003) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)).

[48] *Cook County, Illinois v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)).

[49] 31 U.S.C. § 3729(a)(1)(A) (emphasis supplied); d/e 33, First Amended Complaint, ¶133; before May 2009, this section prohibited knowingly presenting, or causing to be presented, *to an officer or employee of the United States Government or a member of the Armed Forces of the United States* a false or fraudulent claim for payment or approval.  *See United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 638 (7th Cir. 2016).

[50] 31 U.S.C. § 3729(a)(1)(B) (emphasis supplied); d/e 33, First Amended Complaint, ¶134; 31 U.S.C. § 3729(a)(1)(B) applies to all cases pending on or after June 7, 2008. *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 639-41 (7th Cir. 2016).

[51] *Garbe*, 824 F.3d at 639; Undisputed Material Fact ("UMF") No. 5.

The FCA defines a "claim" as "any request or demand . . . for money or property, that . . . is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used  on the Government's behalf or to advance a Government program or interest" and to which the Government either "provides or has provided any portion of the money or property" or "will reimburse such contractor, grantee, or other recipient for any portion of the money or property."[52]

Accordingly, Defendants presented or caused to be presented false or fraudulent prescription claims when they submitted to Medco (a Medicare Part D "downstream entity") a "request or demand . . . for money" since the Government "provided [a] portion of the money."[53]  These claims were false or fraudulent because they reported an inflated U&C price that did not accurately reflect the lower U&C discounted cash price matches that Defendants widely and consistently offered to the general public at their pharmacies nationwide.[54] In addition to the October 11, 2006 CMS directive,[55] Defendants also ignored Medco's specific requirement that Defendants' U&C price submissions include "all applicable discounts" "including, but not limited to, . . . competitor's price matched prices."[56] In this action, Defendants elected to implement a billing system designed to hide their actual U&C price from Medicare Part D PBMs like Medco and thus "protect their U&C"[57] in the following way.

First, they required that competitor price matches be processed only as cash transactions.[58] This ensured that actual discounted U&C prices for these price match drugs were never reported to

---

[52] 31 U.S.C. § 3729(b)(2).

[53] UMF Nos. 5-7.

[54] UMF Nos. 7, 9; See, e.g., *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 379 (1st Cir. 2011), *cert. denied*, 132 S. Ct. 815 (2011) (false claims are not limited to claims expressly identified as conditions of payment).

[55] UMF Nos. 1-2.

[56] UMF Nos. 23-24, 33**.**

[57] UMF No. 34.

[58] UMF Nos. 8-11 and 15; **Exhibit J-4**, McCann Depo., 83:24 -84:5; 142:3-8; **Exhibit K**, d/e #152, Amended Stipulation, ¶¶ G.1.a.1.-.2.

PBMs like Medco.[59]

Second, they programmed the ARX software billing system to report a higher U&C price that was set at the headquarters level without regard to the discounted cash competitor match prices actually charged for the same drugs to cash customers who were not allowed to use their insurance.[60] As designed, no one outside of SuperValu headquarters could set the U&C rates entered into the ARX software system. Pharmacists who were filling prescriptions and submitting the claims for payment could not alter these preset U&C prices.[61]

Third, the U&C prices electronically reported and billed through the ARX system to Medco and other Medicare Part D PBMs never reflected the discounted cash competitor match prices for those same drugs, even though Defendants tracked these cash price matches at their pharmacies.[62]

In accord with *Garbe*, the Defendants submitted false or fraudulent claims for Medicare Part D payment to Medco, a Part D PBM, and received payment of federal funds based upon those false or fraudulent submissions:

> When Kmart submitted an alleged false claim for payment, it happened at the lower level of the Medicare Part D structure. Precisely, this alleged fraud occurred when Kmart submitted its electronic claim for payment to the PBM (or, occasionally, the Plan Sponsor depending on the arrangement) that referenced an allegedly false U&C price. After this, the claim entered what Relator likes to refer to as a "black box" that ultimately reached CMS by way of a PDE [Prescription Drug Event] that was submitted by the Plan Sponsor. The false claim was not on the PDE; the PDE does not even mention U&C price. As explained above, however, this does not mean that these claims were not material, as they still affected the Medicare Part D system as a whole. Kmart received more money that it was entitled to get.[63]

**D.     Defendants made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. 3729(a)(1)(B)**

---

[59] *Id.*; *See also* **Exhibit J-4**, McCann Depo., 117:24 -118:16, 119:10-19; 130:8-12.
[60] UMF Nos. 18-19.
[61] *Id.*
[62] UMF Nos. 17, 19.
[63] *United States ex rel. Garbe v. Kmart Corp.,* 73 F. Supp. 3d 1002, 1029 (S.D. Ill. 2015), *aff'd in part, rev'd in part* 824 F.3d 632 (7th Cir. 2016).

