E-FILED
Monday, 21 May, 2018  10:32:33 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT G



# Transcript of John Bertko, F.S.A, MAAA

**Date:** March 16, 2018
**Case:** The United States of America, et al. -v- Supervalu, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE CENTRAL DISTRICT OF ILLINOIS

3                  SPRINGFIELD DIVISION

4                        o0o

5   THE UNITED STATES OF AMERICA, and THE
    STATES OF CALIFORNIA, DELAWARE, ILLINOIS,
6   INDIANA, MASSACHUSETTS, MINNESOTA,
    MONTANA, NEVADA, NEW JERSEY, NORTH
7   CAROLINA, RHODE ISLAND, and VIRGINIA,
    ex rel., TRACY SCHUTTE and MICHAEL YARBERRY,

8
        Plaintiff,

9
    vs.                      No. 3:11 cv 03290 RM TSH
10
    SUPERVALU, INC., SUPERVALU HOLDINGS,
11  INC., FF ACQUISITIONS, LLC, FOODARAMA,
    LLC, SHOPPERS FOOD WAREHOUSE CORP,
12  SUPERVALU PHARMACIES, INC., ALBERTSON'S,
    LLC, JEWEL OSCO SOUTHWEST, LLC, ACME
13  MARKETS, INC., SHAW'S SUPERMARKET, INC.,
    STAR MARKET COMPANY INC., JEWEL FOOD
14  STORES, INC., and AB ACQUISITIONS, LLC,

15      Defendants.
                                       /
16

17

18        DEPOSITION OF JOHN BERTKO, F.S.A, MAAA

19

20

21      Taken before Catherine M. Meyer, RPR, CSR

22                  CSR No. 11596

23                  March 16, 2018

24

25

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                           2

```
1                          I N D E X

2                                                    PAGE

3   EXAMINATION BY MR. ROBINSON              6, 165

4   EXAMINATION BY MR. MARTINS               162

5

6

7

8

9

10                       E X H I B I T S

11  DEFENDANTS'                                      PAGE

12  Exhibit 47    Notice of Deposition        7

13  Exhibit 48    Expert Report of            11
                  John Bertko, F.S.A, MAAA
14
                  Actuarial Standards Board,  71
15  Exhibit 49    Expert Testimony by Actuaries

16  Exhibit 50    Defendants' Objections and  86
                  Responses To Relators' Second
17                Set of Interrogatories

18  Exhibit 51    Expert Report of Leslie Norwalk  107

19  Exhibit 52    Medicare Part D Prescription  116
                  Drug Event (PDE) Data Elements
20
    Exhibit 53    CMS document dated April 27,  130
21                2006

22

23

24

25
```

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                    3

```
1              DEPOSITION OF JOHN BERTKO, F.S.A, MAAA

2

3        BE IT REMEMBERED, that pursuant to Notice, and on

4    the 16th day of March 2018, commencing at the hour of

5    9:10 a.m., in the offices of Norton, Rose, Fulbright US,

6    LLP, 555 California Street, Suite 3300, San Francisco,

7    California, before me, Catherine M. Meyer, a Certified

8    Shorthand Reporter, personally appeared JOHN BERTKO,

9    F.S.A, MAAA, produced as a witness in said action, and

10   being by me first duly sworn, was thereupon examined as

11   a witness in said cause.

12

13                            o0o

14

15   APPEARANCES:

16   For the Plaintiffs:

17              PAUL B. MARTINS
                HELMER, MARTINS, RICE & POPHAM CO., L.P.A.
18              600 Vine Street, Suite 2704
                Cincinnati, Ohio 45202
19              (513) 421 2400
                pmartins@fcalawfirm.com
20
                TIMOTHY KELLER
21              Aschemann Keller, LLC
                300 North Monroe Street
22              Marion, Illinois 62959
                (618) 998 9988
23              tkeller@quitamlaw.org

24

25
```

