E-FILED
Monday, 04 June, 2018  06:28:02 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A1

*United States ex rel. Schutte v. SuperValu Inc., et al.*
*Case No. 11-cv-03290 (C.D. Ill.)*

**Report of Kenneth W. Schafermeyer, Ph.D.**
**February 2, 2018**

EXHIBIT A1

# 1 – QUALIFICATIONS AND BACKGROUND OF THE CASE

I am a Professor of Pharmacy Administration and Director of the Office of International Programs at the St. Louis College of Pharmacy.  Since my licensure as a pharmacist in 1976, I have worked with, taught about, and analyzed the operations of pharmacies, their financial performance, their costs of dispensing, and their reimbursement by private and public prescription programs, including government-supported health care programs such as Medicare, Medicaid, TRICARE, and the Federal Employees Health Benefits Program.  I have also worked with and taught about the operations of managed care organizations and pharmacy benefit managers (PBMs).  I have been designated as a Fellow of the Academy of Managed Care Pharmacy and as a Fellow of the American Pharmacists Association.  Through my education and experience, I have personal knowledge of the practices of pharmaceutical manufacturers, pharmacy benefit managers, state and federal healthcare programs, third-party insurance payers and pharmacies as they relate to the purchasing, pricing, dispensing, and reimbursement of prescription drugs.  My *curriculum vita* (Exhibit A) contains a list of the cases for which I have testified within the last five years.

Plaintiffs in this case allege that Defendants SuperValu and Albertsons ("SuperValu"), grocery chains that include retail pharmacies, submitted false and fraudulent prescription drug claims in order to obtain inflated reimbursements on submitted claims from government-supported health programs. This conduct started in 2006, continued for many years, and impacted Medicare, Medicaid, TRICARE and the Federal Employee Health Benefits Program.[1]

I have been retained by the Plaintiffs to provide testimony regarding: (1) the billing process and payment system for prescription drugs under various Government Health Plans (GHPs), including Medicare Part D, TRICARE, Federal Employees Health Benefit Plans, and Medicaid, and private health insurance plans (Commercial Insurance Plans)[2] (2) the relevant regulations, standards and practices relating to the usual and customary pricing and negotiated pricing requirements for third-party plans, (3) comparison of third-party plans' usual and customary pricing standards to the billing practices of SuperValu and Albertsons pharmacies, and (4) the model for calculating damages in this case. My report is based on my knowledge of the industry, professional experience, review of relevant industry publications, government statutes, regulations, rules, guidance and relevant case law and pleadings as well as documents, including deposition transcripts and exhibits, provided to me by counsel.  A list of the materials I relied upon in forming my opinions are attached as Exhibit B.  I am compensated at the rate of $500

---

[1]  My understanding is that the relevant time period for this case is September 1, 2006 through December 31, 2016.

[2]  Collectively, GHPs and private Commercial Insurance Plans are known as "Managed Care Plans" or "Third-Party Payers.""

EXHIBIT A1

per hour for research, review, preparation, and testimony.  I reserve the right to amend or update my opinions based on any information that may become available to me or known by me in the future.

## 2 - EXECUTIVE SUMMARY

I reviewed various materials in this case, as explained in greater detail below.  Based on this review, it is my understanding that SuperValu offered to match competitor prices on prescription medication for its cash-paying customers over the relevant time period. In simplest terms: if a SuperValu competitor offered a 30-day prescription for $4, SuperValu would verify certain information and then match that cash price. SuperValu excluded these discounted cash transactions from its usual and customary price calculations, and these cash transactions had no effect on SuperValu's reported usual and customary pricing submitted as part of a claim for payment to third-party insurers, including GHPs.[3]  SuperValu's price-match guarantee was designed to not only retain existing customers, but to attract new customers.[4]

SuperValu claims that its price matches bore no relation to its usual and customary pricing because customers were required to request a price match and pharmacy personnel were required to verify the competitor's price before the price match was given.[5] As a result of this "customer request and competitor price verification" process, SuperValu deemed its price matching an exception to its established cash sale price/minimum retail price for any particular drug.[6,7,8,9,10] According to SuperValu, its price matching was an "exception" because it represented a very small percentage of SuperValu's prescription sales.[11]

SuperValu's reported usual and customary price was established and strictly maintained by its pricing department at corporate headquarters.[12,13,14,15] As such, reported usual and customary pricing could not be altered, or affected in any manner by, pharmacist price-matching activity at any of its pharmacies.[16,17,18] SuperValu also claims its usual and customary price reporting

---

[3]  Allgood Deposition, pp. 90, 106-7.
[4]  McCann Deposition, pp. 72-4, 102.
[5]  Allgood Deposition, pp. 90, 106-7, 119-21, 156.
[6]  McCann Deposition, pp. 154-5.
[7]  Dony Deposition, p. 170.
[8]  McCann Deposition, pp. 43, 135,152-3.
[9]  Johnson Deposition, p. 184.
[10]  Allgood Deposition, pp. 44, 251.
[11]  Allgood Deposition, p. 200.
[12]  Allgood Deposition, pp. 45-7, 88-9, 104-7.
[13]  Johnson Deposition, p. 155.
[14]  McCann Deposition, pp. 29, 153, 199, 223.
[15]  Salemi Deposition, pp. 81-2.
[16]  Allgood Deposition, pp. 46, 88-9, 106-7.

requirements with respect to third-party payers was dependent upon SuperValu's third-party PBM contracts. Consequently, in order to determine SuperValu's contractual pricing requirements for any given third-party PBM, SuperValu claims it is necessary to resort to the applicable contract.[19,20]

Based upon my experience and familiarity with long-standing industry practice, I understand a drug's "usual and customary" price to be the cash price offered to the general public. In addition, as early as 2006, CMS notified sponsors and pharmacies that they must report discounted prices as the usual and customary price when such discounts are offered to customers throughout the benefit year.[21] Such discounts are considered usual and customary prices rather than "one-time lower cash prices" and take the place of the drug's higher negotiated price. A more complete explanation of this CMS guidance is set forth in my expanded opinion below. SuperValu's price match as implemented is not, in my opinion, an exception to this regulatory scheme. Indeed, SuperValu's failure to account for price matching in its reported usual and customary price does not comport with industry standards for several reasons.

First, the price match was offered to everyone through generally available and broadly published advertisements and marketing materials.[22] Advertisements, store signage, circulars, and other ads were not directed at any particular subset of customer. In fact, SuperValu "guaranteed" a price match to *all* customers – existing and potential – and its internal communications from corporate officer(s) to pharmacy personnel dictated that SuperValu would not lose a customer to its competition due to price differences.[23] While SuperValu contends that the "customer request[24] and competitor price verification" requirement differentiated its price match customers from the general public, its *de facto* marketing and sales practices reveal that barriers to obtaining a price

---

[17] Johnson Deposition, p. 183.

[18] McCann Deposition, p. 29-30.

[19] Allgood Deposition, pp. 44, 90-1, 151, 235.

[20] McCann Deposition, p. 42, 152.

[21] This policy was included in the *CMS Medicare Prescription Drug Benefit Manual* [October 11, 2006 memorandum to Plan D Sponsors from Cynthia Tudor, Director of the CMS Medicare Drug Benefit Group] and posted on the "Frequently Asked Questions" section of the CMS website [Centers for Medicare and Medicaid Services, *Medicare Prescription drug Benefit Manual*, Ch. 14 – Coordination of Benefits, Section 50.4.2.]

[22] Allgood Deposition, pp. 68-72; McCann Deposition, pp. 74-76

[23] SuperValu Prescription Pricing Policy adopted September, 2009: "The company will not lose a prescription because of price." [Exhibit 11]

[24] SuperValu claims that it was "implied" that customers must affirmatively request a price match before a pharmacist was allowed to match a competitor's price. [Allgood Deposition, p. 203]  However, a December 22, 2010 memo from Maxine Johnson to all SuperValu pharmacies is the first evidence I have seen in which SuperValu expressly required that a customer initiate the price match request. [SVU00001554].  A written company policy explicitly requiring customers to require a price match before a price match could be given was not adopted until August 12, 2012. [Exhibit 14; Allgood Deposition, pp. 90, 106-7; Johnson Deposition, p. 162]

EXHIBIT A1

match were nearly, if not entirely, nonexistent.[25] SuperValu established no meaningful selectivity demarcating the subset of price-match qualified customers.  No meaningful financial obligation, such as a membership fee, was expected of any customer to which a price match was offered.  Again, SuperValu's nationwide price-match policy was designed to never lose a customer – any customer - due to price.[26]

As referenced in Footnote 24, SuperValu did make an ostensible change in its price-matching policy in August of 2012.[27]  At that time, SuperValu first required customers to request a price match before a pharmacist would sell the drug at that low price.  SuperValu sought to implement this new approach through a written Prescription Pricing policy stating, "Please note that price matching must not be offered without a customer-initiated request."[28]  As a practical matter based upon my experience in the industry, it is likely this new policy had little material impact.  SuperValu patients had already been receiving these low cash prices for several years, so patients would naturally be quick to request the continued price-matching if their pricing increased.  Also, with respect to refills of many high-volume generics, such as "maintenance" drugs, the request for a price-match was unnecessary as the patient was already receiving the low cash price.

Second, equally flawed is SuperValu's assertion that its price matching was an "exception" insofar as it represented a small percentage of SuperValu's total prescription sales.[29] SuperValu specifically limited its price matching to cash transactions.[30] Usual and customary price is commonly understood in the industry to be the cash price to the general public. Therefore, the relevant inquiry is not the percentage of cash price matches to total prescription sales (including prescriptions covered by third-party insurers) but rather the percentage of cash price matches to *total cash sales* (i.e., cash sales at SuperValu's at retail price or minimum retail price [cash sales not involving a price match] plus cash price matches). Price-matched cash sales were a significant portion of SuperValu's total cash sales.[31] In fact, transactional data provided by

---

[25] By November 2008, SuperValu had implemented an ARx enhancement that obviated the need for subsequent customer requests for a price match. This enhancement consisted of an "on-going price match override" feature. The intention behind the enhancement, in the words of one SuperValu employee, was to avoid customer service related issues on subsequent refills and rewrites after agreeing to charge the customer a matched price on the prior fill.  This "enhancement" only occurred with respect to cash transactions that were never submitted to third-party payers, including GHPs. [Exhibits 160 and 161; Allgood Deposition, pp. 108-9]

[26] SuperValu Prescription Pricing Policy adopted September, 2009: "The company will not lose a prescription because of price." [Exhibit 11]

[27] See Exhibit 14.

