E-FILED
Monday, 04 June, 2018  06:28:02 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | § | |
| and THE STATES OF CALIFORNIA, | § | |
| DELAWARE, ILLINOIS, INDIANA, | § | |
| MASSACHUSETTS, MINNESOTA, | § | |
| MONTANA, NEVADA, NEW JERSEY, | § | |
| NORTH CAROLINA, RHODE ISLAND, | § | |
| and VIRGINIA *ex rel.* TRACY | § | |
| SCHUTTE and MICHAEL YARBERRY, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| SUPERVALU, INC., SUPERVALU | § | No. 11-cv-03290 |
| HOLDINGS, INC., FF ACQUISITIONS, | § | |
| LLC, FOODARAMA, LLC, SHOPPERS | § | |
| FOOD WAREHOUSE CORP., | § | |
| SUPERVALU PHARMACIES, INC., | § | |
| ALBERTSON'S, LLC, JEWEL OSCO | § | |
| SOUTHWEST LLC, NEW | § | |
| ALBERTSON'S, INC., AMERICAN | § | |
| DRUG STORES, LLC, ACME | § | |
| MARKETS, INC., SHAW'S | § | |
| SUPERMARKET, INC., STAR | § | |
| MARKET COMPANY, INC., JEWEL | § | |
| FOOD STORES, INC., and AB | § | |
| ACQUISITION LLC | § | |
| | § | |
| Defendants. | § | |

## EXPERT REPORT OF IAN M. DEW
## FEBRUARY 2, 2018

### I.  Executive Summary

I was retained by the relators, Tracy Schutte and Michael Yarberry (Relators), through

Aschemann Keller, LLC to provide opinions regarding claims submitted by SuperValu, *et al.*

(Defendants) to Government Health Plans (GHPs) and reimbursements paid for such claims

1

EXHIBIT B

between September 1, 2006 through December 31, 2016[1]. Specifically, I was asked to identify Actual Usual and Customary Prices (AUACs)[2] appearing in the Defendants' discounted cash sales, re-adjudicate GHP claims submitted by defendants using these AUACs, identify claims with overpayments relative to the AUACs, and calculate aggregate overpayments for such claims.

In brief, I found that between September 1, 2006 and December 31, 2016, Defendants submitted 42,534,663 claims to GHPs. Defendants were paid $169,665,301 more based on 22,910,154 of these claims with the U&Cs that Defendants submitted on them (Reported U&Cs) than they would have if the Defendants had submitted claims with AUACs instead. These higher reimbursements are termed overpayments in this report. In other words, overpayments were identified on 22,910,154 of total claims submitted to GHPs. In addition, of the 42,534,663 claims that Defendants' submitted to GHPs, 39,184,779 of these list Reported U&Cs that were higher than AUACs and could have reasonably listed AUACs instead of the Reported U&Cs. In other words, the Defendants' Reported U&Cs were higher than AUACs on 39,184,779 of claims submitted to GHPs. A summary of claims and results by GHP is in the table, below.

**Table 1. Summary of Claims and Overpayments by GHP.**

| GHP | Number of Claims | Number of Overpaid Claims | Amount of Overpayment |
|---|---|---|---|
| Federal Employee Programs | 1,249,047 | 562,125 | $5,830,109 |
| Medicaid | 9,073,158 | 4,445,792 | $34,082,810 |
| Medicare Part D | 30,141,893 | 17,326,453 | $124,297,115 |
| TriCare | 2,012,083 | 563,194 | $5,332,601 |
| Department of Veterans Affairs | 58,482 | 12,590 | $122,666 |
| Totals | 42,534,663 | 22,910,154 | $169,665,301 |

---

[1] Through 12/31/2016 for New Albertson's, Inc. claims and through 11/9/2016 for SuperValu, Inc. claims.
[2] I was directed by counsel to use the term "Actual" in this context. I am not expressing any opinion by using it.

To perform these analyses, I used data and documents produced by Defendants, publicly available data and documents from the Centers for Medicare and Medicaid Services (CMS), publicly available Federal Medical Assistance Percentage (FMAP) data from the U.S. Department of Health and Human Services (HHS), and certain methodological details provided by a fellow testifying expert. The methods I used in processing these datasets are consistent with those that I and other data analysts typically employ in analyzing data. When two or more interpretations or alternative actions were acceptable in assessing the data, I chose the more conservative approach, which served to reduce the number of claims and overpayments associated with them.

I have more than 25 years of experience analyzing large datasets with more than 10 years of experience focused on healthcare matters. I have directly performed analyses and supervised other analysts in dozens of healthcare and other fraud investigations that have involved large volumes of diverse types of data as well as intricate and complex calculations. The majority of these projects have involved millions of Medicaid or Medicare claims in addition to other large transaction datasets. They have involved a variety of allegations including mis-reporting of drug prices, off-label marketing of drugs, kickbacks and Stark Law violations, retail pharmacies' failure to submit accurate usual and customary charges, and billing for medically unnecessary products and services, among others. This is the eighth time I have been engaged as a testifying expert. My current resume is in Attachment A.1. My compensation for this work is summarized in Attachment A.2.

In the following sections, I describe the datasets I used and the steps I performed in analyzing them. I make no value judgments and state no opinions about the propriety of

EXHIBIT B

prescription sales or claims to GHPs or other payors made by Defendants. I am confident that the results and opinions in this report are accurate to a reasonable degree of certainty.

**II. Scope**

I was asked by Relators' counsel to analyze Defendants' sales, claims, and related datasets and documentation to determine, identify, and quantify several things. Primarily, I surveyed Defendants' sales files to identify and tabulate quantities and corresponding prices that appeared repeatedly in discounted cash sales. I also surveyed Defendants' carriers files, which list third party carriers associated with the transaction data, a separate list of GHP carriers produced by Defendants during discovery along with a recent supplement, and two lists of Medicare Part D plans published by CMS. I used these to compile a list of carriers that represent GHPs, distinguished by different categories of GHPs (*e.g.*, Medicare Part D, Medicaid).

Treating the discounted prices that I identified as AUACs, I assessed whether the Reported U&Cs on Defendants' claims were greater than the AUACs for the same drugs in the same states and timeframes. I further re-adjudicated all GHP claims as if the AUACs had been the Reported U&Cs on them. Based on my experience analyzing prices and claims in numerous drug pricing matters, GHPs and other payors typically pay the *lesser of* all available prices on each claim based on a reimbursement formula. If the AUAC represents a lower amount than the reimbursed amount, the difference between the reimbursed amount and the AUAC would represent an overpayment relative to the AUAC. In other words, in those instances where the AUAC was lower than the reimbursed amount, the AUAC would have represented the lowest price available, and would have been the basis of reimbursement by GHPs and other payors. Finally, I created several summaries of claims and overpayments associated with the different categories of GHPs.

EXHIBIT B

### III. Data

To perform these analyses, I utilized several datasets and documents. Most of these were produced by the Defendants, a few were downloaded from government websites, and a methodological detail and a pair of associated parameters were provided by fellow testifying expert, John Bertko.

###### a.   Defendants' ARx Data

Between June 29, 2017 and July 7, 2017, Defendants produced a series of eight productions of datasets from their ARx database system covering all sales, claims and certain other related data from the New Albertsons, Inc. (NAI) and SuperValu divisions for pharmacies in 24 states with sale dates between September 1, 2006 and December 31, 2016. Each type of data was produced in a separate file in each production. Defendants' productions are listed in the table below.

**Table 2. List of Defendants' Productions.**

| Production Date | Division | Years Covered |
|:---:|:---:|:---:|
| 6/20/2017 | SuperValu | 2006-2016 |
| 6/29/2017 | NAI | 2006-2009 |
| 6/29/2017 | NAI | 2010 |
| 6/29/2017 | NAI | 2011 |
| 6/30/2017 | NAI | 2012 |
| 6/30/2017 | NAI | 2013 |
| 6/30/2017 | NAI | 2014 |
| 7/7/2017 | NAI | 2015 |
| 7/7/2017 | NAI | 2016 |
| 7/7/2017 | SuperValu | 2011[3] |

The most significant types of data produced by the Defendants from their ARx system are briefly described in the table below.[4]

---

[3] This addendum covers sales in the last two days of 2011 that were omitted in the production received on 6/20/2017.

