IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, and THE STATES OF CALIFORNIA, DELAWARE, ILLINOIS, INDIANA, MASSACHUSETTS, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NORTH CAROLINA, RHODE ISLAND, VIRGINIA, *ex rel*. TRACY SCHUTTE and MICHAEL YARBERRY,<br><br>    Plaintiffs and Relators,<br><br>v.<br><br>SUPERVALU, INC., SUPERVALU HOLDINGS, INC., FF ACQUISITIONS, LLC, FOODARAMA, LLC, SHOPPERS FOOD WAREHOUSE CORP., SUPERVALU PHARMACIES, INC., ALBERTSON'S LLC, JEWEL OSCO SOUTHWEST LLC, NEW ALBERTSON'S INC., AMERICAN DRUG STORES, LLC, ACME MARKETS, INC., SHAW'S SUPERMARKET, INC., STAR MARKET COMPANY. INC., JEWEL FOOD STORES, INC., and AB ACQUISITION LLC,<br><br>    Defendants. | NO. 11-3290 |

**OPINION**

RICHARD MILLS, U.S. District Judge:

Pending is the Defendants' motion to exclude the expert testimony of Ian Dew.

## I.     BACKGROUND

A. Introduction

This is a False Claims Act case, wherein the Relators allege that Defendant pharmacies submitted false or fraudulent claims to obtain federal funds from Government Healthcare Programs (GHP) to which they were not entitled. The Relators allege this occurred through the electronic submission of inflated usual and customary charges to GHPs because Defendants failed to report their cash price matches as their usual and customary price.

One of three experts retained by the Relators is Ian Dew. Defendants move to exclude Mr. Dew's opinions, claiming they fail to satisfy the standards of admissibility set by the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

The Defendants allege Mr. Dew is a computer programmer who lacks expertise in the pharmacy or prescription-drug distribution industry. The Relators state Mr. Dew is an electronic data analyst and computer programmer with extensive experience working on more than 60 healthcare fraud investigations for the

Department of Justice, various State Attorneys General and private clients. Mr. Dew has extensive experience in dealing with and analyzing large compilations of electronic transaction data like that produced by the Defendants in this action. The Relators say Mr. Dew is not being offered as an expert on usual and customary pricing requirements, but instead is being offered to testify only about the calculations of the overcharges that resulted from Defendants' alleged manipulation of their usual and customary prices.

The Relators further claim Mr. Dew used his skills as a data analyst to electronically review more than 42 million claims for payment that Defendants submitted to GHPs. Mr. Dew used the definitions of the actual usual and customary prices, as defined by Relators' other experts, Dr. Kenneth Schafermeyer, a Doctor of Pharmacy Administration and a professor at St. Louis College of Pharmacy, and John Bertko, a healthcare actuary. The Relators claim that, relying on those definitions, Mr. Dew was able to calculate the amount that GHPs were overcharged in approximately 22 million transactions between 2006 and 2016, by comparing the reimbursement amount based upon the usual and customary amount Defendants reported to the PBMs and to Medicaid in claims for payment with the actual usual and customary amount that Defendants should have reported based on their cash price match override transactions.

The Relators claim that, to analyze the Defendants' alleged overcharges, Mr. Dew did not need to have a specific expertise in the legal underpinnings of those overcharges. The Relators allege Mr. Dew could simply rely on the assumptions provided by other experts in rendering an opinion on large collections of electronic data analysis, his area of expertise.

Ian Dew has worked on complex, computer-assisted data analysis for more than 25 years, focusing on complex healthcare litigation since 2004. Much of his work on False Claims Act cases was performed at the request of the United States Department of Justice and the Attorneys General for various states.

Mr. Dew has a bachelor's degree in mathematics and psychology, a Master of Engineering from the University of Virginia and a Master of Environmental Science from Johns Hopkins. He summarized his experience in his Expert Report:

> I have more than 25 years of experience analyzing large datasets with more than 10 years of experience focused on healthcare matters. I have directly performed analyses and supervised other analysts in dozens of healthcare and other fraud investigations and have involved large volumes of diverse types of data as well as intricate and complex calculations. The majority of these projects have involved millions of Medicaid or Medicare claims in addition to other large transaction datasets. They have involved a variety of allegations including mis-reporting of drug prices, off-label marketing of drugs, kickbacks and Stark Law violations, retail pharmacies' failure to submit accurate usual and customary charges, billing for medically unnecessary products and services, among others. This is the eighth time I have been engaged as a testifying expert.

