IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, and THE STATES OF CALIFORNIA, DELAWARE, ILLINOIS, INDIANA, MASSACHUSETTS, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NORTH CAROLINA, RHODE ISLAND, VIRGINIA, *ex rel*. TRACY SCHUTTE and MICHAEL YARBERRY, | ) ) ) ) ) ) ) ) ) | |
|  | ) | |
| Plaintiffs and Relators, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | |
| SUPERVALU, INC., SUPERVALU HOLDINGS, INC., FF ACQUISITIONS, LLC, FOODARAMA, LLC, SHOPPERS FOOD WAREHOUSE CORP., SUPERVALU PHARMACIES, INC., ALBERTSON'S LLC, JEWEL OSCO SOUTHWEST LLC, NEW ALBERTSON'S INC., AMERICAN DRUG STORES, LLC, ACME MARKETS, INC., SHAW'S SUPERMARKET, INC., STAR MARKET COMPANY. INC., JEWEL FOOD STORES, INC., and AB ACQUISITION LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | NO. 11-3290 |
|  | ) | |
| Defendants. | ) | |

OPINION

RICHARD MILLS, U.S. District Judge:

This is a False Claims Act case, wherein the Relators allege that Defendant pharmacies submitted false or fraudulent claims to obtain federal funds from Government Healthcare Programs (GHP) to which they were not entitled. The Relators allege this occurred through the electronic submission of inflated usual and customary charges to GHPs because Defendants failed to report their cash price matches as their usual and customary price.

Pending is the Relators' motion for partial summary judgment. The Parties dispute the effect of the Seventh Circuit's decision in *United States ex rel. Garbe v. Kmart*, 824 F.3d 632 (7th Cir. 2016) on this case.

## I. BACKGROUND

### (A)

The Relators allege the price-match program for Defendants SuperValu and Albertsons began in the fall of 2006. The Defendants claim advertising of the price-match program occurred at certain times between 2006 and 2012 but Defendants have had a price match policy in place since the 1980s. A price-match program "override" occurred when pharmacy personnel replaced Defendants' then-current, reported cash "retail" price with a lower competitor price. Albertsons discontinued the price-match program in October 2013. SuperValu discontinued the price-match program in December 2016.

The Defendants offered a price match policy and a price match guarantee. The Defendants state the Court must decide how the legal definitions of "offer" and "general public" apply to the facts of this case.

All of the Defendants' banners (i.e. Cub Pharmacy, Osco Drug, etc.) advertised price matching in all states where those banners operated at various times between October 2006 and June 2012. The Defendants' advertisements publicized Defendants' practice of matching competitor prices on prescription drugs and generally included disclaimers. Defendants' price match advertisements were disseminated to the public through various means, such as in-store and pharmacy signage, fliers, circulars, in-store audio announcements, mailers, newspapers of general circulation, on the back of store receipts and Defendants' web pages. The price-match program advertisements described an offering about Defendants' price match policy.

The Relators allege the price-match program was available to anyone who would request that Defendants match a competitor's price. The Defendants say certain other requirements had to be met before receiving a competitor's lower price, including the fact that the lower price had to be available at a local pharmacy and could be verified by pharmacy staff. No fee was required of customers to participate in the price match program.

Not all price matches were the same. On a single day for the same drug, Defendants' pharmacies could match different prices charged by Rite Aid, Walmart, CVS and any other competitor, or no competitor at all. Price match transactions were not the majority of Defendants' cash transactions and only a nominal percentage—about 2%--of all Defendants' transactions overall.

Unlike Walmart and some other competitors, the Defendants did not have an official discount drug formulary. Defendants have produced price matching advertisements and competitor drug formularies its employees collected in March 2012 from approximately 222 of Defendants' stores that can be individually identified. However, the Defendants claim they cannot determine from Relators' exhibit whether it is an accurate portrayal of all of these produced documents. Of the 222 stores, 201 self-reported and produced competitor's discount drug formularies kept in the pharmacies at those stores, including 192 stores that kept Wal-Mart's discount drug formulary in the pharmacy; Defendants' stores "most commonly would have a Wal-Mart list or—because it's very accessible off the internet, so they would have it . . . they would print them off and have them instead of having to keep going to the internet." The Defendants claim that, in addition to problems with accuracy, the Relators' information is immaterial and taken out of

context because Defendants operate over 1,000 pharmacies, while the Relators' exhibit only gives information for 222.

