E-FILED
Wednesday, 01 July, 2020  04:24:16 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and | ) | |
| THE STATES OF CALIFORNIA, | ) | |
| DELAWARE, ILLINOIS, INDIANA, | ) | |
| MASSACHUSETTS, MINNESOTA, | ) | |
| MONTANA, NEVADA, NEW JERSEY, | ) | |
| NORTH CAROLINA, RHODE ISLAND, | ) | |
| VIRGINIA, *ex rel*. TRACY SCHUTTE and | ) | |
| MICHAEL YARBERRY, | ) | |
| | ) | |
| Plaintiffs and Relators, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SUPERVALU, INC., SUPERVALU | ) | NO. 11-3290 |
| HOLDINGS, INC., FF ACQUISITIONS, | ) | |
| LLC, FOODARAMA, LLC, SHOPPERS | ) | |
| FOOD WAREHOUSE CORP., | ) | |
| SUPERVALU PHARMACIES, INC., | ) | |
| ALBERTSON'S LLC, JEWEL OSCO | ) | |
| SOUTHWEST LLC, NEW | ) | |
| ALBERTSON'S INC., AMERICAN | ) | |
| DRUG STORES, LLC, ACME | ) | |
| MARKETS, INC., SHAW'S | ) | |
| SUPERMARKET, INC., STAR MARKET | ) | |
| COMPANY. INC., JEWEL FOOD | ) | |
| STORES, INC., and AB ACQUISITION | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

1

## OPINION

RICHARD MILLS, U.S. District Judge:

This is a False Claims Act ("FCA") case.

The Relators allege that the Defendant pharmacies submitted false or fraudulent claims to obtain federal funds from Government Healthcare Programs (GHP) to which they were not entitled.

The Relators claim this occurred through the electronic submission of inflated usual and customary charges to GHPs because Defendants failed to report their cash price matches as their usual and customary price.

## I.      INTRODUCTION

Federal and State GHPs include Medicare, Medicaid, TRICARE and the Federal Employees Health Benefits Program.  The federal government provides beneficiaries of GHPs with prescription drug-benefits through relationships with private subcontractors known as pharmacy benefit managers.  GHPs would offer pharmaceutical benefits, reimbursing those providers who dispense covered drugs to program beneficiaries.  At issue here is the "usual and customary price" that must be reported under the FCA if the Defendants matched Wal-Mart's or other competitors' discount drug prices—specifically the meaning of "usual and customary price" and  whether in submitting claims to GHPs for reimbursement

Defendants were obligated to report any individualized price matches as their usual and customary price.

Plaintiffs United States of America and the States, through the Relators, filed this action alleging violations of the FCA, 31 U.S.C. § 3729 *et seq*., and analogous false claims acts and health care fraud remedial statutes of the Plaintiff States. The Relators seek recovery on the basis of the state statutes and the FCA.[1]

The Relators allege the Defendants have submitted false claims to the Medicaid programs of a number of states through the use of false records and documents, and by failing to disclose material information in presenting their claims. Regarding these states, the Relators do not seek to recover under a false claims act or similarly named health care fraud remedial statute. They allege that because Medicaid is a program jointly funded by the United States and each state, each false claim submitted by the Defendants in those states is a false claim against the United States for the federal share of the claimed amount in violation of the FCA.[2]

As part of a Stipulation, the Medicaid claims relating to the ten Plaintiff States other than California and Illinois have been dismissed. The Medicaid claims related to the ten non-Plaintiff States except for Utah and Washington have been dismissed.

---

[1] The Relators' amended complaint sought recovery based on the false claims and/or health care fraud remedial statutes for California, Delaware, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Jersey, North Carolina, Rhode Island and Virginia.

[2] These non-Plaintiff states include Idaho, Iowa, Maine, Maryland, Missouri, New Hampshire, Oregon, Pennsylvania, Utah, Vermont, Washington and Wyoming.

The Medicaid claims as to the United States, regarding the Federal Financial Participation paid in connection with these 20 states, have been dismissed.

Accordingly, the Relators' claims on behalf of the United States and the States of California, Illinois, Utah and Washington related to Medicaid remain pending. The Relators' claims on behalf of the United States related to Medicare Part D, TRICARE and the Federal Employees Health Benefit Plan also remain at issue.

This Court previously considered the Relators' motion for partial summary judgment based on the Seventh Circuit's decision in *United States ex rel. Garbe v. Kmart*, 824 F.3d 632 (7th Cir. 2016). At issue in that Order granting the Relators' motion for partial summary judgment was the Defendants' Price Match Program and whether those discounted prices constituted the usual and customary prices.

