# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | |
|---|---|
| **THE UNITED STATES OF AMERICA et. al,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 11-CV-3290** |
| ) | |
| **SUPERVALU, INC., et. al,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>OPINION AND ORDER</u>

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE:**

Before the Court are Plaintiffs' Motion for Summary Judgment as to Scienter (d/e 359), Motion for Summary Judgment as to Materiality (d/e 366), Defendants' Motion for Summary Judgment (d/e 370), the parties' Responses in Opposition (d/e 371, 374, 375) as well as the Replies thereto (d/e 385, 386, 387). For the following reasons, Plaintiffs' Motion for Summary Judgment as to Scienter (d/e 359) and Defendants' Motion for Summary Judgment (d/e 370) are DENIED. Plaintiffs' Motion for Summary Judgment as to Materiality (d/e 366) is GRANTED.

## I.    INTRODUCTION

The Relators allege that the Defendant pharmacies submitted false or fraudulent claims to obtain federal funds from Government Healthcare Programs to which the pharmacies were not entitled. The Federal Government provides beneficiaries of Government Healthcare Programs with prescription drug-benefits through relationships with private subcontractors known as pharmacy benefit managers. Government Healthcare Programs offer pharmaceutical benefits, reimbursing those providers who dispense covered drugs to program beneficiaries.

At issue here is the "usual and customary price" that must be reported under the False Claims Act if the Defendants matched Wal-Mart's or other competitors' discount drug prices. The parties dispute the meaning of "usual and customary" price. The parties also dispute the implications of Defendants' price matching program on usual and customary price. Specifically, were Defendants, when providing customers a "price match," required to report those lower prices provided by their pharmacies to Government Healthcare Programs.

Plaintiffs, United States of America, and the States, through the Relators, filed this action alleging violations of the False Claims Act,

31 U.S.C. § 3729 *et seq,* and analogous false claims acts and health care fraud remedial statutes of the Plaintiff States. The Relators seek recovery based on state statutes and the False Claims Act.

On August 5, 2019, the Court entered an Order and Opinion granting partial summary judgment in Relator's favor. (d/e 301). At issue in that Order was the Defendants' price match program and whether those discounted prices constituted the usual and customary prices. The Court granted summary judgment as to falsity regarding Defendants reporting of "usual and customary" pricing. Specifically, the Court, pursuant to *Garbe* determined that the Defendants' "discount cash prices" offered through a price match program available to all cash customers "are the usual and customary prices." *See United States ex rel. Garbe v. Kmart,* 824 F.3d 632, 645 (7th Cir. 2016) (holding the offer to the general public determines the usual and customary price – not whether the offer was couched as a discount club or whether a majority of people accepted it.) Further, Medicare Part D and Medicaid programs were entitled to those usual and customary prices. *Id.* at 644. (d/e 301, p. 19-20).   On February 16, 2024, Defendants filed a Motion to

Reconsider the Court's August 2019 Order and Opinion, which was denied. (d/e 391, April 26, 2024, Order and Opinion).

## II.   BACKGROUND

The parties have provided the facts to the Court on numerous occasions, and the Court restates them as follows. Defendants offered a price match guarantee. The Relators allege that this price match program for the Defendants began in the Fall of 2006. Defendants, however, claim they have had a price match policy in place since the 1980s. Defendants claim advertising of the price-matching program occurred at various times between 2006 and 2012. A price match program "override" occurred when pharmacy personnel replaced Defendant's then-current, reported cash "retail" price with a lower competitor price. Albertson's discontinued the price-match program in October 2013, and SuperValu did so in December 2016.

The Defendants' advertisements publicized Defendants' practice of matching competitor prices on prescription drugs and generally included disclaimers. Defendants' price match advertisements were disseminated to the public through various means, such as in-store and pharmacy signage, fliers, circulars, in-

store audio announcements, mailers, newspapers of general circulation, on the back of store receipts, and Defendants' web pages.

The Relators allege the Defendants' price match program was a "stealthy" discount program and a direct response to Wal-Mart's discount prescription drug program. Relators also argue the price match program was available to anyone who requested that Defendants match a competitor's price. Defendants argue that certain other requirements had to be met before receiving a competitor's lower price including verification of the lower price by pharmacy staff. No fee was required for customers to participate in the price match program.

