# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS
# SPRINGFIELD DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, and THE STATES OF CALIFORNIA, DELAWARE, ILLINOIS, INDIANA, MASSACHUSETTS, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NORTH CAROLINA, RHODE ISLAND, and VIRGINIA *ex rel.* TRACY SCHUTTE and MICHAEL YARBERRY, § § § § § § § § § | |
| Plaintiffs, § | No. 11-cv-03290 |
| § § | |
| v. § § | |
| SUPERVALU, INC., SUPERVALU HOLDINGS, INC., FF ACQUISITIONS, LLC, FOODARAMA, LLC, SHOPPERS FOOD WAREHOUSE CORP., SUPERVALU PHARMACIES, INC., ALBERTSON'S, LLC, JEWEL OSCO SOUTHWEST LLC, NEW ALBERTSON'S, INC., AMERICAN DRUG STORES, LLC, ACME MARKETS, INC., SHAW'S SUPERMARKET, INC., STAR MARKETS COMPANY, INC., JEWEL FOOD STORES, INC., and AB ACQUISITION LLC, § § § § § § § § § § § § § § § | |
| Defendants. § § § | |

**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FEDERAL RULE OF CIVIL PROCEDURE 50(b)**

1

## INTRODUCTION

After a three-and-a-half week trial, the jury found for Defendants (collectively, "SuperValu") on causation and this Court entered judgment in Defendants' favor. As the prevailing party at trial, SuperValu does not need to renew its motion for judgment as a matter of law to preserve all arguments. *See Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 n.3 (7th Cir. 2012) ("It would waste time and resources to require a party to move for judgment as a matter of law under Rule 50(b), formerly denominated 'judgment *notwithstanding* the verdict,' if that party has obtained a jury verdict in its favor."). But an outlier, out-of-circuit case to the contrary leads SuperValu to file this motion for avoidance of any doubt.[1] *See Babin v. Plaquemines Par.*, 2022 WL 3097852, at *2 (5th Cir. Aug. 3, 2022) ("Although the [prevailing party] raised this argument in a Rule 50(a) motion for judgment as a matter of law, it did not renew this motion after trial under Rule 50(b). Without a Rule 50(b) motion, we cannot review the [prevailing party's] argument [on appeal].").

SuperValu is entitled to judgment as a matter of law on the issue of scienter under Rule 50(b). At trial, Relators presented no evidence from which a reasonable jury could conclude that

---

[1] SuperValu files this motion twenty-eight days after the Court entered judgment in this case. *See* Dkt. 563 (entering judgment on the docket on March 12, 2025); Fed. R. Civ. P. 50(b) ("No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law."); *Massey v. Blue-Cross-Blue Shield of Ill.*, 1999 WL 703727, at *8 (N.D. Ill. Aug. 26, 1999), *aff'd*, 226 F.3d 922 (7th Cir. 2000) ("As the Seventh Circuit has made clear, a judgment is not effective (and, thus, the time does not start running for a motion for judgment as a matter of law or for an appeal) until two things have occurred: (1) the judgment has been set forth in writing on a separate document pursuant to rule 58 of the Federal Rules of Civil Procedure, and (2) the judgment so set forth must be entered in the civil docket as provided by Rule 79(a)." (cleaned up)).

SuperValu had a culpable mental state. The Court should enter judgment for SuperValu on scienter.[2]

## ARGUMENT

**I.  Legal Standard**

The Court may resolve an issue against a party if, after the "party has been fully heard on [the] issue," "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). If the Court denies or defers ruling on a Rule 50(a) motion and the jury returns a determination against the moving party, that party "may file a renewed motion for judgment as a matter of law" under Rule 50(b). When it reviews such a Rule 50(b) motion, the Court is to decide whether "the evidence presented at trial, with all the reasonable inferences drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the prevailing party." *Gower v. Vercler*, 377 F.3d 661, 666 (7th Cir. 2004) (cleaned up).

**II.  SuperValu Did Not Have Scienter**

Judgment should be entered for SuperValu on the element of scienter because the evidence presented at trial on that element "support[ed] but one conclusion—the conclusion not drawn by the jury." *Ryl-Kuchar v. Care Ctrs., Inc.*, 565 F.3d 1027, 1030 (7th Cir. 2009).

