## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA** | ) | |
| **and THE STATE OF ILLINOIS** | ) | |
| **ex rel., TRACY SCHUTTE and** | ) | |
| **MICHAEL YARBERRY,** | ) | |
| | ) | |
| **Plaintiffs and Relators** | ) | |
| | ) | |
| **v.** | ) | **No. 11-cv-3290-SEM** |
| | ) | |
| **SUPERVALU, INC., et al.** | ) | |
| | ) | |
| **Defendants** | ) | |

### RELATORS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' RENEWED RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW (571)

**I.  Introduction**

SuperValu attempts to use Fed. R. Civ. P. (Rule) 50(b) to bypass a jury finding of scienter based on overwhelming evidence that SuperValu knowingly submitted false claims to federal and state government healthcare programs ("GHPs"). The record contains compelling direct and circumstantial evidence from which a reasonable jury could conclude, and ultimately did conclude, that SuperValu knew what it was doing when it submitted false claims.

This evidence includes admissions by SuperValu executives

acknowledging that price-matching would affect their U&C pricing, deliberate programming of systems to conceal discounted prices from government payors, and internal documents describing their price-matching program as "stealthy"—all while systematically overcharging GHPs. Relators presented ample evidence regarding SuperValu's culpable state of mind. Under the applicable standard requiring all evidence to be viewed in the light most favorable to Relators, SuperValu's motion should be denied. SuperValu moved for judgment as a matter of law twice during the trial, and each time this Court correctly denied its requests. (2/26/25 Trans. 123:1 and 3/3/25 Trans. 236:17).[1]  The Court should do so a third time.

## II.    **Legal Standard**

A renewed motion for judgment as a matter of law ("JMOL") may be brought by a party under Rule 50(b) if "the court does not grant a motion for judgment as a matter of law made under Rule 50(a)." Fed. R. Civ. P. 50(b). JMOL under Rule 50(a) is appropriate only when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." The Rule 50 standard "mirrors" the standard for summary judgment, requiring

---

[1] All transcript citations are to the unofficial version.

evidence to be viewed in the light most favorable to the non-moving party. *Murray v. Chicago Transit Authority*, 252 F.3d 880, 886-87 (7th Cir. 2001) (internal citations omitted).

In evaluating a Rule 50 motion, the court must draw all reasonable inferences in favor of Relators and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).[2] When reviewing a Rule 50 JMOL, a court does "not make credibility determinations or weigh the evidence." *Thorne v. Member Select Ins. Co.*, 882 F.3d 642, 644 (7th Cir. 2018). The Seventh Circuit has cautioned that a reviewing court must "refrain[] from weighing for ourselves the credibility of evidence and testimony." *Bowers v. Dart*, 1 F.4th 513, 519 (7th Cir. 2021).

Here, SuperValu's motion fails because Relators have introduced extensive evidence from which a reasonable jury could— and ultimately did—find in Relators' favor on the element of scienter

---

[2] Under Reeves, the jury did not have to believe the testimony of the SuperValu executives and the previous employees of the pharmacy benefit managers upon which much of SuperValu's Motion relies; the jury was free to disregard this evidence and as described herein, this Court cannot simply put more weight on one set of evidence over other conflicting evidence. This rebutted testimony is no basis to grant SuperValu's Renewed Motion for Judgment as a Matter of Law as it would require this Court to act within the role of the jury when analyzing the evidence presented at trial.

under the FCA.

## III. Relators' Extensive Evidence Established SuperValu's Scienter

According to the Seventh Circuit, "a False Claims Act case requires proof of falsity, knowledge, materiality . . . , and the involvement of federal funds." *United States ex rel. Heath v. Wis. Bell, Inc.*, 75 F.4th 778, 783 (7th Cir. 2023), *aff'd on other grounds,* 145 S. Ct. 498 (2025). The Illinois False Claims Act has analogous elements.[3] The <u>only</u> issue before the Court is whether the Defendants "knowingly" submitted false claims; because the record contains ample evidence on this element, SuperValu's renewed challenge under Rule 50 fails.