The electronic submissions that Defendants made to Medco for Medicare Part D claims were false records or statements because they reported an inflated U&C price for drugs that Defendants were competitor cash price matching for lesser amounts. Pursuant to the October 2006 CMS directive, Part D sponsors were to consider these lower prices to be Defendants' "'Usual and customary' and reimburse [them] on the basis of this price," which took the place of the Negotiated price.[64] Defendants' inflated U&C prices also "caused" the PBM (Medco) to, in turn, make a false record or statement in the form of the PDE on which appeared the higher Negotiated Price instead of the required discounted U&C, that was passed up the Medicare Part D chain to CMS.[65]

In 2009 the FCA was amended to expressly define the term "material" as "having a natural tendency to influence," or "capable of influencing" the Government's decision to pay the claim.[66] Prior to this amendment, this same definition of "materiality" was employed by the federal courts (*see, e.g.*, *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008)) and was characterized as a "lenient" standard. *United States ex rel. Sanders v. Allison Engine Co.*, 471 F.3d 610, 623 n.7 (6th Cir. 2006), vacated and remanded on other grounds, *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008).

The definition of materiality in the False Claims Act "requires only that the false record or statement influence the 'payment *or receipt* of money or property'"[67] Plaintiffs are required to show only that Defendants' false claims, i.e., their overstatement of their U&C prices, were material to their receipt of more money than they were entitled to receive.[68]

Here, Defendants reported to Medco (a Medicare Part D downstream PBM) U&C prices

---

[64] UMF Nos. 1-2.
[65] **Exhibit A-3**, Bertko Report/Declaration at 10.
[66] 31 U.S.C. § 3729(b)(4) (as amended May 20, 2009).
[67] *Garbe*, 824 F.3d at 639 (emphasis in original).
[68] *Id.*; *Neder v. United States*, 527 U.S. 1, 16 (1999).

higher than their lower cash match prices that were widely and consistently offered to the general public.[69]  This had the natural tendency to influence, and certainly was capable of influencing, Medco's payment decisions, which resulted in Defendants receiving more money than they were entitled to receive. Defendants' claims were express false statements. There is no materiality question of "implied certification" (or reason to believe that Medco would have continued to pay inflated prices if it had access to Defendants' discounted match price sales data (which it did not)), like the situation at issue in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct 1989 (2016). An express request for payment from government funds is, by definition, material.

As explained below, analysis of Defendants' transaction data establishes that Defendants' overstatement of their U&C prices on prescription claims submitted to Medco resulted in Defendants' receipt of millions of dollars of overcharges from Medicare Part D coffers.

### E.    Defendants Knew That Medco Required That its Cash Price Match Prices Be Provided as Defendants' U&C Charge for Billed Prescriptions.

Under the FCA, a person acts "knowingly" if he: "has actual knowledge of the information"; "acts in deliberate ignorance of the truth or falsity of the information"; or, "acts in reckless disregard of the truth or falsity of the information."[70] No proof of specific intent to defraud is required.[71] Through this definition, Congress intended "'to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted.'"[72] Reckless disregard is a gross negligence-plus standard, and is satisfied, for example, when claims are prepared in "a sloppy or

---

[69] UMF Nos. 7, 9, 17.

[70] 31 U.S.C. § 3729(b)(1)(A).

[71] 31 U.S.C. § 3729(b)(1)(B).