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                    4

1    For the Defendants:

2                    RICK ROBINSON
                     Norton, Rose, Fulbright US, LLP
3                    799 Ninth Street, NW, Suite 1000
                     Washington D.C. 20001 4501
4                    (202) 662 0200
                     rick.robinson@nortonrosefulbright.com
5

6

     Also present:
7
                     Alfredo Domidor, videographer.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                                    5

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  Good morning.  Here | 09:10:27 |
| 2 | begins media number one in the video recorded | 09:10:33 |
| 3 | deposition of John Bertko in the matter of The | 09:10:36 |
| 4 | United States of America, et al., vs. SuperValu, | 09:10:40 |
| 5 | Incorporated, et al., in the United States District | 09:10:44 |
| 6 | Court for the Central District of Illinois, | 09:10:48 |
| 7 | Springfield Division.  And the case number is | 09:10:50 |
| 8 | 11 cv 03290.  Today's date is March 16th, 2018. | 09:10:54 |
| 9 | The time on the video monitor is 9:11 a.m.  The | 09:11:01 |
| 10 | videographer today is Alfredo Domador representing | 09:11:06 |
| 11 | Planet Depos.  This video deposition is taking | 09:11:10 |
| 12 | place at 555 California Street, Suite 3300, | 09:11:13 |
| 13 | San Francisco, California 94104. | 09:11:19 |
| 14 | Would counsel please identify yourselves | 09:11:22 |
| 15 | and state whom you represent. | 09:11:25 |
| 16 | MR. ROBINSON:  Frederick Robinson of | 09:11:26 |
| 17 | Norton, Rose, Fulbright for the defendants. | 09:11:30 |
| 18 | MR. MARTINS:  Paul Martins on behalf of | 09:11:31 |
| 19 | the relators and the United States. | 09:11:33 |
| 20 | MR. KELLER:  Tim Keller on behalf of the | 09:11:36 |
| 21 | relators and the plaintiffs. | 09:11:40 |
| 22 | THE VIDEOGRAPHER:  Thank you, Counsel. | 09:11:41 |
| 23 | The court reporter today is Cathy Meyer | 09:11:42 |
| 24 | representing Planet Depos. | 09:11:46 |
| 25 | Would the reporter please swear in the | 09:11:47 |

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                    6

```
1    witness so we can begin.

2              JOHN BERTKO, F.S.A, MAAA,

3                 sworn as a witness,

4                 testified as follows:            09:11:58

5    EXAMINATION BY MR. ROBINSON:                  09:11:58

6        Q.  Would you please state your name for the   09:12:00

7    record and spell out your last name.          09:12:02

8        A.  My name is John Bertko, B E R T K O.  09:12:04

9        Q.  And Mr. Bertko, where do you live?    09:12:09

10       A.  In 888 Maple Street, Pacific Grove,   09:12:11

11   California.                                   09:12:16

12       Q.  Have you ever been deposed before?    09:12:16

13       A.  Yes.                                  09:12:21

14       Q.  In what kind of cases have you been   09:12:22

15   deposed?                                      09:12:24

16       A.  When I was the chief actuary for Humana, I  09:12:25

17   was deposed in some internal   not internal, some  09:12:31

18   litigation matters back then which was probably 12,  09:12:34

19   15 years.                                     09:12:40

20       Q.  What kind of litigation matters were  09:12:41

21   those?                                        09:12:43

22       A.  I can't recall.                       09:12:43

23       Q.  Did they deal with claims against Humana  09:12:45

24   by employees of Humana?                       09:12:48

25       A.  No.                                   09:12:50
```