[28] See Exhibit 24.

[29] Allgood Deposition, pp. 200-201.

[30] Allgood Deposition, pg. 87; McCann Deposition, pp. 83-84.

[31] SuperValu's 2006 analysis of the impact of price matching the 300 generic products included in Walmart's $4.00 pricing indicated that these 300 items would "represent 21.2% of all scripts" for Albertsons. [September 22, 2006 memo "Wal-Mart Pricing Scenario Impact" Exhibit 36]

SuperValu and analyzed by Mr. Ian Dew of Steck Consulting illuminates the baselessness of SuperValu's "small percentage" argument: approximately half of all *cash* sales of high-volume drugs resulted from price matching, and price-matched cash transactions were a significant portion of cash sales for all drugs included by Mr. Dew in his calculations.[32] No empirical basis exists to suggest that price matching was in any respect an exception to its established retail price.  Indeed, transactional data clearly reflects that Supervalu offered price matches widely and consistently nationwide to cash-paying customers continuously throughout multiple benefit years.

Finally, SuperValu maintains that its usual and customary price reporting requirements with respect to third-party payers were dependent upon SuperValu's individual contracts with those third parties.[33,34] The transactional data and testimony indicate that SuperValu did not vary its usual and customary pricing logic pursuant to these contracts.[35] As noted previously, SuperValu's reported usual and customary price was established and strictly maintained by SuperValu's pricing department at corporate headquarters and that amount *did not change* depending on the third-party carrier.[36,37,38,39]

## 3 - A USUAL AND CUSTOMARY PRIMER - *United States of America ex rel. James Garbe v. Kmart Corporation*

My knowledge of usual and customary (U&C) industry practices is supported more than informed by the relatively recent *Garbe* holding of the United States Court of Appeals for the Seventh Circuit. I include this reference at the outset, before even an introduction of the various programs utilizing the concept of U&C pricing, because *Garbe* presents a clear and concise expression of how U&C pricing practices should be applied in the pharmaceutical industry as well as the policies supporting and necessitating that application.  The reasoning of *Garbe* encapsulates my long-standing understanding of the principles of U&C pricing and will hopefully serve as a roadmap for the various regulations and definitions presented below. As such, references to *Garbe* are found in various footnotes throughout this opinion. While I am not a lawyer and do not suggest by this discussion a legal conclusion about this case, the various U&C factors evaluated by the *Garbe* court are instructive and entirely consistent with my knowledge of industry practices and CMS guidance, and my understanding of definitions

---

[32] Expert Report of Ian M. Dew, pp. 7-10, incl. Tables 4, 5, 6 and 7.
[33] Allgood Deposition, pp. 44, 90-1, 151, 235.
[34] McCann Deposition, pp. 42, 152.
[35] Allgood Deposition, pp. 47-8.
[36] Allgood Deposition, pp. 45-7, 88-9, 104-7.
[37] Johnson Deposition, p. 155.
[38] McCann Deposition, pp. 29, 153, 199, 223.
[39] Salemi Deposition, pp. 81-2.

employed by the vast majority of private plans as well as federal and state GHPs. The *Garbe* case concisely articulates long-understood U&C industry standards and practices and, more pointedly, CMS guidance issued at or near the advent of the Part D program.

## 4 – PUBLIC AND PRIVATE THIRD-PARTY PRESCRIPTION PROGRAMS

There are three major sources of payment for prescription drugs in the United States: (1) private third-party prescription plans; (2) public third-party prescription plans (*e.g.*, Medicaid, Medicare, Federal Employees Health Benefits Program and TRICARE); and (3) cash-pay (or private-pay) customers. In 2015, 39% of independent pharmacies' prescription volume was covered by private insurance, 52% was covered by public funds and 9% were paid out-of-pocket.[40] The administration of the various types of third-party prescription programs is discussed below.

### 4.1 – Administration of Third-Party Prescription Plans

Third-party prescription plans do not buy drugs. Instead, they reimburse providers such as pharmacies that dispense covered drugs to program beneficiaries. Statutes, regulations and rules mandate that payments for the services delivered to GHP beneficiaries be consistent with efficiency, economy, and quality of care and that GHP funds are utilized for the acquisition of drugs in the most economical manner feasible.[41] Commercial Insurance Plans impose similar requirements in their pharmacy agreements in an effort to keep drug costs under control.

Community pharmacies enter into contracts ("participating pharmacy agreements") to dispense prescriptions to beneficiaries of third-party plans' networks[42] and are reimbursed based on the rates specified in the contracts. Contracts involving GHPs are governed and interpreted by statutes, regulations and rules imposed on the parties to protect the government, as the third-party payer, and its beneficiaries from fraud, waste and abuse. Government regulations require pharmacy providers such as Defendants to conduct and attest to Annual Compliance/Fraud Waste and Abuse Training.[43] Commercial Insurance Plan contracts operate under similar common industry standards and practices which are intended to prevent fraud, waste and abuse. Defendants adopted policies to confirm their "commitment to compliance with the Deficit

---

[40] National Community Pharmacists Association, *NCPA Digest*, 2016, p. 19.

[41] 42 *USC* §1396a(a)(30); 42 *CFR* §50.503; *United States ex el. Garbe v. Kmart Corp.*, 824 F3rd 632, p.644 (7th Cir. 2016).

[42] With respect to Part D in particular, each and every contract governing Part D sponsors and first tier, downstream, and related entities, must contain language specifying that such entities must comply with all applicable federal laws, regulations, and CMS instructions. This includes when the Part D plan sponsor delegates any part of its CMS contract activities or responsibilities to first tier or downstream entities. [42 *CFR* 423.505(i)(iv) and 42 *CFR* 423.505(i)(4)(iv)]

[43] See Exhibit 142: Albertsons Attestation to Caremark 2014 Annual Compliance/Fraud Waste and Abuse Training; Exhibit 125 SuperValu 2012 UnitedHealth Fraud Waste and Abuse Training Attestation.

Reduction Act, the Medicare Modernization Act ["MMA"], the Social Security Act and all other state and federal laws pertaining to fraud waste and abuse of government funds."[44]

Both private Commercial Insurance Plans and public GHPs are usually administered by pharmacy benefit managers (PBMs) that help the plans isolate cost centers and concentrate a workforce of prescription benefit experts to manage the plans' prescription drug benefits.  There are thousands of different private third-party plans administered by dozens of different PBMs.[45] PBMs provide two basic functions: 1) they serve as brokers for prescription benefits by arranging transactions between payers and providers, and 2) they use databases and various tools to report on and to influence the cost and quality of healthcare services.  The administrative services provided by PBMs include:[46]

- Combining existing pharmacies into large networks
- Communicating with both patients and providers to explain and update administrative policies
- Providing reports to plan sponsors
- Identifying eligible beneficiaries
- Processing claims submitted by pharmacies
- Reimbursing network pharmacies
- Creating and maintaining formulary systems
- Performing disease-management programs
- Conducting drug utilization review (DUR)
- Educating providers
- Auditing pharmacies
- Tracking beneficiaries' out-of-pocket costs, such as deductibles, copayments and coinsurance for purposes of administering contractual cost

---

[44] See Exhibit 146: SuperValu Government-Funded Program Compliance Policy and Exhibit 147: SuperValu Fraud Waste and Abuse of Government Funds Policy: "Associates who work in company pharmacies or in any pharmacy management or support capacity are expected to be familiar with, and strictly adhere to, all laws governing the provision of products or services funded by federal and state government programs including, but not limited to, Medicare, Medicaid, and Tri-Care/Champus, billing procedures and other practices required for compliance with the law in the prevention of fraud, waste, and abuse of government funds must be followed without exception. . . . It is illegal for anyone to improperly receive payment from, or avoid payment to, the government. These laws apply to persons with actual knowledge of on offense as well as to those acting in deliberate ignorance or reckless disregard. For this reason, the company maintains a no tolerance position on any practice that is, or appears to be, in violation of statutes, rules, and regulations governing Medicare, Medicaid, and other federal and/or state-funded health care assistance programs." (Emphasis in original.)

[45] There were over 50 PBMs listed in a directory published by the Pharmacy Benefit Management Institute.  The two largest are CVS Caremark and Express Scripts.  [Pharmacy Benefit Management Institute directory at http://www.pbmi.com/pbmdir.asp]

[46] Some of these services may be provided directly by some state Medicaid programs.

EXHIBIT A1

sharing provisions.

Many of these functions are defined and described in the plans' participating pharmacy agreements, which are contracts that identify the pharmacy services that will be provided in exchange for a specified reimbursement. Typically, PBMs contract with existing community pharmacies to create a network of pharmacies to dispense prescriptions to covered patients.

## 4.2 - Medicare Part D

Medicare Part D was established pursuant to the Medicare Prescription Drug Benefit, Improvement, and Modernization Act of 2003 (MMA) effective January 1, 2006. Medicare Part D provides subsidized coverage for prescription drugs to eligible beneficiaries voluntarily enrolled through qualified insurance providers referred to as "Sponsors."[47] These eligible beneficiaries must first sign up for Medicare Parts A and B.  Sponsors are reimbursed by the Federal Government through the Centers for Medicare and Medicaid Services (CMS), a federal agency and branch of the U.S. Department of Health & Human Services that administers Medicare and Medicaid.

Part D beneficiaries pay a premium that is lower than what would be available without a federal subsidy.  Other sources of funding for Part D include patient cost sharing (deductibles, copayments, or coinsurance), contributions from the general fund of the U.S. Treasury, and payments from states, which must offset some of the cost of prescription drugs for Medicaid beneficiaries who also are enrolled in Medicare.[48,49,50]

The Defined Standard Benefit includes (1) an annual deductible, (2) initial coverage period, (3) coverage gap, and (4) the catastrophic coverage. During each phase, the plan beneficiary and the plan Sponsor each pay a different share of covered drug costs.[51]

For example, in 2016, under the Part D standard benefit, beneficiaries paid a $360 deductible for prescription drugs, after which they paid 25% of the next $2,950 of drug costs. Thus, in total, patients paid $1,098 of the first $3,310 in prescription drug costs. At that point, there was a

---

[47] 42 *CFR* § 243.

[48] Centers for Medicare and Medicaid Services. (2016). Brief summaries of Medicare and Medicaid. Baltimore, MD: U.S. Department of Health and Human Services. Retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MedicareProgramRatesStats/Downloads/MedicareMedicaidSummaries2016.pdf.