**Table 3. Primary ARx Data Files.**

| Data Type | Description | Records Produced |
|---|---|---|
| Sales | Information about each dispensed prescription | 371,220,879 |
| Sales Notes | Dispensing notes for certain sales, typically documenting price overrides | 711,309 |
| Claims | Details about each claim to a third party as well as to cash paying customers (one or more claim per sale) | 419,108,626 |
| Drugs | Information describing each drug appearing in the sales | 212,794 |
| Patients | Information about each patient to whom drugs were dispensed (no patient data was produced associated with sales after 2011) | 11,913,435 |
| Pharmacies | Information about each pharmacy referenced in the sales | 5,241 |
| Carriers | Information about each third party payor, covering both GHPs and commercial payors | 1,150,829 |

Defendants also produced several code lookup tables that contain a plain English description for each code used in certain fields in the above-listed datasets. In addition, on August 31, 2017, Defendants produced a list of carriers they identified as GHPs. On January 4, 2018, Defendant's produced a supplement to this list of GHP carriers.

To give a sense of the volume of claims over time, the table below lists the number of sales, claims, and discounted sales per year in the Defendants' data.

---

[4] The same drug, patient, pharmacy, or carrier can appear in multiple productions. So, these record counts do not necessarily reflect unique counts of drugs, patients, pharmacies, or carriers.

EXHIBIT B

**Table 4. Summary of Sales and Claims per Year.**

| Year | Sales | Claims | Cash Sales | Cash Sales with Price Override |
|------|-------|--------|------------|-------------------------------|
| 2006 | 882,381 | 942,150 | 61,538 | 3,813 |
| 2007 | 25,271,285 | 27,687,645 | 1,623,962 | 142,154 |
| 2008 | 44,027,272 | 48,282,809 | 3,070,495 | 505,595 |
| 2009 | 42,684,942 | 47,915,590 | 3,300,096 | 983,886 |
| 2010 | 39,916,422 | 45,749,159 | 3,242,412 | 1,219,348 |
| 2011 | 39,139,129 | 45,018,958 | 3,180,202 | 1,251,883 |
| 2012 | 39,831,598 | 45,169,491 | 2,961,776 | 1,083,389 |
| 2013 | 37,645,186 | 42,625,397 | 2,388,881 | 748,347 |
| 2014 | 37,303,825 | 42,262,398 | 1,544,788 | 162,289 |
| 2015 | 35,628,870 | 40,456,492 | 1,347,323 | 132,162 |
| 2016 | 28,889,969 | 32,998,537 | 1,010,373 | 77,309 |
| Totals | 371,220,879 | 419,108,626 | 23,731,846 | 6,310,175 |

Data was produced for 24 states, with widely varying volumes of sales and claims between different states. The table below lists the number of sales, claims, and discounted sales per state in the Defendants' data.

7

**Table 5. Summary of Sales and Claims per State.**

| State | Sales | Claims | Cash Sales | Cash Sales with Price Override |
|---|---|---|---|---|
| CA | 55,505,267 | 60,509,969 | 2,972,509 | 581,748 |
| DE | 2,573,359 | 2,894,363 | 144,185 | 28,016 |
| IA | 715,539 | 829,357 | 46,678 | 20,760 |
| ID | 17,484,107 | 19,426,485 | 1,249,317 | 478,353 |
| IL | 120,527,934 | 137,548,117 | 7,359,867 | 1,569,124 |
| IN | 2,650,573 | 2,950,015 | 167,382 | 43,019 |
| MA | 7,727,905 | 8,947,527 | 425,048 | 145,730 |
| MD | 4,501,805 | 5,068,115 | 326,302 | 67,742 |
| ME | 4,693,959 | 5,740,372 | 302,865 | 140,212 |
| MN | 27,992,984 | 31,142,344 | 1,520,870 | 362,690 |
| MO | 9,734,714 | 11,649,974 | 904,847 | 457,229 |
| MT | 12,903,713 | 14,068,224 | 1,267,958 | 274,708 |
| NC | 450,150 | 525,584 | 32,436 | 8,809 |
| NH | 3,795,441 | 4,154,626 | 335,304 | 190,970 |
| NJ | 12,363,147 | 14,854,601 | 593,624 | 133,989 |
| NV | 9,306,075 | 10,611,229 | 560,117 | 120,453 |
| OR | 14,640,595 | 15,849,146 | 1,143,493 | 357,272 |
| PA | 12,520,317 | 14,603,734 | 712,023 | 162,403 |
| RI | 247,202 | 296,986 | 14,717 | 4,686 |
| UT | 6,008,999 | 6,443,371 | 572,434 | 226,555 |
| VA | 18,406,581 | 21,712,016 | 1,183,599 | 389,711 |
| VT | 1,227,544 | 1,347,898 | 70,590 | 16,562 |
| WA | 19,958,281 | 22,110,061 | 1,274,788 | 446,376 |
| WY | 5,284,688 | 5,824,512 | 550,893 | 83,058 |
| Totals | 371,220,879 | 419,108,626 | 23,731,846 | 6,310,175 |

As the tables above show, across all drugs in the Defendants' data, 6,310,175 of the 23,731,846 cash sales (26.6%) have a price override associated with them. Focusing on just the top 20 drugs in the Defendants' data, identified in terms of the magnitude of calculated overpayments associated with them, the proportion of cash sales with price overrides to all cash sales for these drugs is 48.3% (662,079 of 1,370,923). The tables below list the number of sales, claims, and discounted sales for the top 20 drugs per year and per state in the Defendants' data.

8

EXHIBIT B

**Table 6. Summary of Sales and Claims of Top 20 Overpaid Drugs per Year.**

| Year | Sales | Claims | Cash Sales | Cash Sales with Price Override |
|------|-------|--------|-----------|-------------------------------|
| 2006 | 60,884 | 66,678 | 2,233 | 66 |
| 2007 | 2,053,613 | 2,296,970 | 63,036 | 5,526 |
| 2008 | 4,038,869 | 4,483,049 | 136,361 | 40,213 |
| 2009 | 4,429,743 | 5,031,899 | 195,497 | 97,592 |
| 2010 | 4,301,451 | 4,972,838 | 222,199 | 132,916 |
| 2011 | 4,266,043 | 4,932,744 | 228,150 | 140,507 |
| 2012 | 4,229,861 | 4,776,972 | 202,202 | 121,382 |
| 2013 | 3,877,124 | 4,356,449 | 149,481 | 83,499 |
| 2014 | 3,778,656 | 4,238,837 | 67,513 | 18,130 |
| 2015 | 3,613,541 | 4,065,846 | 60,828 | 14,503 |
| 2016 | 2,962,466 | 3,348,998 | 43,423 | 7,745 |
| Totals | 37,612,251 | 42,571,280 | 1,370,923 | 662,079 |

9

EXHIBIT B

**Table 7. Summary of Sales and Claims of Top 20 Overpaid Drugs per State.**

| State | Sales | Claims | Cash Sales | Cash Sales with Price Override |
|-------|-------|--------|------------|-------------------------------|
| CA | 5,302,810 | 5,781,421 | 138,372 | 52,356 |
| DE | 196,612 | 220,105 | 7,975 | 3,359 |
| IA | 95,432 | 109,635 | 4,494 | 3,337 |
| ID | 1,499,827 | 1,655,846 | 67,373 | 39,780 |
| IL | 13,429,895 | 15,366,333 | 449,506 | 177,165 |
| IN | 289,943 | 319,574 | 9,798 | 4,354 |
| MA | 912,664 | 1,063,761 | 26,858 | 18,067 |
| MD | 453,734 | 511,070 | 20,727 | 9,732 |
| ME | 436,493 | 537,244 | 30,070 | 24,135 |
| MN | 3,150,828 | 3,505,140 | 87,890 | 34,510 |
| MO | 1,098,160 | 1,312,911 | 81,129 | 67,998 |
| MT | 1,099,183 | 1,197,714 | 60,475 | 22,095 |
| NC | 39,726 | 46,814 | 1,813 | 822 |
| NH | 335,940 | 365,019 | 25,743 | 19,964 |
| NJ | 1,060,795 | 1,299,597 | 41,333 | 18,993 |
| NV | 879,689 | 1,000,147 | 27,812 | 12,966 |
| OR | 1,273,504 | 1,367,317 | 46,533 | 25,731 |
| PA | 1,315,063 | 1,542,392 | 39,928 | 21,030 |
| RI | 28,785 | 34,693 | 816 | 555 |
| UT | 492,202 | 530,191 | 26,726 | 16,497 |
| VA | 1,873,529 | 2,204,084 | 73,661 | 37,138 |
| VT | 93,132 | 104,800 | 4,216 | 2,292 |
| WA | 1,831,342 | 2,030,161 | 69,184 | 41,530 |
| WY | 422,963 | 465,311 | 28,491 | 7,673 |
| Totals | 37,612,251 | 42,571,280 | 1,370,923 | 662,079 |

Each of the datasets produced by Defendants is described in more detail in the sections below.