Dew Report at 3. Mr. Dew has fourteen years of experience in healthcare data analysis matters.

The Relators note Mr. Dew does not claim to be a "damages" expert. Rather, he used his data transaction analytical skills to determine the amount of "overcharges" based on the inflated prices allegedly reported by the Defendants. Although "damages" considerations can involve a broad range of legal issues outside the scope of Mr. Dew's expertise, the Relators allege he is fully qualified to calculate the usual and customary overpayments that are often used as a component of damages.

B. Scope of Mr. Dew's work

The Relators state that Mr. Dew calculated the difference between two price points found in Defendants' data—cash override sales corresponding to discounted price matches (the actual usual and customary prices), and GHP reimbursements to Defendants based on the reported usual and customary prices sent to third party PBM and Sponsor payers. He needed only to look at the Defendants' data production to identify these basic elements of the calculation. In his Report, Mr. Dew states:

> Specifically, I was asked to [1] identify Actual Usual and Customary Prices (AUACS)[1] appearing in the Defendants' discounted cash sales, [2] re-adjudicate GHP claims submitted by defendants using these AUACs, [3] identify claims with overpayments relative to the AUACs, and [4] calculate aggregate overpayments for such claims.

---

[1] "I was directed by counsel to use the term 'Actual' in this context. I am not expressing any opinion by using it."

5

Dew Report at 2. Mr. Dew described his methodology as follows:

> Primarily, I surveyed Defendants' sales files to identify and tabulate quantities and corresponding prices that appeared repeatedly in discount cash sales. . . .
>
> Treating the discounted prices that I identified as AUACs, I assessed whether the Reported U&C on Defendants' claims were greater than the AUACs for the same drugs in the same states and timeframes. I further re-adjudicated all GHP claims as if the AUACs had been the Reported U&Cs on them. . . .
>
> If the AUAC represents a lower amount than the reimbursed amount, The difference between the reimbursed amount and the AUAC would represent an overpayment relative to the AUAC. . . .
>
> Finally, I created several summaries of claims and overpayments associated with the different categories of GHPs.

*Id*. at 4.

Mr. Dew states that, to ensure he was only identifying ongoing price matching and not capturing one-time special pricing, he conservatively required that each of the lower actual and usual customary prices identified in his analysis must have appeared in at least two sales over a period of three consecutive months. According to Mr. Dew, this approach is conservative when compared to a similar usual and customary price analysis he performed for the Texas Attorney General, where he was directed to identify a price matched cash sale as the pharmacy's true usual and customary price if it occurred a single time throughout the entire relevant time period of that litigation covering multiple years.

The Relators allege the concept of "cash price to the general public" had to be reduced to specific numbers for purposes of calculating overpayments. According to his report, Mr. Dew instituted a working definition of actual usual and customary prices that incorporated discounted cash overrides from the Defendants' transactions data while excluding one-time special prices. The Relators claim that determining the best way to organize discrete data elements and performing calculations on that data (Defendants' cash override prices) falls within Mr. Dew's expertise as a data analyst.

The Relators further allege Mr. Dew's work had a limited scope. He was simply asked to calculate the difference between the two types of price points found within Defendants' data production—1) discounted cash override prices, and 2) reimbursement based upon undiscounted reported usual and customary prices. However, it was exceedingly difficult to execute this conceptually simple task because of the multiple hundreds of millions of claim records involved.[2] The bulk of the necessary information required to perform the task was found within the set of data produced by the Defendants. As stated in his report, Mr. Dew conducted external research to the limited extent required, such as downloading CMS lists of Medicare Part D Carriers to ensure that he was capturing all claims for payment to

---

[2] Mr. Dew's report provided that the information he analyzed from Defendants' production included more than a decade's worth of transactions occurring in Defendants' pharmacies across 24 states, concerning 371,220,879 sales transactions involving 419,108,626 claims.

Medicare and Annual Reports of the Medicare Board of Trustees to understand the percentages of federal funds for Medicare and other federal programs, as calculated by Mr. Bertko.