The Defendants' price overrides grew from 8.75% of cash sales of all drugs (including drugs that were not available from the competitors at a lower cash prize) in 2007 to 39.36% of cash sales of all drugs in 2011. The Defendants allege this is immaterial because growth in number of price overrides does not go to (1) falsity, (2) knowledge or (3) materiality as to claims submitted by Defendants. Moreover, the percentages are taken out of context with respect to how many total cash transactions occurred.

The Defendants identified specific competitor price matches for 88.31% of all price overrides. Defendants identified 56.94% of all price overrides as Walmart price matches. The Defendants claim this is immaterial because the percentage of price overrides identified as being matched to a specific competitor or Walmart in particular does not go to (1) falsity, (2) knowledge or (3) materiality as to claims submitted by Defendants. Moreover, the ratio of price matches to the total cash sales show that only about 15% of cash sales were matched to Walmart's prices.

Price match overrides occurred as frequently as 18,000 times per week. The Defendants say that, across the roughly 1,000 pharmacies that Defendants operated, this number equates to merely 17 or 18 price overrides per week—or about 2.57

price overrides per day for all drugs dispensed to customers. Moreover, the overall number of cash sales in 2011 and 2012 total 6,141,978, which constitutes an average of 59,057 per week across the two-year period. Although up to 18,000 individuals may have sought and received a price match during this time, over 41,000 customers paid the regular cash prices.

The Defendants did not submit lower matched price cash sales transactions to third-party payors, including GHPs. The Defendants would not allow lower matched prices to be submitted to third party insurance even if a customer specifically asked Defendants to process a price match transaction through the customer's insurance. The Defendants claim doing so would have violated their contracts with these payors. The customer's preference does not control. The contract does.

(B)

In October 2006, soon after Walmart announced its discount generics program, the Defendants estimated that adopting a similar discount generics program would result in tens of millions of lost profits, 90% of which "would go to PBMs, Managed Care and other payors due to co-pay and U&C contract language." The Defendants claim this was a business decision so they would not lose money.

On December 27, 2017, SuperValu Executive Ron Richmond (Director of Managed Healthcare Contracting) sent an email to SuperValu Executives Pamela Caselius (Marketing Director), Maxine Johnson (Vice President, Managed Care Operations) and Dan Salemi, writing in part:

> As for price matching on the various competitors generic programs, I believe that we have always taken a "stealthy" approach. We consider this to be something that we do as an "exception" for customer service reasons. Once we deviate to a process that is more "rule" or routine, we begin to affect the integrity of our U&C price – a slippery slope, as true U&C price is a claim submission requirement for all Medicaid and private commercial Managed Care and PBM agreements. The financial implication of this is very broad, Please communicate with Max and Dan for a broader discussion on Generic Price matching and/or promotional activities.

Doc. 164, Ex. H. The Defendants promoted price matching in part to "combat" discount generic drug programs offered by Walmart and other competitors. The Defendants' price matching program was designed to retain existing customers and to attract new customers.

In October 2008, Defendants' ARx pharmacy application was enhanced with an ongoing price match override feature. The "Ongoing Price Override" 1) processed subsequent fills of the same prescription at the overridden price automatically; 2) maintained a record of the competitor pharmacy whose price had been matched; and 3) automatically logged notes to the prescription on which the override had been performed. The Defendants note that the pharmacist was still

required to validate the competitor's price at the time of each refill. The Relators dispute that Defendants' pharmacists validated competitor prices on automatic refills. Testimony in this matter reveals that patients were not required to ask for a price match, and that refills were done automatically.

SuperValu Prescription Pricing Policy (September 2009) stated that "[t]he company will not lose a prescription because of price," and required SuperValu employees responding to price quotes to "Mention service, convenience and price match guarantee." The Defendants state this did not change their longstanding approach to price matching. Customers were still required to take an affirmative action, quote a local competitor and price, and have the pharmacy staff verify the competitor's price before providing the customer with a price match. The Relators dispute that customers had to initiate the price match transaction. They claim that was not a written requirement prior to the August 2012 revisions to the written Prescription Pricing Policy and, after implementation of the October 2008 ARx automatic refill enhancement, the patients no longer even nominally had to "ask for a price match."

SuperValu's August 2012 Prescription Pricing Policy added the words "[i]f a customer requests that we match the price . . ." to SuperValu's "Prescription Price

Match Program" and removed the requirement from the September 2009 Prescription Pricing Policy to "Mention . . . price match guarantee."

Individual pharmacies could not change the usual and customary price reported to third parties, including GHPs. The usual and customary price reported to third parties, including GHPs, "was set by Defendants' corporate pricing department." The Defendants state the usual and customary prices were controlled by applicable third-party contracts or state law.