In an Opinion and Order entered on August 5, 2019 which considered the effect of *Garbe*, the Court determined that the Defendants' "discount cash prices" offered through a Price Match Program available to all cash customers "are the usual and customary prices" and that Medicare Part D and the California, Illinois, Utah and Washington Medicaid programs were entitled to those usual and customary prices. *See* Doc. No. 301, at 20. The Court noted that the knowledge element of the FCA was not at issue in the motion for partial summary judgment based on *Garbe*. *See id.* at 21.

4

Pending are the (1) Defendants' motion for partial summary judgment as to all Medicaid claims based on Defendants' assertion that Relators cannot prove each of the FCA elements, including knowledge and materiality; (2) Relators' second motion for partial summary judgment as to inflated Medicare Part D claims submitted to Medco Health Solutions, Inc., based on the Defendants' alleged failure to report their discounted cash prices offered to the general public as their usual and customary prices; and (3) Defendants' motion for partial summary judgment as to the Medicare Part D, TRICARE and FEP claims based on Defendants' assertion that Relators' cannot prove each of the elements under the FCA, including knowledge and materiality.

Also pending is the Defendants' motion for case management procedures regarding related motions for summary judgment under *Safeco Insurance Co. of Am. v. Burr*, 551 U.S. 47 (2007). The motion states that Defendants have filed the aforementioned summary judgment motions in this case that raise identical legal issues to a motion filed by Defendant Safeway, Inc. in *U.S. ex rel. Proctor v. Safeway, Inc.*, case No. 3:11-cv-03406. The Defendants claim that, in the interest of judicial efficiency, the Court should consider both motions together or, alternatively, decide the *Proctor* motion first. That is because the Court's ruling in *Proctor*, which concerns membership-only and price-matching programs, will largely determine its ruling here, which concerns price-matching only. The Court decided the motion in

*Proctor* on June 12, 2020, holding that because there was no authoritative guidance warning Safeway away from what before *Garbe* was an objectively reasonable position, the Relator could not satisfy *Safeco*'s objective scienter standard and thus could not meet the FCA's "knowing" element as a matter of law.

## II.    BACKGROUND

The Defendants' "banners" (i.e. Cub Pharmacy, Osco Drug, etc.) offered a price-match guarantee.  SuperValu and Albertsons operated more than 1,000 pharmacies located inside grocery stores in 24 states during the time at issue between 2006 and 2016.

The Price Match Program began for the Defendants in 2006.  The Defendants claim advertising of the Price Match Program occurred at certain times between 2006 and 2012 but Defendants have had a price match policy in place since the 1980s.  A Price Match Program "override" occurred when pharmacy personnel replaced Defendants' then-current, reported cash "retail" price with a lower competitor price.  Albertsons discontinued the Price Match Program in October 2013.  SuperValu discontinued the Price Match Program in December 2016.

The Defendants' advertisements publicized their practice of matching competitor prices on prescription drugs and generally included disclaimers. Defendants' price match advertisements were disseminated to the public through

various means, such as in-store and pharmacy signage, fliers, circulars, in-store audio announcements, mailers, newspapers of general circulation, on the back of store receipts and Defendants' web pages.  The Price Match Program advertisements described the Defendants' price match policy.

The Relators allege the Defendants' Price Match Program was a "stealthy" discount program that was a response to Walmart's discount prescription drug program.  It was available to anyone who would request that Defendants match a competitor's price.  The Defendants say certain other requirements had to be met before a customer could receive a competitor's lower price, including the fact that the lower price had to be available at a local pharmacy and be verified by pharmacy staff.  No fee was required of customers to participate in the Price Match Program.

The Defendants' price overrides grew from 8.75% of cash sales of all drugs (including drugs that were not available from the competitors at a lower cash price) in 2007 to 39.36% of cash sales of all drugs in 2011.  The Defendants claim these percentages are taken out of context with respect to how many total cash transactions occurred.  Moreover, price-match transactions were at most 26.6% of total cash sales throughout the relevant time period.  The Relators state that price-match overrides occurred as frequently as 18,000 times per week.  When all of the prescriptions filled by the Defendants between 2006 and 2016 are taken into account, at most, 2% were priced-matched prescriptions.

The Defendants did not submit lower matched price cash sales transactions to third-party payors, including GHPs. The Defendants would not allow lower matched prices to be submitted to third party insurance even if a customer specifically asked Defendants to process a price match transaction through the customer's insurance. The Defendants claim doing so would have violated their contracts with these payors. The customer's preference does not control. The contract does.

The Relators allege the Defendants refused to sacrifice profits from third parties by "officially" lowering their prices. Instead, they made an end-run around established law to deprive the Government of discount prices.