In 2007, the Defendants' price overrides were 8.75% of cash sales of all drugs and grew to 38.65% in 2011. The Defendants claim these percentages as reported are taken out of context as to how many total cash transactions occurred. Further, price match transactions were at most 26.6% of total cash sales throughout the relevant time period. Notably, when all prescriptions filled by the Defendants between 2006 and 2016 are taken into account, a nominal amount, about 2%, were price-matched prescriptions.

Price match overrides occurred as frequently as 18,000 times per week. The Defendants argue that, across the roughly 1,000 pharmacies that Defendants operate, this number equated to 17 to 18 price overrides per week – about 2.75 price overrides per day for all drugs dispensed to customers. Moreover, the overall number of cash sales in 2011 and 2012 total 6,141,978, which constitutes an average of 59,057 per week across the two-year period.

Defendants did not submit lower matched price cash sales transactions to third-party payors, including Government Healthcare Providers. The Defendants did not allow lower matched prices to be submitted to third party insurance even if a customer specifically asked Defendant to process a price match transaction through the customer's insurance. The Defendants claim that doing so would have violated their contracts with these payors as the customer's preference does not control, but the contract does.

In October 2006, soon after Wal-Mart announced its discount generics program, the Defendants estimated that adopting a similar discount generics grogram could result in tens of millions of lost profits, 90% of which "would go to Pharmacy Benefit Managers, Managed Care and other payors due to co-pay and U&C contract

language." The Defendants argue this analysis and estimation was solely discussed to determine how best to move forward and is not indicative of any knowledge element.

On October 27, 2006, Medco Health Solutions, Inc.'s Senior Director, Bill Strein, sent Defendants' top managers an email entitled "usual and customary (U&C) pricing provision reminder" which stated in part:

> [W]e wanted your organization to be reminded of the Usual and Customary pricing provision in all Medco pharmacy network agreements.
>
> Pharmacy is required, by contract, to:
> Submit Pharmacy's Usual and Customary ("U&C") price, which represents the lowest net price a cash patient would have paid on the day that the prescription was dispensed inclusive of all applicable discounts.
> These discounts include, but are not limited to, senior citizen discounts, loss leaders, frequent shopper or special customer discounts, competitor's matched price, or other discounts offered customers. For Medco members or patients, it is expected that their prescription claim will be submitted through TelePAID/POS by pharmacy submitting appropriate pharmacy U&C pricing.

This email was circulated to SuperValu Executive Ron Richmond (Director of Managed Health Care Contracting), Maxine Johnson (Director of Managed Care Operations), Dan Salemi (Vice President of Pharmacy Services) and Chris Dimos (President of

Pharmacies). The Defendants claim this email is immaterial to any knowledge element because their relationship and requirements with Medco were governed exclusively by contracts, and Defendants did not violate any contractual terms with respect to claims to Medco during the relevant period.

On December 27, 2007, Ron Richmond sent an email to SuperValu Executives Pamela Caselius (Marketing Director), Maxine Johnson and Dan Salemi, writing in part:

> As for price matching on the various competitor generic programs, I believe that we have always taken a "stealthy" approach. We consider this to be something that we do as an "exception" for customer service reasons. Once we deviate to a process that is more "rule" or routine, we begin to affect the integrity of our U&C price – a slippery slope, as true U&C price is a claim submission requirement for all Medicaid and private commercial Managed Care and PMB agreements. The financial implication is very broad, Please communicate with Max and Dan for a broader discussion on Generic Price matching and/or promotional activities. (Doc. 136, Ex. H).

The Defendants promoted price matching in part to "combat" discount generic drug programs offered by Wal-Mart and other competitors. The Defendants' price matching program was designed to retain existing customers and attract new customers.

In October 2008, Defendants' ARx pharmacy application was enhanced with an ongoing price match override feature. This override feature: 1) processed subsequent fills of the same prescription at the overridden price automatically, 2) maintained a record of the competitor pharmacy whose price had been matched, and 3) automatically logged notes to the prescription on which the override had been performed. Defendants note that the pharmacist was still required to validate the competitor's price at the time of each refill. Patients were not required to ask for a price match with automatic refills which were done automatically.