The False Claims Act punishes fraud on the government, not good-faith mistakes or negligence. To establish liability, therefore, a relator must prove the defendant's submission was

---

[2] SuperValu also expressly preserves the arguments it raised in its summary judgment briefing that Relators did not and cannot establish the elements of falsity or materiality. *See* Dkts. 172; 176; 370; 391. Because these elements were not tried to the jury, a post-trial motion is not required to preserve them for appeal, *Dupree v. Younger*, 598 U.S. 729, 738 (2023), and they are not argued further below, but in the interest of clarity SuperValu expressly notes its intent to preserve these arguments.

"knowing[]." 31 U.S.C. § 3729(a)(1)(A). The Act defines a knowing state of mind to mean (1) actual knowledge, (2) "deliberate ignorance of . . . truth or falsity," or (3) "reckless disregard of . . . truth or falsity." *Id.* § 3729(b)(1)(A)(i)-(iii). Relators did not prove at trial either that SuperValu subjectively believed that the claims it submitted were false, as would be required to show actual knowledge, or that SuperValu was aware of a substantial and unjustifiable risk that the claims were false, as would be required to show deliberate ignorance or reckless disregard. *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749-50 (2023).

*First*, every single SuperValu employee who was asked testified they did not believe SuperValu's decades-old price matching program affected its "usual and customary" price. When asked whether during his entire career at SuperValu he ever believed price matching was usual and customary, Chris Dimos, the former President of Pharmacy Services, testified that he did not. Day 5, 18:12-15 (Dimos). Daniel Salemi, the Vice President of Pharmacy Services, likewise testified that he did not understand price matches to be usual and customary. Day 2, 85:3-5 (Salemi). Every other SuperValu witness who testified on the issue said the same. *See, e.g.*, Day 3, 40:11-16 (Allgood); Day 6, 89:16-23 (Johnson); Day 7, 28:8-11 (Knutson); Day 7, 174:7-12 (McCann); Day 7, 222:17-18 (Walls). Instead, the undisputed record evidence was that SuperValu viewed price matching as an *exception* to the usual and customary price that could be made for customer service reasons. *See, e.g.*, Day 4, 11:2-21 (Dimos); Day 2, 106:6-17 (Salemi); Day 5, 113:12-18 (Johnson).

*Second*, industry evidence corroborated SuperValu's good-faith belief that its price matches were not usual and customary. *United States ex rel. Patzer v. Sikorsky Aircraft Corp.*, 722 F. Supp. 3d 839, 853-55 (E.D. Wis. 2024) (citing *Schutte*, 598 U.S. at 742) (explaining that industry practice remains "highly relevant" to scienter after *Schutte* because "[i]f defendants

4

acted consistently with industry practice, then it is less likely that they acted with [a] culpable mental state[]"). Every single Pharmacy Benefit Manager witness who appeared at trial testified that their understanding of "usual and customary" during the relevant time period was the same as SuperValu's understanding. It was SuperValu's contracts with the Pharmacy Benefit Managers that *defined* usual and customary. Each Pharmacy Benefit Manager witness was asked about the definitions of "usual and customary" in those contracts, *see, e.g.*, DX 37, 76, and all of them testified that during the period between 2006 and 2016 they never believed those definitions included price matches. For example:

- o Joe Zavalishin testified that while at Aetna, Optum, and Catamaran, he never thought price matching was usual and customary. Day 9, 176:12-17, 177:8-11, 183:7-17, 186:3-11 (Zavalishin); *cf.* Day 6, 97:5-9 (Johnson) (SuperValu did not understand the definition of usual and customary in the Optum contracts to include price matching).

- o Amber Compton testified that while at Express Scripts, Inc. ("ESI") she never believed price matching was usual and customary. In her words: "The price match is not [SuperValu's] usual and customary pricing. Their usual and customary pricing is their usual and customary pricing. The price match is just that; it's matching, it's an exception . . . ." Day 10, 76:13-15, 85:23-86:1, 167:12-16 (Compton); *cf.* Day 6, 102:14-25 (Johnson) ("This is a codification or put into our contract exactly what [SuperValu] had understood before it was actually spelled out.").

- o Brian Correia testified that Caremark "never changed their position on price matching for the thirty-three years that [he] was there . . . [W]e thought they were matching somebody else's usual and customary price. It wasn't that pharmacy's usual and customary price." Day 11, 139:6-13 (Correia); *see also id.* at 27:1-8. Contemporaneous documents reflect the same understanding. *See* DX 8; Day 11, 56:2-14 (Correia).