### A. Relators Presented Substantial Evidence that SuperValu "Knowingly" Submitted False Claims

Relators' trial evidence demonstrated that SuperValu knowingly submitted false claims by failing to report its widespread price-matching program prices as its usual and customary price to GHPs. During their case-in-chief, Relators introduced evidence of the following:

---

[3] *See United States ex rel. Batty v. Amerigroup Illinois, Inc.*, 528 F. Supp. 2d 861, 871 n.8 (N.D. Ill. 2007) (recognizing that the Illinois FCA is "nearly identical" to the federal FCA and follows federal FCA case law.).

***In 2006 Walmart Disrupted the Industry***. Although SuperValu claimed to have had a price-matching policy as far back as the 1980s, SuperValu initiated a formal programmatic price-matching program in 2006 to compete with Walmart. Ex. 485, 486.[4] In September 2006, Walmart—one of SuperValu's biggest competitors—disrupted the entire retail pharmacy industry by offering a set list of 30-day supplies of popular generic drugs to any cash paying customer for $4. Ex. 76; 2/11/25 Trans. 131:3–12. Walmart's offer of discount generics involved approximately 300 drugs. 2-13-2025 Tr. at 85:22-24. Upon announcement of this program, SuperValu immediately fielded questions about how it would respond to this monumental change. Ex. 261; 2/11/25 Trans. 202:4-6.

SuperValu quickly calculated decreased revenue of between $40-$45 million per year if it sold the Walmart 300 drugs for $4, based on the assumption that matching Walmart's $4 price point for those generics would become SuperValu's usual and customary price. Ex. 36; 2/11/25 Trans. 199: 25-200:1-17. When Walmart expanded its generic discount program in June 2008 to other

---

[4] All exhibit references are to Plaintiffs' trial exhibits.

states, SuperValu calculated increased losses around $70 million annually. Ex. 44. These financial calculations reveal that SuperValu not only recognized the competitive threat posed by Walmart's discount program, but more critically, understood that properly reporting matched prices as their usual and customary price would significantly decrease their government reimbursements.

*SuperValu's Strategic Response—Price Match, but Do Not Report Price Matches as U&C*. Facing this competitive threat, SuperValu implemented a nationwide price-matching program offering to match cash prices (including Walmart's $4 generics) for all its customers. This program quickly became available throughout SuperValu's pharmacy network (2/13/25 Trans. 130:18-20), with staff keeping Walmart formularies behind pharmacy counters to facilitate matches. 2/14/25 Trans. 74:8-11.

The Price Match Program was available to anyone who requested that SuperValu match a competitor's price. 2/14/25 Trans. 11:12-21. Through this price-matching program, SuperValu offered lower cash discount prices to everyone in all of its stores over many years. 2/13/25 Trans. 130:18-20. Yet critically, government payors never received the benefit of these discounted

prices, as SuperValu excluded these widespread price matches from its U&C price calculations submitted to GHPs. 2/13/25 Trans. 163:6-19. This strategic decision created a dual pricing system that enabled SuperValu to compete with Walmart for cash customers while continuing to charge government payors inflated prices.

***SuperValu's Dual Pricing System Designed to Maximize Profits***. SuperValu's price-matching program effectively operated with two separate books. For cash customers, pharmacy personnel could override the standard "retail" price with a lower competitor price. 2/14/25 Trans. 71:8-18 and 73:1-8. Meanwhile, GHPs, which reimbursed based on a "lesser of" formula—paying the lowest of negotiated rate, benchmark prices, or the pharmacy's "Usual and Customary" (U&C) price (2/11/25 Trans. 126:19-127:12)—received false reimbursement claims with artificially inflated U&C prices that excluded these widespread discounts available throughout the benefit year.

The U&C price is generally understood to be the cash price to the general public. 2/11/25 Trans. 127:13-21; 2/13/25 Trans. 68:2-3. Critical to SuperValu's price-matching program was the requirement that price-match customers only pay cash. 2/13/25

Trans. 36:24-37:6. SuperValu did not submit lower matched price cash sales transactions to GHPs. 2/13/25 Trans. 163:6-19. As designed by SuperValu and its ARx system, cash price match sales were never reported to GHPs.