[72] UMF Nos. 28-29; *United States v. Bourseau*, 531 F.3d 1159, 1168, (9th Cir. 2008) quoting S. Rep. No. 99-345, at 21 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5286. The definition of "knowingly" is a "fairly low standard, making it easier for the United States to prevail in FCA actions." *United States ex rel. Chandler v. Cook County, Illinois*, 277 F.3d 969, 976 (7th Cir. 2002), *aff'd*, 538 U.S. 119 (2003).

unsupervised fashion."[73]

Medco's written communications to the Defendants were unambiguous. At the beginning of the Medicare Part D program Medco emphasized its U&C definition in an October 27, 2006 reminder to Defendants.[74] As far as Medco was concerned, Defendants' U&C price encompassed "all applicable discounts, . . . These discounts include, but are not limited to, . . . competitor's matched price."[75]

Defendants knew that Medco required their Medicare Part D claims for payment to be limited to the lower of the negotiated price or the U&C price.[76] They also knew that Medco expressly required that their U&C price include "all applicable discounts" including a "competitor's matched price."[77] And they understood that this billing requirement included their price matching policy. Daniel Salemi, the Vice President of Pharmacy Services, focused on price matching when he forwarded the Medco U&C e-mail to the President of Pharmacy Operations, Chris Dimos: "Note the comment about price matching. Theoretically they could audit."[78]

In December 2007, Mr. Richmond, the Director of Managed Care Contracting, wrote to his colleagues that their price matching program used a "stealthy approach." While Defendants avowed that its price match policy was an "exception," he admitted that

> Once we deviate to a process that is more "rule" or routine, we begin to affect the integrity of our U&C price — a slippery slope, as true U&C price is a claim submission requirement for all Medicaid and private commercial Managed Care and

---

[73] *United States v. Krizek*, 111 F.3d 934, 941–42 (D.C. Cir. 1997), *citing* 132 Cong. Rec. H9382-03 (daily ed. Oct. 7, 1986) (statement of Rep. Berman). *Accord*, *United States v. Mack*, 2000 U.S. Dist. LEXIS 17367 *15–16 (S.D. Tex. 2000) ("The statute does not excuse defendants who claim the defense of confusion over billing practices or records . . . .").
[74] UMF Nos. 23-24, 33.
[75] UMF No. 33.
[76] UMF No. 3, 35.
[77] UMF Nos. 23-24, 33.
[78] UMF No. 33.

PBM agreements. The financial implication of this is very broad.[79]

Mr. Richmond's reference to a "stealthy" approach strikes at the heart of what Defendants sought to accomplish with their price match guarantee. Defendants understood that disclosing their discounted match prices to PBMs would result in lower reimbursement and lower gross margins.[80] Separating cash transactions from third party transactions was a "stealthy" approach that allowed Defendants to hide discounted prices from PBMs while still offering price incentives to attract and keep pharmacy customers. It was a classic "have our cake and eat it too" system. However, this "stealthy" approach was actually Medicare fraud.

In September of 2006, Kevin Tripp, Executive Vice President of Retail, requested Defendants' upper management to provide him a presentation focusing on Defendants' response to the Walmart $4 discount program. In her response, Maxine Johnson, the Vice President of Managed Care Operations, acknowledged that "PBMs have asked us how we are responding." She went on to explain the PBMs had stated that "if we did this, no matter how we packaged the situation, they would consider the $4 our usual and customary price on those products."[81]

In June 2008, Maxine Johnson wrote to Mr. Salemi and Mr. Richmond of the "bad news" that Walgreens had a $4 discount program and that Medco considered $4 the Walgreens U&C price.[82] Mr. Salemi considered this information important enough to forward it up to his superiors, Executive Vice President of Retail, Kevin Tripp and President of Pharmacy, Chris Dimos. Mr. Salemi stated, "KT – As soon as we hung up, I got this. Medco views Walgreens

---

[79] UMF No. 30.
[80] UMF Nos. 25-26, 30 and 34.
[81] UMF No. 31.
[82] UMF No. 32.

program as U&C."[83] Nevertheless, Defendants continued to offer and provide their cash price

match guarantee to the general public at all of its pharmacies nationwide, which they persisted

in hiding from all GHPs including Medco.