1    might call health insurance statisticians.  And we          09:37:16

2    evaluate the probability and project what premiums          09:37:20

3    need to be for future years.  We do other things            09:37:25

4    also, but that's one of the main things that I've           09:37:29

5    done over the last 40 years.                                09:37:32

6        Q.  So is it fair to say that actuaries help            09:37:36

7    their clients quantify the risk of future events?           09:37:41

8        A.  Among other things, yes.  And in my case            09:37:45

9    it's for future health events, not all events.              09:37:49

10       Q.  Okay.  So as an actuary you're looking              09:37:52

11   at   for an insurance company, for a health                 09:37:55

12   insurance company you're looking at the likelihood          09:37:59

13   that the individuals insured by that company are            09:38:02

14   going to have certain health needs that need to be          09:38:08

15   paid for in the future and try to help the                  09:38:10

16   insurance company calculate how much to charge for          09:38:14

17   their premiums in order to cover the cost of those          09:38:18

18   anticipated health needs; is that correct?                  09:38:22

19       A.  Yes, it is.  And I'd only add that it's on          09:38:24

20   a basis of a group of individuals, not a single             09:38:27

21   individual.                                                 09:38:30

22       Q.  Okay.  So you're looking at their risk as           09:38:30

23   a whole                                                     09:38:33

24       A.  Yes.                                                09:38:33

25       Q.    and trying to assess what does the                09:38:34

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                    35

| | | |
|---|---|---|
| 1 | resume you were involved in development of strategy | 09:51:59 |
| 2 | and pricing for Medicare Part D program.  What did | 09:52:01 |
| 3 | that entail? | 09:52:04 |
| 4 | A.  So the Medicare Modernization Act, | 09:52:05 |
| 5 | otherwise known as the MMA, was enacted and signed | 09:52:12 |
| 6 | in I believe December or the end of year in 2003. | 09:52:17 |
| 7 | And so instantly beginning in 2004 there was a | 09:52:20 |
| 8 | two year time period in order to be ready to offer | 09:52:23 |
| 9 | coverage on January 1st, 2006.  And there were a | 09:52:28 |
| 10 | variety of strategies that had to be thought | 09:52:32 |
| 11 | through.  The first one was should Humana offer | 09:52:36 |
| 12 | Part D benefits in all regions, mainly covering the | 09:52:41 |
| 13 | 50 states plus the District of Columbia.  Secondly | 09:52:45 |
| 14 | and importantly should it offer the combined | 09:52:49 |
| 15 | Medicare Advantage Part D program.  We refer do | 09:52:53 |
| 16 | that as MAPDs.  So a person signing up for a | 09:52:56 |
| 17 | Medicare Advantage would also, under a premium that | 09:53:01 |
| 18 | was to be determined, get their prescription drug | 09:53:04 |
| 19 | benefit without having two separate programs.  And | 09:53:06 |
| 20 | then most importantly for my job was without | 09:53:10 |
| 21 | available historic data, because there was no drug | 09:53:15 |
| 22 | coverage for most of seniors, developing projected | 09:53:18 |
| 23 | rates for 2006 and then immediately after it was | 09:53:23 |
| 24 | offered in 2006 assessing in the first three or | 09:53:28 |
| 25 | four months what the premium should be based on the | 09:53:34 |

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                              36

| | | |
|---|---|---|
| 1 | enrollees that we had to develop the Part D rates | 09:53:36 |
| 2 | for 2007 because as noted in some of the testimony, | 09:53:41 |
| 3 | the rates were all due basically the first Monday | 09:53:47 |
| 4 | in June to be evaluated by the office of the | 09:53:51 |
| 5 | actuary at CMS. | 09:53:54 |
| 6 | Q.  The first Monday of June in what year? | 09:53:55 |
| 7 | A.  2006 for later year 2007 and then | 09:53:58 |
| 8 | following the same cycle after that. | 09:54:02 |
| 9 | Q.  So when you worked at Humana, were you | 09:54:07 |
| 10 | involved in putting together the bids that were | 09:54:18 |
| 11 | submitted to CMS each year? | 09:54:21 |
| 12 | A.  Yes.  But my part was the bids that | 09:54:24 |
| 13 | included all the numeric factors, which for the MA | 09:54:27 |
| 14 | plans were about a 20 page template that went to | 09:54:33 |
| 15 | the office of the actuary and I think a somewhat | 09:54:36 |
| 16 | shorter template that was for Part D only. | 09:54:38 |
| 17 | Q.  Okay.  So at Humana when you were putting | 09:54:41 |
| 18 | together these bids, when you were looking at the | 09:54:45 |
| 19 | drug coverage part   well, was there a separate | 09:54:50 |
| 20 | part of the bid that related to drug coverage? | 09:54:55 |
| 21 | A.  Yes. | 09:54:58 |
| 22 | Q.  Okay.  And when you were putting together | 09:54:58 |
| 23 | the part of the bid relating to drug coverage | 09:55:01 |
| 24 | let me start over. | 09:55:08 |
| 25 | To provide the drug benefit under the | 09:55:10 |