[49] Henry J. Kaiser Family Foundation. (2005a). *Medicare Chart Book 2005*. Menlo Park, CA: Henry J. Kaiser Family Foundation.

[50] Henry J. Kaiser Family Foundation (2015a). *Medicare Advantage*, June 29, 2015. Menlo Park, CA: Henry J. Kaiser Family Foundation. Retrieved from http://kff.org/medicare/fact-sheet/medicare-advantage/.

[51] 42 *CFR* § 423.104(d).

coverage gap (or "doughnut hole") in Medicare coverage that required Medicare patients to pay a larger share of their total drug costs until they have paid a total of $4,850 in prescription drug costs out of their own pockets. After beneficiaries have spent this amount out of pocket, Medicare's catastrophic coverage kicks in; beneficiaries then pay the greater of either a 5% coinsurance charge or copayments of $2.95 for generic or preferred multisource drugs and $7.40 for other drugs. The annual deductible, benefit limits, and catastrophic threshold are indexed to rise with Part D spending.[52]

All Medicare Part D Plans must be authorized by CMS. As long as their designs are at least actuarially equivalent or better than the standard plan design, prescription drug plans are given the flexibility to offer alternative benefit designs.[53] Taken in total, Part D is designed for the Federal Government, on average, to pay at least 74.5% of all covered Part D drug spending.  The 74.5% total is established by federal law.[54]

Medicare provides a variety of subsidies for low-income beneficiaries who enroll in Part D. For example, individuals with both Medicare and Medicaid (those who are "dual eligibles") pay no monthly premium or deductible, and their copayments for prescription drugs are fairly nominal and vary according to income with those copayments for generic drugs being less than for brand-name drugs. Dual eligibles in nursing homes have no copayments. Numerous other groups of Medicare beneficiaries with limited incomes and resources also qualify for some type of assistance with Part D premiums, deductibles, and copayments. In 2009, more than one third of Medicare Part D enrollees received some form of low-income subsidy.[55]

The Patient Protection and Affordable Care Act enacted in March 2010 brought important changes to the Part D drug benefit. This healthcare reform law provided for a $250 rebate to Part D enrollees to cover spending in the coverage gap (doughnut hole) during 2010. Additional subsidies in the coverage gap were then phased in for generic drugs beginning in 2011 and for brand-name drugs beginning in 2013, eventually reducing the coinsurance rate in that gap from 100% to 25% by 2020. The law also reduces the level of out-of-pocket spending required for catastrophic coverage between 2014 and 2019.[56]

---

[52] Henry J. Kaiser Family Foundation (2015b). *The Medicare Part D Prescription Drug Benefit*.  Menlo Park, CA: Henry J. Kaiser Family Foundation. Retrieved from http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/

[53] 42 *CFR* § 423.104(e).

[54] 42 *USC* 1395w-115.

[55] Henry J. Kaiser Family Foundation. (2009b). *Low-Income Assistance under the Medicare Drug Benefit*. Menlo Park, CA: Henry J. Kaiser Family Foundation. Retrieved from https://www.kff.org/medicare/fact-sheet/low-income-assistance-under-the-medicare-drug/.

[56] Henry J. Kaiser Family Foundation. (2010b). *Explaining Health care Reform: Questions about Medicaid's Role*. Menlo Park, CA: Henry J. Kaiser Family Foundation. Retrieved from https://www.kff.org/health-reform/issue-brief/explaining-health-care-reform-questions-about-health/.

EXHIBIT A1

CMS requires that Sponsors develop networks of participating pharmacies to dispense medications to beneficiaries.[57]  Sponsors generally contract with PBMs to establish these networks, process claims and perform other administrative duties.  Participating pharmacy agreements between the PBM and network pharmacies determine discounted "Negotiated Prices" (explained below) and other contract terms.

## 4.3 – Medicaid

Medicaid is a joint federal/state program that provides coverage for health services, including prescription drugs.  Beneficiaries are certain low-income individuals who are children, parents, pregnant, elderly, blind, or disabled.[58]

Because Medicaid is funded by both federal and state governments, these entities share responsibility for administering this program. Through CMS, the Federal Government establishes broad guidelines under which states must design and operate their individual programs. At the state level, a single agency must be designated as responsible for the Medicaid program. Within the federal guidelines, states have responsibility for establishing eligibility criteria, determining the type and scope of services to be covered, setting rates of payment for services, and administering their programs.

States generally satisfy the requirement to administer the Medicaid prescription program by contracting with private PBMs.  The PBMs then develop networks of participating pharmacies, process claims and administer prescription benefits. Reimbursement to pharmacies must be the lower of: (1) the drug acquisition cost determined by the plan, plus the plan's dispensing fee; or (2) the pharmacy's usual and customary (U&C) charge.[59] This critical reimbursement formula will be discussed in more detail later in this report.

## 4.4 – Other Federal GHPs

TRICARE is a GHP that provides civilian health services for military personnel and dependents as well as some reservists.  It is managed by the Defense Health Agency, which is part of the U.S. Department of Defense. TRICARE offers a Standard Benefit, which provides traditional indemnity/fee-for-service coverage; TRICARE Extra provides a preferred provider organization (PPO) benefit; and, TRICARE Prime provides a health maintenance organization (HMO)

---

[57] 42 *CFR* §423.120(a).
[58] Medicaid.gov (A Federal Government-managed website by the CMS). Eligibility. Retrieved from https://www.medicaid.gov/affordable-care-act/eligibility/index html .
[59] 42 *CFR* §447.512(b).

benefit. TRICARE offers prescription benefits through military health facilities, home delivery, network pharmacies or non-network pharmacies. Over 57,000 pharmacies participate in the network.  Beneficiaries pay copayments which vary depending on the type of pharmacy site that dispenses the medication and whether the medication is generic, brand-name or non-formulary.[60]

Express Scripts provides PBM services for TRICARE, including the mail-order component.  As with the other GHPs described previously, TRICARE reimburses for prescriptions based on the lower of (1) the acquisition cost for drug ingredients, plus a specified dispensing fee; or (2) the pharmacy's U&C charge.[61]

The Federal Employees Health Benefits Program (FEHBP) provides health benefits to civilian government employees through a variety of options including fee-for-service, PPOs, HMOs and high-deductible health plans.  The FEHBP is administered by the U.S. Office of Personnel Management. About 250 plans operate; about 20 on a multi-state or national basis and about 230 locally, mostly as HMOs. The FEHBP relies on consumer choices among competing private plans which determine costs, premiums, benefits and services.[62,63] The prescription benefit is administered by PBMs, the largest of which is Caremark (currently referred to as CVS/Caremark) and operates much as do private Commercial Insurance prescription programs with reimbursement set at the lower of the plan's determination of acquisition cost plus a dispensing fee or the U&C charge.[64]

### 4.5 – Private Commercial Insurance Plans

Private commercial health insurance is usually provided as an employment benefit to employees and their dependents.  Funding is provided through premiums, which may be paid in part by the beneficiaries, as well as through patient cost sharing in the form of deductibles, coinsurance and copayment.  Individuals can also purchase health insurance in the private market place.  These plans take a variety of forms, including PPOs, HMOs, high-deductible health savings plans and traditional indemnity plans. Prescriptions are dispensed by community pharmacies contracted through a PBM network or through a mail-order plan. PBMs administer the plan and typically

---

[60] Government Accountability Office. *Defense health care: evaluation of TRICARE pharmacy services contract structure is warranted*. Sep., 2013. Retrieved from http://www.gao.gov/assets/660/658332.pdf..

[61] See *ESI Network Provider Manual* (2010) at SVU00463028; *ESI Network Provider Manual* (2011) at SVU00436951; *ESI Network Provider Manual* (2012) at SVU00461846.

[62] Francis, W. *Guide to Health Plans for Federal Employees*. Washington DC: Center for the Study of Services. Retrieved from https://www.checkbook.org/newhig2/year16/text.cfm.

[63] Blom KB and Cornell AS. *Federal Employees Health Benefits Program: An Overview*. Congressional Research Services. Feb. 3, 2016. Retrieved from https://fas.org/sgp/crs/misc/R43922.pdf.

[64] *Caremark Provider Manual* (2011) at SVU00513444; *Caremark Provider Manual* (2012) at SVU00513692; *Caremark Provider Manual* (2013) at SVU00515255.

reimburse for prescriptions based on the lower of (1) the plans' determination of acquisition cost for drug ingredients plus a specified dispensing fee or (2) the pharmacy's U&C charge.

## 5 – USUAL AND CUSTOMARY PRICE CAP

### 5.1 Negotiated Price and U&C

A pharmacy's negotiated contract price is generally based on a formula derived from the cost of the drug and a fee for dispensing the drug. These contract measures for drug costs include, among others, Actual Acquisition Cost (AAC), Estimated Acquisition Cost (EAC), Wholesale Acquisition Cost (WAC), Average Wholesale Price (AWP), and Average Manufacturer Price (AMP).[65]  In an effort to keep costs for drug ingredients under control, federal and state GHPs and PBMs impose limits on what they will pay for certain multi-source drug products.  These limits are known as the Federal Upper Limit (FUL) for Medicaid and the Maximum Allowable Cost (MAC) for other plans.[66]  Reimbursement for drug ingredient costs for multiple-source drug products that are subject to a FUL or MAC is capped at the FUL or MAC limit even if the pharmacy dispenses a prescription with ingredient costs that are higher than the FUL or MAC.

In addition to MAC and FUL price caps, a pharmacy's negotiated contract price is also subject to a cap known as the "usual and customary" (U&C) price. The U&C provisions in statutes, rules, regulations and contracts for private third-party plans and GHPs prohibit pharmacy providers from being reimbursed for drugs at amounts greater than what the provider otherwise charges members of the "general public." Third-party payer transactions, such as private insurance sales,

---

[65] Federal Medicaid regulations now mandate that payments for drugs under the program must not exceed the *lower of* the (1) Actual Acquisition Cost plus reasonable dispensing fees established by the agency; *or* (2) *Providers' usual and customary charges to the general public*. 42 *CFR* § 447.512(b) (2016) (emphasis added). Actual Acquisition Cost (AAC) means the agency's determination of the pharmacy providers' actual prices paid to acquire drug products marketed or sold by specific manufacturers after all discounts have been deducted and is derived from actual audits of pharmacy invoices. The Estimated Acquisition Cost (EAC) was a state Medicaid agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers." *Id.* § 447.502 (2006). Medicaid regulations were amended in 2016 to substitute the Estimated Acquisition Cost standard with the Actual Acquisition Cost standard because CMS concluded that the AAC standard more accurately reflects the actual prices that pharmacies pay to acquire drugs.