### i.        ARx Sales and Sales Notes

Each production from the Defendants included one or more sales files and sales notes files. Each sales file consists of records that represent prescription sales, with fields that list values specific to each sale such as the date of service, National Drug Code (NDC) of the dispensed drug, quantity, and patient paid (Patient Liability) amount, among others. Each sales

notes file consists of records that represent notes associated with certain prescription sales in the sales file. These notes typically contain details regarding price overrides applied to the corresponding sales.

Sales are uniquely identified by two fields named PRESCRIPTION_SYS_ID and FILL_NUM. Values in the PRESCRIPTION_SYS_ID are 32-character strings of hexadecimal values with four embedded hyphens, for example, "4dec3186-0764-4ccb-9407-a41e010e1551", and FILL_NUM fields list an integer reflecting the refill count of the prescription (0 (zero) for the first fill). These two fields represent a unique key that can be used to relate records in the sales files with corresponding records in the sales notes and claims files.

Attachments B.1 and B.2 list the Defendants' productions, files and record counts associated with sales and sales notes data, respectively.

### ii.      ARx Claims

Each production from the Defendants included one or more claims files. Each record in each claims file represents a claim-related action associated with a sale. In some instances, the claim-related action can reflect a payment for a cash sale. In others, it can reflect a claim and expected payment from a third party payor. In yet others, it can reflect a claim denial or reversal or other type of transactional event associated with a claim.

In addition to the PRESCRIPTION_SYS_ID and FILL_NUM fields, which facilitate relating claim records to corresponding sale records, records in the claims files consist of numerous additional fields that indicate the type of activity reflected in the claim record, identify the third party payor, list the Reported U&C and patient's date of birth, and document the expected paid amount, among other details.

EXHIBIT B

There are three basic types of claim records that can be distinguished in terms of values that appear in the field named TP_CA_COB_IND. The first few characters in this field are either "CA", which identifies cash payments; "TP", which identifies single third party payor claim activities; and "COB", which identifies third party payor claim activities that involve a coordination of benefits (COB) – potentially involving more than a single third party payor. This field also contains additional codes following these values that reflect the type of activity represented by the claim record (*e.g.*, payment, reversal).

Attachment B.3 lists the Defendants' productions, files and record counts associated with claims data.

### iii.　　Other ARx Datasets

### 1.　　ARx Drugs

Each sale record identifies the drug involved in the sale by its NDC. Each production from the Defendants included a drugs file that contains records listing each drug's NDC and provides additional details about each drug, such as the name and, if the drug is associated with a generic drug category, a Generic Code Number (GCN). Drugs from different manufacturers, that are equivalent in terms of active ingredient, form, strength, and route of administration (*e.g.*, oral, topical, *etc.*) can be related to and potentially dispensed in place of each other if they have the same GCN. A single GCN can include multiple therapeutically equivalent drugs from different manufacturers, and these equivalent drugs would have different NDCs. As such, the GCN is a broader designation than the product specific NDC.

Attachment B.4 lists the Defendants' productions, files and record counts associated with drugs data.

EXHIBIT B

### 2.    ARx Patients

Each sale record identifies the patient who received the dispensed drugs in the PATIENT_SYS_ID field, which has a similar format to the PRESCRIPTION_SYS_ID field that appears in the sales, sales notes, and claims files. Each production from the defendants included a file of patient data that provides additional details about each patient, for those patients with sales prior to 2012. Each record in each patients file includes a PATIENT_SYS_ID field in addition to other fields that contain the patient's name, birthdate, and address.

Attachment B.5 lists the Defendants' productions, files and record counts associated with patients' data.

### 3.    ARx Pharmacies

Each sale record identifies the pharmacy that dispensed the prescription in the ABS_STORE_NUM field, which contains an integer that uniquely identifies each pharmacy. Each production from the Defendants included a pharmacies file that consists of one record per pharmacy. Each of these records includes an ABS_STORE_NUM field in addition to fields listing the pharmacy name[5], National Provider Identifier (NPI) number and address.

Attachment B.6 lists the Defendants' productions, files and record counts associated with pharmacies data.

### 4.    ARx Carriers

Each claim record identifies the payor associated with the claim record. Third party payors are represented in the claims files and in the carriers files by a combination of four fields named PLAN_CODE, BIN (Bank Identification Number), PCN (Processor Control Number), and GROUP_ID. Each production from the Defendants included a carriers file that provides

---

[5] Pharmacy names are not store-specific but rather store banner names, such as "Sav-On Pharmacy."

additional information about each payor, including the PLAN_TYPE field (listing a code associated with different plan categories), the carrier name and address, and the plan name.

Attachment B.7 lists the Defendants' productions, files and record counts associated with carriers data.

## 5. ARx Lookup Tables

Several of the different types of ARx data files produced by the Defendants include fields that reference codes. For example, the PLAN_TYPE field in carriers files list values between 1 and 10. Such coded values cannot be interpreted without the use of lookup tables that provide a plain English description for each code. Defendants produced a set of such code lookup tables with their productions on June 20 and June 29, 2017.

### iv. Defendants' GHP Lists

On August 31, 2017, Defendants produced a PDF document that lists carriers identified as GHPs. This list identifies GHPs in terms of their PLAN_CODE, BIN, PCN, and CARRIER_ID field values and distinguishes which plan each GHP represents. On January 4, 2018, Defendants produced a supplemental PDF document listing additional carriers identified as GHPs. In particular, the table below lists the number of payors associated with certain plans of interest listed in the Defendants' GHP List.

**Table 8. Primary GHPs in the Defendants' Lists.**

| GHP | Number of Carriers |
|---|---|
| Department of Veterans Affairs[6] | 16 |
| FEP | 2 |
| Medicare Part D[7] | 535 |
| Medicaid | 274 |
| TRICARE | 13 |

---

[6] "Dept of VA" in the Defendants' original data.
[7] "Med D" in the Defendants' original data.

14

EXHIBIT B

### v.        Defendants' ARx Documentation and Related Items

Prior to the Defendants' production of ARx data, they produced a series of data dictionaries that list databases, tables, and fields in the ARx system as well as schemas that diagrammatically relate different tables to each other. In addition to these documents, Defendants responded to a series of questions that Relators' counsel and I asked about the ARx data. This communication included at least two teleconferences in which Defendants' staff participated.[8] I used these documents and communications to develop a sufficient understanding of the ARx data to perform my analyses.

### vi.        CMS Lists of Medicare Part D Carriers

To supplement the Medicare Part D Plans that Defendants produced in their lists of GHPs, I used publicly available lists of Medicare Part D plans published by CMS for 2015 and 2016 to identify Medicare Part D plans in the Defendants' claims files.[9] These lists identify plans by BIN and PCN, and there is considerable overlap between the two annual lists as well as between the Medicare Part D plans in the Defendants' list. I also searched the CMS website and the Internet Archive (*a.k.a.,* Wayback Machine)[10] for CMS lists covering earlier years but found none.

### vii.        Discounting Factors for Medicare Part D and FEP

Medicare Part D and FEP plans can have more complex reimbursement methodologies than other GHPs in that they can involve various forms of Patient Liability, including deductibles, coinsurance, and proportional copays, which can even vary depending on the amount of benefits a beneficiary has received as of the date of a given claim. To account for

---

[8] One on 12/8/2016 and another on 2/24/2017.
[9] Available at www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovGenIn/Pharma html.
[10] archive.org/web.

EXHIBIT B

these complexities, fellow testifying expert John Bertko provided an approach with associated parameters for refining overpayments on claims to Medicare Part D and FEP plans. Specifically, Mr. Bertko indicated that overpayments for these GHPs should be refined by taking the sum of the original reimbursed amount and the final Patient Liability amount minus the AUAC, all multiplied by 72% (a 28% discount) for Medicare Part D and by 70% (a 30% discount) for FEP.

### viii.        Federal Medical Assistance Percentages

The Medicaid program is funded jointly by the federal government and by individual states with the contribution of the federal government varying by state and over time. While the joint funding does not affect the calculation of overpayments, it does affect the apportioning of them between the federal government and the states. To accomplish this, publicly available FMAP data is needed, which specifies the federal contribution percentage by state and quarter.[11] From 2006 through 2016, federal contribution percentages varied between 50% and 76%. Due to the Medicaid expansion associated with the Affordable Care Act, application of FMAP percentages yields accurate apportioning only up to the date on which expansion states implemented Medicaid expansion. After that, results will under-represent the federal contribution because the federal government covered 100% of expenses for beneficiaries added under Medicaid expansion at least through 2016.[12]

### ix.        Other Government Documents

I also downloaded and examined several other government documents. These include a document that explains certain aspects of Medicaid expansion under the Affordable Care Act, a

---

[11] Available at aspe hhs.gov/federal-medical-assistance-percentages-or-federal-financial-participation-state-assistance-expenditures.
[12] medicaid.gov/affordable-care-act/financing/index.html

document that specifies how Medicare Part D plans are to be identified starting in 2012, and all of the Medicare Board of Trustees Annual Reports from 2006 to 2016.