The Defendants allege Mr. Dew's approach is contrived and unsupported. He had no industry expertise to determine if his calculation had any real-world relevance. Mr. Dew did not perform any research to determine if his alternative usual and customary price construct is consistent with any federal or state legal authority, published literature or industry standards. The Defendants claim he did not evaluate whether the contracts between Defendants and the PBMs would recognize this "contrived" figure as the usual and customary price, nor did he rely on any other expert retained by Relators (who also define usual and customary price in terms of cash price) to support this definition.

The Defendants also note that Mr. Dew's analysis concludes with his "re-adjudication" of the claims Defendants submitted to GHP using his alternative calculation instead of Defendants' usual and customary price. Mr. Dew classified as an "overpayment" each claim for which Defendants' usual and customary price was higher than his alternative calculation.

The Defendants allege that using this process allows Relators—through Mr. Dew—to construct artificial and inflated "overpayments" where none actually existed. They cite the example of a Springfield pharmacy consistently reporting the

usual and customary price for a drug at $10, reflecting the price that 100 cash customers paid. The Defendants contend that under the Relators' approach, this scenario would result in 100 putative false claims and $200 in single damages if just two customers paid $8 for the same drug elsewhere in the State of Illinois any time that month.

## II. DISCUSSION

The Defendants contend Mr. Dew is not qualified to provide an expert opinion on usual and customary pricing. Moreover, his methodology is not reliable and is outcome-driven.

The Relators claim Mr. Dew is qualified to quantify the overcharges that resulted from Defendants' alleged manipulation of their usual and customary pricing requirements. They further assert that his methodology is reliable.

A. <u>Standard for admissibility</u>

"The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (internal quotation marks omitted). A court must evaluate: (1) the qualifications of the proposed expert; (2) the reliability of his or her methodology; and (3) the relevance of the proposed testimony. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771,

779 (7th Cir. 2017). In evaluating the reliability of expert testimony, courts should consider a number of factors and employ a "flexible" inquiry. *See id*. at 779-80.

B. Mr. Dew's methodology

The Defendants criticize Mr. Dew as a hired gun and litigation consultant, frequently advocating for false claims plaintiffs. However, that is hardly disqualifying. In the Court's experience, it is not uncommon for individuals testifying as experts to testify regularly for one side or the other and most do not work for free.

The fact that Mr. Dew has no practical experience in the pharmacy or healthcare industry does not preclude him from analyzing large amounts of electronic data relating to usual and customary prices applicable to GHP contracts—as defined by others such as Dr. Schafermeyer and Mr. Bertko. Mr. Dew has extensive experience with what he was tasked to do--analyzing large amounts of electronic data. The Court has no trouble concluding that Mr. Dew is qualified by education and experience to analyze large amounts of electronic data.

The Defendants claim Mr. Dew's methodology is not reliable in that his usual and customary price approach was contrived by Relators' counsel to drive a favorable outcome. They note that Mr. Dew testified he applied Relators' counsel's formulation of usual and customary pricing.

The Relators counter by stating that counsel simply instructed Mr. Dew to assume that lower matched prices that are widely available are the usual and customary prices that Defendants should have charged GHPs for their drugs—an approach consistent with *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 645 (7th Cir. 2016) ("Because Kmart offered the terms of its 'discount programs' to the general public and made them the lowest prices for which its drugs were widely and consistently available, the Kmart discount prices at issue represented the 'usual and customary' charges for the drugs.").

Federal Rule of Evidence 703 states in part: "An expert may base an opinion on facts or data in the case that the expert has been made aware of." Fed. R. Evid. 703. Thus, he can rely on information provided to him in formulating an opinion. "Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true." *Williams v. Illinois*, 567 U.S. 50, 57 (2012). Moreover, an expert may render an opinion that is based on information provided by counsel. *Manpower, Inc. v. Insurance Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013).

Here, Mr. Dew relied on information provided by others to formulate his opinions. The Relators claim Mr. Dew's approach as to how to aggregate discounted cash override sale records to obtain an actual usual and customary price pursuant to those instructions is a matter of data analysis, not an argument contrived by counsel.