The Defendants did not acknowledge or consider discount price match program cash prices when setting the usual and customary prices they reported to third parties. The Defendants claim that, if appropriate under an applicable contract or State Plan to include price-matched prices when reporting their usual and customary prices, however, Defendants performed back-end reconciliation. The Relators dispute that Defendants performed back-end reconciliation to include price-matched prices when reporting their usual and customary prices. The Defendants' supporting materials only address Massachusetts. The Relators also dispute the Defendants' inference that they voluntarily began reimbursing Massachusetts for overcharges. Defendants made no efforts to comply with the 2009 revisions to Massachusetts law until Defendants became aware in January 2012 that their price

matching program was under investigation and a subpoena was issued for documents related to its price matching program.

The "PBM Industry Definition of U&C Price" is "generally understood to be the cash price charged to the general public."

The Defendants allege the primary Pharmacy Benefit Managers that processed more than 92% of Defendants' total prescription records and more than 94% of their total amount paid for those prescription records did not consider Defendants' individualized price matching to have altered the usual and customary prices they submitted. Moreover, the Defendants were not required to submit lower price-match amounts as their usual and customary prices, at least for some part of the relevant time period, regardless of the Defendants' advertisements indicating their willingness to price match. The Relators dispute that Defendants were not required to submit lower price-match amounts as their usual and customary prices. Pharmacy reimbursement is governed by statutory and regulatory requirements. Contracts between Defendants and Pharmacy Benefit Managers must be construed consistent with those statutes and regulations.

The Defendants allege the enforceable regulatory Medicaid State Plans in effect in California, Illinois, Utah and Washington during the relevant time period did not capture individualized price matching as part of any definition of "usual and

customary." The Relators dispute the assertion and note that Defendants were required to comply with the federal Medicaid reimbursement regulation, 42 C.F.R. § 447.512, which has governed the state Medicaid programs, usual and customary regulations and defined usual and customary price as "charges to the general public." Moreover, whether price matching is "individualized" is immaterial to compliance with Medicaid regulatory requirements.

The Defendants allege the Pharmacy Benefit Managers and the state Medicaid programs were well aware of these types of discount programs. The Department of Justice and relevant states investigated the allegations in Relators' amended complaint for more than three years before declining to intervene. Moreover, the Pharmacy Benefit Managers and the state Medicaid programs at issue extensively audited Defendants' prescription claims. The Relators dispute that Pharmacy Benefit Managers and state Medicaid programs were "well aware" of Defendants' price match program. They allege that Defendants did not provide Pharmacy Benefit Managers and state Medicaid programs with candid and complete disclosure of the scope and operation of their price match program.

The Defendants claim customers would sometimes quote local competitor prices that were unverifiable. In those situations, the Defendants declined to sell the drug at the customer's quoted price and would deny the customer's request for a

price match. The Relators dispute that Defendants denied price matches in any meaningful way when local competitor prices were not verifiable. Denial of price matches is inconsistent with Defendants' Prescription Pricing Policy (September 2009) which stated that "[t]he company will not lose a prescription because of price."

## II. DISCUSSION

The Relators allege the Defendants' price match program was offered to the general public. Those discounted matched prices were not one time lower cash prices. Because California, Illinois, Washington and Utah regulations do not provide otherwise, the "usual and customary" price for Medicaid in those States is defined as the "cash price offered to the general public." Relying on *Garbe*, the Relators contend the Defendants' lower matched prices, offered to the general public and widely and consistently available, are the usual and customary prices for their drugs and, further, Medicare Part D and Medicaid were entitled to those actual usual and customary prices.

The Defendants claim that *Garbe* has a limited impact on this case, as its facts differ significantly from the facts of this case. They point to a district court case from California, *Corcoran v. CVS*, No. 15-cv-03504, 2017 WL 3873709 (N.D. Cal. Sept. 5, 2017), as being more analogous to this case. However, the Ninth Circuit has since reversed the district court's grant of summary judgment and other rulings

and remanded the case for further proceedings. *See Corcoran v. CVS Health Corporation*, ___ F. App'x ___, 2019 WL 2454529, at \*3 (9th Cir. June 12, 2019).

The Defendants further allege that Relators have failed to show the submission of any false claims. Moreover, *Garbe* does not affect the required element of "knowledge" that Relators need to prove in order to prevail. *Garbe* also does not affect the required element of "materiality" that Relators must prove in order to prevail in this case.

A. Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The Court construes all inferences in favor of the non-movant. *See Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 925 (7th Cir. 2011). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th

Cir. 2008).  Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor.  *See id*.