In October 2006, soon after Walmart announced its discount generics program, the Defendants estimated that adopting a similar discount generics program would result in tens of millions of dollars of lost profits, 90% of which "would  go to PBMs, Managed Care and other payors due to co-pay and U&C contract language." The Defendants viewed this as a business decision so they would not lose money.

On October 27, 2006, Medco Health Solutions, Inc.'s Senior Director, Bill Strein, sent Defendants' top managers an email entitled "Usual and Customary (U&C) pricing provision reminder" which stated in part:

> [W]e wanted your organization to be reminded of the Usual and Customary pricing provision in all Medco pharmacy network agreements.

8

> Pharmacy is required, by contract, to:
> "Submit Pharmacy's Usual and Customary ("U&C") price, which represents the lowest net price a cash patient would have paid on the day that the prescription was dispensed inclusive of all applicable discounts."
> These discounts include, but are not limited to, senior citizen discounts, loss leaders, frequent shopper, or special customer discounts, competitor's matched price, or other discounts offered customers.  For Medco members or patients, it is expected that their prescription claim will be submitted through TelePAID/POS by pharmacy submitting appropriate pharmacy U&C pricing.

The email was circulated to SuperValu Executive Ron Richmond (Director of Managed Health Care Contracting), Maxine Johnson (Director of Managed Care Operations), Dan Salemi (Vice President of Pharmacy Services) and Chris Dimos (President of Pharmacies).  The Defendants claim the email is immaterial because their relationship with Medco was governed exclusively by contracts and Defendants did not violate any contractual terms with respect to submitted claims processed by Medco during the relevant time period.

On December 27, 2007, Ron Richmond sent an email to SuperValu Executives Pamela Caselius (Marketing Director), Maxine Johnson and Dan Salemi, writing in part:

> As for price matching on the various competitors generic programs, I believe that we have always taken a "stealthy" approach.  We consider this to be something that we do as an "exception" for customer service reasons.  Once we deviate to a process that is more "rule" or routine, we begin to affect the integrity of our U&C price – a slippery slope, as true U&C price is a claim submission requirement for all Medicaid and private commercial Managed Care and PBM agreements.  The financial implication of this is very broad, Please communicate with Max and Dan for a broader discussion on Generic Price matching and/or promotional

activities.

The Defendants promoted price matching in part to "combat" discount generic drug programs offered by Walmart and other competitors. The Defendants' Price Matching Program was designed to retain existing customers and attract new customers.

In October 2008, Defendants' ARx pharmacy application was enhanced with an ongoing price match override feature. The "Ongoing Price Override" 1) processed subsequent fills of the same prescription at the overridden price automatically; 2) maintained a record of the competitor pharmacy whose price had been matched; and 3) automatically logged notes to the prescription on which the override had been performed. Regarding automatic refills, patients were not required to ask for a price match and refills were done automatically.

SuperValu Prescription Pricing Policy (September 2009) stated that "[t]he company will not lose a prescription because of price," and required SuperValu employees responding to price quotes to "Mention service, convenience and price match guarantee." The Defendants say this did not change their longstanding approach to price matching. Customers were still required to take an affirmative action, quote a local competitor and price, and have the pharmacy staff verify the competitor's price before providing the customer with a price match. The Relators dispute that customers had to initiate the price match transaction.

SuperValu's August 2012 Prescription Pricing Policy added the words "[i]f a customer requests that we match the price . . ." to SuperValu's "Prescription Price Match Program" and removed the requirement from the September 2009 Prescription Pricing Policy to "Mention . . . price match guarantee."

Individual pharmacies could not change the usual and customary price reported to third parties, including GHPs. The usual and customary price reported to third parties, including GHPs, "was set by Defendants' corporate pricing department." The Defendants state the usual and customary prices were controlled by applicable third-party contracts or state law. The Defendants generally did not acknowledge or consider discount Price Match Program cash prices when setting the usual and customary prices they reported to third parties.

The Relators dispute the Defendants' assertion that they "sought clarification" from payers regarding the proper reporting of usual and customary price. The Defendants only did this when the Price Match Program "exception" was directly challenged. At best, the Relators claim the Defendants remained deliberately ignorant of their obligations and did not want to let third-party payers find out about the scope of their Price Match Program.

The "PBM Industry Definition of U&C Price" is "generally understood to be the cash price charged to the general public." The Defendants allege the primary Pharmacy Benefit Managers that processed more than 92% of Defendants' total

prescription records and more than 94% of their total amount paid for those prescription records did not consider Defendants' individualized price matching to have altered the usual and customary prices they submitted.  Pharmacy reimbursement is governed by statutory and regulatory requirements.  Contracts between Defendants and Pharmacy Benefit Managers must be construed consistent with those statutes and regulations.