SuperValu Prescription Pricing Policy (September 2009) stated that "[t]he company will not lose a prescription because of price," and required SuperValu employees responding to price quotes to "mention service, convenience and price match guarantee." The Defendants say this did not change their longstanding approach to price matching. Customers were still required to take an affirmative action, quote a local competitor and price, and have the pharmacy staff verify the competitor's price before providing the customer with a price match. Relators dispute that customers had to initiate the price match transaction.

SuperValu's August 2012 Prescription Pricing Policy added the words "[i]f a customer requests that we match the price . . ." to SuperValu's "Prescription Price Match Program" and removed the requirement from the September 2009 Prescription Pricing Policy to "mention . . . price match guarantee."

Individual pharmacies could not change the usual and customary price reported to third parties, including GHPs. The usual and customary price reported to third parties, including GHPs, "was set by Defendants' corporate pricing department." The Defendants state the usual and customary prices were controlled by applicable third-party contracts or state law. The Defendants generally did not acknowledge or consider discount Price Match Program cash prices when setting the usual and customary prices they reported to third parties.

The Relators dispute the Defendants' assertion that Defendants "sought clarification" from payors regarding the proper reporting of usual and customary pricing. Relators argue Defendants only did this when the Price Match Program "exception" was directly challenged. At best, the Relators claim the Defendants remained deliberately ignorant of their obligations and did not want to let third-

party payors find out about the scope of Defendants' Price Match Program.

The "Pharmacy Benefit Manager Industry Definition of U&C Price" is "generally understood to be the cash price charged to the general public." The Defendants allege the primary Pharmacy Benefit Managers that processed more than 92% of Defendants' total prescription records and account for more than 94% of Defendants total amount paid for those prescription records, did not consider Defendants' individualized price matching to have altered the usual and customary prices they submitted. Pharmacy reimbursement is governed by statutory and regulatory requirements. Contracts between Defendants and Pharmacy Benefit Managers must be construed consistent with those statutes and regulations.

The Defendants allege the Pharmacy Benefit Managers and the state Medicaid programs were well aware of these types of discount programs. The Department of Justice and relevant States investigated the allegations in Relators' amended complaint for more than three years before declining to intervene. Moreover, the Pharmacy Benefit Managers and the State Medicaid programs at issue extensively audited Defendants' claims. The Relators dispute

that Pharmacy Benefit Managers and State Medicaid programs were "well aware" of Defendants' Price Match Program. They allege that Defendants did not provide Pharmacy Benefit Managers and State Medicaid programs with candid and complete disclosure of the scope and operation of their Price Match Program.

Relators Motions for Summary Judgment as to Scienter and Materiality (d/e 359, 366), as well as Defendants Motion for Summary Judgment (d/e 370) are all pending. Among the issues in each is whether the Relators can meet the False Claims Act "knowing" element.

### III.   LEGAL STANDARD

A. Summary Judgment Standard

When moving for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the moving party bears the burden of showing, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) & (c); *Hummel v. St. Joseph Cty Bd. of Comm'rs*, 817 F.3d 1010, 1015–16 (7th Cir. 2016). "The moving party has the burden of either: (1) showing that there is an absence of evidence supporting an essential element of

the non-moving party's claim or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Id.* But even where there is no dispute as to the basic facts of a case, summary judgment will not be appropriate "if the parties disagree on the inferences which may reasonably be drawn from those undisputed facts." *Cent. Nat. Life Ins. Co. v. Fidelity & Deposit Co. of Md.*, 626 F.2d 537, 539–40 (7th Cir. 1980). The facts and all reasonable inferences derived therefrom are viewed in the light most favorable to the non-moving party. *Woodruff v. Mason*, 542 F.3d 545, 550 (7th Cir. 2008).