- o Bill Strein testified that while at Medco he did not understand SuperValu's price-match prices to be usual and customary prices. Day 11, 179:3-6 (Strein).

In addition to the Pharmacy Benefit Manager testimony, Leslie Norwalk, who ran the Centers for Medicare and Medicaid Services when Medicare Part D was created, testified that the industry definition of usual and customary between 2006 and 2016 would not "include price matches in usual and customary." Day 12, 164:21-165:2 (Norwalk). That unrebutted evidence directly

5

contradicted Relators' claim that SuperValu knew or was aware of an unjustifiable risk that price matching affected its usual and customary price.

*Third*, SuperValu's conduct was completely inconsistent with any reasonable inference of scienter. The evidence showed that SuperValu transparently discussed price matching with state Medicaid officials and with Pharmacy Benefit Managers. And those payors, in real time, advised SuperValu that its price matches were *not* usual and customary under the applicable Pharmacy Benefit Manager contracts or the relevant state Medicaid regulations. *See, e.g.*, DX 10, DX 360, DX 631. For example, SuperValu reached out to Pharmacy Benefit Manager Caremark in 2011 to ask whether price matches should be reported under a revised definition of usual and customary. *See* DX 8. Caremark responded confirming that the revised definition did *not* include price matches. *See* DX 8; Day 11, 56:2-14 (Correia). As another example, Idaho officials responded to an inquiry from SuperValu explaining: "If you charge your competitors'[] price to a customer on a case by case basis, only if they specifically ask you to match that price on an individual prescription, we would not consider that your usual and customary charge." DX 360; *see also* DX 631 (same as to Oregon). That correspondence strongly supported SuperValu's understanding that price matches need not be reported as usual and customary. Consistent with this evidence, Maxine Johnson, SuperValu's former Vice President of Managed Care, testified that she was not aware of any state Medicaid official or Pharmacy Benefit Manager ever informing SuperValu that price matches should be reported as usual and customary. Day 6, 90:15-23; 163:7-13 (Johnson).

*Fourth*, even the documents *Relators* chose to emphasize at trial support the conclusion that SuperValu lacked scienter. Relators argued SuperValu understood that Pharmacy Benefit Managers viewed *Walmart's* $4 prices as usual and customary. But each and every document

Relators showed to SuperValu's witnesses demonstrated that both SuperValu and the Pharmacy Benefit Managers viewed the Walmart program as categorically different from SuperValu's price matching policy. That was because, as both SuperValu and Pharmacy Benefit Manager witnesses explained, Walmart offered universal, across-the-board $4 prices, while SuperValu did not. Day 2, 141:17-22 (Salemi); Day 4, 49:21-22 (Dimos); Day 10, 95:9-23 (Compton).

For example, Relators focused on an excerpt from talking points where Ms. Johnson wrote: "Repercussions: [Pharmacy Benefit Managers] have asked us how we are responding. They have stated if we did this, no matter how we packaged the situation, they would consider $4 our usual and customary price." PX 205A. That bullet, which is under the heading "Walmart" and immediately above a note about "the potential impact . . . if SVU would move to the $4 generic policy as WMT" clearly concerns the possibility of adopting a program identical to Walmart's, which SuperValu never did. *Id.* Ms. Johnson agreed. She testified: "This would be a Walmart list that's what I was referring to or something extremely similar to what Walmart did." Day 6, 157:3-16 (Johnson). Relators similarly emphasized an October 27, 2006, email from Bill Strein at Medco where he recited a definition from the 2010 Medco Pharmacy Services Manual that said "[t]hese discounts include, but are not limited to . . . competitor's matched price." PX 112. When asked, Mr. Strein testified that this definition would cover situations where a pharmacy decided to "say, well, we're competing with Walmart, all of our generics are going to be $4." Day 11, 191:20-192:2 (Strein). Medco did not believe SuperValu's price match program—which reflected a choice *not* to change its prices across-the-board to copy Walmart— met that definition. Day 11, 192:1-24, 193:11-15 (Strein). Each of the documents Relators selectively quoted reflects that same understanding.

The trial record is unequivocal: SuperValu honestly believed that, unlike Walmart's approach, SuperValu's price matches were not usual and customary. An honestly held belief about the meaning of an ambiguous requirement is not fraud, even if the belief is, ultimately, incorrect. *United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015); *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000); *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996). The "deliberate ignorance" and "reckless disregard" standards do not make "differences in interpretation growing out of a disputed legal question . . . false under the FCA." *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (citing *Hagood*, 81 F.3d at 1477-78).