Frank Knutson, SuperValu's manager of third-party compliance/audits, admitted that PBMs auditing SuperValu never saw SuperValu's actual lower cash prices because SuperValu did not process them through the third-party plans and therefore PBMs never had access to that information. 2/21/25 Trans. 7:12-16. Mr. Knutson testified that, if claims were processed as cash claims "then the auditor would have no idea of the number of cash price match claims that were being issued by SuperValu," and that the auditor "would have no idea of the prices of the price match claims because those cash claims were never submitted to the plan." *Id.* at 7:17-8:3. SuperValu would not allow lower matched prices to be submitted to GHPs. *Id.* at 158:12-17. This policy ensured that third-party payors, including government payors, remained unaware of SuperValu's true cash prices.

***SuperValu's Price Matching: From Occasional Discount to Calculated Deception***. Relators' evidence demonstrated that the

sheer magnitude of SuperValu's price-matching reflected a widely-applicable, routine business practice. Over the decade-long scheme, SuperValu executed more than 6.3 million price matches, with overrides occurring as frequently as 18,000 times weekly at peak periods (Ex. 58A).

Most telling was SuperValu's own March 2012 internal analysis, which revealed that for 44 of its top 50 drugs, price matching represented the majority of cash transactions, with 30 drugs being sold at matched prices over 80% of the time. Ex. 458C. These discounted prices—the true U&C prices—were systematically concealed from government payors.

Relators' expert's analysis determined that over 17,630,692 of the 31,703,264 total claims SuperValu submitted to GHPs between September 1, 2006, and December 31, 2016, resulted in overpayments. 2/24/25 Trans. 227:2-7.

### *Corporate Control and Deliberate Technical Decisions.*

The trial record shows that SuperValu's corporate leadership maintained tight control over its price-matching program, implementing technical systems designed to segregate discounted cash transactions from its reported U&C prices. U&C prices reported to government programs were centrally established by

SuperValu's corporate pricing department (2/13/25 Trans. 60:17-19), with local pharmacists having no authority to modify these figures. *Id.* at 158:20-23.

Marc Allgood's testimony provided crucial evidence of SuperValu's conscious technical design choices. He confirmed that while SuperValu possessed the technical capability to program its ARx system to report cash price matches as its U&C price, SuperValu deliberately chose not to do so. *Id.* 162:14-22. This decision reveals that SuperValu's failure to properly report discounted prices was not due to technical limitations but rather a conscious choice to maintain two separate pricing systems. SuperValu later enhanced this dual system by adding a price match override feature to ARx, with an "Ongoing Price Override" feature that processed subsequent fills of the same prescription at the overridden price automatically, further systematizing the practice. Ex. 160; 2/13/25 Trans. 164:23-165:8.

Under SuperValu's policy, a cash price match transaction would not be submitted to a third party PBM, ensuring that PBMs would have no visibility into these discounted transactions. *Id.* at 26:8-17. This policy effectively prevented government payors from discovering SuperValu's actual cash prices.

Anne Walls' (formerly known as Anne Dony) testimony established that SuperValu never even considered cash prices when setting its inflated U&C prices it reported to GHPs. She explained SuperValu used three methods to set its U&C consisting of: 1) outside competitive analysis surveys; 2) third party reimbursement rates; or, 3) acquisition costs. 2/21/25 Trans. 191:19-193:11. None of these methods incorporated SuperValu's contractual U&C definitions or considered the company's widespread price-matching practices. *Id.* at 197:6-15 and 218:7-15. Indeed, SuperValu did not acknowledge or consider its discounted price match program cash prices when setting the U&C prices it reported to third parties. *Id.* at 191:19-193:23. These methodological choices allowed SuperValu to artificially maintain inflated U&C prices for GHPs while offering substantially lower prices to cash customers to improperly maximize its revenue at the government's expense.