When Walmart first introduced their $4 discount program in 2006, Mr. Salemi

calculated the decrease in Defendants' gross margins would be if from implementing a

transparent discount program like Walmart's under which Defendants would have reported

the lower discounted prices as their U&C to third party payers. His initial calculations in 2006

estimated the decrease at $40 to $45 million annually. When Walmart expanded the drugs

offered under its discount program in 2008, Mr. Salemi recalculated the cost of complying

with the law reporting the impact would have increased to approximately $70 million

annually.[84]

In November 2008 Mr. Salemi again showed how seriously he took the possibility that

Defendants might be forced to disclose their discount competitor price matches to Medco,

which he referred to as the "Medco impact".[85] He sent an email to Mr. Dimos and the

Pharmacy Pricing Manager, Anne Dony, expressing reservations with the idea of offering a

generic discount card.[86] Mr. Salemi was concerned that implementing such a discount card

program would necessarily involve public dissemination of the discount prices offered in the

price match program, thereby uncloaking the "stealthy" aspect of the price match program to

Medco. Once that occurred, Mr. Salemi rightfully feared that Medco would reduce

Defendants' reimbursement correspondingly, which he calculated as resulting in a loss of

---

[83] *Id.*
[84] UMF No. 26
[85] UMF No. 25 (Exhibit 50).
[86] *Id.*

between $11 million and $12.5 million dollars annually.[87] Nevertheless, Defendants continued

to offer and provide their cash price match guarantee to the general public at all of its

pharmacies nationwide.

### F.    Relators' Damages Model

The Seventh Circuit focused on a retail pharmacy's "offer" to widely and consistently sell

drugs at reduced prices "throughout a benefit year" and not its actual "sales".[88] Accordingly, *Garbe*

does not require *any* evidence that a retail pharmacy actually sold drugs at a discounted price.

Nevertheless, Relators' damages analysis is conservative in that it does require multiple actual sales

of the discounted drugs before assessing damages. Even when multiple sales are identified in

Defendants' data, Relators' approach only calculates damages for a limited amount of time instead

of throughout the benefit year as contemplated by *Garbe*.

In general terms, Relators' damages model calculates the difference between reimbursement

received from the submission of inflated U&Cs sent to GHPs and PBMs (including Medco) through

the ARX system from the reimbursement Defendants would have received had they reported their

Actual U&C price for the same drug based upon discounted cash override competitor match prices.

Transactions are then re-adjudicated on a claim-by-claim basis using the discounted Actual U&C in

place of reimbursement based on Reported U&C. An illustration is found in Table 4 from Ian

Dew's Rebuttal Report.[89] This table includes but is not limited to claims processed by Medco.

---

[87] *Id.*

[88] *See* **Exhibit A-4**, Schafermeyer Rebuttal Report at 3 Under "Usual and Customary" for a brief discussion of the distinction between an "offer" and the amount actually "charged".

[89] **Exhibit A-2**, Dew Rebuttal Report/Declaration at 8.

**Table 4. Cash Override Prices and Reported U&Cs for Simvastatin 20mg Tablets (658620052)**

| Year | Days Supply | Most Common Override Price | Number of Cash Sales at Override Price | Most Common Reported U&C | Number of Cash Sales at Reported U&C | Discounted Overpayment |
|---|---|---|---|---|---|---|
| 2008 | 30 | $4.00 | 949 | $52.69 | 546 | $927,791 |
| | 90 | $10.00 | 169 | $150.69 | 31 | |
| 2009 | 30 | $4.00 | 3,146 | $36.69 | 871 | $587,716 |
| | 90 | $10.00 | 1,094 | $103.99 | 56 | |
| 2010 | 30 | $4.00 | 3,773 | $36.69 | 1,214 | $539,200 |
| | 90 | $10.00 | 1,747 | $103.99 | 63 | |
| 2011 | 30 | $4.00 | 3,919 | $39.69 | 677 | $385,230 |
| | 90 | $10.00 | 2,237 | $45.99 | 137 | |
| 2012 | 30 | $4.00 | 2,406 | $33.69 | 790 | $295,654 |
| | 90 | $10.00 | 1,591 | $97.69 | 86 | |
| **Totals** | | | 21,031 | | 4,471 | $2,735,590 |

Table 4 shows that, for Simvastatin 20mg tablets, there were 21,031 discounted cash sales priced at $4 or $10 from 2008 through 2012. During this same time frame, there were 4,471 sales at higher Reported U&C prices that were sent to Medco and other PBMs ranging from $33.69 to $150.69. Clearly, reported U&Cs were significantly higher than cash discount prices. Reported U&Cs ranged from $29.69 higher than the $4 discount price in 2012 to $140.69 higher than the $10 discounted price in 2008. Defendants never reported the $4 or $10 discounted cash override price match prices to Medco (or any other GHP) even though Medco specifically instructed them to do so and prohibited separating cash and third party transactions. The relatively high number of total discounted price match sales (21,031) compared to the low number of sales at Reported U&C (4,471) is also noteworthy. This disparity demonstrates that cash overrides were not the "exception" but the "rule."