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                    37

| | | |
|---|---|---|
| 1 | Humana plans, did Humana utilize the services of | 09:55:14 |
| 2 | pharmacy benefit managers or PBMs? | 09:55:20 |
| 3 | A.  No.  To the best of my recollection, | 09:55:24 |
| 4 | Humana did the contracting itself both with | 09:55:27 |
| 5 | pharmaceutical manufacturers and the retail chains | 09:55:31 |
| 6 | and then had   at one point it had its own unit | 09:55:35 |
| 7 | that actually served in the PBM capacity for | 09:55:39 |
| 8 | checking and authorizing bids.  The first year it | 09:55:43 |
| 9 | may have used an outside PBM to do only those | 09:55:47 |
| 10 | administrative aspects, but not the network | 09:55:51 |
| 11 | contracting or the purchase negotiations. | 09:55:54 |
| 12 | Q.  Okay.  So the network contracts relate to | 09:55:58 |
| 13 | the contracts between   either between Humana, or | 09:56:01 |
| 14 | if it did use a sort of outside service, that | 09:56:07 |
| 15 | outside service and then the actual pharmacies that | 09:56:11 |
| 16 | would dispense the drugs to the people who were | 09:56:14 |
| 17 | enrolled in a Humana plan; is that correct? | 09:56:16 |
| 18 | A.  Yes.  That latter I would describe as our | 09:56:18 |
| 19 | retail pharmacy network. | 09:56:21 |
| 20 | Q.  Okay.  Okay. So would you   when you | 09:56:23 |
| 21 | were putting together the bids to CMS for the | 09:56:25 |
| 22 | pharmacy benefit that was going to be provided in | 09:56:31 |
| 23 | your Part D plans, did you actually consult the | 09:56:35 |
| 24 | language of the contract with the providers in the | 09:56:39 |
| 25 | pharmacy network to see what the terms of those | 09:56:43 |

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                    38

| | |
|---|---|
| 1 | contracts required you to pay those individual | 09:56:47 |
| 2 | pharmacies? | 09:56:49 |
| 3 | A.  I may have, but most of the time I worked | 09:56:50 |
| 4 | with our director of pharmacy and the contracting | 09:56:53 |
| 5 | officers at Humana to ask them just those kinds of | 09:56:58 |
| 6 | questions, like what would be the unit prices for | 09:57:01 |
| 7 | this category of drug or that category of drug | 09:57:05 |
| 8 | knowing in early 2006 what the utilization would be | 09:57:08 |
| 9 | for the three benefit plans we were offering. | 09:57:13 |
| 10 | Q.  Do you know how they calculated the unit | 09:57:19 |
| 11 | prices of the drugs that you would  that you've | 09:57:28 |
| 12 | just referenced? | 09:57:33 |
| 13 | A.  In general terms, yes.  I had many | 09:57:34 |
| 14 | conversations with the director of pharmacy on what | 09:57:39 |
| 15 | categories of drugs would cost. | 09:57:42 |
| 16 | Q.  Was it your understanding when you worked | 09:57:45 |
| 17 | at Humana that there were any requirements that the | 09:57:50 |
| 18 | federal government imposed on the terms of Humana's | 09:57:54 |
| 19 | contracts with the pharmacies in the provider | 09:57:59 |
| 20 | network? | 09:58:02 |
| 21 | A.  So that answer is from Part D itself, no. | 09:58:02 |
| 22 | But there were related contracts such as the | 09:58:08 |
| 23 | Medicaid best price which served as a floor for our | 09:58:11 |
| 24 | contract negotiators. | 09:58:15 |
| 25 | Q.  Okay.  So when you refer to the Medicaid | 09:58:17 |