[66] Since the Federal Government reimburses states a portion of Medicaid expenditures, CMS has established a "Federal Upper Limit" (FUL) to cap the amount the Federal Government will allow for reimbursing most multiple-source (generic) drug products.  By regulation, CMS was directed to set a FUL price at 150 percent of the published price of the least costly therapeutically equivalent multiple-source drug product, provided there were at least three suppliers.  In practice, however, CMS exercised considerable discretion and did not always set FUL at 150 percent of the lowest published price. States are allowed to set lower MAC price limits for multiple-source drug products or to add additional products to their own list of drugs subject to a maximum reimbursement limit.

are generally excluded from U&C price calculations making the U&C price equal to the amount cash customers (i.e., customers without insurance) pay for the drug.[67]

The U&C provision acts as a cap on reimbursement for third-party payers and is understood in the industry as preventing a pharmacy from charging a customer with insurance more than it would otherwise charge a customer paying cash.

"Negotiated Price" is the CMS defined term for Medicare Part D drugs that the Part D sponsor and pharmacy have negotiated as the amount the pharmacy will receive, in total, for a particular drug reduced by discounts the Part D sponsor has elected to pass through to enrollees and inclusive of dispensing fees.[68] A pharmacy's online payment system must be set up to process

---

[67] Some State Medicaid programs such as Massachusetts and New Hampshire impose "Most-Favored Nation" provisions by regulations that require those Medicaid programs to be charged the *lowest* price offered to anyone *including Managed Care Plans*. If the price offered a cash-paying customer is the lowest price offered to anyone, then the cash price still sets the U&C under a most-favored nation provision. [See, Exhibits.18 and 19]

[68] Negotiated prices means prices for covered Part D drugs that –(1) Are available to beneficiaries at the point of sale at network pharmacies;(2) *Are reduced by those discounts, direct or indirect subsidies, rebates, other price concessions, and direct or indirect remunerations that the Part D sponsor has elected to pass through to Part D enrollees at the point of sale*; and (3) Includes any dispensing fees. [42 *CFR* §423.100 (2007)]

Negotiated prices means prices for covered Part D drugs that— (1) The Part D sponsor (or other intermediary contracting organization) and the network dispensing pharmacy or other network dispensing provider have negotiated as the amount such network entity will receive, in total, for a particular drug; (2) *Are reduced by those discounts, direct or indirect subsidies, rebates, other price concessions, and direct or indirect remuneration that the Part D sponsor has elected to pass through to Part D enrollees at the point of sale*; and (3) Includes any dispensing fees. [42 *CFR* §423.100 (2011)]

Negotiated prices means prices for covered Part D drugs that meet all of the following: (1) The Part D sponsor (or other intermediary contracting organization) and the network dispensing pharmacy or other network dispensing provider have negotiated as the amount such network entity will receive, in total, for a particular drug. (2) *Are inclusive of all price concessions from network pharmacies except those contingent price concessions that cannot reasonably be determined at the point-of-sale*; and (3) Include any dispensing fees; but (4) Excludes additional contingent amounts, such as incentive fees, if these amounts increase prices and cannot reasonably be determined at the point-of-sale. [42 *CFR* §423.100 (2016)]

EXHIBIT A1

claims through the beneficiaries' Part D plan at the Negotiated Price.[69] A pharmacy that fails to offer a Part D beneficiary the applicable Negotiated Price of a drug commits fraud.[70]

Access to Negotiated Prices must be provided to Part D beneficiaries even when no benefits would otherwise be payable on behalf of a Part D beneficiary due to the application of a deductible, coverage limit or gap, copayment, or other cost- sharing.[71] In other words, the Negotiated Price for a particular covered Part D drug purchased at a particular pharmacy must always be the same regardless of what phase of the Part D benefit an enrollee is in. For example, if a beneficiary's drug is on a $10 cost-sharing tier but the Negotiated Price of the drug is $4 as a result of negotiated price concession (such as discounts, subsidies or rebates) passed through to enrollees at the point of sale, the beneficiary never pays more than $4 through the Part D Plan even when he or she is in the coverage gap.[72]

Under the "lower of" or "lesser of" contractual provisions and GHP statutes, rules and regulations, virtually all third-party prescription plans pay the lower of the negotiated contract price set by the third party or the U&C price charged to cash customers. Pharmacies have long been aware that third-party prescription plans, including GHPs, require pharmacies to compare the plan's specified reimbursement formula with the pharmacy's U&C cash price. If the amount the pharmacy usually charges a cash-paying customer is lower than the plan's reimbursement formula, the pharmacy is to be reimbursed at that lower U&C cash price.

The "lesser of" contractual provision or "lower-of logic" that compares a plan's specified reimbursement formula with the pharmacy's U&C cash price and pays the pharmacy the lower of the two is well known and is a standard provision for reimbursing pharmacy claims in the pharmaceutical industry.

---

[69] CMS *Prescription Drugs Benefits Manual* Ch. 5: Benefits and Beneficiary Protections, Sec. 20.5 – Negotiated Prices (2008); CMS *Prescription Drugs Benefits Manual* Ch. 5: Benefits and Beneficiary Protections, Sec. 20.6 – Negotiated Prices (2011).

[70] CMS *Prescription Drugs Benefit Manual*, Ch. 9: Part D Program to Control Fraud, Waste and Abuse: §70.1.3 Pharmacy Fraud, Waste and Abuse at p. 59 (2006).  See also Exhibit 146, SuperValu's Government-funded Program Compliance Policy and Exhibit 147, SuperValu's Fraud Waste and Abuse of Government Funds Policy. Both reference the failure of a pharmacy to offer Negotiated Prices as pharmacy fraud. Caremark Medicare Part D Compliance Fraud, Waste & Abuse Training for Network Pharmacies (2011/2012) also cites as an example of pharmacy fraud the "failure to offer negotiated prices [which] occurs when a pharmacy charges a beneficiary the wrong amount."

[71] 42 *CFR* §423.104 (g); CMS *Prescription Drugs Benefits Manual* Ch. 5: Benefits and Beneficiary Protections, Sec. 20.5 – Negotiated Prices (2008); CMS *Prescription Drugs Benefits Manual* Ch. 5: Benefits and Beneficiary Protections, Sec. 20.6 – Negotiated Prices (2011).

[72] CMS *Prescription Drugs Benefits Manual* Ch. 5: Benefits and Beneficiary Protections, Sec. 20.5 – Negotiated Prices (2008).20.6.

When a pharmacy submits a claim through a third-party plan's online adjudication system, it is required to submit its U&C cash price for the product being dispensed. Standards for electronic prescription claims are generally established by the National Council for Prescription Drug Programs (NCPDP), which defines U&C as "[The] [a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed."[73] Generally speaking, U&C prices are submitted on the U&C Pricing Segment Field 426-DQ, but the requirements for how and where to submit U&C price may vary by payer.[74, 75] Regardless of how or where the U&C price is reported on the NCPDP claim form, the third-party plan's payment system is programmed to compare the U&C cash price submitted by the pharmacy to the plan's contract-rate reimbursement formula for drug acquisition cost plus the dispensing fee and then pays the pharmacy the lower of the two. When the U&C is less than the Negotiated Price, the lower U&C "take[s] the place of the . . . negotiated price."[76] When a pharmacy submits an electronic claim form, the information contained on that form is ultimately transmitted to CMS. When a pharmacy fails to accurately report, or reports an inflated U&C amount, that is, an amount that exceeds the lower price amounts available to the general public throughout the benefit year, the pharmacy causes the sponsor to likewise report false inflated amounts on the Prescription Drug Event (PDE) data submitted to CMS.[77]

Traditionally, third-party prescription programs set prescription reimbursement at a level lower than community pharmacies' U&C prices to cash customers. Since more than 90 percent of prescriptions are covered by third-party plans,[78] relatively few prescriptions were charged at the pharmacy's U&C cash price.

---

[73] *NCPDP Data Dictionary* (1999) found at:
http://www hosinc.com/products/ascend/help/billing/EDI%20Manuals/data%20dictionary%20september%2099.pdf

[74] *NCPCP Billing and Payment Scenarios* (May 2017) found at:
http://www ncpdp.org/members/pdf/WG45DocumentMapping-D_0-scenarios-combined.pdf

[75] For example, it is well known to pharmacy providers in California that Medi-Cal does not use this "Usual and Customary" field when adjudicating claims but instead adjudicates claims using NCPDP's "Gross Amount Due" (GAD) field, which is the sum of the "Ingredient Cost Submitted" and the "Dispensing Fee Submitted" fields.  Providers are expected to use a combination of ingredient costs and dispensing fees that reflects the U&C. [Medi-Cal: Pharmacy FAQs (1/25/2012.  Found at http://files medi-cal.ca.gov/pubsdoco/ncpdp/ncpcp_faq.asp]

[76] Exhibit 127, fn 1.

[77] "Every time a beneficiary fills a prescription under Medicare Part D, a prescription drug plan sponsor must submit a summary record called the prescription drug event (PDE) data to CMS.  The PDE data are not the same as individual drug claim transactions, but are summary extracts using CMS-defined standard fields….The PDE record contains prescription drug cost and payment data that enables CMS to make payments to plans and otherwise administer the Plan D benefit." [CMS, *Questions and Answers on Obtaining Prescription Drug Event (PDE) Data*.  Found at *https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovGenIn/Downloads/PartDClaimsDataQA.pdf*.

[78]  National Community Pharmacists Association, *NCPA Digest*, 2016, p. 19.

This changed when Walmart and Kmart implemented their generic discount programs in 2006 and advertised a $4 charge for 30-day supplies of about 300 generic drugs. Other national pharmacy chains subsequently instituted similar discount programs with a $4 charge for 30-day supplies and $10 to $15 for 90-day supplies, depending on the drugs.  In addition, some chains implemented across-the-board percentage discounts on selected non-formulary generic and brand-name drugs.  Instead of developing their own discount programs, some pharmacy chains, including Kmart and the Defendants, offered to match discount prices by Walmart and other competitors.  As a result, many prescriptions that once had higher U&C prices than third-party plans' contract reimbursement formulae now had lower U&C charges than the plans' traditional reimbursement for drug acquisition cost plus a dispensing fee.