## IV. Methods

I performed my analyses in a series of phases. These began with the receipt and initial processing of productions from the Defendants, continued with a series of steps to manage the large scale of the datasets, and proceeded with specific analysis steps tailored to accomplish the scope of work described above.

I used several hardware systems, operating systems, software packages, and methods in this work. Most significantly, I performed most programming tasks in Unix using the Bash shell, the Ruby scripting language, and the Stata data analysis environment and programming language. In addition, due to the volume of sales and claims, I distributed datasets across several servers and performed certain operations in parallel to reduce processing time. These methods and tools are widely used and accepted in the field of data analysis.

The following sub-sections of this Methods section describe in detail the steps I performed, with certain sub-sections including examples taken from the Defendants' data.

### a. Initial Processing

#### i. Receipt, Examination, and Canonicalization

Upon receipt or downloading of data, I performed several actions on each dataset to ensure that it is consistently and properly formatted and that fields of various types contain valid values. This began with a review of cover material and data documentation and a visual inspection of, at a minimum, the first several records in each file.

This was followed by running a proprietary program called "canonicalize", which verifies that each record in each file contains the expected number of fields and checks the format of

EXHIBIT B

certain types of fields such as dates, numeric values, and NDCs, among others. The canonicalize program also converts the bar ("|") delimited ASCII text format, in which the Defendants produced data, to a tab-delimited ASCII text format and reformats values in certain types of fields (maintaining values in their original format in auxiliary fields) to formats compatible with tools used in subsequent processing. For example, dates were converted from their original format (*e.g.*, 2007-03-12 01:47:00.000 PM) to a tool-compatible format (*e.g.*, 20070312).

The canonicalize program is generally run in two phases. First, the program scans the raw data files to check for record and field value consistency. Any inconsistencies are identified, and the user can intercede to accept automatic corrections or apply manual corrections for any program-identified problems. The second phase then applies the corrections and produces one canonicalized data file for each original data file.

In a small number of cases, invalid values, such as the value 0 (zero) in a field that should list an 11 digit NDC were identified. Such invalid original values are reformatted to be blanks by the canonicalize program. No records are deleted by the canonicalize program, but records with blanks in critical fields will be deleted in subsequent processing. This may occur as a result of explicit filtering or as a result of such records not properly merging with records in other datasets. For example, if a sale record contains a blank in the NDC field, merging this record with a list of prices that are NDC specific will result in no price being associated with the sale record, and sale records without prices would not be further evaluated.

### ii.      Splitting Produced Datasets

The sizes of the Defendants' ARx sales and claims files necessitated the reorganization of them into subsets on which processing could be performed efficiently. In particular, several of the sales and claims files produced by Defendants contain more than 20 million records each,

18

and records in them need to be related to each other using, in part, the 32-character PRESCRIPTION_SYS_ID field values. It is much easier and more efficient to do this with smaller files that each contain fewer records.

There are several ways one could organize the sales and claims files into smaller files. The approach I took was to split the produced files into 256 separate files based on the first two characters in the PRESCRIPTION_SYS_ID field. I further split these files into other files based on the state in which the pharmacy identified in each prescription is located, further by the month associated with the date of service, and finally by the type of claim record ("CA", "TP", or "COB", as described above). This splitting of datasets resulted in one sales and one claims file per division, PRESCRIPTION_SYS_ID value prefix, state, month, and claim type.

In the final phase of splitting files by claim type, some inconsistencies were encountered. For example, 14,476 sale records have no corresponding claim record. In other instances, sale records are associated with both a "CA" and a "TP" type of claim record. As subsequent processing depends on consistent claim types, these indeterminate and inconsistent sale and claim records were eliminated at this point from further processing.

### iii.        Recombining Split Datasets

After splitting the production datasets as described above, I recombined the records into a single sales file and a single claims file per division, state, month, and claim type. The resulting files typically consisted of tens of thousands of records rather than the original tens of millions of records. This made relating records between sales and claims files much more efficient while also facilitating separate analysis by state, month, and claim type. Subsequent analytical steps were all performed using these recombined sales and claims files in conjunction with the ARx drugs, patients, pharmacies, and carriers files.

### b.  Identifying Government Health Plans

In order to distinguish claims submitted to GHPs from those submitted to non-GHP third party payors, I associated certain carriers referenced in Defendants' claims files with GHPs. This involved distinguishing GHP carriers from non-GHP carriers as well as identifying the specific GHP associated with each GHP carrier. GHPs in this analysis are limited to Federal Employee Programs (FEPs), Medicaid, Medicare Part D, TRICARE, and the Department of Veterans Affairs (VA). GHP carriers associated with workers' compensation programs, flu or vaccine programs, or other government programs were not considered in this analysis. This approach is conservative as it undercounts overpayments to some extent. For example, several flu and vaccine programs were omitted that are covered by a variety of otherwise relevant GHPs, including Medicaid and Medicare Part D.

I related carriers to GHPs in three phases. The first phase made an initial designation. The second phase distinguished four categories of Medicare Part D carriers based on timeframe and application of lists of Medicare Part D carriers downloaded from the CMS website. The third phase refined identification of states associated with Medicaid carriers as Medicaid programs are state-administered and jointly funded with the federal government.

#### i.        Initial Designation of GHPs

Identifying GHPs was based on several datasets produced by Defendants and datasets downloaded from the CMS website. Specifically:

1.  Defendants' carriers files,
2.  Defendants' lists of GHP carriers, and
3.  CMS lists of Medicare Part D carriers in 2015 and 2016.

Carriers are identified in different ways in each of these datasets, and accounting for this required using different fields in each dataset to associate carriers with GHPs.

20

EXHIBIT B

In the Defendants' carriers and claims files, carriers are uniquely identified using values in the four fields named PLAN_CODE, BIN, PCN, and GROUP_ID.

In contrast to how carriers are identified in the Defendants' carriers and claims files (via the PLAN_CODE, BIN, PCN, and *GROUP_ID* fields), the Defendants' lists of GHP carriers relate certain carriers in terms of PLAN_CODE, BIN and PCN and *CARRIER_ID* values, to specific GHPs. In addition, the CMS lists of Medicare Part D providers identify them only via BIN and PCN values, which are definitive starting in 2012[13]. Finally, there is text in certain fields in the Defendants' carriers files that appear to relate certain carriers to GHPs not otherwise identifiable in the Defendants' GHP lists or via the CMS Medicare Part D lists. Thus, a combination of sources and methods are required to associate carriers with GHPs.

I first associated carriers with GHPs using the Defendants' GHP lists. As mentioned above, these lists relate specific carriers, in terms of values in the PLAN_CODE, BIN, PCN, and CARRIER_ID fields with specific GHPs. Designations in the Defendants' GHP lists associating 85 carriers with Workers' Compensation programs, 84 carriers with Medicare Part B, and 18 carriers with "Other Government" programs were ignored. The Defendants' GHP lists were provided as PDF documents in which there are numerous artifacts, such as non-alphanumeric characters. These have the effect of creating mismatches between values in the list and values in carrier records that would otherwise yield matches.

As an example, the Defendants' lists of GHPs include the following entry.

---

[13] Tudor, Cynthia, "Implementation of the Unique Part D 4Rx Identifier Requirements", 9/16/2011, available at www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/ MemoUniquePartD_091611.pdf.

**Table 9. Example Entry in the Defendants' GHP Lists.**

| Field | Value |
|---|---|
| Carrier | ZSHP |
| Plan | ZSHP |
| Bin# | 610097 |
| PC# | 9999 |
| Name | SECURE HORIZONS MEDICARE PART D |
| Plan Type | Med D |
| Concatenate (Plan) | ZSHP |
| Bin | 610097 |
| PCN | 9999 |

Based on this entry, carriers with CARRIER_ID "ZSHP", PLAN_CODE "ZSHP", BIN

"610097", and PCN "9999" were identified as representing Medicare Part D plans.