Mr. Dew analyzed the data and determined the best way to group the raw information into a form that could be plugged into his algorithm, while excluding potential outliers. This methodology in calculating usual and customary pricing by using the most frequently occurring discounted cash price offered by month is more conservative than the methodology Mr. Dew employed in another case when he used the median discounted price over all time as the alternative usual and customary price.

Mr. Dew testified that his use of the most frequently occurring price is recognized as a statistically valid method to find the central tendency of a large data set. Similarly the mean, the median and average are also statistically valid methods of finding a central value. Mr. Dew stated all of these details of analysis are properly within the professional discretion of the data transaction analyst because they all fall within the accepted methodology of large data set analysis. Certainly, there are different ways to determine one or more usual and customary prices over time. The district court in *Garbe* noted the methodology of calculating usual and customary price need only be "sound" to be admissible:

> That is not to say it is correct, only that it is admissible and, of course, subject to "the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" (internal citations omitted). As the Seventh Circuit stated in *Schultz v. Akzo Nobel Paints, LLC*: the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion; the inquiry must 'focus . . . solely on principles and methodology, not the conclusions they generate.'"

12

*United States ex rel. Garbe v. Kmart Corp.*, 2017 WL 3175983, at *4 (S.D. Ill. July 21, 2017) (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 595)). Whether an expert has selected "the best data set to use" is "a question for the jury, not the judge." *Manpower,* 732 F.3d at 809. As long as there is "a rational connection between the data and the opinion," "an expert's reliance on faulty information"—as the Defendants allege Mr. Dew did in his methodology—"is a matter to be explored on cross-examination; it does not go to admissibility." *Id.*

Mr. Dew's analysis is not unlike that of the Relators' expert in *Garbe*. Both analyzed Defendants' transaction data, comparing the sale price and reimbursement based on the reported price on the basis of drug, dosage, quantity and administration on a transaction-by-transaction basis to calculate the Defendants' usual and customary prices. *See Garbe*, 2017 WL 3175983, at *5.

Based on the foregoing, the Court is unable to conclude that Mr. Dew's expert testimony should be excluded based on methodology.

C. Reliability

The Court is unable to conclude that any of the Defendants' critiques warrant excluding Mr. Dew's testimony based on reliability. The Seventh Circuit has stated:

> District judges have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."

> *Kumho Tire Co.*, 526 U.S. at 152, 119 S. Ct. 1167. Reliability, however, is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). "Rule 702's requirement that the district judge determine that the expert used reliable methods does not ordinarily extend to the reliability of the conclusions those methods produce-that is, whether the conclusions are unimpeachable." *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed. *See id*. at 766; *Smith*, 215 F.3d at 720.

*Manpower*, 732 F.3d at 806 (7th Cir. 2013).

The Court concludes Mr. Dew's methodology is sufficiently reliable to present to a jury. It can be tested by cross-examination and presentation of contrary evidence.

### D. Relevance

A qualified expert's opinions are admissible only if they are relevant, meaning "the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson*, 492 F.3d 901, 904 (7th Cir. 2007) (citing Fed. R. Evid. 702). The jury must evaluate whether any Defendant submitted any false claim by considering whether Defendants' reporting of their usual and customary price was faithful to their contracts and the applicable law. Obviously,

that is a matter of some complexity that is not within a typical juror's scope of knowledge.

The Defendants allege the usual and customary price is often defined as the cash prize for a specific drug offered on a specific date of service at a specific pharmacy. Mr. Dew's approach is significantly different from that. The district court in *Garbe* noted there are multiple ways to define usual and customary price and found the relator's expert methodology--which involved an analysis of sales data "on the basis of drug, dosage, quantity, and administration on a transaction-by-transaction basis"—reliable and of assistance to the jury in understanding the evidence.

For similar reasons, the Court finds Mr. Dew's methodology to be relevant and potentially of assistance to the jury in understanding the evidence. Mr. Dew's testimony is admissible pursuant to the Federal Rules of Evidence and applicable case law.

<u>Ergo</u>, the motion to exclude the expert testimony of Mr. Ian Dew [d/e 177] is DENIED.

ENTER: March 19, 2019

    FOR THE COURT:

                                            /s/ *Richard Mills*
                                            Richard Mills
                                            United States District Judge