    B.  *Garbe* decision

(1)

The Relators claim that Medicare Part D and Medicaid are entitled to usual and customary prices.  In *Garbe*, the Seventh Circuit stated:

> Medicare, Medicaid, and their corresponding regulations mandate that state plans ensure that "payments for services be consistent with efficiency, economy, and quality of care."  [42 C.F.R.] § 447.200 (citing 42 U.S.C. § 1396 a(a)(30)).
>
> . . . .
>
> Taken together, "[t]he purpose of these regulations is clear: state agencies are not to pay more for prescribed drugs than the prevailing retail market price." *United States v. Bruno's, Inc.*, 54 F. Supp.2d 1252, 1257 (M.D. Ala. 1999) (interpreting 42 C.F.R. § 447.512(b), then numbered 42 C.F.R. § 447.331(b)). Regulations related to "usual and customary" price should be read to ensure that where the pharmacy regularly offers a price to its cash purchasers of a particular drug, Medicare Part D receives the benefit of that deal.  See generally *Arkansas Pharmacists Ass'n v. Harris*, 627 F.2d 867, 869 n.4 (8th Cir. 1980).

*Garbe*, 824 F.3d at 644.

In *Garbe*, Kmart introduced a policy of "setting low 'discount' prices for cash customers who signed up for one of its programs, while charging higher 'usual and customary' prices to non-program cash customers, 'to drive as much profit as possible out of [third-party] programs.'" *Id*. at 636.

Kmart contended that the term "general public," as found in the definition of "usual and customary" pricing, excludes individuals participating in its "discount programs." *Id*. at 643. Members of its discount programs "belong to a particular group" representing a subset of its customer base and thus were not members of the general public. *See id*.

The Seventh Circuit rejected Kmart's argument. "Saying that someone is a member of a 'particular' organization . . . does not make it so. We are given no reason to think that there was any meaningful selectivity for the people who joined Kmart's programs, and thus that they could be distinguished in any way from the 'general public.'" *Id*. The Seventh Circuit explained that "barriers to joining the Kmart 'programs' were almost nonexistent" and that "[c]ash customers walking into Kmart do not cease to be members of the general public the minute they are offered—or pushed into—'membership' in Kmart's discount program.'" *Id*. The court stated its interpretation of "general public" is "consistent with the regulatory structure that gave rise to the 'usual and customary' price term." *Id*. at 644.

The court in *Garbe* noted an auditor's testimony that, "under industry practice and the terms of over 1,000 contracts between Kmart and Medicare Part D Benefit Managers and Plan Sponsors, Kmart should have based its reimbursement requests

to the insurance companies handling Medicare Part D on its 'discount program' prices." *Id*. at 636-37.  The court further stated:

> The [usual and customary price] term is included in state regulations, plans and contracts related to Medicare Part D because the Medicare and Medicaid regulations demand that it be.  *Id*. [42 C.F.R.] § 447.512(b).  Its meaning in many state regulations, plans, and contracts is lifted from the federal regulations without significant modification.

*Id*. at 644.  "Unless state regulations provide otherwise, the 'usual and customary' price is defined as the 'cash price offered to the general public.'" *Id*. at 643.

"The CMS Manual has long noted that 'where a pharmacy offers a lower price to its customers throughout a benefit year' the lower price is considered the 'usual and customary' price rather than 'a one-time 'lower cash' price,' even where the cash purchaser uses a discount card."  *Id*. at 644 (quoting CENTERS FOR MEDICARE & MEDICAID SERVS., *Chapter 14—Coordination of Benefits, in* MEDICARE PRESCRIPTION DRUG BENEFIT MANUAL 19 n.1 (2006), https://perma.cc/MW6A-H4P6).  If a pharmacy "offered the terms of its 'discount programs' to the general public and made them the lowest prices for which its drugs were widely and consistently available," those "discount" prices are the pharmacy's "usual and customary" charges for the drugs.  *Id*. at 645.  Medicare Part D and Medicaid are entitled to those usual and customary prices.  *See id*. at 644.

(2)

The Defendants acknowledge the Court cannot disregard applicable Seventh Circuit precedent, though they believe *Garbe* was wrongly decided for a number of reasons, including what they claim is the Seventh Circuit's failure to recognize (1) that the "non-interference" clause contained in 42 U.S.C. § 1395w-111(i) (2003) prohibits CMS from imposing any requirements on the amounts that pharmacies can charge Pharmacy Benefit Managers or Part D sponsors; (2) that the same statutory provision bars CMS both from defining the term "usual and customary" for purposes of the Part D program and from both requiring pharmacies to charge usual and customary prices for covered prescriptions; and (3) that the regulations upon which the panel relied to fashion a "usual and customary" definition for the Medicare Part D program are, in fact, regulations governing entirely different government healthcare programs that have no applicability to Medicare Part D.