The Defendants allege the Pharmacy Benefit Managers and the state Medicaid programs were well aware of these types of discount programs.  The Department of Justice and relevant States investigated the allegations in Relators' amended complaint for more than three years before declining to intervene.  Moreover, the Pharmacy Benefit Managers and the State Medicaid programs at issue extensively audited Defendants' prescription claims.  The Relators dispute that Pharmacy Benefit Managers and State Medicaid programs were "well aware" of Defendants' Price Match Program.  They allege that Defendants did not provide Pharmacy Benefit Managers and State Medicaid programs with candid and complete disclosure of the scope and operation of their Price Match Program.

A number of summary judgment motions are pending.  Among the issues in each is whether the Relators can meet the FCA's "knowing" element.

III.   DISCUSSION

Summary judgment standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The Court views the evidence and construes all reasonable inferences in favor of the non-movant. *See Driveline Systems, LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). "The court does not assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Driveline Systems*, 36 F.3d at 579 (internal quotation marks omitted). Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

<u>FCA and applicable law</u>

The Defendants allege the summary judgment motions in this case raise the same dispositive legal question as the summary judgment motion based on *Safeco* in *Proctor*—that being whether the Relators can establish that Defendants' position on the meaning of usual and customary prices was objectively reasonable based on the standard announced by the United States Supreme Court in *Safeco Ins. Co. v. Burr*, 551 U.S. 47 (2007). The Defendants assert the Court's recent decision

applying *Garbe* regarding usual and customary prices cannot meet the *Safeco* standard as to any pre-*Garbe* conduct.

(1)

To create a factual dispute on an FCA claim, a relator must establish a knowing falsehood.  *See United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 840 (7th Cir. 2011).  The FCA provides for liability if a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," *see* 31 U.S.C. § 3729(a)(1)(A), or  "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).  A person acts "knowingly" for purposes of the FCA if he: "has actual knowledge of that information;" "acts in deliberate ignorance of the truth or falsity of the information;" or "acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required.  31 U.S.C. § 3729(b)(1)(B).

In *Safeco*, the Supreme Court examined the scienter requirement of the Fair Credit Reporting Act ("FCRA").  The Court noted that "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well."  *Safeco*, 551 U.S. at 57. The Court further observed that the common law has generally judged "recklessness" according to an objective standard and that Safeco's conduct could

not meet the statute's scienter requirement absent an "objectively unreasonable" interpretation of the statute's legal requirements.  *See id*. at 58-60.  The argument that "evidence of subjective bad faith can support a willfulness finding even when the company's reading of the statute is objectively reasonable" is unsound.  *Id*. at 70 n.20.  "Congress could not have intended" to make a defendant liable for knowing or reckless violations if the defendant "followed an interpretation that could reasonably have found support in the courts, whatever [its] subjective intent may have been."  *Id*.  Given that recklessness requires awareness of an objective risk, a defendant cannot act recklessly—let alone knowingly--if the apparent risk it took was "not objectively unreasonable."  *Id*. at 69.

Because "'reckless disregard' . . . is the most capacious of the three" mental states, *see United States v. King-Vassel*, 728 F.3d 707, 712 (7th Cir. 2013), it follows that if a relator is unable to prove recklessness, he also would not be able to establish actual knowledge or deliberate indifference.

The Supreme Court in *Safeco* thought it significant that defendant did not have "the benefit of guidance from the courts of appeals or the Federal Trade Commission (FTC) that might have warned it away from the view it took."  *Id*. at 70.  No such guidance existed except for a letter "written by an FTC staff member to an insurance company lawyer."  *Id*. at 70 n.19.  Because of this lack of guidance, "Safeco's

reading was not objectively unreasonable" and fell well short of constituting reckless disregard. *Id.* at 70.

The United States Court of Appeals for the Seventh Circuit has not addressed whether *Safeco*'s standard with respect to the FCRA applies to the FCA and its scienter requirement. However, every court of appeals to consider the issue has held that it does. *See U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 290 (D.C. Cir. 2015) (noting that under the FCA's knowledge element, the inquiry involves the "objective reasonableness" of the defendant's interpretation of an ambiguous term and whether the defendant was warned away from that interpretation); *U.S. ex rel. Streck v. Allergan Inc.*, 746 F. App'x 101, 106 (3d Cir. 2018) (quoting *Purcell* and stating that because of the "knowing" requirement, "the FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation. Nor does it reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations."); *U.S. ex rel. McGrath v. Microsemi Corp.*, 690 F. App'x 551, 552 (9th Cir. 2017) (finding that scienter under the FCA could not be established because defendant's good faith interpretation of a key term in the applicable regulation was reasonable); *U.S. ex rel. Donegan v. Anesthesia Associates of Kansas City, PC*, 833 F.3d 874, 879-80 (8th Cir. 2016) (concluding FCA scienter could not be established under *Safeco* barring evidence of government guidance warning a regulated defendant away from an otherwise

reasonable interpretation of an ambiguous regulation).  The court in *U.S. ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645 (5th Cir. 2017) cited *Safeco* with approval and found the trial testimony supported the defendant's assertion that a "reasonable interpretation of any ambiguity inherent in a regulation belies the scienter necessary" to violate the FCA.  *Id*. at 657-58 & n.39.