B. False Claims Act

The False Claims Act imposes liability on anyone who "knowingly" submits a "false" claim to the Government. 31 U.S.C. § 3729(a). The two essential elements of a False Claims Act violation are (1) the falsity of the claim and (2) the defendant's knowledge of the claim's falsity. The False Claims Act provides for liability if a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," *see* 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent

claim." 31 U.S.C. § 3729(a)(1)(B). A person acts "knowingly" for purposes of the False Claims Act if he: "has actual knowledge of that information;" "acts in deliberate ignorance of the truth or falsity of this information;" or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1)(A).

In this matter, the Court entered an order on falsity on August 5, 2019. Specifically, the Court found that Defendant's lower matched prices were its "usual and customary" prices as they were offered to the general public and widely and consistently available. (d/e 301). The Court also found by not reporting these matched prices as their usual and customary prices that Defendants submitted claims that were false. *Id.*

On July 1, 2020, this Court granted summary judgment for Defendants based on the scienter element, holding Defendants could not have acted "knowingly" as Defendant's actions in reporting their matched prices were objectively reasonable. (d/e 333). This definition of knowingly and the two-step inquiry applied was taken from *Safeco Ins. Co. of America v. Burr,* 551 U.S. 47 (2007).

The Relators appealed the District Court's Opinion and Order to the Seventh Circuit which affirmed the determinations of the

District Court. The Relators then filed and were granted a writ of certiorari to the United States Supreme Court. The Supreme Court noted that the Seventh Circuit and the District Court's reliance on *Safeco* was misplaced. *United States ex rel. Schutte v. SuperValu Inc.,* 143 S. Ct. 1391, 1404 (2023). Indeed, the Supreme Court noted that *Safeco* interpreted a different statute, the Fair Credit Reporting Act, which had a different *mens rea* standard of "willfully." *Id.* Therefore, *Safeco*'s interpretation of the common-law definitions of "knowing" and "reckless" does not apply to the facts here.

The appropriate standard under the False Claims Act is a subjective one: what did the Defendants know as it related to the claims submitted to various government entities. The Supreme Court has held that plaintiffs may establish scienter under the False Claims Act by showing that defendants "(1) actually knew that their reported prices were not their 'usual and customary' prices when they reported those prices, (2) were aware of a substantial risk that their higher, retail prices were not their 'usual and customary' prices and intentionally avoided learning whether their reports were accurate, or (3) were aware of such a substantial and unjustifiable risk but

submitted the claims anyway." *United States ex rel. Schutte v. SuperValu Inc.,* 143 S. Ct. 1391, 1404 (2023).

In essence, the Supreme Court found the False Claims Act scienter element refers to respondents' knowledge and subjective beliefs. Further, even though the phrase "usual and customary" may indeed be ambiguous, such facial ambiguity is not sufficient by itself, to prevent a finding that Defendant's knew their claims were false. *Id.* at 1399.

## IV.  ANALYSIS

Arguments by both the Relators and the Defendants remain similar to those previously considered by this Court, with the understanding that a different standard applies than the one previously applied. Given that this Court has already granted summary judgment for the Relators as to falsity, and has found that the Defendants lower matched prices, offered to the general public, are the usual and customary prices for Defendants' drugs, the Court will limit its analysis to scienter and materiality.

A. Scienter

The False Claims Act defines the term "knowingly" as encompassing three mental states. *Id.* at 1399-1400. A person either

"has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in disregard of the truth or falsity of the information." § 3729(b)(1)(A)(i)-(iii).

In *United States ex rel. Schutte v. SuperValu Inc.,* the Supreme Court specifically considered the mental state necessary to prove a False Claims Act claim. The Court noted that the text of the False Claims Act tracks the common law scienter requirement for claims of fraud. Further, such connection is unsurprising considering the False Claims Act is a fraud statute. *United States ex rel. Schutte v. SuperValu Inc.,* 143 S. Ct. 1391, 1404 (2023). *See Universal Health Servs. v. United States es rel. Escobar*, 579, U.S. 176, 187-188 (2016). Further, the False Claim Act's definition of "knowing" tracks the common law scienter standard for fraud. *Schutte* at 1400.