*Fifth*, no evidentiary basis supported Relators' argument that SuperValu tried to hide price matching. To the contrary, there are dozens of price matching advertisements in evidence, spanning decades. *See, e.g.*, PX 411A. And the evidence at trial made clear that SuperValu expressly discussed price matching with the government payors who received the supposedly false claims. Pharmacy Benefit Manager witnesses testified that SuperValu employees told them about price matching. Day 9, 176:1-11 ("Q: Do you recall how you became aware that SuperValu price matched? A: Through conversations with different individuals, including Ron Richmond . . . .") (Zavalishin); Day 10, 90:7-12 ("Q: [H]ow did you know what SuperValu's price match program was? A: I knew—I was aware of their program from our conversations with meeting with representatives from the SuperValu organization.") (Compton); Day 11, 138:7-9 (Correia) (same); Day 11, 178:1-12 (Strein) (same). Pharmacy Benefit Manager witness Joe Zavalishin perhaps had the best response to Relators' contention that SuperValu intended for its price matching program to be "stealthy," when he remarked: "I don't know if I would call

[price matching] stealthy since it was something that the industry [knew] about." Day 10, 14:12-27 (Zavalishin).

*Sixth*, Relators also focused on the volume of price matches. But SuperValu witnesses did not view the volume of price matches as impacting the usual and customary price. *See, e.g.*, Day 6, 21:19-24 (Johnson). And the Pharmacy Benefit Managers testified they did not view the volume of price matching as affecting whether or not it was usual and customary, making it all the more likely that SuperValu did not view it that way either. For example, Mr. Zavalishin testified a pharmacy's usual and customary price is independent of frequency or volume. Day 9, 173:20-25 (Zavalishin). Ms. Compton testified that the volume of SuperValu's price matches would not have made any difference to her when considering whether those price matches were usual and customary. Day 10, 201:21-202:5 (Compton). Mr. Correia said the same thing: a price point's frequency in the data has no relevance to the usual and customary price. Day 10, 227:9-19 (Correia); *see also* Day 12, 78:4-14 (Strein). If anything, the evidence of volume supported SuperValu because even *Relators'* expert acknowledged that SuperValu price matched *less than two percent* of transactions. Day 9, 169:19-23 ("Okay so I think it was the number of override cash sales was 6.3 million. The number of all sales I think was about 370 million. So that's a little under two percent.") (Dew).

In short, the record contains no evidence to support the jury's conclusion that any individual at SuperValu possessed a subjectively culpable mental state. The Court should direct entry of judgment as a matter of law for SuperValu on scienter.

At a minimum, the Court should enter judgment as a matter of law as to SuperValu's scienter for claims pursuant to its post-2009 ESI contracts and post-2011 Caremark contracts. *See* Day 10, 110:4-18. As explained at trial, SuperValu's post-2009 contracts with ESI explicitly

9

excluded price-matched prices as usual and customary. *See, e.g.*, Day 6, 101:17-102:18 (Johnson); DX 37. And in 2011, a representative from Caremark explicitly informed SuperValu that its price matching did not need to be taken into consideration when determining its usual and customary prices. *See, e.g.*, Day 6, 134:20-137:7 (Johnson); DX 8. No reasonable jury could conclude SuperValu was knowingly failing to submit its price-matched prices as usual and customary to either ESI or Caremark when both entities unambiguously excluded that very thing.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment as a matter of law for SuperValu on the element of scienter.

DATED: April 9, 2025

Respectfully submitted,

By: /s/ *Enu Mainigi*
Enu Mainigi
*Lead Counsel*
Craig Singer
Jennifer Wicht
A. Joshua Podoll
Annie Showalter
Kimberly Broecker
WILLIAMS & CONNOLLY LLP
680 Maine Ave, SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
emainigi@wc.com
csinger@wc.com
jwicht@wc.com
apodoll@wc.com
ashowalter@wc.com
kbroecker@wc.com

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I certify that on April 9, 2025, in accordance with Local Rule 5.3 and Federal Rule of Civil Procedure 5(b), this document was filed electronically with the Clerk of the Court using CM/ECF and served upon counsel of record.

/s/ *Enu Mainigi*
Enu Mainigi