***Internal Knowledge of Wrongdoing.*** SuperValu's awareness of its improper reporting is thoroughly documented. Tom Rousonelos (SuperValu's Vice President of Pharmacy Operations) circulated a Bloomberg news article announcing that Walmart was lowering its prices on 300 generic drugs to $4 cash per prescription to SuperValu executives Chris Dimos (Pharmacy President), Daniel

Salemi (Vice President of Pharmacy Services) and Maxine Johnson (Vice President of Managed Care). Ex. 76. SuperValu quickly modeled the financial impact, projecting a $40–45 million annual decrease in gross margins if properly reported. Ex. 36. Dan Salemi explicitly acknowledged in a September 22, 2006, email that if "$4 becomes our U&C and needs to be passed to managed care," profits would significantly decline, noting that "Humana has already formally asked about our position"—an inquiry Mr. Dimos characterized as "dangerous." Ex. 201.

Maxine Johnson, Vice President of Managed Care Operations, acknowledged in bullet points she drafted for SuperValu's Board of Directors that PBMs were asking SuperValu how it intended to respond to Walmart. Ex. 205, 205A. Ms. Johnson further acknowledged that PBMs had stated: "if we [SuperValu] did this, no matter how we packaged the situation, they would consider the $4 our usual and customary price on those products." *Id.* SuperValu's Vice President Dan Salemi estimated that adopting a similar discount generics program would result in tens of millions of lost profits, 90% of which "would go to PBMs, Managed Care and other payors due to co-pay and U&C contract language." Ex. 115.

In 2011, SuperValu Manager of Pharmacy Pricing & Analytics Anne Walls told SuperValu executives Dan Salemi, Marc Allgood, and other pharmacy employees responsible for programming SuperValu's ARX claims processing software, that "[w]e cannot have different U&C pricing for Cash vs. TP [third party] customers." Exhibit 52. This acknowledgment demonstrates that SuperValu was not only aware of proper U&C reporting requirements but knowingly maintained a dual pricing system in direct contravention of those requirements.

***SuperValu Ignores Red Flag Warnings***. On October 11, 2006, CMS issued a Memorandum to all Part D Sponsors addressing when a Medicare Part D customer may obtain a lower cash price at a network pharmacy than the Part D plan's negotiated price due to a "special" price or other discount. SuperValu possessed this memo. d/e 152, Amended Stipulation, ¶A.4 at 2. CMS's memo specifically addressed Walmart's $4 program, stating that "the low Wal-Mart price on these specific generic drugs is considered Wal-Mart's 'usual and customary' price" and that "Part D sponsors consider this lower amount to be 'Usual and customary' and will reimburse Wal-Mart on the basis." Ex. 127.

This guidance was reinforced by PBMs, as shown when Ms. Johnson informed colleagues that "Caremark is considering this their U&C for these [Walmart $4] products." Ex. 110. While employed by Medco, Bill Strein explicitly reminded SuperValu that U&C prices must include "all applicable discounts," including "competitor's matched price"—a message Salemi forwarded with "high importance," noting, "Theoretically, they could audit." Ex. 112.

In January 2007, SuperValu executives described a U&C notice from Coventry Health Care as, "Another plan makes a specific notice regarding the $4 Walmart generic program." Ex. 21, 22. Coventry's notice reminded pharmacies that the U&C provisions required them to bill the "lowest possible price for the drug," that they "must include any applicable discounts offered to attract customers," and that the pharmacy shall collect the lesser of U&C or drug acquisition cost plus dispensing fees. *Id.*

### A "Stealthy" Approach to Deliberately Evade Detection.

Among the most incriminating evidence is Ron Richmond's December 27, 2007, email—a smoking gun that reveals SuperValu's conscious scienter to conceal its price-matching practices. Richmond, SuperValu's Director of Managed Healthcare

Contracting, explicitly characterized the company's approach to price matching as "stealthy," acknowledging that a more transparent "rule" or "routine" approach would "affect the integrity of our U&C price -- a slippery slope, as true U&C price is a claim submission requirement for all Medicaid and private commercial Managed Care and PBM agreements." Ex. 401.