**G.     Original v. Rebuttal Damages Approaches**

Relators have calculated two alternative damages approaches, as set forth in expert Ian

Dew's original report and rebuttal report.[90] Both approaches calculated the difference between: a) reimbursement based upon the Reported U&C Defendants sent to Medco and other PBMs, and b) discounted match prices.[91] Actual U&Cs were determined using records of actual discounted cash sales from Defendants' transaction data.

The major difference between Relators' original and rebuttal analyses involved the specificity with which Actual U&Cs were identified.[92] Relators' original damages approach calculated Actual U&Cs by grouping drugs using an industry classification system known as the Generic Code Number (**GCN**).[93] GCNs are broader than National Drug Codes (**NDCs**).[94] NDCs identify drugs in terms of active ingredient, form, strength, and manufacturer. GCNs cover multiple manufacturers. A given GCN might group five therapeutically equivalent drugs with five unique NDCs (corresponding to different manufacturers) together. Using a GCN-based approach, a discounted sale of any one of the five therapeutically equivalent drugs within the GCN could be considered toward establishing an Actual U&C.

Defendants criticized Relators' expert report for a number of reasons, including use of GCNs instead of NDCs to establish Actual U&Cs. In rare instances, use of GCNs resulted in calculating damages for brand drugs based on discounted generic sales. Given the minor impact of the brand drug issue, Relators stand by the original approach as a reasonable and conservative estimate of damages. Relators nonetheless issued a rebuttal report adopting Defendants' NDC-

---

[90] **Exhibit A-2**, Dew Rebuttal Report / Declaration at 2-4 (describing changes in methodology between original and rebuttal reports.).

[91] **Exhibit A-1**, Dew Original Report / Declaration, at 4 ("Treating the discounted prices that I identified as AUACs, I assessed whether the Reported U&Cs on Defendants' claims were greater than the AUACs for the same drugs in the same states and timeframes." "If the AUAC represents a lower amount than the reimbursed amount, the difference between the reimbursed amount and the AUAC would represent an overpayment relative to the AUAC.")

[92] **Exhibit A-2**, Dew Rebuttal Report / Declaration at 2-4 (describing changes in methodology between original and rebuttal reports.).

[93] **Exhibit A-1**, Dew Original Report at 12, 26-30, and 34.

[94] *Id.* at 12.

specific approach, so as to cure any potential issues related to brand drugs and establish a "floor" or absolute minimum amount of damages. The original report contains a reasonable estimate of damages. The rebuttal report establishes a minimum amount as an alternative.[95]

The Relators intend to present both options for the jury's consideration at trial. For the purposes of this motion, Relators advance the lower number of false claims and damages identified for the plans at issue in Mr. Dew's rebuttal report. From 2006 to December 31, 2015, Relators identified 1,578,161 false claims corresponding to $12,058,310 in damages under this conservative alternative.[96] There is thus no fact issue as to whether the original or rebuttal alternative damages approach applies.

## III.    CONCLUSION

Under *Garbe*, Defendants' offer of discounted competitor match prices to the general public and failure to report those prices as U&C is sufficient to warrant FCA liability. Relators are not required to engage in an argument over whether particular PBMs put Defendants on actual notice of their obligation to report discounted prices as U&C.

With respect to Medco, Defendants' arguments fail even when one goes far beyond *Garbe* or the False Claims Act and construes the facts in Defendants' favor. Medco demanded that discount prices be reported as U&C and prohibited pharmacies from separating cash and third party transactions. All transactions involving Medco beneficiaries were to have been reported to Medco. Defendants understood this and modeled the financial impact of complying with Medco's terms. When the cost of doing business in a manner that would withstand a spotlight was deemed too high,

---

[95] **Exhibit A-4**, Schafermeyer Rebuttal Report at 4. ("While calculating damages based on NDC9 instead of GCN is certainly valid, doing so was not necessary in my opinion. I considered calculation of damages using GCNs to be entirely appropriate in this case, and believe that Plaintiffs may be undercounting damages by narrowing the methodology from GCNs to NDC9.")

[96] **Exhibit A-2**, Dew Rebuttal Report / Declaration Attachment B.4 (Calculation of damages for the three Part D Plans processed by Medco, derived from Attachment B.4 to Ian Dew's rebuttal report.)