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                          64

| | | |
|---|---|---|
| 1 | A.  Yes, given that I do think   I agree with | 10:46:30 |
| 2 | you that October 15th was the start of open | 10:46:34 |
| 3 | enrollment. | 10:46:37 |
| 4 | Q.  Okay.  And the footnote in the memo | 10:46:39 |
| 5 | references the Wal Mart generic pricing program; is | 10:47:10 |
| 6 | that correct? | 10:47:17 |
| 7 | A.  Yes. | 10:47:17 |
| 8 | Q.  And you were already aware of the Wal Mart | 10:47:18 |
| 9 | generic pricing program when you got   when   by | 10:47:20 |
| 10 | October 11th, 2006? | 10:47:24 |
| 11 | A.  Yes. | 10:47:26 |
| 12 | Q.  In preparing your report, is there any | 10:47:27 |
| 13 | information that you asked counsel for that was not | 10:47:46 |
| 14 | provided to you? | 10:47:52 |
| 15 | A.  Not that I recall. | 10:47:55 |
| 16 | Q.  Okay.  All right.  So let's   I want to | 10:47:58 |
| 17 | ask you some questions about your report now.  So | 10:48:11 |
| 18 | let's go to page 2 of the report.  Now, I just want | 10:48:13 |
| 19 | to make sure I understand.  Do you consider | 10:48:29 |
| 20 | yourself to be an expert on the manner in which | 10:48:31 |
| 21 | insurance companies contract with pharmacy | 10:48:39 |
| 22 | providers? | 10:48:44 |
| 23 | A.  No. | 10:48:47 |
| 24 | Q.  Do you consider yourself an expert on the | 10:48:49 |
| 25 | definition of usual and customary pricing as that | 10:49:00 |

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                         65

| | | |
|---|---|---|
| 1 | term is used in pharmacy network contracts? | 10:49:05 |
| 2 | A.  No. | 10:49:10 |
| 3 | Q.  Now, you say in your report in the first | 10:49:11 |
| 4 | paragraph under purpose of the engagement on the | 10:49:32 |
| 5 | fifth line, you say "Specifically, I have been | 10:49:39 |
| 6 | retained to opine on Federal Government Healthcare | 10:49:41 |
| 7 | Program policies, practices and procedures as it | 10:49:44 |
| 8 | relates to billing processes, drug reimbursement | 10:49:48 |
| 9 | claims funding, and assessing damages to the | 10:49:52 |
| 10 | Government arising from Medicare Part D and Federal | 10:49:55 |
| 11 | Employee Health Benefit Program (FEHBP) programs," | 10:49:59 |
| 12 | paren, "(referred to generally as "Federal | 10:50:05 |
| 13 | Government Health Programs (GHP) policies, | 10:50:08 |
| 14 | practices and procedures")," end of quote, end of | 10:50:11 |
| 15 | paren, period.  Did I read that correctly? | 10:50:13 |
| 16 | A.  Yes. | 10:50:17 |
| 17 | Q.  Okay.  And so I want to make sure I | 10:50:17 |
| 18 | understand.  So you were not asked to opine on the | 10:50:27 |
| 19 | policies, practices and procedures of state | 10:50:35 |
| 20 | Medicaid programs; is that correct? | 10:50:40 |
| 21 | A.  Yes. | 10:50:42 |
| 22 | Q.  Yes, that's correct? | 10:50:44 |
| 23 | A.  Yes, that's correct. | 10:50:46 |
| 24 | Q.  Okay.  Now, by billing processes what | 10:50:47 |
| 25 | specifically did you mean as used in that sentence | 10:50:52 |