## 5.2 – U&C Price Cap – Federal and State Reimbursement

Various GHP prescription drug reimbursement statutes, rules, regulations and contracts for Medicare, TRICARE, FEHBP and Medicaid programs prohibit pharmacies from being reimbursed for prescriptions at amounts greater than the pharmacy's U&C.  Unless specified otherwise by a state Medicaid program, the U&C charge is generally understood to be the amount that the pharmacy charges to the general public. Because the general public does not include payments by third-party payers, the U&C price is equivalent to the price paid by cash customers (i.e., those without prescription insurance coverage). Pharmacy discount programs or price-match programs (such as the Defendants') that are widely and consistently available are, in my opinion, offers to the "general public."  Based on my professional experience and education, as well as my examination of various documents in this case, it is my opinion that the Defendant's price-match program was an open offer to the general public and, therefore, these discounted prices were required to be reported on each applicable claim as the pharmacy's U&C price.

The *Garbe* court interpreted the applicable regulations to mean that state agencies and the Federal Government should not pay more for prescribed drugs than the prevailing retail market price.  It also stated that "[r]egulations related to 'usual and customary' price should be read to ensure that where the pharmacy regularly offers a price to its cash purchasers of a particular drug, Medicare Part D receives the benefit of that deal."

As also noted accurately in *Garbe*, U&C price is not simply a price arbitrarily set by a pharmacy, but is a price based on the actual retail market prices offered by the pharmacy to the general public, namely to its cash customers.[79] Pharmacies are required by statutes, regulations and contracts to calculate U&C prices, certify their accuracy, and retain documents to allow PBMs and GHPs to inspect and audit how U&C prices were in fact determined by the pharmacy. GHPs

---

[79] *United States ex el. Garbe v. Kmart Corp.*, 824 F3rd 632, p.644 (7th Cir. 2016).

and PBMs paying third-party claims rely on a pharmacy's truthful determination, certification and reporting of its U&C prices to make accurate payments under the terms of the contracts.

Specific CMS guidance issued some ten years earlier in response to the introduction of various cash discount programs at retail pharmacies referenced the Walmart $4 discount program as an example of a program that offered to customers a reduced cash price for certain drugs and that discounted price, in turn, established Walmart's U&C price for those drugs.  Moreover, CMS required that the discount prices be offered within the Plan's Part D benefit design so the beneficiary's expenditures could count toward the beneficiaries' true out-of-pocket cost (TrOOP) for deductibles, copayments and coinsurance.

Deposition Exhibit 127 is the CMS memorandum from Cynthia Tudor, then the Director of Medicare Drug Benefit Group, dated October 11, 2006 that explains that when cash discounts are offered to customers throughout the benefit year, the discounted price offered establishes a pharmacy's U&C price. These discounts are considered U&C prices rather than "one-time lower cash prices" even when the cash purchaser uses a discount or "membership" card.[80]  This policy was also included in the CMS Medicare Prescription Drug Benefit Manual and posted on the Frequently Asked Questions section of the CMS website.[81]

The CMS "Lower Cash Price" guidance stated that:

> "Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The low Wal-Mart price on these specific generic drugs is considered Wal-Mart's "usual and customary" price, and is not considered a one-time "lower cash" price. Part D sponsors consider this lower amount to be "usual and customary" and will reimburse Wal-Mart on the basis of this price. To illustrate, suppose a Plan's usual negotiated price for a specific drug is $10 with a beneficiary copay of 25% for a generic drug. Suppose Wal-Mart offers the same generic drug throughout the benefit for $4. The Plan considers the $4 to take the place of the $10 negotiated price. The $4 is not considered a lower cash price, because it is not a one-time special price. The Plan will adjudicate Wal-Mart's claim for $4 and the beneficiary will pay only a $1 copay, rather than a $2.50 copay. This means that both the Plan and the beneficiary are benefiting from the Wal-Mart "usual and customary" price, and the discounted Wal-Mart price of the drug is actually offered within the Plan's

---

[80] CMS *Prescription Drugs Benefits Manual*, Chapter 14 - Coordination of Benefits, p. 19 n.1 (2006).

[81] Exhibit 127, October 11, 2006 CMS memorandum from Cynthia Tudor, Director of the CMS Medicare Drug Benefit Group and CMS, *Medicare Prescription drug Benefit Manual*, Ch. 14 – Coordination of Benefits, Section 50.4.2.

EXHIBIT A1

Part D benefit design. Therefore, the beneficiary can access this discount at any point in the benefit year, the claim will be adjudicated through the Plan's systems, and the beneficiary will not need to send documentation to the plan to have the lower cash price count toward TrOOP."

## 5.3 – U&C Requirements of State Medicaid

As noted above in sections 4.3 and 5.2, among others, individual State Medicaid agencies have specific formulas (also referred to as methodologies) for setting drug reimbursement. These formulas contain "lower of" or "lesser of" analysis when comparing certain price points.  Federal law generally provides that, in the absence of some other cap on reimbursement, such as upper limits on generic drugs, payment for drugs should not exceed the usual and customary charges to the general public.[82]  Accordingly, a key price component in these State Medicaid reimbursement formulas is U&C.  Each State has regulations which govern the meaning and use of U&C in their State Medicaid program, however, the regulations must be approved by the secretary of HHS and must incorporate the "lower of" U&C requirements embodied in 42 *CFR* 447.512.

At the instruction of counsel, I have been asked only to review and opine about four (4) State Medicaid programs in the context of this case at this time.  Those States are California, Illinois, Utah, and Washington.  I set forth below an explanation of the importance of U&C in their reimbursement methodologies.

<u>California</u>

California law stated clearly, "[n]o provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service."[83]  Likewise, the regulations also state "…no provider shall charge for any service or article [such as a drug] more than would have been charged for the same service or article to other purchasers of comparable services or articles under comparable circumstances."[84] These regulatory requirements were effective from at least 2006, which I understand is the beginning of the damage period in this case.  The California Medicaid program made this legal requirement known to its provider community, including presumably all SuperValu pharmacies operating in California and enrolled as Medi-Cal providers.  For instance, as of June 2009, if not earlier, the *California Medi-Cal Pharmacy Provider Manual* provisions concerning drug reimbursement stated the following in a section titled "Pharmacy Discounts":

---

[82] See 42 *CFR* 447.331 which then moved to 42 *CFR* 447.512.
[83] See paragraph (a) of the *Cal. Code Regs*. Title 22, Division 3, Subdivision 1, Ch. 3, Art. 6, Sec. 51480.
[84] See paragraph (a) of the *Cal. Code Regs*. Title 22, Division 3, Subdivision 1, Ch. 3, Art. 7, Sec. 51501.

EXHIBIT A1

> "DHCS is aware that certain pharmacies engage in various advertising promotions that essentially result in some form of discount for their customers.  Examples include, but are not limited to, the offering of price discounts, cash rebates and free promotions.  Pharmacy providers offering such discounts to the general public <u>must</u> be available on the same terms and conditions to Medi-Cal customers.  Failure to do so may result in billing the Medi-Cal program more than the usual and customary amount charged to the general public for the same service and is prohibited by *California Code of Regulations* (CCR), Title 22, Sections 51480 and 51513(b)(1)(A), (c) and in accordance with Title 42, *Code of Federal Regulations*, Part 447.331."

The Medi-Cal Provider Manual reflected that California Medicaid deemed it important for providers to comply with California and Federal legal requirements concerning U&C.  Furthermore, as is clear from this Provider Manual, Medi-Cal required low prices charged to the general public to be reflected in the U&C values providers reported.[85]  This instruction appears particularly pointed toward the then growing awareness of generic discount programs, such as SuperValu's price-matching effort, which had become more common in response to Walmart's $4 generic program.[86]

I am aware that on Oct. 1, 2009 a regulatory definition of U&C in California became effective that was ultimately enjoined by a federal judge in Los Angeles.  Specifically, the legal ruling halted enforcement of the U&C definition set forth in *CCR* 14105.455.  Importantly, however, California Medicaid announced to the public and the pharmacy provider community, that

> "pharmacies must continue to comply with the Usual and Customary charge billing limits that existed prior to section 14105.455 . . . (and) providers are still subject to the Usual and Customary charge billing limits

---

[85] One nuance of Medi-Cal was that providers were required to report their U&C values in the field titled Gross Amount Due (sometimes known as GAD) in the claims submissions process.  (See public Medi-Cal "FAQ" stating "The Department adjudicates claims based on the "Gross Amount Due" field which, for prescription drugs, is the sum of the "Ingredient Cost Submitted" and the "Dispensing Fee Submitted" fields. In order to comply with the definition of "Usual and Customary" pursuant to the W&I Code, a provider should enter the combination of ingredient cost and dispensing fee that reflects the lower of (1) the lowest price reimbursed to the pharmacy by other third-party payers in California, excluding Medi-Cal managed care plans and Medicare Part D prescription drug plans and (2) the lowest price routinely offered to any segment of the general public.")

[86] Medi-Cal made it clear that "the lowest price routinely offered to any segment of the public" includes discount schemes similar to prince-match discounts, such as so-called "club prices" or "discount cards." [Medi-Cal: Pharmacy FAQs (1/25/2012.  Found at http://files.medi-cal.ca.gov/pubsdoco/ncpdp/ncpcp_faq.asp]

that were the law prior to the enactment of section 14105.455.  For example, providers must continue to comply with title 22, *California Code of Regulations*, section 51480, which prohibits providers from billing or submitting a claim for Medi-Cal reimbursement in any amount greater or higher than the usual fee charged by the provider to the general public."[87]

Accordingly, in my opinion the enjoined California definition is ultimately unimportant with respect to SuperValu's requirement to report U&C values to Medi-Cal based upon the prices SuperValu charged the general public.

It should be noted that a regulation that provides an additional U&C requirement, such as a so-called "Most-Favored Nation" pricing standard, does not excuse providers from satisfying the U&C regulations cited above in prior years or presently.  If the price offered a cash-paying customer is the lowest price offered to anyone, then the cash price still sets the U&C under a most-favored nation provision.[88]

Illinois

Illinois Medicaid regulations state that Medicaid providers agree to "[m]ake charges for the provision of services and supplies to recipients in amounts not to exceed the provider's usual and customary charges and in the same quality and mode of delivery as are provided to the general public."[89]  The U&C price is defined as "[t]he pharmacy's prevailing charge to the general public."[90] Since the term "prevailing" is generally understood to mean "existing and accepted,"[91] it is my opinion that SuperValu's common, widespread, and continuous application of $4 price matching for many high-volume generic drugs clearly makes these price-matched prices SuperValu's actual U&C prices.