I then associated unassociated carriers with GHPs by parsing values in the PCN,

PLAN_CODE, GROUP_ID and PLAN_NAME fields, looking for specific terms. For example,

several state Medicaid programs can be identified based on having the value "MED" followed by

the state abbreviation (*e.g.*, "CA" for California, yielding "MEDCA") in the PLAN_CODE

field.[14] For example, the Defendants' lists of GHPs contain the following entry:

**Table 10. Example Entry in the Defendants' GHP Lists.**

| Field | Value |
|---|---|
| Carrier | MEDIL |
| Plan | |
| Bin# | 008259 |
| PC# | VPC3 |
| Name | ILLINOIS MEDICAID |
| Plan Type | Medicaid |
| Concatenate (Plan) | MEDIL |
| Bin | 008259 |
| PCN | 3 |

Due to the artifact of underscore characters in the PC# field, which lists "_____VPC3",

automated matching of this entry in the Defendants' GHP lists failed to associate it with any

---

[14] Letter from Rick Robinson to Timothy Keller on March 15, 2017, pp. 3-4.

records in the Defendants' carriers files. However, based on information from the Defendants, as discussed above, a number of carrier records in the Defendants' carriers files list the value "MEDIL" in the PLAN_CODE field and, via parsing, this was used to associate this carrier with the Illinois Medicaid program. Records in the Defendants' carriers files list the correct PCN value of "VPC3" associated with this carrier.

Next, I associated unassociated carriers with GHPs using the CMS Medicare Part D carrier lists. These lists identify carriers by BIN and PCN and include 251 unique carriers in 2015 and 557 in 2016, not all of which are present in the Defendants' carriers files.

The Defendants' carriers files also include a PLAN_TYPE value for most carriers. PLAN_TYPE values in the Defendants' carriers files are listed in the following table.

**Table 11. Defendants' Carrier PLAN_TYPE Codes.**

| PLAN_TYPE Code | Description |
|---|---|
| 1 | Private Plans (includes Medicare Part D and Medicaid Managed Care)[15] |
| 2 | Medicare Part B |
| 3 | State Medicaid Plans |
| 4 | Special Medicaid Plans (any programs that are funded through Medicaid programs in addition to the standard Medicaid) |
| 5 | County Plans |
| 6 | Special Plans (Payor of last resort plans) |
| 7 | ECP and PPY Plans |
| 8 | WORKCOMP Plans |
| 9 | Eligibility Plans |
| 10 | Medicaid DME |

In addition, many carriers in the Defendants' carriers files do not list any value in their PLAN_TYPE field. Using these values, I associated unassociated carriers with Medicaid if they list PLAN_TYPE values 3, 4, or 10. Carriers with the PLAN_TYPE value of 1 were not

---

[15] "Private Plans (includes Managed Medicaid & MED D)" in Defendants' original data.

23

tentatively associated with Medicare Part D because this PLAN_TYPE value contains a mixture of commercial and Medicare Part D plans.

As a further refinement, I also performed parsing on certain fields to tentatively associate Medicaid GHPs with specific states. This step did not add or eliminate any GHPs and ultimately does not impact the final results: it merely attributes the majority of Medicaid overpayments in the final results to specific state Medicaid programs. For example, California Medicaid encompasses several programs that appear to relate to various specific patient conditions in addition to the standard Medicaid carrier plan.

Finally, I dis-associated carriers from GHPs if certain fields in the carrier records suggest they are associated with worker's compensation, Medicare Part A, Medicare Part B, correctional facilities, health departments, or flu or vaccine programs.

### ii. Refinement of Medicare Part D Carriers

As noted above, Defendants' PLAN_TYPE values cannot be used to distinguish Medicare Part D carriers from commercial payors. Further, Defendants communicated that they cannot be certain whether carriers they have identified as Medicare Part D carriers in their GHP lists were Medicare Part D carriers prior to 2012.[16] For this reason, I created four different groups of Medicare Part D carriers. These groups of Medicare Part D carriers are specific to certain timeframes – prior to 2012 or from 2012-on. So, in relating claims to carriers in subsequent steps, Medicare Part D carriers were related using both carrier identifiers and year whereas non-Medicare Part D carriers were related to claims using only the carrier identifiers.

First, for those carriers that the Defendants identified as Medicare Part D carriers in their GHP lists, I assigned these to a group of Defendant-identified Medicare Part D carriers in each

---

[16] Doc 79, "Defendant's Response to Relators' Motion to Compel Discovery Response 040417.pdf", 4/4/2017, 10-11; and Doc 79-2, "Exhibit B 040417.pdf", 4/4/2017, 3.

year from 2012-on. Second, I separately assigned these same carriers to a group of pre-2012
Defendant-identified Medicare Part D carriers in each year prior to 2012. For additional carriers
identified by CMS as Medicare Part D carriers in their 2016 list, I assigned these to a group of
2012 to 2016 CMS-identified Medicare Part D carriers in each of these years. For additional
carriers identified by CMS as Medicare Part D carriers in their 2015 list but not in their 2016 list,
I assigned these to a group of 2012 to 2015 CMS-identified Medicare Part D carriers in each of
these years. Conservatively, CMS-identified Medicare Part D carriers were not associated with
Medicare Part D prior to 2012 in this analysis.

### iii.        Refinement of Medicaid States

The Defendants' sales files identify the pharmacy associated with each sale. Defendants'
pharmacies files provide information about each pharmacy, including the state in which it is
located. I used this information to refine the state associated with each Medicaid carrier.
Specifically, I associated a state with a Medicaid carrier if either the carrier's PLAN_CODE
value specifically identifies the state, as described above, or if at least 90% of claims submitted
to the carrier originated from pharmacies in one state. If neither of these criteria were satisfied, I
did not associate the Medicaid carrier with a specific state but still designated it as a Medicaid
carrier.

Continuing the example of the Illinois Medicaid carrier from above, the PLAN_CODE
value of "MEDIL" is sufficient to relate this Medicaid program with Illinois. If it weren't, there
are 427 distinct carriers in Defendants' carriers files with the PLAN_CODE value of "MEDIL",
BIN value of "8259", and PCN value of "VPC3". Each differs by having a different GROUP_ID
value. For the GROUP_ID value of NULL (*i.e.*, no value), this carrier is associated with sales in
multiple states, as shown in the table below. However, the vast majority of sales were at

EXHIBIT B

pharmacies in Illinois, and based on this the carrier would have been associated with the Illinois

Medicaid program if the PLAN_CODE value had not itself been definitive.

**Table 12. Summary of Sales for Illinois Medicaid Carrier Example.**

| State of Pharmacy | Number of Sales | Percent of Sales |
|---|---|---|
| MO | 115 | 0.00% |
| IA | 8,238 | 0.11% |
| IN | 26,258 | 0.34% |
| IL | 7,759,885 | 99.56% |
| Totals | 7,794,496 | 100.01% |

c.  **Identifying Actual Usual and Customary Prices**

In order to re-adjudicate claims using AUACs, I first compiled the AUACs from the

Defendants' sales files. Ultimately, I identified AUACs separately for each state, month, and

drug. The reason for identifying AUACs separately for each state is that some states do not allow

below-cost sales whereas others do, and it would be invalid to use a below-cost AUAC from a

state that allows such sales to re-adjudicate claims in a different state that does not.[17]

I identified each drug in two ways based on the drug's 11 digit NDC as listed in each sale

record. NDCs consist of three components: a 5 digit labeler code that is unique to each drug

manufacturer or labeler, a 4 digit product code that is unique to each ingredient, form, strength,

and route for the corresponding labeler, and a 2 digit package code that is unique to the number

of units (*e.g.*, tablets) per package (*e.g.*, bottle) for the corresponding labeler and product. The

last 2 digits do not distinguish one drug from another. So, I used the first 9 digits (NDC9) to

uniquely identify each drug. In addition, equivalent drugs from different manufacturers can be

grouped together based on being associated with the same GCN. Defendants produced drugs

files that list GCNs for those drugs that are associated with them. Across Defendants' different

---

[17] Bates SVU00002370, "ARX-1951 Requirement Specifications for ARX-1950 Price Match Enhancement", version 1.01, 11/22/2006, Requirement # SR1951.009, p. 7.

drugs files, there are some inconsistent relationships between NDCs and GCNs. For such drugs, each NDC9 was treated as not being associated with any GCN. Across all sales files, there are 38,756 unique NDC9s, and of these 32,290 are associated with one of the 8,572 GCNs.

I identified AUACs via a series of processing steps. The first steps are specific to each NDC9 and GCN, within each state and across all months. Ultimately, I compiled the final lists of AUACs specific to each state, month, and NDC9 and GCN. Note that this means that I compiled a separate list of AUACs for each state, month, and NDC9 and for each state, month, and GCN. The reason for identifying separate NDC9 and GCN AUACs is that not all NDC9s are associated with GCNs, so their AUACs need to be specific to the NDC9.