*Garbe* makes clear that Medicare Part D and Medicaid are entitled to the benefit of the usual and customary price regularly offered by a pharmacy to its cash customers. *See Garbe*, 824 F.3d at 644. The Defendants' actual usual and customary price can be determined by noting the discount lower cash prices that were offered to the general public and accepted over the years. As in *Garbe*, those were the "lowest prices for which [their] drugs were widely and consistently available."

Significantly, the Defendants' price match program was available to anyone who requested a price match. The Defendants' nationwide advertising publicized the program. Any individual could ask for a price match as long as the programs were available at the particular pharmacy. The pharmacy would them simply verify that the lower price was available at a local pharmacy. Although Kmart required its club members to opt-in to the club, provide basic personal information and pay a $10 fee, *see Garbe*, 824 F.3d at 643, the Defendants' price match program did not have similar barriers. Relying on *Garbe*, in denying the Defendants' motion to dismiss, this Court previously stated: "The offer to the general public determines the usual and customary price—not whether the offer was couched as a discount club or whether a majority of people accepted it." Doc. No. 65 (citing and quoting *Garbe*, 824 F.3d at 645). Accordingly, the Court concludes that Defendants' price match program was an offer to the general public that determined the Defendants' usual and customary price.

Additionally, the Defendants' discounted matched prices were not one time lower cash prices. The Defendants offered these prices throughout the benefit year over the years, beginning in 2006. Albertsons offered its price match program through October 2013, while SuperValu's program continued through December

2016.  Therefore, the lower price constitutes the usual and customary price during those years.  *See Garbe*, 824 F.3d at 644.

The Seventh Circuit noted that the Federal Medicaid regulations applicable to all state Medicaid programs cap pharmacy reimbursement at the "[p]rovider's usual and customary charges to the general public."  *Id*.  "Unless state regulations provide otherwise, the 'usual and customary' price is defined as the 'cash price offered to the general public.'"  *Id*. at 643.

(3)

Upon reviewing the Medicaid regulations for the states of California, Illinois Utah and Washington, the Court finds that those regulations do not otherwise provide a definition of "usual and customary."  Therefore, the applicable definition of usual and customary price for Medicaid reimbursement in the four states is the "cash price offered to the general public."  *Garbe*, 824 F.3d at 643.  To the extent that Defendants contend it was understood in the industry or by the States that the regulatory Medicaid State Plans in effect in California, Illinois and Washington did not capture individualized price matching as part of any definition of usual and customary, the Court is not persuaded.  In determining "usual and customary" price, it is what the state regulations say or do not say that is important.  Because the Defendants offered their price match program to the general public and made those

19

lower cash prices widely and consistently available, the California, Illinois, Utah and Washington Medicaid programs should have received the benefit of those prices. *See id.* at 644-45.

The Court also is not persuaded that *Garbe* is limited to only legally enforceable "offers," and that advertisements about Defendants' willingness to price match local competitors' prices were not legal offers because they did not include set pricing terms. The court in *Garbe* did not discuss the elements of an offer. Its concern was meeting the purpose of the regulations—that state agencies not pay more for prescriptions than the prevailing retail market rate. *See Garbe*, 824 F.3d at 644.

The Defendants also claim that because their price match transactions did not approach a majority of their cash transactions, those prices could not constitute the usual and customary price. However, the Seventh Circuit did not say that the usual and customary price was the price charged to 50.1% of a pharmacy's customers. The key factor is that "Kmart offered the terms of its 'discount programs' to the general public and made them the lowest prices for which its drugs were widely and consistently available." *Garbe*, 824 F.3d at 645. Here, the price match program was available to all of the cash customers, as long as the lower price was verified. Accordingly, the discount cash prices are the usual and customary prices. *See id.*

Because the Defendants offered their price match program to the general public and made those lower cash prices widely and consistently available, the California, Illinois, Utah and Washington Medicaid programs should have also received the benefit of that deal.

The knowledge and materiality elements are not addressed in the Relators' motion.

Ergo, the Relators' first motion for partial summary judgment [d/e 164] is ALLOWED.

The Court finds that Defendants' lower matched prices, offered to the general public and widely and consistently available, are the usual and customary prices for their drugs.

The Court further finds that Medicare Part D and Medicaid were entitled to those actual usual and customary prices.

ENTER: August 5, 2019

    FOR THE COURT:

                                      */s/ Richard Mills*
                                      Richard Mills
                                      United States District Judge