This high bar is important in that it "avoid[s] the potential due process problems posed by 'penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule.'"  *Purcell*, 807 F.3d at 287. The Defendants contend that, as those courts of appeal have found, the Supreme Court's analysis of the common-law definition of recklessness with respect to the FCRA in *Safeco* applies with equal force regarding the FCA.  The Seventh Circuit has endorsed that principle, stating that "mere differences in interpretation growing out of a disputed legal question" involving a contractual term cannot violate the FCA.  *Yannacopoulos*, 652 F.3d at 836 (internal quotation marks).  Because the FCA requires a knowingly false statement, 31 U.S.C. § 3729(a)(1)(B), a defendant lacks knowledge if "the particular false statements were the result of a difference in interpretation or even negligence."  *U.S. ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 561-62 (7th Cir. 2015).

In *Proctor*, this Court noted that every court of appeals to address the issue has found that the Supreme Court's analysis of the common-law definition of

recklessness as to the FCRA in *Safeco* applies equally to the FCA and that the Seventh Circuit had approved the principle.  This Court agreed with those circuit courts and found that *Safeco*'s standard applies to the FCA and its scienter requirement.

Relying on *Garbe*, this Court previously determined that Defendants' "discount cash prices" offered through a Price Match Program "are the usual and customary prices."  The issue now is whether the Defendants' interpretation of "usual and customary price" was objectively reasonable at the time of their Price Match Program.  If there was more than one reasonable interpretation of "usual and customary price" and Defendants' interpretation was consistent therewith, a defendant should not be treated as a "knowing or reckless violator." *See Safeco*, 551 U.S. at 70 n.20.  "Congress could not have intended such a result for those who followed an interpretation that could reasonably have found support in the courts." *Id*.  Additionally, the Seventh Circuit's decision to address  whether the district court correctly identified the "usual and customary" price, *see  Garbe*, 824 F.3d at 637, suggested the issue was one "as to which there is substantial ground for difference of opinion" at the time.  28 U.S.C. § 1292(b).

The question becomes whether "there was 'guidance from the courts of appeals' or relevant agency 'that might have warned [the Defendants] away from the view they took.'" *Purcell*, 807 F.3d at 289 (quoting *Safeco*, 551 U.S. at 70).  The

Price Matching Programs at issue ran between 2006 and 2016. *Garbe* was decided on May 27, 2016. The mandate issued on July 26, 2016, which was after the Defendants had submitted almost all of their allegedly false claims. Moreover, the United States Supreme Court denied certiorari in *Garbe* on January 9, 2017, *see* 137 S. Ct. 627, after the Defendants had stopped their Price Match Programs altogether. Accordingly, *Garbe* could not have warned the Defendants away from the view they took. Unless there was some other guidance such as a contract, binding agency rule or court of appeals decision prohibiting Defendants' interpretation of the "usual and customary" price at the time of their Price Matching Programs, then Defendants conduct would have been objectively reasonable and not knowingly false.

If an objectively reasonable interpretation of the law supported its conduct, however, the Defendants could not actually know they were violating a legal obligation. Otherwise, two actors could engage in the same conduct on the exact same facts and be subject to different liability under the FCA based on how they subjectively interpret the law. Such a result is not permitted under *Safeco*. This "[s]trict enforcement of the FCA's knowledge requirement" serves to prevent a party from becoming liable due to an innocent mistake, thereby "avoiding the potential due process problems posed by penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule." *Purcell*, 807 F.3d at 287. The court in *Purcell* overturned a jury verdict finding FCA violations because

the defendants "could reasonably have concluded" their conduct was permitted, even though defendants subjectively believed they were wrong and one witness "knew" they were wrong.  *See id*.  Subjective intent is "irrelevant" if a defendant has a reasonable interpretation.  *See id*. at 290.  In order for the conduct to be "knowingly" or "recklessly" illegal, therefore, an authoritative interpretation must exist stating that it is.  Here, there does not appear to be any such authoritative interpretation.