The Supreme Court further observed that the language of the False Claims Act and at common law, the False Claims Act standard focuses "primarily on what respondents thought and believed." *Id.* "Actual knowledge "refers to whether a person is "aware of" information. *Escobar,* 579 U.S. at 191. "Deliberate ignorance" encompasses defendants who are aware of a substantial risk that

their statements are false, but intentionally avoid taking steps to confirm the statements' truth or falsity. *See Global-Tech Appliances, Inc.* v. *SEB S. A.*, 563 U. S. 754, 769 (2011). And the term "reckless disregard" relates to defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway. *See Farmer v. Brennan*, 511 U.S. 825, 826 (1994).

Because "'reckless disregard'... is the most capacious of the three" mental states, *see United States v. King-Vassel,* 728 F3d 707, 712 (7th Cir. 2013), it follows that, if a relator is unable to prove recklessness, he also would not be able to establish actual knowledge or deliberate indifference.

Here, Relators argue that Defendants were aware that they were required to report lower cash prices offered to the general public as the usual and customary price. Further, Defendants tried to hide the price matching program from audits and government entities. Relators point to various emails and memoranda from various pharmacy benefit managers in support of Relators contention that Defendants knew that any discount pricing should be reported as a usual and customary price.

Specifically, Relators point to emails from SuperValu executives where they discussed the implications of Wal-Mart's $4 generic program. In September 2006, SuperValu executives calculated how much they would lose in profits each year if they followed Wal-Mart's same scheme. In early October, additional electronic communications were sent between executives with VP Maxine Johnson informing the recipients that pharmacy benefit managers were "asking how we are responding" to Wal-Mart's $4 program. VP Johnson further stated that, if SuperValu did the same program as Wal-Mart, pharmacy benefit managers would consider the $4 prices the usual and customary price on those products.

The Center for Medicare and Medicaid Services specifically issued a memorandum in October 2006 identifying a "lower cash price policy" which was aimed at Wal-Mart's $4 generic program. The memo made clear that the $4 is considered Wal-Mart's usual and customary price and is not considered a one-time lower cash price. This memorandum was followed by some reminders from pharmacy benefit managers on the same topic. Medco, a pharmacy benefit manager, sent SuperValu a pricing provision reminder that the usual and customary pricing included a "competitor's matched price."

Relators cite a December 2007 email from SuperValu's Director of Managed Healthcare Contracting referring to a "stealthy" approach to price matching. Relators place emphasis in this email noting that it again shows that the Defendants knew that their usual and customary price should be reported differently. However, Defendants argue that the emails cited by the Relators, especially the December 2007 email, show no intent for fraud and do not indicate any knowledge of the submission of false claims. Rather, Defendants argue that the email communications show a good faith effort on the part of the Defendants to ensure that their price matching program could continue and had no impact on the usual or customary price.

Indeed, the same emails that Relators point to in 2006 are those that Defendants use to bolster their positions. Although the word "stealthy" is mentioned, Defendants argue that, read in context, "stealthy" is used to reflect a customer service approach rather than a desire to lie or omit price matching to government entities. Defendants argue that they cannot be accused of hiding price matching from pharmacy benefit managers when evaluating scienter, when they have also been accused of marketing their price matching program extensively in direct contrast.

Defendants further argue that there was no specific and consistent industry position as to usual and customary price and whether price matching impacted said price. In support, Defendants provide declarations and communications from pharmacy benefit managers. These declarations, Defendants posit, prove there was disagreement between what various contracts believed usual and customary pricing meant. Defendants also provide evidence of direct correspondence between Defendant executives with various Medicaid administrators and a national pharmacy benefit manager who agreed that price matching did not affect usual and customary price.

Defendants argue that during the relevant time period that their understanding of usual and customary price was the retail price that was offered to a customer who does not use insurance or some other prescription drug benefit.  Further, there was no intent to defraud and Defendants lacked subjective intent to defraud when submitting false claims and, therefore, there was no actual knowledge that they were submitting false claims.

Based on the facts at issue in this matter, there remains an issue of material fact as to whether Defendants' knowledge as to whether their reported prices were not their usual and customary

prices when they reported those prices to various third parties. Defendants conduct and the information presented to them by payors, government entities, and pharmacy benefit managers raises a genuine question as to whether Defendants acted in reckless disregard of the truth or falsity of the claims submitted.