This characterization of SuperValu's price matching strategy as "stealthy" contradicts any notion that SuperValu was merely making a good faith interpretation of its obligations. Rather, it demonstrates SuperValu's consciousness that its practices violated proper reporting requirements. This "stealthy" approach was further operationalized through Maxine Johnson's February 2008 directive to all pharmacies that price matches must be processed as cash transactions only, emphatically instructing in all-capital letters: "UNDER NO CIRCUMSTANCES SHOULD YOU BILL THE THIRD PARTY INSURANCE." Ex. 109. This instruction ensured that government payors and PBMs would remain completely unaware of SuperValu's widespread discounting practices.

***SuperValu's Active Evasion and Obstruction***. The evidence confirms that SuperValu's "stealthy" price-matching program was actively concealed from government payors and PBMs. When PBM

Prime Therapeutics asked about SuperValu's $4 generic policy in May 2008, Mr. Richmond expressed concern about "any response where we acknowledge doing it." Ex. 402. Johnson replied they "should not respond unless we know what they are going to do with this information," instructing Richmond to ensure SuperValu's attorney "can defend our price match policy as not being our U and C if they are pressing for a response." *Id.*

The duplicity of SuperValu's approach is further evidenced by its marketing strategy. While publicly advertising "we match prices EVEN $4 generics" to attract cash customers, Ms. Johnson and Mr. Salemi privately discussed the need for "damage control" if these advertisements were discovered by Managed Care organizations. Ex. 113. Johnson and Salemi acknowledged they were counting on the fact that it was "[u]nlikely anyone in Managed Care will really see the ad." *Id.* This stark contrast between SuperValu's public promotion of price matching to customers and its active concealment of the same practice from payors demonstrates conscious awareness of improper conduct.

***Document Destruction Cover-Up***. The evidence culminates with SuperValu's reaction to a January 2012 subpoena seeking information about its price-matching program—specifically

advertising and signage and the competitor drug lists that it offered to match. Ex. 137. On January 27, 2012, an email with the subject: "Urgent Per Chris [Basler]"—a SuperValu District Manager— instructed pharmacists at SuperValu's Shop 'n Save pharmacies to "throw away all of your competitor's price matching lists and get rid of all signs that say we match prices." Ex. 320.

This extensive and compelling evidence provides more than sufficient basis for a reasonable jury to conclude that SuperValu knowingly submitted false claims.

### B. Relators Introduced Direct and Circumstantial Evidence that Defendants Were *at Least* Acting in Reckless Disregard as to Whether they were Submitting Falsely Inflated Claims to GHPs

As SuperValu acknowledges at page 4 of its motion, the Supreme Court outlined the subjective aspects of the FCA's scienter standard in this case, noting that the FCA's knowledge standard can be satisfied by a defendant's subjective awareness of the claim's falsity or of a substantial and/or unjustifiable risk of such falsity:

> [T]he FCA's standards focus primarily on what respondents thought and believed. First, the term "actual knowledge" refers to whether a person is "aware of "information. … Second, the term "deliberate ignorance" encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity. … And, third, the term "reckless disregard" similarly captures defendants who are conscious of a

substantial and unjustifiable risk that their claims are false, but submit the claims anyway.

*United States ex rel. Schutte v. SuperValu Inc.,* 598 U.S. 739, 751, (2023) (citations omitted).

The jury instructions in this case defined "reckless disregard" as being "conscious of a substantial and unjustifiable risk that a claim was false but submitted it anyway." (d/e 558, pg. 24). SuperValu's own executives acknowledged this risk when they characterized PBM inquiries as "dangerous" (Ex. 201) and their price-matching approach as "stealthy" to avoid affecting "the integrity of our U&C price" Ex. 401.

Relators introduced direct and circumstantial evidence that allowed the jury to find that SuperValu was acting with reckless disregard as to whether they were charging GHPs falsely inflated amounts. Relators presented two primary categories of evidence to establish scienter under the FCA. First, evidence of SuperValu's systematic program of price manipulation demonstrated the scale, duration, and deliberate nature of the company's actions. Second, direct and circumstantial evidence consisting of contemporaneous emails and testimony revealed SuperValu's subjective awareness that its pricing practices violated reporting requirements.