Defendants adopted a "stealth" approach to treatment of U&C: competitor prices were matched and treated as cash transactions. Discounted cash price match transactions were hidden from Medco (and Medicare Part D) pursuant to the express terms of Defendants' pricing policies. In this way, Defendants attempted to have their cake and eat it too. They offered the same low prices as competitors like Wal-Mart, and were reimbursed for the same drugs at higher levels due to U&C manipulation.

Defendants reaped a significant benefit by shielding discounted match prices from PBM view. From 2006 to December 31, 2015, Defendants' U&C fraud caused Medco to falsely report over one million claims to Medicare Part D Plan Sponsors. Defendants' U&C fraud involved at least 1,578,161 false claims submitted to Medco and $12,058,310 in corresponding damages during this time period under Relators' most conservative alternative damages calculation.

Pursuant to the Federal False Claim Act, Relators request partial summary judgment relating to the inflated Medicare Part D claims submitted to Medco as follows:

1.      1,578,161 false claims; and,

2.      $12,058,310 damages, subject to the mandatory provisions of 31 U.S.C. §3729(a)(1).

Accordingly, the Relators' Second Motion for Partial Summary Judgment should be GRANTED.

Respectfully submitted,

*/s/ Timothy J. Keller*
Timothy Keller
Illinois Bar No. 6225309
Dale J. Aschemann
Illinois Bar No. 6269347
ASCHEMANN KELLER LLC
300 North Monroe Street
Marion, Illinois 62959-2326
Telephone: (618) 998-9988
Facsimile: (618) 993-2565
E-Mail: tkeller@quitamlaw.org

*Lead Counsel for Relators*

/s/ Jason M. Idell

Jason M. Idell
Texas Bar No. 24055714
Idell PLLC
6800 Westgate Blvd. Ste 132 #301
Austin, Texas 78745
Telephone: (512) 689-3081
E-Mail: jason@idellpllc.com

Paul B. Martins
Ohio Bar No. 0007623
Julie Webster Popham
Ohio Bar No. 0059371
James A. Tate
Ohio Bar No. 0085319
Helmer, Martins, Rice and Popham Co.,
L.P.A
600 Vine Street, Suite 2704
Cincinnati, Ohio 45202
Telephone: (513) 421-2400
Facsimile: (513) 421-7902
E-Mail: pmartins@fcalawfirm.com
jpopham@fcalawfirm.com
jtate@fcalawfirm.com

Glenn Grossenbacher
Texas Bar No. 08541100
Law Office of Glenn Grossenbacher
24165 IH-10 W., Ste 217-766
San Antonio, Texas 78257-1160
Telephone: (210) 271-3888
E-Mail: gglaw@satx.rr.com

Rand J. Riklin
Texas Bar No. 16924275
Goode Casseb Jones Riklin Choate & Watson
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
Telephone: (210) 733-6030
Facsimile: (210) 733-0330
E-Mail: riklin@goodelaw.com

Gary M. Grossenbacher
Texas Bar No. 24008972
Attorney at Law

402 Vale Street
Rollingwood, Texas 78746
Telephone: (512) 699-5436
E-Mail: gmgtex@austin.rr.com

C. Jarrett Anderson
Texas Bar No. 00796124
Anderson LLC
1409 Wathen Avenue
Austin, TX 78703-2527
Telephone: (512) 619-4549
Facsimile: (512) 582-8545
E-Mail: jarrett@anderson-llc.com

*Attorneys for Relators*

## CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION

I certify that the foregoing Motion for Partial Summary Judgment complies with the type volume limitation set forth in C.D. Ill. Local Rules 7.1(B)(4)(b)(1) and 7.1(D)(5). The Argument section of the memorandum is 4,187 words.

*/s/ Jason M. Idell*

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2018, pursuant to Local Rule 5.3 and Federal Rule of Civil Procedure 5(b), that the foregoing document was filed electronically with the Clerk of the Court using the CM/ECF system and served upon counsel of record.

*/s/ Timothy J. Keller*
Timothy Keller
Illinois Bar No. 6225309
ASCHEMANN KELLER LLC
300 North Monroe Street
Marion, Illinois 62959-2326
Telephone: (618) 998-9988
Facsimile: (618) 993-2565
E-Mail: tkeller@quitamlaw.org