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                    72

| | |
|---|---|
| 1 | A.  I did not reconsult it, but being a | 11:00:07 |
| 2 | long time actuary, I had read it in the past. | 11:00:14 |
| 3 | Q.  And would you agree with me that to the | 11:00:17 |
| 4 | extent that you are offering actuarial opinions in | 11:00:23 |
| 5 | this case that actuarial standard of practice | 11:00:26 |
| 6 | number 17 would govern those opinions? | 11:00:31 |
| 7 | A.  To the extent that I offer actuarial | 11:00:34 |
| 8 | opinions, yes. | 11:00:37 |
| 9 | Q.  Are you offering actuarial opinions in | 11:00:38 |
| 10 | this case? | 11:00:40 |
| 11 | A.  I think the answer is no.  I'm offering | 11:00:40 |
| 12 | industry experience and explanations of how Part D | 11:00:48 |
| 13 | works. | 11:00:52 |
| 14 | Q.  All right.  So in the second paragraph of | 11:00:53 |
| 15 | your report, the first sentence begins with the | 11:01:35 |
| 16 | phrase "The premise of the lawsuit."  Do you see | 11:01:41 |
| 17 | that there? | 11:01:44 |
| 18 | A.  Yes. | 11:01:44 |
| 19 | Q.  Okay.  From where did you get your | 11:01:46 |
| 20 | understanding regarding the premise of this | 11:01:49 |
| 21 | lawsuit? | 11:01:52 |
| 22 | A.  This would be what counsel had told me to | 11:01:54 |
| 23 | start with. | 11:02:00 |
| 24 | Q.  Did you review the first amended complaint | 11:02:01 |
| 25 | in the case? | 11:02:05 |

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                    74

| | | |
|---|---|---|
| 1 | answered. | 11:04:09 |
| 2 | BY MR. ROBINSON: | 11:04:09 |
| 3 | Q.  Other than the   other than the Merck | 11:04:10 |
| 4 | excuse me.  You said the MedCo and the Aetna | 11:04:14 |
| 5 | contract, the Aetna Coventry contract, is that | 11:04:17 |
| 6 | right, those are the two that you've reviewed? | 11:04:20 |
| 7 | A.  Yes. | 11:04:22 |
| 8 | Q.  Okay.  Other than those, you haven't | 11:04:22 |
| 9 | reviewed the terms of any other contracts that | 11:04:24 |
| 10 | SuperValu had with Part D plans to see if SuperValu | 11:04:28 |
| 11 | complied with the terms of those contracts or not? | 11:04:32 |
| 12 | A.  Not that I can recall. | 11:04:35 |
| 13 | Q.  Okay.  And you haven't looked   have you | 11:04:36 |
| 14 | looked at the regulatory definitions that any state | 11:04:39 |
| 15 | Medicaid programs have promulgated regarding usual | 11:04:44 |
| 16 | and customary pricing to determine if SuperValu's | 11:04:50 |
| 17 | claims violated the terms of those regulations? | 11:04:54 |
| 18 | A.  No. | 11:04:57 |
| 19 | Q.  Okay.  So are you expressing an opinion on | 11:04:58 |
| 20 | whether SuperValu violated the terms of any | 11:05:03 |
| 21 | contracts other than the MedCo and Aetna Coventry | 11:05:10 |
| 22 | contracts? | 11:05:20 |
| 23 | A.  I'm expressing an opinion that Ian Dew did | 11:05:22 |
| 24 | his set of appropriate calculations on the broader | 11:05:28 |
| 25 | set of contracts. | 11:05:32 |