The Illinois Medicaid Pharmacy Provider Manual has a slightly different, but entirely consistent definition of U&C as "[t]he amount a provider would charge cash customers for a prescription,

---

[87] See May 24, 2010 notice titled, "Medi-Cal Fee-For-Service Reimbursement for Drugs May 5, 2010 Court Action".

[88] On June 29, 2011, California Medicaid adopted the proposed most-favored nation provision directing that U&C was considered to be the lower of "(1) The lowest price reimbursed to the pharmacy by other third-party payers in California, excluding Medi-Cal managed care plans and Medicare Part D prescription drug plans" or "(2) The lowest price routinely offered to any segment of the general public." [*Welfare & Institutions Code* § 14105.455 (2011).  See also Exhibits 18 and 19]

[89] 89 *Ill. Am. Code* 140.12 (2011).

[90] 89 *Ill. Adm. Code* 119.100 (2005 and 2011)

[91] *The Cambridge Dictionary* found at: https://dictionary.cambridge.org/us/dictionary/english/prevailing

exclusive of sales tax."[92] The Provider Manual then makes it clear that certain discounts are to be reflected in the pharmacy's usual and customary charge:

> "Discounts provided to the general public must also be provided to Medical Assistance participants.  If, however, discounts are allowed only to a certain defined group, then the discount should be extended to a Medical Assistance participant if they can be considered a member of the group.  For example, if the pharmacy extends a discount to 'senior citizens,' then the pharmacy must extend the discount to all Medical Assistance 'senior citizens.'  A pharmacy cannot exclude a Medical Assistance participant from a discount group based solely on their status as a Medical Assistance participant. However, Medical Assistance participants can constitute a special group and receive a discount."[93]

Since SuperValu's price-match discounts were available to essentially any member of the general public, they must also be offered to Medicaid patients.  The previous description instructs pharmacy providers that usual and customary prices must reflect discounts, such as price-match discounts offered to the general public, and is consistent with my interpretation of how usual and customary prices are to be determined.

Utah

Utah Medicaid's Pharmacy Provider Manual states that for prescription claims, "[t]he billed charge may not exceed the usual and customary rate billed to the general public, such as individual patient accounts or third-party payer accounts."[94]  The "general public" language is consistent with my long-held understanding that price-match discounts offered to the general public, such as those offered by SuperValu, constitute the U&C price. Utah Medicaid confirms this understanding in its State Plan, Attachment 4.19-B, Section S, which says that "[p]harmacies must submit their lowest usual and customary charges to Medicaid, including promotional rates such as $4.00 generics, if they are offered to the general public."[95]  This requirement was clearly explained in an October, 2008 *Medicaid Information Bulletin*, which stated "$4.00 prescriptions offered by pharmacies with low-cost generic programs are being considered as usual and

---

[92] Illinois Department of Healthcare and Family Services, *Handbook for Providers of Pharmacy Services*, Chapter P-200, p. *vii* (Nov. 2010).

[93] Illinois Department of Healthcare and Family Services, *Handbook for Providers of Pharmacy Services*, Chapter P-202.1 (Nov. 2010).

[94] *Utah Medicaid Provider Manual: Pharmacy Services*, 6-6 – Billing Medicaid (Updated July 2014).

[95] *Utah Medicaid Provider Manual: Pharmacy Services*, Pharmacy Reimbursement (Updated July 2014).

customary by Utah Medicaid. Pharmacies offering these discounts must transmit the $4.00 as the U&C. Medicaid will recoup reimbursement amounts above the $4.00 upon audit."[96]

In my opinion, Utah's very explicit language does not constitute a new interpretation of "usual and customary;" it simply acknowledges and confirms what had already been understood in the pharmacy industry.

Pharmacies participating in Utah Medicaid are required to submit accurate claims, including proper reporting of U&C prices.  The Utah Medicaid Pharmacy Provider Agreement states that "[t]he provider agrees that the submittal of any claim by or on behalf of the provider will constitute a certification…that…the payment claimed does not exceed the provider's usual and customary charges or the maximum amount negotiated under applicable regulations of the Division of Medical and Health Financing, and…the information submitted in, with, or in support of the claim is true, accurate and complete."

<u>Washington</u>

Washington Medicaid regulations define usual and customary to be "[t]he fee that the provider typically charges the general public for the product or service."[97] Washington's Medicaid Provider Guide states that reimbursement for prescriptions cannot exceed "[t]he provider's usual and customary charge to the non-Medicaid population." It goes further, however, to make it clear that all discounts are to be passed on as the U&C price:

> "Note:
> - If the pharmacy provider offers a discount, rebate, promotion or other incentive that directly relates to the reduction of the price of a prescription to the individual non-Medicaid customer, the provider must similarly reduce its charge to the Agency for the prescription. (Example; A $5.00 off coupon for purchases elsewhere in the store.)
> - Any drug or product provided free to the general public must also be provided free to the Medicaid customer."[98]

---

[96] Utah Department of Health, *Medicaid Information Bulletin*: October 2008, p. 17 Sec. 08-93 - $4 Low-Cost Generic Programs.  Found at https://medicaid.utah.gov/Documents/manuals/pdfs/Medicaid%20Information%20Bulletins/Traditional%20Medicaid%20Program/2008/October2008-MIB.pdf.

[97] *WAC* 182-530-1050 (Definitions).

[98] Washington State Health Care Authority, *Medicaid Provider Guide: A Guide to Prescription Drug Program*, p. H-12.

The language in the Provider Manual is consistent with my understanding a discount, rebate, price match or other incentive or promotion that lowers prices for non-Medicaid customers is to be the pharmacy providers' usual and customary charge.

### 5.4 - U&C Contract Requirements

I have reviewed numerous U&C related documents bearing on SuperValu's relationship with third-party payers (commercial and GHP). A sampling of these third-party contracts consist of CVS Caremark (84 contracts; most of which relate to Part D or FEHBPs); Medco (85 contracts; 21 of which relate to Part D); Express Scripts (65 contracts; 3 related to Medicaid, 15 Part D, 3 TRICARE); Humana, (23 contracts; 10 related to Part D); UnitedHealth (14 contracts; 1 related to Part D); and Aetna (19 contracts; 15 related to Part D). For simplicity I refer to these documents collectively as "contracts" but note, for instance, that some of the documents consist of amendments, addenda, and letters of agreement. Relators' counsel has also provided me with summaries of contracts and contract-related documents they have obtained to date in this matter. In addition, I have had the brief opportunity to review a so-called ALL TOP spreadsheet summary.[99] That summary consists of a crosswalk between Part D Plans and their associated PBM contract U&C definitions from 2006 through 2016. Although the top 20 PDP/plans varied over this time and resulted in the identification of 35 PBMs, U&C language appears to have remained relatively constant with only 15 unique U&C definitions appearing during that period. Due to the late receipt of this information, my own desire to further scrutinize source documents, and the seeming import of the documents, I specifically reserve the right to amend my opinion about the ALL TOP documents until such time as I've had an opportunity to obtain and thoroughly review them.

From my review and consideration of the documents now at my disposal and not limited to the ALL TOP crosswalk, it is my observation and opinion that usual and customary contract language in PBM contracts is ubiquitous. The inclusion of U&C language is clearly no accident and, in fact, exists as a reflection of long-standing industry practice. Tantamount to a usage in trade for retail drug pricing, U&C pricing predates Part D and reflects an approach to pricing so regularly observed as to justify an expectation that such language will be employed as an ultimate measure of cost containment. Indeed, even a cursory review of the available contracts in this case reveals the prevalence of U&C reimbursement limitation requirements. And though U&C language may differ marginally from contract to contract, the very employment of U&C language – however varied – seeks the same goals of efficiency, economy, and quality of care noted by the *Garbe* court decision.

In the context of Medicare Part D, usual and customary pricing PBM contract language works in concert with regulatory negotiated price requirements to ensure that the government pays no

---

[99] ALL TOP summary.

more for prescription drugs than the prevailing retail market price. This reflects the guidance of CMS in 2006 through, and culminating in, the observations of the *Garbe* court decision in 2016. So central to Part D pricing is U&C that virtually all of the plans approved by CMS ultimately include some form of U&C contract language for the downstream entities dispensing drugs (i.e., the community pharmacies).

Returning to the contracts in this matter and again leaving aside the particulars of the ALL TOP contracts, U&C definitions over the relevant time period generally reference cash pricing or pricing to patients without prescription benefits. While the precise language may marginally differ based on the payer, the predominant definition of U&C is (consistent with the *Garbe* decision) the cash price to the general public. With the exception of the Express Scripts contract definition of December 2009, price-match exclusion language is virtually nonexistent.[100] The existence of "exclusion" language, however, appears to have had little bearing on SuperValu's reported U&C – even when third parties specifically told SuperValu management that U&C must include price matches and other such discounts.

Exhibit 112, for instance, reveals that on October, 27, 2006, Medco notified SuperValu of the following:

> "Given the array of unique discounted pricing, and even free, offerings being announced every few days over the last weeks, we wanted your organization to be reminded of the Usual and Customary pricing provision in all Medco pharmacy network agreements. Pharmacy is required, by contract, to: "Submit Pharmacy's Usual and Customary ("U&C") price, which represents the lowest net price a cash patient would have paid on the day that the prescription was dispensed inclusive of all applicable discounts." These discounts include, but are not limited to, senior citizen discounts, loss leaders, frequent shopper, or special customer discounts, *competitor's matched price*, or other discounts offered customers. For Medco members or patients, it is expected that their prescription claim will be submitted through TelePAIDIPOS by pharmacy submitting appropriate pharmacy U&C pricing."

Despite this communication, SuperValu failed to submit its price-matched prices through its online adjudication system as required by Medco.

Some twenty months later, on June 23, 2008, SuperValu executives clearly acknowledged Medco's contract expectations with respect to U&C:

> "When a new company does a press release saying they are doing the $4 generic, they get an email and a formal letter from Medco letting them

---

[100] It is not clear whether Express Scripts understood the price match exclusion to apply on an ad-hoc basis or as a regular and ongoing offer to the general public. What is clear is that by February 2013, the price match exclusion no longer appeared in Express Scripts contracts with SuperValu.

EXHIBIT A1

> know Medco's definition of U&C . . . Medco revokes payment down to
> the $4 level thru the audit department, on the products the retailer submits
> at their U&C."[101]

As reflected in a communication on June 24, 2008, the principal concern of SuperValu's executives did not appear to be whether to accurately report U&C as Medco required, but how SuperValu's advertising campaign promoting $4 generic price matches would be seen by "Managed Care" particularly after "we found out that Medco is revoking payment on pharmacies that advertise $4."[102]

That SuperValu seemingly ignored Medco's notice that U&C should include competitor price matches is consistent with the testimony offered by Pharmacy Pricing Analyst Christina Zook.[103] SuperValu's methods for calculating U&C prices don't reflect SuperValu's actual cash sales to customers.