First, I compiled the number of sale records referencing each DAYS_SUPPLY value and QTY_DISPENSED value per state and drug. The most common values across all drugs in the Defendants' sales files are 30- or 90-day supplies. So, if either of these values occurs in the DAYS_SUPPLY field, these were taken as the most significant. To the extent that either of these two values do not appear in the DAYS_SUPPLY field for a drug, the one or two other most frequently occurring values were used. Only those DAYS_SUPPLY values that have at least 10 supporting sale records were used. At the end of this step each NDC9 and GCN was associated with up to two DAYS_SUPPLY values (often 30 or 90 days) in each state.

As an example, the generic drug Pravastatin Sodium in the form of 40mg tablets was sold by several pharmaceutical manufacturers between 2006 and 2016 and is associated with 16 distinct NDCs in Defendants' drugs files, the records of which all identify this drug as GCN 48673. Looking at the 338,555 sales for this drug in Illinois in the Defendants' sales files, there are 241,263 sales (71.3%) listing the DAYS_SUPPLY value of 30 and 84,129 sales (24.8%) listing the value 90. These two values, 30 and 90, are by far the two most common values of

DAYS_SUPPLY in the data. Taken together, the 30 day supply (71.3%) and 90 day supply (24.8%) account for 96.1% of sales in the Defendants' data for Pravastatin Sodium 40mg tablets in Illinois between 2006 and 2016.

Next, I identified the most frequently occurring QTY_DISPENSED values for each of the most frequent DAYS_SUPPLY values associated with each drug in each state over all months. In a small number of instances this led to some apparent inconsistencies, typically associated with small numbers of transactions. For example, a drug might have a DAYS_SUPPLY of 30 associated with a QTY_DISPENSED of 30 and also have a DAYS_SUPPLY of 60 associated with a QTY_DISPENSED of 30. In such cases, the higher value of DAYS_SUPPLY was excluded from further consideration.

Continuing the Pravastatin Sodium example from above, of the 241,263 sales for this drug in Illinois listing the DAYS_SUPPLY value of 30, there are 232,372 sales (96.3%) that list the QTY_DISPENSED value of 30. Of the 84,129 sales listing the DAYS_SUPPLY value of 90, there are 80,895 sales (96.2%) that list the QTY_DISPENSED value of 90. Thus, these two values, 30 and 90, are the most common values of QTY_DISPENSED in the data, and there is no conflict between these two DAYS_SUPPLY or QTY_DISPENSED values.

Based on the two most frequent QTY_DISPENSED values for each drug in each state resulting from this process, I performed further processing separately for each state, month, and drug (NDC9 and GCN, independently). Starting with Defendants' sales files, I focused on only cash sales for at least one dollar that involved a discount or price override. I identified these in the Defendants' sales files by examining values in the fields named ONE_TIME_PRICE_OVERRIDE and ONGOING_PRICE_OVERRIDE in cash sale records. If either field lists the value "true", the record reflects a sale involving a price override.

EXHIBIT B

I identified the most frequently occurring cash override price paid in the FINAL_PATIENT_PAY_AMT field for each relevant quantity in each state in each month for each drug and took this as the tentative AUAC for the corresponding quantity. In a small number of instances this led to some apparent inconsistencies. For example, a QTY_DISPENSED value of 30 might have a most frequent cash override price of $4 and a QTY_DISPENSED value of 60 for the same state, drug, and month might also have a most frequent cash override price of $4. In such instances, I excluded the lower price per quantity values (in this example, the $4 for 60) from further consideration. This is conservative because it leads to higher AUACs for larger QTY_DISPENSED values after scaling up the available AUAC price to be consistent with the quantity in the sale. For example, applying the AUAC of $4 for 30 to a claim that lists a QTY_DISPENSED value of 60, the $4 for 30 would be multiplied by two to get $8 for 60 to apply in re-adjudicating the claim. This is conservative in comparison to applying the $4 for 60 that also could appear in the Defendants' sales files.

In identifying the most frequently occurring override price paid, I included sales referencing QTY_DISPENSED values other than the two most common values. I did this by scaling the FINAL_PATIENT_PAY_AMT and QTY_DISPENSED values to make them consistent with the two most common values. For example, if the two most common QTY_DISPENSED values are 30 and 90, sales with quantities from 31 through 89 could be used to support the AUAC for the quantity 30, and sales with quantities over 90 could be used to support the AUAC for the quantity 90. In other words, a sale at $8 for 60 is consistent with a sale at $4 for 30, and a sale at $20 for 180 is consistent with a sale at $10 for 90.

In some instances, particularly for low-utilization drugs evaluated by NDC9, there may be months with no cash override sales for the relevant QTY_DISPENSED values. When there is

a single month without such a price sandwiched between two months that both have a cash override price, the month with a missing price was conservatively assigned the higher of the two neighboring months' prices. This gap filling step was applied to each QTY_DISPENSED value for each state, month, and drug.

In some instances, particularly for low-utilization drugs, there may be few cash override sales associated with them in certain months and states. To conservatively identify ongoing price matching and ensure that AUACs are not based on special prices, I required that each AUAC (or a lower AUAC) appear in at least two sales over a period of three consecutive months. For example, if a potential AUAC does not appear in any sales in January, appears in one sale in February, and in no sales in March, this value is eliminated from consideration for use in February. As another example, if a $4 for 30 sale appears in January, a $5 for 30 sale appears in February, and a $4 for 30 appears in March, the $5 sale is supported by the two $4 sales, and the two $4 sales (but not the $5 sale) support each other. This filtering was applied after the gap-filling step described above.

Ultimately, this process yielded up to one pair of AUAC price-quantities per state, month, and NDC9. For those drugs associated with a GCN, this process also yielded a pair of AUAC price-quantities per state, month, and GCN. The specific quantities and prices vary across states, months, and drugs, but all were derived directly from cash override prices in the Defendants' sales files.

Continuing the Pravastatin Sodium example from page 28, there were 467 cash override sales out of 504 total cash sales for this drug in Illinois in June 2012. Of these, 219 sales list the QTY_DISPENSED value of 30, and of these 215 (98.2%) list the value $4 in the FINAL_PATIENT_PAY_AMT field. In addition, 184 sales list the QTY_DISPENSED value of

EXHIBIT B

90, and of these 183 (99.5%) list the value $10 in the FINAL_PATIENT_PAY_AMT field.

Based on this, the two AUACs of $4 for 30 and $10 for 90 were used in subsequent steps for this

drug in Illinois in June 2012.

    The Defendants' sale records contain a field named PHARMACY_COMPETITORS_ID.

In sale records that indicate that a price override was implemented, this field may contain a code

that identifies the competitor pharmacy chain whose price was the basis of the price override.

The table below summarizes the number of references to competitors in the Defendants' cash

sales and shows that Wal-Mart is by far the most frequently referenced competitor.

**Table 13. Frequencies of Override Sale Competitor References.**

| Competitor | Number of Override Sales | Percent of Total |
|---|---|---|
| WAL-MART[18] | 3,592,699 | 56.94% |
| NULL[19] | 737,963 | 11.69% |
| COSTCO | 597,178 | 9.46% |
| TARGET[20] | 320,026 | 5.07% |
| ALBERTSONS[21] | 257,923 | 4.09% |
| OTHER | 214,432 | 3.40% |
| SCHNUCKS | 96,428 | 1.53% |
| FRED MEYER | 86,806 | 1.38% |
| KMART | 70,722 | 1.12% |
| HANNAFORD | 67,858 | 1.08% |
| ALL OTHERS[22] | 268,140 | 4.25% |
| TOTAL | 6,310,175 | 100.01% |

---

[18] Includes Wal-Mart and Super Wal-Mart.
[19] NULL refers to no value (*i.e.*, a blank) in the competitor field.
[20] Includes Target and Super Target.
[21] Includes Non-SuperValu Osco and Sav-On Albertsons.
[22] Includes 32 other competitors.

EXHIBIT B

### d.  Re-adjudicating Claims

To identify and quantify any GHP overpayments relative to AUACs, I re-adjudicated claims associated with non-cash Defendants' sales using the AUACs. I accomplished this through another series of processing steps.

There are two types of non-cash sales to consider. The first are sales and claims associated with a single third party payor (TP sales and claims). The second are sales and claims potentially associated with more than one third party payor, which involve a coordination of benefits (COB sales and claims). Since COB sales may involve a combination of GHP and non-GHP payors, I performed the re-adjudication process on all claims for all carriers only after which I associated claims and any corresponding overpayments with GHPs and non-GHPs.