(2)

The Defendants first contend their interpretation was objectively reasonable because their Price Match Programs did not impact the usual and customary price given that the governing contracts and regulations did not equate discounted prices with the usual and customary price.  Even if their interpretation is wrong, the Defendants assert it is at least a reasonable one.

The Defendants further note that before, while and after their allegedly fraudulent conduct took place, numerous courts have issued rulings either adopting their position or acknowledging that the phrase "usual and customary" is susceptible to multiple interpretations.  They point to district court decisions both from within and outside the Seventh Circuit showing how different courts have interpreted the phrase. *See Forth v. Walgreen Co.*, 2018 WL 1235015, at \*5 (N.D. Ill. Mar. 9, 2018) (noting Walgreen's assertion that "because cash-paying customers need to opt in to

the [discount program] and pay a yearly membership fee to access [discount] prices, such prices cannot qualify as U&C prices"); *Madison v. Mississippi Medicaid Comm'n*, 86 F.R.D. 178, 188 n.*** (N.D. Miss. 1980) (stating discount prices offered to a portion of customers "would be excluded from the usual and customary calculations unless the patients receiving the favorable prices represent more than 50 percent of the store's prescription volume"); *U.S. ex rel. Garbe v. Kmart Corp.*, 73 F. Supp.3d 1002, 1015 (S.D. Ill. 2014) (stating "with respect to government programs . . . U&C is defined by the relevant contract and/or payer sheet of the PBMs [and] [w]ith respect to state Medicaid programs, U&C is defined by statute or regulation"); *Corcoran v. CVS Health*, 2017 WL 3873709, at *14 (N.D. Ca. Sept. 5, 2017) (finding that specific terms of each PBM contract controlled whether defendants were "required to submit the [discount] program prices as U&C" and concluding none did), *rev'd*, 779 F. App'x 431, 433 (9th Cir. June 12, 2019) (finding there were genuine issues of material fact concerning the meaning of U&C which required the reversal of summary judgment); *U.S. ex rel. Gathings v. Bruno's, Inc.*, 54 F. Supp.2d 1252, 1257 (M.D. Ala. 1999) ("This court agrees that, in the context of the federal and Alabama regulations, '[usual and customary charge to the] general public' refers to customers paying the prevailing retail price.").

Based on those authorities showing there was more than one reasonable interpretation of "usual and customary price," the Defendants allege they cannot be

treated as a "knowing or reckless violator." *See Safeco*, 551 U.S. at 70 n.20. *Id*. Based on the aforementioned district court cases and the lack of any controlling authority at the time, it would be difficult to describe the Defendants' pre-*Garbe* position as objectively unreasonable.

The Defendants allege *Garbe* confirms this was an unsettled legal question at the time. The district court in *Garbe* had held that U&C means "cash price to the general public," and that "members of Kmart's generic discount programs are part of the 'general public.'" *Garbe*, 73 F. Supp.2d at 1014, 1017. The district court certified three questions for interlocutory appeal under 28 U.S.C. § 1292(b) and the Seventh Circuit "added the question whether the district court correctly identified the "usual and customary" price." *Garbe*, 824 F.3d at 637. Based on the standard under § 1292(b) that district judges are directed to employ, the Defendants allege the issue was one "as to which there is substantial ground for difference of opinion." 28 U.S.C. § 1292(b).

As noted earlier, this Court based its previous Order on *Garbe*, "apply[ing] the law that was so clearly established by the Seventh Circuit," as the Relators alleged in their motion for partial summary judgment. D/E 164, at 2; *see also* 2019 WL 3558483, at *6 ("*Garbe* makes clear that Medicare Part D and Medicaid are entitled to the benefit of the usual and customary price regularly offered by a pharmacy to its cash customers."). By adding "whether the district court correctly

identified the 'usual and customary' price" to the issues certified by the district court in *Garbe*, s*ee Garbe*, 824 F.3d at 637, the Seventh Circuit appeared to determine the issue of generic drug discount programs and usual and customary price was sufficiently debatable to be addressed.

<u>Medicaid claims</u>

The Defendants contend the Relators have not shown any facts demonstrating that Defendants knowingly submitted false claims that were material to the Government's payment decision as to the four Medicaid programs that are still at issue.

The Court finds that, as in the appellate court cases interpreting *Safeco*— including *Purcell*, *Streck*, *Hixson* and others—there was no authoritative guidance from any court of appeals or CMS at the time the Defendants submitted the relevant claims that could have warned them away from their objectively reasonable interpretation. As the Defendants note, *Garbe* was the only decision this Court applied when concluding that "discount cash prices are the usual and customary prices" under the California, Illinois, Utah and Washington Medicaid programs.