This Court cannot find that either party has proven there is no genuine issue of a material fact at this juncture. The parties disagree on the inferences which may reasonably be drawn from the facts in this matter specifically, and, what information was communicated and known to individuals at various times, so summary judgment is not appropriate. Plaintiff's Motion for Summary Judgment as to Scienter (d/e 359) and Defendants' Motion for Summary Judgment (d/e 370) are DENIED.

B. Materiality

The two essential elements of a False Claims Act violation are falsity and defendant's knowledge of the claim's falsity, but the analysis does not end there. The False Claims Act also requires proof of materiality - meaning whether the alleged misrepresentations had the natural tendency to influence the payment or receipt of funds -

and the involvement of federal funds. *United States ex. rel. Heath v. Wis Bell, Inc.*, 75 F.4th 778 (7th Cir. 2023).

The False Claims Act defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). "What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016).

Materiality is a demanding standard. The Supreme Court in *Escobar* noted that a "misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Id.* at 194. "Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.*

Relators rely on Supervalu's misrepresentation of usual and customary price and argues that that misrepresentation had a natural tendency to influence the payment of money. Specifically, the

false claims, which did not report price matching, sought more money than SuperValu was entitled to receive and clearly implicate the payment of government funds. In essence, Relators argue SuperValu's prices are *per se* material and rely on *Garbe* in support of this argument.

Specifically, the Seventh Circuit held there that the petitioner is only required to show that a respondent's allegedly false claims were material to the respondent's receipt of more money that it should have received. *United States ex. rel. Garbe v. Kmart Corp.,* 824 F3d 632, 639 (7th Cir. 2016). In other words, a respondent's "misstatement had to be 'capable of influencing the decision making body to which [they were] addressed." *Id.* citing *Neder v. United States*, 527 US. 1, 16 (1999).

Defendants, in contrast, argue that Realtors cannot show any false claims submitted were material to the Government's payment decision or that any purported false claims caused the Government's payment decisions. Further, Defendants argue Relators utilize an incorrect standard for determining materiality. A petitioner must show the false claims were "material to the Government's payment decision." *Escobar* at 181. According to Defendants, Realtors must

3:11-cv-03290-SEM-KLM   # 437   Filed: 09/30/24   Page 25 of 27

have evidence that the Government's decisions would likely or actually have been different had it known SuperValu was not reporting the usual and customary price or adhering to Medicaid guidelines by reporting an incorrect one.

Here, Relators have offered some evidence from which a factfinder could infer that the false or inflated claims are ones that Government entities would have considered so important to "likely or actually" change its decision to reimburse SuperValu. Specifically, the Relators have offered expert testimony how frequently price matching was conducted, the difference in the retail price SuperValu reported versus the price that was actually given to the customer, and the alleged "overage" that SuperValu was provided.

However, Defendants also provide evidence that at least some payors were aware of SuperValu's price matching throughout the relevant ten-year time period. Defendants point to conversations with pharmacy benefit managers, negotiations in contracts, and communication seeking clarification on usual and customary price. Defendants further argue that there is no materiality here where payors actually knew of their price matching and the false claims based on incorrect usual and customary pricing and paid these

claims regardless. Specifically, Defendants argue that payors conducted 12,433 audits of SuperValu pharmacies and never refused to pay a claim on the ground that prices matches were not included in the calculation of usual and customary prices.

Although some payors may have known about the Defendants price matching, there is no evidence they knew claims submitted were false, in that the usual and customary price was inflated, and continued to pay the Defendants. The Seventh Circuit, in *Garbe,* found that a misstatement regarding the collection of more money than actually owed was sufficient to establish materiality. The actions of the Defendants are incredibly similar here. Therefore, this Court finds that Defendants' falsely submitted claims are indeed capable of influencing the payment or receipt of money. Therefore, Relators are entitled to summary judgment as to materiality.

## CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment as to Scienter (d/e 359) and Defendants' Motion for Summary Judgment (d/e 370) are DENIED. Plaintiff's Motion for Summary Judgment as to Materiality (d/e 366) is GRANTED.

**IT IS SO ORDERED.**
**ENTERED: September 30, 2024.**
**FOR THE COURT**

*/s/ Sue E. Myerscough*

**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**