"A relator may of course rely on circumstantial evidence to prove *scienter* under the False Claims Act." *Heath*, 75 F.4th at 787 (7th Cir. 2023) (citation omitted) (emphasis in original). In fact, circumstantial evidence of knowledge is often essential because "[t]here are no eyewitnesses to the mental contents of a person's head . . . ." *United States v. Ytem*, 255 F.3d 394, 396 (7th Cir. 2001). Intent "can be inferred from circumstantial evidence, including whether [the defendant] stood to gain financially . . . ." *United States v. Miller*, 159 F.3d 1106, 1110 (7th Cir. 1998) (citing *United States v. Irwin*, 149 F.3d 565, 571–72 (7th Cir. 1998)). Accordingly, the fact that SuperValu stood to and did profit from its fraudulent scheme is relevant circumstantial evidence of their mental state.

## 1. Systematic Program of Price Manipulation

The evidence shows that SuperValu dramatically expanded its price-matching program after Walmart introduced its $4 generic program. What began as fewer than 1,000 price overrides per month in 2006 exploded to more than 100,000 per month in 2010, ultimately totaling 6.3 million price matches between 2006 and 2016. Ex. 383H, 384D.1. At its peak, SuperValu's own analysis indicated it processed 16,000 to 18,000 price matches weekly. Ex.

108. An internal March 2012 analysis revealed that for 44 of SuperValu's top 50 drugs, price matching occurred in the majority of cash transactions, with 30 drugs being discounted over 80% of the time. Ex. 458C.

Despite these discounted prices becoming SuperValu's *de facto* usual and customary prices for cash-paying customers, the company never reported these lower prices to GHPs. Instead, SuperValu continued to submit inflated corporate-set U&C prices that bore no relationship to what cash customers actually paid.

As Judge Hamilton put it in his dissent—which was subsequently vindicated by the Supreme Court's decision vacating and remanding the decision of the Seventh Circuit— "Without even reaching the direct evidence of knowledge . . . a reasonable jury could infer that SuperValu's decade-long practice of claiming higher reimbursement levels by disregarding the much higher prices it actually charged a majority of the time was a 'knowing' fraud on the government." *United States ex rel. Schutte v. SuperValu, Inc.*, 9 F.4th 455, 475 (7th Cir. 2001) (Hamilton, J., dissenting), *vacated and remanded*, 598 U.S. 739 (2023).

## 2. Direct and Circumstantial Evidence of Knowledge

Beyond SuperValu's longstanding and systematic price manipulation, Relators presented compelling evidence of SuperValu's subjective awareness that its claims were false:

- **Executive Acknowledgments**: Executives recognized the pricing implications—Maxine Johnson told the Board in 2006 that PBMs would "consider the $4 our usual and customary price" (Ex. 205A), while Anne Walls explicitly stated "We cannot have different U&C pricing for Cash and TP [third party] customers." Ex. 52.

- **Financial Calculations**: SuperValu calculated lost revenue of $40-45 million annually if properly reporting discounted prices (Ex. 36), increased those losses to $70 million annually, and acknowledged that "90%" of SuperValu's lost profits "would go to PBMs, Managed Care and other payors due to co-pay and U&C contract language." Ex. 115.

- **Ignored Regulatory Guidance**: Despite CMS's October 2006 memorandum stating Walmart's $4 program constituted its "usual and customary" price (Ex. 127), and similar guidance from PBMs (Ex. 110, 112), SuperValu deliberately maintained its dual pricing system.

- **Self-Described "Stealthy" Approach**: Ron Richmond characterized SuperValu's approach as "stealthy," acknowledging a more "routine" approach would "affect the integrity of our U&C price" which is "a claim submission requirement for all Medicaid and . . . PBM agreements." Ex. 401.

- **Active Concealment**: Johnson directed that "UNDER NO CIRCUMSTANCES SHOULD YOU BILL THE THIRD PARTY INSURANCE" for price matches (Ex. 109), while executives discussed "damage control" if their practices were discovered. Ex. 113.