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                    75

1     Q.  And are you offering an opinion that the     11:05:34

2  manner in which Mr. Dew defined actual, usual and    11:05:37

3  customary price is correct?                          11:05:42

4     A.  No.                                           11:05:48

5     Q.  So in the section of the report on page       11:05:49

6  at the bottom of page 2 where you list a summary of  11:06:11

7  your opinions where you say "The prices SuperValu     11:06:14

8  charged to cash paying customers under its Price     11:06:17

9  Match Guarantee program established its Usual and    11:06:20

10  Customary charges for those particular drugs," is    11:06:23

11  that your opinion or is that Mr. Dew's opinion?      11:06:27

12     A.  That's my opinion based on the materials     11:06:30

13  that I got from plaintiffs' counsel.                 11:06:35

14     Q.  Okay.  What is the basis for that opinion?   11:06:37

15     A.  The basis is a series of e mails that they   11:06:41

16  provided to me and the limited number of those      11:06:45

17  contracts.                                           11:06:48

18     Q.  Okay.  So do you remember what it is in      11:06:50

19  the e mails that you saw that makes you believe      11:06:52

20  that the prices SuperValu charged to cash paying    11:06:55

21  customers under its price match guarantee program   11:06:59

22  established its usual and customary charges for      11:07:02

23  those particular drugs?                              11:07:05

24     A.  There were a wide variety of comments        11:07:07

25  about   or directives from more senior management   11:07:12

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                          80

| | |
|---|---|
| 1 | A.  Yes. | 11:14:12 |
| 2 | Q.  Okay.  And do you know how the Humana | 11:14:13 |
| 3 | analysts identified what the usual and customary | 11:14:16 |
| 4 | prices were? | 11:14:19 |
| 5 | A.  Not specifically. | 11:14:21 |
| 6 | Q.  You understand that Mr. Dew defined the | 11:14:23 |
| 7 | actual, usual and customary price as the most | 11:14:38 |
| 8 | frequent price override amount that he saw in the | 11:14:45 |
| 9 | SuperValu data? | 11:14:52 |
| 10 | MR. MARTINS:  Objection. | 11:14:53 |
| 11 | THE WITNESS:  That's my recollection of | 11:14:55 |
| 12 | what was written in his report. | 11:15:00 |
| 13 | BY MR. ROBINSON: | 11:15:01 |
| 14 | Q.  Have you seen any other analyses ever in | 11:15:02 |
| 15 | your career of usual and customary pricing that | 11:15:08 |
| 16 | used the same definition as Mr. Dew did? | 11:15:11 |
| 17 | A.  Not that I recall. | 11:15:14 |
| 18 | Q.  Are you aware of any state Medicaid | 11:15:16 |
| 19 | programs that use the same definition that Mr. Dew | 11:15:22 |
| 20 | used for the determination of actual, usual and | 11:15:25 |
| 21 | customary prices? | 11:15:29 |
| 22 | A.  No. | 11:15:30 |
| 23 | Q.  Were you aware that Mr. Dew was told by | 11:15:32 |
| 24 | counsel to use the term "actual" in describing his | 11:15:41 |
| 25 | calculation of usual and customary prices? | 11:15:49 |

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                                    83

| | |
|---|---|
| 1    did review his methodology and found it reliable in | 11:19:29 |
| 2    comporting with actuarial review standards" | 11:19:34 |
| 3         A.   Yes. | |
| 4         Q.     is that right? | 11:19:37 |
| 5         A.   Yes. | 11:19:37 |
| 6         Q.   He did not do an actuarial audit.  He did | 11:19:38 |
| 7    not do an actuarial review; did he? | 11:19:42 |
| 8         A.   No. | 11:19:45 |
| 9         Q.   Okay.  So what actuarial review standards | 11:19:45 |
| 10   would be applicable to the work that Mr. Dew did? | 11:19:48 |
| 11        A.   None for him, but for me it applies. | 11:19:52 |
| 12   Actuaries have a duty under the code of conduct and | 11:19:55 |
| 13   similar ASOP to be sure that they're I'll put it | 11:20:01 |
| 14   comfortable that the data is what they are relying | 11:20:06 |
| 15   upon. | 11:20:09 |
| 16        Q.   But he himself was not doing any actuarial | 11:20:10 |
| 17   review? | 11:20:13 |
| 18        A.   No. | 11:20:14 |
| 19          MR. ROBINSON:  Okay.  Since we're about to | 11:20:18 |
| 20   run out of tape and we've been almost an hour, why | 11:20:19 |
| 21   don't we take our second break. | 11:20:21 |
| 22          THE WITNESS:  Okay. | 11:20:23 |
| 23          THE VIDEOGRAPHER:  We are going off the | 11:20:24 |
| 24   record.  The time is 11:20 a.m.  This marks the end | 11:20:26 |
| 25   of media unit number one. | 11:20:28 |