Ms. Chris Zook, who reported at all relevant times to Ms. Anne Dony in SuperValu's Pricing Department, was responsible for calculating SuperValu's U&C prices during the entire period of conduct alleged in this case, 2006 to the end of 2016. Ms. Zook reviewed U&C prices on a weekly basis and, upon consultation with Ms. Dony, adjusted them as necessary. She explained that three methods established U&C pricing for generic drugs: 1) competitive analysis which entails retaining an outside company to survey the competition's prices within a given area. Ms. Zook used these competition reports to make recommendations to Ms. Dony about raising or lowering U&C prices; 2) third-party reimbursement, that is, the amount that "came back from insurance." (Ms. Zook noted that SuperValu focused on the retail amounts received on third-party prescriptions instead of focusing on cash transactions for that drug from uninsured customers); and 3) acquisition costs, also known as "store billing cost."[104]

In determining U&C prices for brand-name drugs, Ms. Zook explained that ARx monitored increases in AWP and SuperValu's price would automatically increase accordingly.[105]

For definitional clarity, Ms. Zook explained that the term "U&C" was synonymous with "retail price" and "regular cash price."[106] "Retail price" and "regular cash price" is not to be confused with "minimum retail price."[107] SuperValu's "minimum retail price" implicates the "logic in the [ARx] system that prevents regular cash price from going below a certain amount."[108] The,

---

[101] Exhibit 47.

[102] Exhibit 113.

[103] See also testimony from Marc Allgood, Director of Pharmacy Systems & Process Redesign at New Albertsons, Inc. When asked during his deposition to respond to the statement that the U&C amount set by Pricing and entered in ARx does not change depending on the third-party carrier (Express-Scripts, Medco), Mr. Allgood responded, "I think that's a fair statement." Allgood Deposition, p. 47.

[104] Zook Deposition, pp. 58-60, 65, 71, 98-113.

[105] Zook Deposition, pp. 97-8.

[106] Zook Depositio, pp. 21-4, 57, 70, 93-4.

[107] Zook Deposition, p. 93.

[108] Zook Deposition, p. 20.

"minimum retail price" is $7.69 for generic drugs and $9.99 for brand-name drugs.[109]  If, on any given cash sale to a customer, "minimum retail price" was higher than U&C, the drug would sell at the "minimum retail price." If, however, the U&C was higher than the minimum retail price, the drug would sell at the U&C price.[110] A change in AWP, WAC, or MAC would never affect a drug's minimum retail price.[111]

SuperValu established six tiers of pricing and Ms. Zook explained that stores are set up in markets across the country. Because each drug has its own tier, a market doesn't have just one tier of pricing. Tier 6 represents the highest price; that is, the higher the tier, the higher the price. The Pharmacy Pricing department makes all decisions with respect to store markets and drug tiers.[112]

SuperValu's methods of calculating U&C excluded its own cash sales data and, in doing so, did not capture discounted cash transactions that were heavily advertised across its banner(s). In disregarding its own cash transactions, SuperValu ensured that such transactions would have no effect on the usual and customary pricing it submitted to third-party payers, including GHPs.[113]

In addition, Ms. Zook explained that the manner in which SuperValu calculated U&C and the methods utilized did not change based on contracts with third parties. In fact, with respect to third-party transactions, Ms. Zook's testimony made clear that the subject matter was not her "area of expertise;" her responsibilities were limited to cash pricing and that she was unable to identify anyone responsible for third-party pricing at SuperValu.[114] Despite Ms. Zook's unfamiliarity with SuperValu's third-party business, she was nonetheless a central figure in SuperValu's Pricing Department and its determination of U&C pricing. The Pricing Department calculated and established U&C and those results were disseminated to the rest of SuperValu's business for use by all pharmacies. Marc Allgood, Director of Pharmacy Systems and Process Redesign at New Albertsons, Inc. testified that with respect to U&C pricing, Ms. Dony and Ms. Zook were the only people in the company who could set U&C prices and pharmacists were unable to change them.[115]

Ms. Zook's description of SuperValu's static approach to calculating U&C undermines – if not entirely refutes – the premise that SuperValu paid heed to U&C price reporting requirements to third-party payers.  Ms. Zook established U&C, she described the methods by which U&C was/is determined, and the U&C pricing requirements contained in third-party contracts played no role in that calculation. While it may be true that it is necessary to consult SuperValu's third-party contracts to determine U&C requirements, it is equally true that, in practice, those requirements had no bearing on SuperValu's ultimate establishment of U&C pricing.

---

[109] Zook Deposition, p. 94.
[110] Zook Deposition, pp. 94-5.
[111] Zook Deposition, p. 95.
[112] Zook Deposition, pp. 71-9.
[113] Zook Deposition, pp. 71, 110-5.
[114] Zook Deposition, pp. 24, 25, 42.
[115] Allgood Deposition, p. 46.

EXHIBIT A1

**5.5 – Manipulating U&C by Processing Third-Party Claims as Cash Transactions**

A primary objective of contract provisions requiring claims processing through the third-party online adjudication systems is to prevent the pharmacy from separating their cash transaction business from their third-party business.[116] That is, third-party plans do not allow pharmacies to manipulate their U&C prices by processing some member claims "off the books" as cash transaction claims at lower prices than the pharmacy charges member claims processed through their third-party insurance. Pharmacies cannot have separate U&C prices for cash customers and third-party payers.[117] Processing third-party claims as cash transactions outside of the plans' systems instead of reporting the lower cash prices as U&C through the plans' systems undermines the entire purpose of the "lower of" contract price or U&C provision.  It allows providers to charge some members lower cash prices (ordinarily when their copay is higher than the cash price) while charging members paying through their third-party plans higher prices because a third party is paying the claim.

Akin to what the *Garbe* court decision pointed out with respect to Kmart's price matching and discount club programs, allowing SuperValu to insulate its high U&C prices by artificially dividing its customer base undermines contract requirements and cost-containment efforts. Like the conduct in the *Garbe* case, SuperValu's price match program frustrates the U&C price reporting requirement by concealing its actual U&C prices. Because SuperValu offered the terms of its price-matching program to the general public and made them the lowest prices for which its drugs were widely and consistently available, based on the general understanding and usage of "usual and customary" in the industry, the SuperValu price-match prices represented the "usual and customary" charges for the drugs.[118]

SuperValu continued to price match competitor prices through December of 2016 even after FBI agents visited multiple stores nationwide and sent SuperValu an OIG subpoena in January of 2012, seeking information about SuperValu's price-matching program.[119,120]

---

[116] See Exhibit 30 where a Caremark compliance officer informed SuperValu: "The main objective is to prevent the pharmacy from separating their cash and U&C prices through third party and non-third party transactions." See also Exhibit 112 for Medco's instruction: "For Medco member or patients, it is expected that their prescription claim will be submitted through TelePAID/POS by pharmacy submitting appropriate pharmacy U&C pricing."

[117] See Exhibit 52 where SuperValu manager Ms. Anne Dony explains to other SuperValu employees, including executives: "It is my understanding that our U&C must be submitted to all TP carriers regardless of whether it is a minimum retail or not. We cannot have different U&C pricing for cash vs. TP customers."

[118] *United States ex el. Garbe v. Kmart Corp.*, 824 F3rd 632, p.645 (7th Cir. 2016).

[119] Tsipakis Deposition, pp. 92-108 and Exhibits 134, 135, 136 and 137.

**5.6 – Impact of Manipulating U&C on TrOOP Tracking**

The failure to submit cash claims also impacts the accuracy of Medicare Part D beneficiaries' true out-of-pocket expenses (TrOOP). TrOOP tracking is required to properly adjudicate beneficiary claims, including the annual initial deductibles, cost sharing amounts, entering and exiting the coverage gap (doughnut hole) and low-income subsidy status. When claims are paid in cash and not submitted to the PBM or Sponsor, beneficiaries do not receive proper credit for their TrOOP payments.[121]

Documents such as deposition Exhibit 30 indicate that SuperValu was made aware of the problems inherent in cash transactions and TrOOP. In Exhibit 30, Caremark's compliance officer informed SuperValu that even if a beneficiary is paying a cash price, "Provider shall still submit a claim to Caremark even if the Eligible Person elects to pay the Usual & Customary Price. In some instances, submitting claims through the member's Plan Sponsor can also be a compliance issue for state and federal guidelines as well. An example is with TrOOP spending for Medicare Part D participants. When a patient has insurance coverage the pharmacy is aware of, electronic submission is required. If cash claims are not properly submitted electronically the patient's out-of-pocket spending may not be accurately maintained."

Exhibits 119 and 55 state SuperValu's policy and direction of requiring Part D cash customers to forgo their Part D insurance, purchase with cash and send in receipts to claim TrOOP credit. In my opinion, such direction fails to comply with CMS guidance on lower cash price policy set forth in Exhibit 127 and the CMS *Medicare Prescription Drug Benefit Manual*, Ch. 14 – Coordination of Benefits, Section 50.4.2 Lower Cash Price policy.[122]

---

[120] Subsequent to the FBI investigation, SuperValu finally ended price matching in December 2016. [McCann Deposition, pp. 199-200 and Exhibit 15].

[121] CMS defines TrOOP Manipulation as a type of pharmacy fraud. "TrOOP manipulation: When a pharmacy manipulates TrOOP to either push a beneficiary through the coverage gap, so the beneficiary can reach catastrophic coverage before they are eligible, or manipulates TrOOP to keep a beneficiary in the coverage gap so that catastrophic coverage is never realized." Pharmacy fraud occurs when Part D beneficiaries are not offered the applicable Negotiated Price for a Part D drug. [CMS *Prescription Drugs Benefit Manual*, Ch. 9: Part D Program to Control Fraud, Waste and Abuse: Sec. 70.1.3 Pharmacy Fraud, Waste and Abuse at p. 59 (2006). See also 42 *CFR* §423.104. See Also SuperValu Policies and Procedures Manual, September, 2014, Deposition Exhibit 185, pp. 54-5.]