Before applying AUACs to third party claims, I conservatively reconciled and filtered records in the Defendants' sales and claims files to exclude any anomalous or potentially problematic sales and claims. Specifically:

1. All sale records (and corresponding claims) that are not unique were excluded,
2. All sale records (and corresponding claims) with non-positive quantities were excluded,
3. All claims with a transaction code (TP_CA_COB_IND field value) indicating that no response was received were excluded,
4. All sales (and corresponding claims) that have any claim with a transaction code indicating a reversal were excluded,
5. All claim records indicating they are duplicates were excluded,
6. All claim records indicating a rejection from the payor were excluded,
7. All claim records indicating an anomaly were excluded,
8. All claim records with an undefined transaction code were excluded,
9. All claim records with a non-positive payor payment amount were excluded,

10. All claim records in which the third party paid more than the least of the gross amount due, Reported U&C, and submitted amount were excluded,[23]

11. All COB claim records that remain but have a gap in payor priorities were excluded,

12. Finally, all sale records that do not have corresponding claims, after the above filtering of claims, were excluded.

In total, this filtering excluded 105,208,647 sale records and 146,654,218 claim records. Most of the excluded claims were dropped because they had either no third party payment amount (98,182,121 claims) or were rejected by the payor (34,330,682 claims). The vast majority of excluded sale records were dropped because all of their corresponding claim records were excluded. Dropping claims with no third party payment amount is conservative because, in the case of COB claims, this may lead to dropping all claims associated with the corresponding sales. So, if a commercial payor on a primary claim makes no payment, and this is followed by a secondary claim to a GHP who made a payment, this GHP claim will not be re-adjudicated.

It is worth pointing out that of the of the 395,375,806 raw COB and TP claims on which filtering was performed, only 3,647,630 (0.92%) were excluded because the third party payor paid more than the least of the gross amount due, Reported U&C, and submitted amount. This both lends support to the assertion that payors typically pay the lesser of all available prices and eliminates all claims not consistent with this assertion from further processing.

Beyond this, I reduced the final Patient Liability amount associated with a small number of sales to ensure that the sum of the provider paid amount plus the Patient Liability amount is no greater than the least of the gross amount due, the Reported U&C, and the amount submitted. This is conservative, as it potentially reduces discounted overpayments associated with Medicare Part D and FEP programs.

---

[23] The submitted amount was calculated as the sum of the ingredient cost submitted, the dispensing fee submitted,

33

For TP claims, the Patient Liability amount is listed in both the sale and claim records. For COB claims, only the Patient Liability amount listed in the sale record (and in the claim record associated with the lowest priority payor) is relevant.

To re-adjudicate TP claims, I first merged AUAC price-quantities with Defendants' TP claims by state, month, NDC9 and separately by state, month, and GCN. Claims for sales of drugs that do not have a unique corresponding GCN were re-adjudicated using NDC9-specific AUACs. Claims for sales of drugs that have a GCN were re-adjudicated using GCN-level AUACs. The 143,167,421 claims for sales that have no available AUAC were dropped from subsequent processing. Conservatively, the 3,161,142 claims for sales that list a DAW (Dispense as Written) code that indicates that drug substitution was not allowed, typically by the prescriber, and which are for drugs that have a GCN were also dropped from subsequent processing.

Using the AUAC price-quantities, sale-specific AUACs were determined by comparing AUAC quantities to the QTY_DISPENSED in each sale record. The simplest situation is when there is an AUAC quantity that is the same as the sale quantity. For example, if the sale quantity is 30 and there is an AUAC price of $4 for 30, the $4 price would be used directly in the re-adjudication. When there is no AUAC quantity that is the same as the sale quantity, if there is a larger AUAC quantity, the price associated with the smallest AUAC quantity larger than the sale quantity would be used. For example, if the sale quantity is 45 and there are AUAC quantities of $4 for 30 and $10 for 60, the AUAC price associated with the quantity $10 for 60 would be used directly in the re-adjudication. This is a conservative choice compared to the alternative approach of multiplying the $4 for 30 by 1.5 and applying the resulting $6 for 45 in the re-adjudication, which would result in a higher calculated overpayment for the claim.

---

the sales tax amount submitted, the professional service fee submitted and the incentive amount submitted.

Finally, if the sale quantity is larger than any AUAC quantity, the largest AUAC quantity and price would be multiplied by the smallest integer that yields a quantity that is equal to or larger than the sale quantity. For example, if a sale quantity is 45 and the only AUAC price-quantity is $4 for 30, an AUAC of $8 for 60 ($4 for 30 x 2) was used in the re-adjudication instead of the less conservative $6 for 45 ($4 for 30 x 1.5).

I performed the re-adjudication of COB claims in a similar fashion with some differences to account for the fact that there can be multiple payors involved. Each sale that involves COB claims has a primary payor and potentially one or more non-primary payors. The priority of each payor in each claim is indicated by the value in the COB_OP_CNT field. The value 0 (zero) identifies the primary payor and claim, and higher values in this field identify non-primary claims and payors in order of priority. The claim submitted to the primary payor was re-adjudicated just as TP claims were. Claims associated with non-primary payors were then re-adjudicated in a manner that factored in the unpaid remainder amount (if any) at the AUAC price. For example, if the AUAC price is $4 and the primary payor paid $3, then there is $1 remaining as the unpaid amount for the next payor to pay in the re-adjudication. If, on the other hand, the AUAC is $4 and the primary payor paid $10, then there is no unpaid remainder amount relative to the AUAC for the next payor to pay, and the full amount paid by the next payor is considered as an overpayment relative to the AUAC. By this method, an underpaid remainder or an overpayment was calculated for each COB claim, relative to the AUAC.

Continuing the example of Pravastatin Sodium from page 30, the table below lists several fields from a prescription and corresponding claim in the Defendants' data to an Illinois Medicaid carrier in June 2012.

35

EXHIBIT B

**Table 14. Example Sale and Illinois Medicaid Claim from June 2012.**

| Sales/Claim Field | Value |
|---|---:|
| Date_Of_Service | 6/19/2012 |
| Abs Store Num | 4530 |
| Pharmacy_Name | Osco Pharmacy |
| NDC | 68180048709 |
| Qty_Dispensed | 30 |
| Days Supply | 30 |
| Plan_Code | MEDIL |
| BIN | 8259 |
| PCN | VPC3 |
| Group ID | |
| Gross_Amt_Due | $21.69 |
| Usual Customary Charge (Reported) | $21.69 |
| Sum of Submitted Amounts | $21.69 |
| Total Amt Paid[24] | $10.02 |
| Final Patient Pay Amt | $0.00 |

The two available AUAC price-quantities for this drug in this month, as previously discussed, are $4 for 30, and $10 for 90. The claim references the quantity 30, so the $4 AUAC price is applicable. If $4 had been the Reported U&C on the claim, Illinois Medicaid would have paid $4 for this claim as it is less than the $10.02 originally paid.

The table below shows several fields from a prescription and corresponding claim in the Defendants' data to a Medicare Part D carrier, also in Illinois in June 2012.

---

[24] The Total_Amt_Paid field represents the total amount paid by a third party payor, inclusive of ingredient cost, dispensing fee, and other amounts. It does not include the Patient Liability amount, which is found in the Final_Patient_Pay_Amt field.

**Table 15. Example Sale and Medicare Part D Claim from June 2012.**

| Sales/Claim Field | Value |
|---|---|
| Date_Of_Service | 6/29/2012 |
| Abs_Store_Num | 3442 |
| Pharmacy_Name | Osco Drug |
| NDC | 68180048709 |
| Qty_Dispensed | 90 |
| Days_Supply | 90 |
| Plan_Code | ZSHP |
| BIN | 610097 |
| PCN | 9999 |
| Group_ID | PDPIND |
| Gross_Amt_Due | $451.21 |
| Usual_Customary_Charge (Reported) | $59.69 |
| Sum of Submitted Amounts | $451.21 |
| Total_Amt_Paid | $17.11 |
| Final_Patient_Pay_Amt | $1.10 |

The two available AUAC price-quantities for this drug in this month, as previously discussed, are $4 for 30, and $10 for 90. The claim references the quantity 90, so the $10 AUAC price is applicable. If $10 had been the Reported U&C on the claim, this Medicare Part D plan would have paid no more than $10 for this claim as it is less than the $17.11 originally paid.

**e.  Calculating Overpayments Relative to AUACs**

Ultimately, I calculated an overpayment relative to the AUAC for each claim. Since GHPs typically pay the lesser of any amount submitted or an even lower price based on Federal Upper Limits (FULs), State Maximum Allowable Costs (SMACs), or others, depending on the GHP, lower amounts than the AUAC that were reimbursed can be regarded as appropriate minimal payments, effectively eliminating any negative overpayment amounts resulting from the re-adjudication.