The Seventh Circuit decided *Garbe* in May 2016 and the mandate was issued and became effective on July 26, 2016, meaning the parties in *Garbe* were bound by the decision. Fed. R. App. P. 41. In January 2017, the Supreme Court denied

certiorari in *Garbe*, after all the alleged false claims had been submitted in this case. No court of appeals had determined that discount cash prices constituted the usual and customary prices before the Seventh Circuit decided *Garbe*.  Accordingly, there was no appellate court guidance to warn the Defendants away from their position. The Defendants point out there is still no appellate guidance in most states where they operated.  There also was no controlling state authority at the time in the form of the Medicaid laws in effect for California, Illinois, Utah and Washington which addressed individualized price-matching as part of the usual and customary definition.  To the extent that any state changed its usual and customary price definition to include price matching, material changes to State Medicaid plans must first receive federal approval pursuant to 42 C.F.R. § 430.12(c)(1)(ii).  The effective usual and customary definitions in the relevant states which lacked federal approval could not have included individualized price match programs.

The meaning of the usual and customary provisions of these state regulations is at least ambiguous, which would make it impossible for the Relators to establish that the claims are false.  *See Safeco*, 551 U.S. at 70 n.20 (noting that if "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator").  Before *Garbe*, the meaning of "usual and customary" within the pharmacy industry did not

encompass individualized price-matching as defined by State Medicaid legal authorities.  In certain instances when a statute, regulation or provider manual language was unclear, the Defendants sought clarification regarding whether a particular state's U&C definition applied to their individualized Price Match Program.

Based on the foregoing, the Defendants could not have acted knowingly or deliberately indifferent or in reckless disregard of whether they were required to submit the lower price-match amount as their usual and customary prices. Accordingly, the Court concludes that no material facts show that Defendant could have acted knowingly under the FCA as to the applicable claims submitted to Medicaid.

### Alleged false claims submitted to Medco Health Solutions

The Relators moved for partial summary judgment contending that, as a matter of law, the Defendants submission of inflated false claims for payment to Medco Health Solutions, Inc., results in FCA liability.

Medco is a Pharmacy Benefit Manager that processed claims for certain Medicare Part D beneficiaries.  The Relators allege the Defendants submitted inflated false claims for payment to Medco by misrepresenting their usual and customary prices charged by the Defendants for prescriptions sold to GHP

beneficiaries by failing to report the discounted cash prices offered through their Price Match Program to the general public at their pharmacies nationwide. The Defendants contend no evidence supports a finding that they knowingly submitted any false claims to Medco.

Based on the October 27, 2006 email to the Defendants' executives, the Relators allege the Defendants knew that Medco required their Medicare Part D claims for payment to be limited to the lower of the negotiated price or the usual and customary price. The Defendants knew that Medco expressly required that their usual and customary price include "all applicable discounts" including a "competitor's matched price."

The Relators also note that in a December 2007 email to his colleagues, SuperValu's Director of Managed Care Contracting, Ron Richmond, wrote that the Price Matching Program used a "stealthy approach." He warned of the "very broad" financial implications if the Price Matching Program became more of a "rule" or routine. The Relators allege the Defendants' approach allowed them to hide discounted prices from Pharmacy Benefit Managers while still offering price incentives to attract and keep pharmacy customers.

In June 2008 Maxine Johnson, Director of Managed Care Operations, advised other SuperValu executives that Medco viewed Walgreens' $4 discount program to

be its usual and customary price.  However, the Relators contend that Defendants continued to offer and provide their cash price match guarantee to the general public at its pharmacies nationwide, while hiding this information from GHPs such as Medco.

The Relators further assert that, from the outset in 2006, SuperValu executives were aware of the financial implications if they reported their discounted price matches as their usual and customary price to third party payers.  SuperValu calculated potential losses of approximately $70 million annually were it to implement a program such as Walmart's.  Additionally Dan Salemi, SuperValu's Vice President of Pharmacy Services, had reservations about offering a generic discount card because that would necessarily involve public dissemination of the discount prices offered in the Price Match Program.  Salemi was concerned that public disclosure of the discount prices would result in Medco reducing the Defendants' reimbursements correspondingly.

The record does show that Defendants' executives expressed concerns about the financial hit if their Price Match Programs became widely known and they had to report their individualized price matches as their usual and customary prices.  As the Court stated in *Proctor*, regardless of the Defendants' subjective beliefs and/or their internal motivations, it is the contracts or other authoritative guidance that controls.  Between 2006 and 2012, the Defendants' contract with Medco did not

define usual and customary price.  Upon Medco's acquisition by Express Scripts, Inc., the December 2009 contract between Express Scripts and Defendants (and later versions executed by the parties) that excluded price matches from the definition of usual and customary price controlled the submission of Defendants' claims for reimbursement from that time forward.  The record does not show that Express Scripts ever objected to Defendants' price-match practices, viewed price matches as affecting usual and customary prices or otherwise objected to the Defendants' usual and customary submissions.