- **Evidence Destruction**: After receiving a January 2012 subpoena, days later a district manager instructed pharmacists to "throw away all of your competitor's price matching lists and get rid of all signs that say we match prices", which was requested in the subpoena. Ex. 320.

This evidence amply supported the ultimate jury finding that SuperValu was "conscious of a substantial and unjustifiable risk that their claims were false, but submitted the claims anyway"—satisfying the "reckless disregard" scienter standard under the FCA. *Schutte*, 598 U.S. at 751.

## IV.   Conclusion

The evidence presented at trial provided a legally sufficient basis for the jury to find for Relators on the scienter element of their FCA claim. SuperValu's knowledge of false claims submission is established through both direct and circumstantial evidence, including contemporaneous internal communications acknowledging the impact of price-matching on U&C pricing, deliberate concealment of discounted prices from government payors, the self-described "stealthy" approach to its price-matching program, and the sheer volume of the corporate wide fraud scheme. Because Relators presented ample evidence from which the jury

found in their favor on scienter, SuperValu's renewed motion for

judgment as a matter of law should be denied.

Respectfully submitted,

/s/ Timothy Keller
Timothy Keller
  Illinois Bar No. 6225309
Dale J. Aschemann
  Illinois Bar No. 6269347
Roderick Throgmorton
  Illinois Bar No. 6339752
Aschemann Keller LLC
300 North Monroe Street
Marion, Illinois 62959-2326
Telephone: (618) 998-9988
Facsimile: (618) 993-2565
E-Mail: tkeller@quitamlaw.org
      dale@aschlaw.org
      rthrogmorton@quitamlaw.org

Paul B. Martins
  Ohio Bar No. 0007623
James A. Tate
  Ohio Bar No. 0085319
Julie Webster Popham
  Ohio Bar No. 0059371
Helmer, Martins, Tate & Garrett Co., L.P.A
1745 Madison Rd.
Cincinnati, Ohio 45206
Telephone: (513) 421-2400
Facsimile: (513) 421-7902
E-Mail: pmartins@fcalawfirm.com
      jtate@fcalawfirm.com
      jpopham@fcalawfirm.com

Glenn Grossenbacher
  Texas Bar No. 08541100
Law Office of Glenn Grossenbacher
17 Derecho Way
Hot Springs Village, Arkansas, 71909
Telephone: (210) 325-3887
E-Mail: gglaw@satx.rr.com

Rand J. Riklin
  Texas Bar No. 16924275

Goode Casseb Jones Riklin
  Choate & Watson
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
Telephone: (210) 733-6030
Facsimile: (210) 733-0330
E-Mail: riklin@goodelaw.com

Gary M. Grossenbacher
  Texas Bar No. 24008972
402 Vale Street
Rollingwood, Texas 78746
Telephone: (512) 699-5436
E-Mail: gmgtex@austin.rr.com

Jason M. Idell
  Texas Bar No. 24055714
Idell PLLC
6800 Westgate Blvd. Ste 132 #301
Austin, Texas 78745
Telephone: (512) 689-3081
E-Mail: jason@idellpllc.com

G. Patrick Murphy
  Illinois Bar No. 1994484
Murphy & Murphy LLC
3415 Office Park Drive, Suite D
Marion, IL 62959
Telephone: (618) 248-3236
E-Mail: efile@murphymurphyllc.com

*Attorneys for Plaintiffs-Relators*

## CERTIFICATE OF COMPLIANCE WITH
## CIVIL LR 7.1(B)(4)(b)(1)

The undersigned, counsel of record for Relators Tracy Schutte and Michael Yarberry, furnishes the following in compliance with Civil LR 7.1(B)(4)(b)(1):

I hereby certify that this brief conforms to the type-volume limitations contained in Civil LR 7.1(B)(4)(b)(1) because it contains 4,137 words.

**Dated**: April 21, 2025

*/s/ Timothy Keller*

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2025, pursuant to Local Rule 5.3 and Federal Rule of Civil Procedure 5(b), that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system and served upon counsel.

*/s/ Timothy Keller*