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                          116

| | | |
|---|---|---|
| 1 | look | 12:33:46 |
| 2 | Let's have this marked as Defendant's | 12:33:47 |
| 3 | Exhibit 52 as long as we're talking about the PDE. | 12:33:49 |
| 4 | (Defendants' Exhibit 52 marked for | |
| 5 | Identification.) | 12:34:13 |
| 6 | BY MR. ROBINSON: | 12:34:13 |
| 7 | Q.  Okay.  So I'm just going to   so we've | 12:34:14 |
| 8 | pulled   this is a document we pulled off the CMS | 12:34:16 |
| 9 | website relating to the description of what's the | 12:34:20 |
| 10 | data elements in a PDE.  I don't know.  Have you | 12:34:23 |
| 11 | ever seen this before? | 12:34:25 |
| 12 | A.  I may have. | 12:34:26 |
| 13 | MR. MARTINS:  Wait.  I'd like him to have | 12:34:27 |
| 14 | a chance to look it over before he starts answering | 12:34:30 |
| 15 | questions. | 12:34:33 |
| 16 | MR. ROBINSON:  No, absolutely, yeah. | 12:34:33 |
| 17 | THE WITNESS:  Thank you. | 12:35:24 |
| 18 | BY MR. ROBINSON: | 12:35:24 |
| 19 | Q.  Do you think you've looked at this, at | 12:35:43 |
| 20 | Defendants' Exhibit 52 before? | 12:35:45 |
| 21 | A.  Maybe not this exact version but ten, | 12:35:47 |
| 22 | 12 years ago most likely while I was at Humana. | 12:35:52 |
| 23 | Q.  Okay.  And you see on page 3 of the | 12:35:56 |
| 24 | exhibit in    it talks about data element number | 12:35:59 |
| 25 | 27.  It indicates that when a pharmacy is | 12:36:04 |

Transcript of John Bertko, F.S.A, MAAA
Conducted on March 16, 2018                        150

| | | |
|---|---|---|
| 1 | drug or particular manufacturer. | 14:46:54 |
| 2 | Q.  And   and I think we've already | 14:46:57 |
| 3 | established that in this case other than the | 14:47:01 |
| 4 | whatever Aetna Coventry contract you read, the | 14:47:04 |
| 5 | Metco and maybe the Express Scripts contract, you | 14:47:09 |
| 6 | haven't looked at any of the contracts that | 14:47:12 |
| 7 | SuperValu had with the payers that are   that are | 14:47:14 |
| 8 | relevant to this case? | 14:47:18 |
| 9 | A.  And when you say payers, did you mean PDP | 14:47:18 |
| 10 | plans? | 14:47:24 |
| 11 | Q.  Well, right, prescription drug plans. | 14:47:24 |
| 12 | A.  No, because   well, the Aetna Coventry is | 14:47:27 |
| 13 | a payer.  Express Scripts and MedCo are PBMs. | 14:47:30 |
| 14 | Q.  Okay.  So you looked at one PDP contract | 14:47:35 |
| 15 | and two PBM contracts? | 14:47:40 |
| 16 | A.  Yes. | 14:47:43 |
| 17 | Q.  Okay.  And any   did you look at any | 14:47:43 |
| 18 | government regulations from the   any of the state | 14:47:46 |
| 19 | Medicaid programs to determine how they calculated | 14:47:49 |
| 20 | or they defined the usual and customary price? | 14:47:51 |
| 21 | MR. MARTINS:  Objection.  You may answer. | 14:47:54 |
| 22 | THE WITNESS:  No.  And I would just remind | 14:47:56 |
| 23 | you that partly because of my current job and my | 14:47:59 |
| 24 | lack of recent relevant experience, one, I can't | 14:48:03 |
| 25 | deal with Medi Cal at all.  It is a sister agency | 14:48:07 |