[122] Exhibit 123 at SVU00438493, Supervalu's Part D Training acknowledges: "the Part D plan must ACCURATELY track all the enrollee's eligible payments so they know when the catastrophic coverage begins. So tracking the enrollee's expenses while they are in the donut hole means two things to you, the pharmacy team. 1. The person must continue to use their Part D insurance plan during the donut hole to have the eligible Part D expenditures tracked 2. You must bill COB claims in the right billing order so the patient and plans are correctly charged the right amount. . . . Remember this is a governmental program - we must comply with all rules, especially the billing order rules." (Emphasis in original.)

**5.7 – Impact of Manipulating U&C on Prospective Drug Utilization Review Programs**

Processing claims through a beneficiary's third-party insurance helps facilitate performance of important online prospective Drug Utilization Review (DUR) functions.  Third-party plans require pharmacies to check a beneficiary's medication history for potentially dangerous problems such as drug interactions and overutilization prospectively (i.e., before dispensing he prescription).[123] While pharmacies are able to check medication histories and perform DUR for patients who patronize that pharmacy exclusively, these histories are incomplete if the patient uses more than one pharmacy.  The third-party's online prospective DUR function supplements individual pharmacies' internal DUR systems and often provides valuable information preventing problems such as drug interactions, duplicate therapy and overutilization that the pharmacy would be unable to detect otherwise. When claims are processed as cash, and not submitted to the beneficiaries' PBM or Sponsor, the beneficiaries' complete DUR history is not able to be properly checked and the current information is not properly recorded to the beneficiaries' medical history for later reference.  As a consequence, subsequent pharmacists seeking to review the patient's DUR history and medical record will be dangerously misled into believing that the patient's DUR medical record was properly recorded and complete when dispensing subsequent prescriptions.

Exhibit 144 is a draft version of a SuperValu DUR policy and explains that proper handling of DUR is "vitally important . . . to the health of the patient." It further acknowledges that: "[a] comprehensive DUR screening can only be performed if the patient's record has complete information on allergies and medical conditions."

In Exhibit 30, Caremark's compliance officer informed SuperValu that: "[Processing through the Part D beneficiaries' plan] is not only for the patient to be compliant with their plan but also for the pharmacy to be compliant with Caremark, to allow DUR edits, etc. As stated on page 7 of Caremark's Provider Manual, *Provider shall disclose to each Eligible Person Provider's Usual and Customary Price if such Usual and Customary Price is less than the applicable Patient Pay Amount. Provider shall allow the Eligible Person to pay either the Usual and Customary Price or the Patient Pay Amount, whichever is lower, unless a Plan otherwise requires.* <u>*Notwithstanding the foregoing, Provider shall still submit a claim to Caremark, even if the Eligible Person elects to pay the Usual & Customary Price*</u>*."* (Emphasis in original.)

---

[123] Participating pharmacy agreements usually specify these DUR requirements.  For Medicare Part D, they are also described in 42 *CFR* §423.153.

SuperValu's policy of requiring price-matched customers to pay as cash and not run claims run through the third-party's online adjudication system, dangerously undermined patient DUR safety checks and resulted in the incomplete recording of the patient's medical history.

## 6 - SUPERVALU'S CONDUCT CAUSED THIRD-PARTY OVERPAYMENTS

When SuperValu reported U&C amounts higher than $4 or other discounted cash override sales, it skewed the lower-of reimbursement formula in SuperValu's favor. For example, assume the following:

1. SuperValu sells a particular generic drug to cash customers for the price-matched amount of $4.00.
2. SuperValu establishes a "minimum retail price" for this same generic drug product of $7.69.
3. SuperValu uses the methods explained in Section 5.4 of this report to establish a "regular cash price" or "retail price" of $14.00 that it represents as its "usual and customary price."
4. SuperValu does not report the prevailing $4.00 cash price as its U&C price as it should.
5. Instead, SuperValu reports:
   a. the "minimum retail price" of $7.69 on the "Transaction pricing ingredient cost" field. (See line 25 of SuperValu's database document.)[124] This is essentially the field where a provider would record the cost for drug ingredient costs (i.e., the EAC), and
   b. $14.00 as its "usual and customary price" (line 30).

Using this assumption, the third-party payer applies the "lower-of" reimbursement formula by comparing the sum of ingredient costs (reported as $7.69 on line 25) plus the applicable dispensing fee (reported on line 26) to the U&C field (line 30). Since the amount reported as the U&C is higher than the sum of ingredient cost plus the dispensing fee (the sum of which is reported as the "Transaction response pricing total amount paid" on line 27), SuperValu causes the third party to overpay the claim. The Actual U&C that should have been disclosed as $4.00 was hidden from the third-party payer. If this had been disclosed properly the third party would pay $4.00, not $7.69 plus the applicable dispensing fee.

In addition, had SuperValu properly processed this price match through the Medicare Part D PBM, the patient would have received credit for the TrOOP associated with this drug purchase, and the drug would be entered into the PBM's DUR system to ensure patient safety and to check for potential problems (such as drug interactions, duplicate therapy problems, over- or under-prescribing) with existing or future prescriptions.

---

[124] SVU00437556, attached as Exhibit C (pertinent sections highlighted for reference).

31

The discussion above is an extremely simplistic reflection of the numbers presented in Mr. Ian Dew's Expert Overpayment Report. I reviewed Mr. Dew's report. He re-adjudicated millions of claims, and essentially calculated the difference in payment amount based on what SuperValu did (reported undiscounted prices as U&C) versus what SuperValu should have done (reported discounted cash override sale prices as U&C). The difference between what SuperValu did and what SuperValu should have done was quantified in the form of overpayments attributable to the four main GHPs discussed previously – Medicare Part D, state Medicaid programs, FEHBP, and TRICARE.

Based on my review of the Overpayment report, I believe the underlying assumptions reflected therein are valid.[125] The Actual U&C prices are calculated based on real examples in SuperValu's data of members of the general public accepting SuperValu's offer to sell drugs at discounted match prices for cash. I am not attempting to offer a mathematician's endorsement of Mr. Dew's methodology; it was beyond the scope of my assignment to evaluate the detailed data analysis methodology.

However, it is my opinion that the analysis is correct in big picture terms: Actual U&Cs can be determined based on analysis of override cash sales in SuperValu's transaction data. Actual U&Cs are the amounts that should have been reported to third parties. These Actual U&Cs can be compared to the Reported U&C that SuperValu sent to GHPs on a transaction-by-transaction basis from 2006 to 2016. Mr. Dew's Overpayment Report re-ran each transaction, applied the Actual U&C gleaned from SuperValu's cash override sale records (the great majority of which were competitor price matches), and determined the overpayment amount after applying various filters to ensure that his calculations were conservative.

The Overpayment report also shows that overrides (meaning sales in which pharmacists override the Retail Price of a drug to price match a competitor's discount price) are not rare exceptions. Table 4 of the Overpayment report indicates that there were 23,731,846 total Cash Sales from 2006 to 2016.  6,310,175, or 26.6%, were Sales with Price Overrides. With respect to the Top 20 Drugs when sorted by overpayment amount, 662,079 overrides out of 1,370,923 total cash sales means that 48.3% of cash sales were overrides. This information indicates that SuperValu routinely offered price matches throughout the relevant time period. Tables 5 and 7 provide similar information on a state-by-state basis.

It is my understanding that Mr. Dew applied a 28% discount to Medicare Part D, and a 30% discount to FEHBP overpayment amounts. The discount amounts were determined by fellow

---

[125] One of the assumptions pertains to interpolation of price quantities. Steve McCann explained that SuperValu's pricing tables assigned a price per tablet. Thus, when a prescription is dispensed, for instance, between 30 and 60 tablets, the retail price per tablet is the 30 count price until the count reaches 60. At that point, the price per tablet will reset at the 60 count retail price per tablet. Steve McCann Deposition, pp 213-214 and Exhibit 195; see also Exhibit 241 and Ward Hartman Deposition, pp. 159-60.

EXHIBIT A1

expert Mr. John Bertko to reasonably approximate the federal contribution to Medicare Part D and FEHBP. 72% represents the amount of Medicare Part D claims paid by the Federal Government, and 28% represents the amount paid by beneficiaries through premiums. In addition to premiums, beneficiaries pay copayments, co-insurance, and deductibles.  The same breakdown holds true for the 30% discount applied to FEHBP. No such discount was applied to Medicaid or TRICARE, because the amount of government funding for Medicaid and TRICARE is a known quantity and does not need to be approximated.

I note that Mr. Bertko participated in a Medicare Technical Advisory Panel that provided guidance to CMS officials when the parameters of Medicare Part D were being determined prior to implementation in 2006. I defer to his experience and judgment in this matter.

## 7 – CONCLUSION

It is my opinion that pharmacies have long been aware that third-party plans, including GHPs, require pharmacies to compare the negotiated plan contract price for a prescription's reimbursement with the pharmacy's U&C cash price. If the amount the pharmacy usually charges a cash-paying customer is lower than the negotiated plan contract price, the pharmacy is to be reimbursed at that lower U&C price.

It is further my opinion that pharmacy discount programs or price-match programs (such as the Defendant's) that are widely and consistently available are offers to the "general public."  Based on my professional experience and education, as well as my examination of documents in this case, it is my opinion that the Defendant's price-match program was an open offer to the general public and, therefore, it was required that their discounted prices be reported on each applicable claim as the pharmacy's U&C price.

The practice of reporting discounted prices available to the general public as the pharmacy's U&C charge is generally understood, in my opinion, as standard practice in the pharmaceutical industry and is required by the applicable statutes, rules, regulations and contracts.  As such, the lowest discounted price that is offered by a pharmacy to the general public should be reported to payers as the U&C charge whether the discount was offered across-the-board, through a "membership" card system, through a competitor price-match program, or any other program that offers a discount to attract customers.[126]

U&C pricing contemplates that whenever a pharmacy regularly offers a price to its cash customers, third-party prescription plans – particularly including GHPs – should receive the benefit of that offer.  GHPs should not pay more for a given prescription than what a GHP

---

[126] As noted previously, some most-favored nation statutes or contract provisions may require pharmacies to report the lowest prices offered to anyone as U&C, not merely the lowest prices offered to cash customers.

beneficiary would have paid had the beneficiary not been covered by a GHP as pharmacies cannot charge GHPs more than they would otherwise charge a member of the general public. The failure to report accurate – meaning actual – U&C prices is, in my opinion, a fraud that prevents third-party plans, including GHPs from enjoying the savings to which they are entitled.


**DECLARATION**

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and ability.

Dated: February 2, 2018

Signed,

Kenneth W. Schafermeyer, Ph.D.

EXHIBIT A1