Simple overpayment amounts – the positive difference between the original reimbursed amount and the AUAC on each claim – were taken as final overpayment amounts on claims associated with Medicaid, TRICARE, and VA GHPs. For claims associated with Medicare Part D

37

and FEP GHPs, the calculation of overpayments is slightly more involved. This is because these

GHPs can have more complex reimbursement methodologies relating to Patient Liability

amounts that can involve deductibles, coinsurance, proportional copays, which can even vary

depending on the amount of benefits a beneficiary has received as of the date of a given claim.

To account for these complexities, discounted overpayment amounts on claims for Medicare Part

D and FEP GHPs were calculated as the sum of the original reimbursed amount and the final

Patient Liability amount minus the AUAC, all multiplied by 72% (a 28% discount) for Medicare

Part D and by 70% (a 30% discount) for FEP. I further limited the discounted overpayment

amounts on FEP and Medicare Part D claims by capping them at the GHP reimbursed amount. In

other words, when the discounted overpayment exceeds the amount reimbursed by a GHP, the

overpayment amount above the GHP reimbursed amount is excluded. I arrived at this approach

and these discount percentage amounts through consultation and instruction from fellow expert

John Bertko. I offer no opinion as to how closely the discount percentages approximate the

federal contribution of funds. I have been told that the Medicare Part D discount percentages are

conservative in that they are lower or in line with the low end of federal contributions to

Medicare Part D as reflected in Medicare Board of Trustees Annual Reports from 2006 to 2016. I

have also been told that the FEP discount percentage was determined based on the structure of

the FEP program.

So, after re-adjudicating claims and associating claims with GHPs, I calculated

overpayment amounts relative to AUACs specific to each GHP. After calculating these specific

claim-level overpayments, I aggregated them in a variety of ways to arrive at summaries by

division, state, month, store banner, drug, GHP, and by several other combinations of these.

EXHIBIT B

Continuing the Pravastatin Sodium examples from page 35, if an AUAC of $4 had been submitted to the Illinois Medicaid plan on a claim for which the plan had originally paid $10.02, the overpayment on this claim is $6.02. For the sale involving the claim to the Medicare Part D plan described above, if an AUAC of $10 had been submitted to the Medicare Part D plan on a claim for which the plan had originally paid $17.11, the simple overpayment on this claim is $7.11. Applying the approach and percentages provided by fellow expert John Berko, the final, discounted overpayment relative to the AUAC for this claim is $5.91 ([$17.11 + $1.10 - $10] x 72%). Note that in this example, the discounted overpayment amount of $5.91 is less than the simple overpayment amount of $7.11.

### f.   Filtering Medicare Part D Plans

My analysis is limited to the top 20 Medicare Part D plans in each year in terms of reimbursements to avoid uncertainty surrounding whether smaller plans were in fact Medicare Part D plans prior to 2012. Attachment C.1 lists the top 20 Medicare Part D plans in each year based on total reimbursements, including Patient Liability amounts.

This involved aggregating the sum of the original reimbursed amount and the final Patient Liability amount for each Medicare Part D plan (identified by carrier name and plan name) and year. I then sorted the plans by sum in each year and kept only the 20 Medicare Part D plans with the largest sums in each year. I eliminated results for all other Medicare Part D plan-years from further processing. Over the 11 years of claims, this filtering conservatively excluded 516 plans with $18,173,581 in discounted overpayments from the analysis.

Continuing the Pravastatin Sodium example from above, the Medicare Part D plan is identified in the Defendants' carriers files with the carrier name "SECURE HORIZON PART D" and the plan name "SECURE HORIZONS MEDICARE PART D." In 2012, there were 322

39

EXHIBIT B

Medicare Part D plans identified in the Defendants' claims files with a total of $259,018,847 million paid (including Patient Liability) across all of them. The "Secure Horizons" plan is ranked first out of the 322, with a total of $31,888,363 paid. Thus, this Medicare Part D plan and its overpayments are included in the final results.

### g.  Applying Federal Medical Assistance Percentages

Application of FMAP data to overpayments facilitates the attribution of overpayments to the federal government and to individual states. To do this, I related FMAP values by state and quarter to overpayments associated with Medicaid claims by the Medicaid state and quarter (based on the prescription date of service). FMAP values represent the federal contribution as a percentage. So, I multiplied each overpayment amount by the FMAP value to determine the federal overpayment. The difference between the total overpayment and the federal overpayment is left as the state's portion of the overpayment.

It was not possible to unambiguously associate certain Medicaid GHPs with a state. For overpayments associated with these Medicaid GHPs, the overpayments were divided between the federal overpayment and the state overpayment in equal parts. This attribution was chosen because the most common (and minimum) FMAP value is 50%.

Note that results from applying FMAPs are accurate for all states until January 1, 2014, when Medicaid expansion coverage began. As of this date, federal overpayments may be understated depending on if and when each state implemented Medicaid expansion, which, as noted above, was funded 100% by the federal government through 2016.[25]

Continuing the Pravastatin Sodium example from page 39, the date of service for the Illinois Medicaid claim was in the second quarter of 2012, and the FMAP value for Illinois in

---

[25] medicaid.gov/affordable-care-act/financing/index.html

40

this quarter was 50%. Therefore, $3.01 of the overpayment is attributable to Illinois and $3.01 is attributable to the federal government. Note that these FMAP calculations do not affect the total amount of overpayments. They only allocate Medicaid overpayments to federal versus state governments.

## V. Results and Conclusions

As stated above, I found that between September 1, 2006 and December 31, 2016, GHPs paid $169,665,301 more based on 22,910,154 claims submitted to them with the Defendants' Reported U&Cs than they would have if the Defendants had submitted claims with AUACs. Of the $169,665,301, $154,238,013 is attributable to the federal government, and $15,427,288 is attributable to state governments for their Medicaid programs based on the application of FMAPs. In addition, the Defendants' submitted 39,184,779 claims to GHPs listing Reported U&Cs that were higher than AUACs and could have listed AUACs instead of Reported U&Cs. Summaries of claims and results by GHP and by year are in the tables, below. Note that Table 16 is the same as Table 1.

**Table 16. Summary of Claims and Overpayments by GHP.**

| GHP | Number of Claims | Number of Overpaid Claims | Amount of Overpayment |
|---|---|---|---|
| Federal Employee Programs | 1,249,047 | 562,125 | $5,830,109 |
| Medicaid | 9,073,158 | 4,445,792 | $34,082,810 |
| Medicare Part D | 30,141,893 | 17,326,453 | $124,297,115 |
| TriCare | 2,012,083 | 563,194 | $5,332,601 |
| Department of Veterans Affairs | 58,482 | 12,590 | $122,666 |
| Totals | 42,534,663 | 22,910,154 | $169,665,301 |

**Table 17. Summary of GHP Claims and Overpayments by Year.**

| Year | Number of Claims | Number of Overpaid Claims | Amount of Overpayment |
|---|---|---|---|
| 2006 | 9,498 | 5,694 | $41,393 |
| 2007 | 1,648,632 | 950,853 | $7,257,834 |
| 2008 | 3,805,600 | 2,331,288 | $20,574,302 |
| 2009 | 4,621,720 | 2,811,445 | $20,362,819 |
| 2010 | 4,944,571 | 2,866,310 | $21,360,548 |
| 2011 | 5,275,740 | 2,819,625 | $20,279,518 |
| 2012 | 7,780,978 | 3,939,745 | $28,740,651 |
| 2013 | 6,870,115 | 3,541,012 | $27,332,610 |
| 2014 | 3,011,822 | 1,617,284 | $10,338,747 |
| 2015 | 2,822,218 | 1,285,027 | $8,605,604 |
| 2016 | 1,743,769 | 741,871 | $4,771,273 |
| Totals | 42,534,663 | 22,910,154 | $169,665,301 |

In terms of total overpayments, there are several ways in which these can be summarized. Attachment D.1 summarizes sales, claims, and overpayments (among other values) by year. Attachment D.2 summarizes the same values by drug, and Attachment D.3 summarizes the same values by GHP, including by Medicaid state and Medicare Part D plan category as described above. Attachment D.4 summarizes these values by GHP, carrier, and year, and Attachment D.5 summarizes them by state, GHP, and year. The files I've produced with this report contain claim-level final results that can be examined and summarized in other ways.

I am confident that the results and opinions in this report are accurate to a reasonable degree of certainty. If additional relevant information is provided to me, subject to the Court's permission, I reserve the right to supplement or revise this report, as necessary, to reflect the impact of such information. The approach I have taken in implementing my analyses would allow me to recalculate overpayments using different discount percentages or other criteria if so specified by counsel or the Court.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and ability.

Respectfully submitted,

$2/1/2018$

Ian M. Dew
Steck Consulting, LLC

Date

**43**

EXHIBIT B