The Defendants relied on the contracts and did not act with actual knowledge, or in deliberate ignorance or reckless disregard, when submitting their regular cash prices as their usual and customary prices—rather than the lower price-match amounts.  Moreover, the Defendants attempted to clarify usual and customary terms when the need arose.

The Court further notes that Bill Strein's 2006 email to Defendants, which references "competitor's matched price" as requiring submission as U&C price under Medco's pharmacy's network agreements, could be interpreted to refer to universal price matching as opposed to individualized price matching.  The record does not show that Medco specifically reviewed or challenged Defendants' price-match practices, viewed Defendants' price matches as affecting U&C prices, or otherwise objected to Defendants' U&C submissions.

28

Based on their reasonable interpretation of the contracts and good faith belief they had complied with the definitions of usual and customary price, the Court concludes that Defendants did not knowingly violate the FCA with respect to the claims submitted to Medco.

<u>Medicare Part D, TRICARE and FEHBP claims</u>

The Defendants also move for partial summary judgment on the basis they did not knowingly submit false claims for payment to the federal healthcare programs Medicare Part D, TRICARE or the Federal Employee Health Benefits Program by reporting their own usual and customary prescription-drug prices instead of local competitors' prices, which Defendants occasionally price-matched.

As the Court has noted, the Defendants' individualized price matching did not affect the usual and customary prices, as defined in their contracts with Pharmacy Benefit Managers.  Any such obligation to include individualized price matching would have been governed by the contracts.  The record shows that the Defendants sought guidance from the Pharmacy Benefit Managers if there was a question about whether price matches would affect usual and customary price.

When the claims were submitted to GHPs between 2006 and 2016, the Defendants did not have actual knowledge, were not deliberately indifferent and did not recklessly disregard any contractual provision defining the usual and customary

price when they submitted their regular cash prices and not the lower price-match amounts to Medicare Part D, TRICARE and the Federal Employees Health Benefit Programs. The Seventh Circuit had not yet decided *Garbe* so the Parties did not have the benefit of that decision in determining whether individualized price matching constituted the usual and customary price.

Accordingly, no material facts indicate the Defendants could have acted knowingly under the FCA when submitting claims for payment to Medicare Part D, TRICARE and FEHBP. The Defendants are entitled to summary judgment.

## IV.   CONCLUSION

For the reasons stated herein and, consistent with its decision in *Proctor*, the Court concludes that *Safeco*'s objective scienter standard applies to the FCA. The Defendants' individualized Price Matching Program had been discontinued by the time the Supreme Court denied certiorari in *Garbe*. Accordingly, the Defendants could not look to the reasoning of *Garbe* in determining whether its individualized price matches had to be reported as its usual and customary price. There was no other guidance in the form of contracts, court of appeals decisions or binding authority from the applicable agency, which means that Relators cannot meet the FCA's scienter requirement. *See Purcell*, 807 F.3d at 287-88. As the Court noted in *Proctor*, there was authority is support of both parties as to how price matching

affected usual and customary price.   However, there was no binding authority warning the Defendants away from their position.

"[W]ithout knowledge of falsity there cannot be a knowingly false claim" under § 3729 of the FCA.  *United States ex rel. Hill v. City of Chicago*, 772 F.3d 455, 456 (7th Cir. 2014).  Having determined that the Relators cannot establish the FCA's knowing element as a matter of law, the Court concludes that the Defendants are entitled to summary judgment.

Ergo, the Defendants' Motion for Partial Summary Judgment as to Medicaid claims [d/e 168] is GRANTED.

The Relators' Second Motion for Partial Summary Judgment relating to False Claims submitted by Defendants' to Medco Health Solutions, Inc. [d/e 169] is DENIED.

The Defendants' Motion for Partial Summary Judgment as to Medicare Part D, TRICARE and FEP claims [d/e 175] is GRANTED.

The False Claims Act claims asserted in Count I are Dismissed with Prejudice.

Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

31

The state law claims asserted in Counts II through XIII are Dismissed without Prejudice.

The Clerk will terminate the Defendants' Motion for Case Management Procedures regarding related *Safeco* Motions for Summary Judgment [d/e 320].

The Clerk will enter Judgment in favor of the Defendants and terminate this case.

ENTER: July 1, 2020

FOR THE COURT:

/s/ *Richard Mills*

Richard Mills
United States District Judge